IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| POLYBRITE INTERNATIONAL, INC., an Illinois Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **FILED: MARCH 28, 2008**<br>NO. 08CV1797 RCC<br>JUDGE GETTLEMAN<br>MAGISTRATE JUDGE NOLAN |
| RICHARD BRENNER, an individual, PAUL CHRISTENSEN, an individual, and CHEE NGON WONG, an individual, | ) ) ) ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, PolyBrite International, Inc. ("PolyBrite"), by its attorneys, William G. Sullivan and Mason N. Floyd of Martin, Brown & Sullivan, Ltd., for its Complaint for Injunctive and Other Relief, states as follows:

## NATURE OF THE CASE

1.     PolyBrite International is one of the world's leading developers of lighting technology. Over ten years, hundreds of shareholders have invested in excess of $45 million to nurture the Company's research, product development and marketing activities. One of the defendants - its Director of Marketing and Sales in North America - forecasted in 2007 that PolyBrite's sales would explode, increasing by as much as $400 million annually over a three year period. See Christensen July 30, 2007 email "Revised Projections" and attachment, true and correct copies are attached hereto as Ex. 1. This action arises out of defendants' scheme to steal success from PolyBrite by defrauding it out of millions of dollars.

2.      Defendant Richard Brenner ("Brenner") was Executive Vice President and Chief Operating Officer of PolyBrite.  He was employed by PolyBrite for more than six years.  He was fired on November 14, 2007.  Defendant Paul Christensen ("Christensen") was PolyBrite's Director of Marketing and Sales.  He resigned on November 27, 2007.  Defendant Chee Ngon ("CN Wong" or "Wong") was employed by PolyBrite to run its Hong Kong office.  He was Vice President of PolyBrite for Asia-Pacific.  He resigned on December 17, 2007, effective January 21, 2008.

3.      At all times relevant to this Complaint, Brenner, Christensen and Wong were senior executives of PolyBrite, all of whom were privy to the most sensitive and confidential information of PolyBrite.

4.      Sometime prior to January, 2007, and at a time better known to themselves, Brenner and CN Wong entered into a conspiracy to subvert the interests of PolyBrite with its customers and prospective customers.  This conspiracy was later joined by Christensen.  They formulated and executed a business plan to compete with PolyBrite while still employed by PolyBrite.  They and other co-conspirators actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers and by forming a business entity, CDW Lighting Technologies, to compete against PolyBrite.

5.      In order to further their goals, defendants entered into an active, covert campaign to destroy PolyBrite's existing business relationships, including its relationship with the company that manufactured its products, Wellstar Electronics, Limited.  Defendants hid their actions by filing false reports with PolyBrite.

2

Defendants entered into agreements with third parties to compete surreptitiously with PolyBrite. Defendants misappropriated financial, marketing and technical product information, all of which was confidential. Defendants have used this information to harm PolyBrite and further their personal financial goals. Defendants actively competed, and continue to compete, in the market through a company secretly organized by them beginning not later than February 13, 2007.

## **PARTIES**

6.     Plaintiff PolyBrite International, Inc. is a corporation duly formed and existing under the laws of Illinois. PolyBrite is a citizen of the State of Illinois. PolyBrite is a wholly-owned subsidiary of Goeken Group Corp. PolyBrite was founded in 1995.

7.     Defendant Richard Brenner is an individual residing at 372 Ameno Drive East, Palm Springs, California. He is a citizen of the State of California. He was hired by PolyBrite in 2001 as PolyBrite's Vice-President of Consumer Sales. He was elevated to Executive Vice President and Chief Operating Officer ("COO") in 2004. Mr. Brenner's employment with PolyBrite was terminated on November 14, 2007.

8.     Defendant Paul H. Christensen is an individual residing at 24 West Lane, South Salem, New York. Mr. Christensen is a citizen of the State of New York. He was hired on June 12, 2006. He served as PolyBrite's Director of Marketing & Sales - North America. Mr. Christensen resigned on November 27, 2007.

9.     Defendant Chee Ngon ("CN") Wong was employed by PolyBrite on January 16, 2004 as Vice President for Asia Pacific affairs. In addition, Mr. Wong was

a director of PolyBrite Asia Limited, a wholly-owned subsidiary of PolyBrite which was formed for the specific purpose of doing business in Asia.  CN Wong is a resident of the Hong Kong Special Administrative Region of the People's Republic of China (commonly referred to as "Hong Kong"), residing at 1/F, 68 J, Ma Liu Shui San Tseun, Fanling, N T Hong Kong, China.  He is a citizen of the People's Republic of China.  He left the employ of PolyBrite on January 21, 2008.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction of this action as to Defendants Brenner and Christensen pursuant to 28 U.S.C. §1332(1) in that this is an action between citizens of different States where the matter in controversy exceeds the amount of $75,000, exclusive of interest and costs.

11.     This Court has jurisdiction of this action as to Defendant Wong pursuant to 28 U.S.C. §1332(2) in that this is an action between citizens of a State and citizens or subjects of a foreign state where the matter in controversy exceeds the amount of $75,000, exclusive of interest and costs.

12.     Venue of this action is proper in this district pursuant to 28 U.S.C. 1339(a) in that a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district.

## NON-PARTY ACTORS

13.     Goeken Group Corp. is a Delaware corporation registered to do business in the State of Illinois.  Goeken Group Corp. is the parent corporation of PolyBrite. Goeken Group Corp. was founded by John "Jack" Goeken, who also founded

Microwave Communications Inc., better known as MCI.  He subsequently founded FTD Mercury Network (flower delivery), Airfone (later sold to GTE), In-Flight Phone Corp. and many others.

14.     Borealis Lighting ("Borealis") is a brand name used by PolyBrite. PolyBrite manufactures solid-state LED lighting systems and products under the Borealis brand.

15.     Commercial Electric LLC ("Commercial Electric") is an Arkansas Limited Liability Company that entered into a distribution contract with PolyBrite.

16.     Phil K. Gamache is President and CEO of Commercial Electric.  Mr. Gamache worked closely with Paul Christensen pursuing large commercial accounts, including Dillard's department stores.

17.     Robert Van Auken is an employee of Commercial Electric.  At all times relevant to this Complaint he was its executive vice president.

18.     William Young is an employee of Commercial Electric.  At all times relevant to this Complaint he was in charge of business development and commercial lighting for Commercial Electric.

19.     Solid State Solutions LLC is an Arkansas limited liability company.  The Arkansas Secretary of State website shows that Solid State Solutions filed its Articles of Incorporation on November 19, 2007 and lists Phil Gamache as "owner."

20.     Patrick Mullins is an expert in electro-optics, including LEDs.

21.     Virgil Cheng is a resident of the Hong Kong Special Administrative Region of the People's Republic of China.  He is a citizen of the People's Republic of

China.  He is an engineer who served as a contractual consultant to PolyBrite.

22.    CDW Lighting Technologies Limited is a corporation organized under the laws of the Hong Kong Special Administrative Region of the People's Republic of China.  It was formed by Richard Brenner, CN Wong, WN Wong and Virgil Cheng on February 12, 2007.  From at least February of 2007 CDW actively competed with PolyBrite.  It sold and advertised a line of lighting products that was in every way identical to PolyBrite's.

23.    Shirley Sy was Assistant to Vice President of PolyBrite's Hong Kong office.  She resigned from PolyBrite in December, 2007.

## FACTUAL ALLEGATIONS RELEVANT TO ALL COUNTS

24.    PolyBrite serves international and domestic customers from its headquarters in Naperville, Illinois.  Its products are available worldwide through distributors, retail stores, websites and catalogs.

25.    PolyBrite has developed - and continues to develop - cutting edge technology that disperses light through a flexible polymer lens illuminated by light emitting diodes (LEDs).  PolyBrite's polymer technology is extruded into a variety of clear, light scattering shapes, as well as certain molded applications.  In addition to being extremely rugged, LEDs consume very little energy.  PolyBrite has engineered advanced thermal management techniques, efficient and compact power supplies leading to more lumens per watt and greater efficiency in sophisticated LED applications.

26.    PolyBrite's engineering versatility and design capability has resulted in creating state of the art LED systems that are incorporated into a diverse and wide range of energy efficient and "green" products for aerospace, military, pet and safety industries and unique lighting systems and LED based light bulbs (lamps).

27.    At all times relevant to the Complaint, the vast majority of PolyBrite bulbs and products were manufactured in China.  PolyBrite entered into a strategic relationship with Vigor Precision Limited ("Vigor"), a high precision injection molding assembly company.  Vigor is headquartered in Hong Kong and operates three manufacturing facilities in China.  At certain times Vigor manufactured PolyBrite's products at its plants in China.

28.    Wellstar Electronics Limited ("Wellstar Electronics") is a wholly-owned subsidiary of Vigor headquartered in Hong Kong, with manufacturing facilities in China.  Wellstar had not previously produced products similar to those that it manufactured for PolyBrite.  It did not have expertise in solid state lighting and relied on PolyBrite to provide the technical expertise to produce its products.

29.    In recent years the majority of PolyBrite's production took place at the Wellstar Electronics manufacturing facility.  PolyBrite has paid in excess of $3.5 million dollars to Wellstar for products manufactured by it and for tooling, for which PolyBrite paid $429,000.00.

## RICHARD BRENNER

30.    On August 13, 2001, Illumination Polymer Technologies, Inc., now known as PolyBrite, made an offer of employment to Defendant Brenner.  He accepted

7

and became PolyBrite's Vice President of Consumer Sales.  He was paid a base salary of $120,000 per year, plus incentives.  A true and correct copy of Brenner's Offer of Employment is attached hereto as Ex. 2.  On September 14, 2001 Defendant Brenner executed the Goeken Group Corporation Employee Agreement.  A true and correct copy of Brenner's Employee Agreement is attached hereto as Ex. 3.  At the time Mr. Brenner joined PolyBrite, he was working for a company known as Cats USA Pets Control California in its sales group.  Mr. Brenner had never worked in the lighting industry before joining PolyBrite.  He had no technical background relating to the products manufactured by PolyBrite prior to becoming one of its employees.  His educational background is in finance and accounting.  At the time he left the employ of PolyBrite, his base salary was $180,000 per year.

31.      As COO, Defendant Brenner was the second highest ranking officer of the company.  He reported directly to the company's Chief Executive Officer, Carl Scianna.  As COO, Mr. Brenner was privy to PolyBrite's most sensitive and confidential information.  He had unfettered access to financial, marketing, technical and production information that was available in its entirety to only one other person in the company, the Chief Executive Officer.  As part of his duties as COO, Mr. Brenner oversaw the activities of PolyBrite's Hong Kong office.  The Hong Kong office was in turn run by Defendant CN Wong.  Mr. Brenner was also directly responsible for the manufacture of PolyBrite products, including those manufactured in Asia.  Mr. Brenner was a fiduciary of PolyBrite.

## CN WONG

32.    In June of 2003, PolyBrite hired CN Wong.  Mr. Wong was hired by PolyBrite to oversee manufacturing in China.  His title was "Vice President, Asia Pacific."  At all times relevant to this Complaint, CN Wong reported directly to Defendant Brenner.  Defendant Wong was a fiduciary of PolyBrite.  He introduced PolyBrite to Wellstar, which manufactured PolyBrite's products in China.  Mr. Wong was responsible for the day-to-day contacts of PolyBrite with Vigor and Wellstar.  Mr. Wong was responsible for working with Wellstar and Vigor to ensure that production schedules were met, and to ensure that quality of produced goods met PolyBrite's standards.  He was also required to report on these matters to PolyBrite's Chief Operating Officer, Richard Brenner, as well as its President, Carl Scianna.

33.    It was Defendant Wong's responsibility to locate an alternative manufacturer to produce PolyBrite's products in China.

## PAUL CHRISTENSEN

34.    On June 12, 2006, PolyBrite entered into an employment agreement with Paul Christensen.  A true and correct copy of Christensen's Employee Agreement is attached hereto as Ex. 4.  Christensen was hired as Director of Sales and Marketing - North America.  He was paid a base salary of $120,000 per year, plus incentives.  A true and correct copy of Christensen's Employment Application is attached hereto as Ex. 5.

35.    In his capacity as Director of Sales and Marketing-North America, Mr. Christensen was personally responsible for some of PolyBrite's most important

9

accounts, including Macy's, Neiman Marcus, Dillard's, Autozone, Beck's and Walmart.  In relation to these and other accounts, he had unfettered access to marketing, technical, financial and production information.  Mr. Christensen began reporting directly to Defendant Brenner some time before May, 2007.  Mr. Christensen worked closely with a distributor of PolyBrite's products, Commercial Electric, LLC, an Arkansas limited liability company, providing support to its employees in sales efforts.  Though not an officer of the corporation, Mr. Christensen was a high managerial agent of PolyBrite.  He was one of its highest paid employees.  He had exclusive charge of some of its most important accounts.  He exercised a high degree of autonomy and discretion in performing his duties, requiring PolyBrite to repose a high degree of trust and confidence in him.  Mr. Christensen was a fiduciary of PolyBrite.  Before being employed by PolyBrite, Christensen had no technical knowledge of, or experience with, solid state ("LED") lighting.  Immediately prior to being hired by PolyBrite, Christensen worked as a commercial photographer.

## UNLAWFUL CONDUCT OF DEFENDANTS

### The Secret Creation Of A Competing Company By Defendants Brenner And Wong

36.     Unknown to PolyBrite, and affirmatively hidden from it, Defendants Brenner and Wong prepared a business plan for an entirely new entity referred to in the business plan as Wellstar Lighting, LLC ("Wellstar Lighting").  See Wellstar Lighting's Business Plan, a true and correct copy of which is attached hereto as Ex. 6.  This occurred in 2006.  The Wellstar Lighting Business Plan was created by Defendant Brenner, using PolyBrite's computer, not later than December, 2006.

10

37. According to Wellstar Lighting's business plan, its mission was "to be a leading company designer manufacturer of High Brightness Solid State Lighting ("HBSSL") lamps and modular light engines for commercial, industrial and residential applications. Such products that provide enhanced lighting quality, substantial energy savings, substantial product life, and thereby improving people's quality of life at work and at home, while conserving the Earth's natural resources." See Ex. 6, p. 6.

38. The Wellstar Lighting Business Plan named four founders. It stated that two of its founders, "Mr. Richard Brenner and Mr. CN Wong were previously senior executives at PolyBrite International, an SSL (solid state lighting) products company, working to develop and launch PolyBrite's line of decorative and general illumination lamps, as well as the company's channel letter lighting system." Ex. 6, p. 6.

39. The Wellstar Lighting Business Plan called for Wellstar Electronics to manufacture products in direct competition with PolyBrite: "Wellstar Electronics, a Hong Kong based manufacturing company embracing nearly three years experience in HBSSL [high brightness solid state lighting] design, prototyping, tooling and manufacturing, and is immediately prepared to manufacture the full line of HBSSL lamps to WLI . . . Wellstar Electronics is managed by Mr. WN Wong, a founding member of WLI [Wellstar Lighting LLC]." Ex. 6, p. 6. The experience referenced by Wellstar Electronics in HBSSL design, prototyping, tooling and manufacturing was that which its principals obtained by working with PolyBrite.

11

40.     The Wellstar Lighting Business Plan identified Virgil Cheng as its fourth founder.  Virgil Cheng, CN Wong and WN Wong are long time personal friends.  They attended school together and have been friends ever since.

41.     The Wellstar Business Plan stated, "The founders anticipate the Commercial users realizing acceptable payback periods, as well as large lighting OEMs (original equipment manufacturers), will be target customers in 2007."

42.     At the same time Defendants Brenner and Wong created the Wellstar Lighting Business Plan, Brenner made plans to relocate his home to California.  He entered into a contract to purchase a home in Palm Springs during the December holidays of 2006.  He never informed anyone at PolyBrite of his intention to do so.  In a letter dated January 19, 2007 Richard Brenner wrote to Countywide Home Loans explaining that he was relocating to Southern California where his career would focus on energy saving lighting technology.  See Brenner January 19, 2007 letter, a true and correct copy is attached hereto as Ex. 7.  Brenner hid from PolyBrite that he sold his house in Illinois and relocated his wife to California.

43.     A search of files backed up from Defendant Brenner's computer showed that on January 27, 2007 Defendant Brenner listed alternative names for the new business enterprise:

    1.     CD2 Lighting Technologies
    2.     WCD Lighting Technologies
    3.     Power2 Lighting Technologies

These alternative names were followed by the names:

        CN Wong
        WN Wong

12

Virgil Cheng
Dick Brenner

See list of names document, a true and correct copy is attached hereto as Ex. 8.

44.     On February 12, 2007, CDW Lighting Technologies Limited ("CDW") was created.  The address of CDW and Wellstar Electronics Ltd. are one in the same: Flat A2, 10/FL Block A, Texaco Road Industrial Centre, Texaco Road, Tsuen Wan, Hong Kong.

45.     On February 13, 2007, CDW Lighting Technologies Limited created a website (www.cdwlighting.com) in which it advertised a full line of "high brightness solid state illumination products for commercial, industrial and residential applications."  The products advertised by CDW Lighting Technologies are PolyBrite's products.  CDW used pictures of PolyBrite's bulbs on its website.  See screenshots of www.cdwlighting.com, true and correct copies are attached hereto as Ex. 9.  That website continues to exist to the date of the filing of the instant Complaint.  The actions of CDW made it a direct competitor of PolyBrite.

46.     On February 21, 2007, one week after creating a company to compete directly with PolyBrite, Richard Brenner recommended to Carl Scianna that one of Brenner's co-conspirators, CN Wong, be given a $50,000.00 per annum raise.  Based upon Mr. Brenner's recommendation, Mr. Wong's salary was increased on March 15, 2007 to $125,000.00 per year.  Effective June 15, 2007, Mr. Wong's salary was increased to $150,000.00 per year.

## GUANGZHOU LIGHT FAIR
### 6/8/07 to 6/11/07

47.     The Guangzhou Light Fair, held from June 6, 2007 through June 11,

2007, was an opportunity for PolyBrite to exhibit its products at the largest lighting

show in Asia.  It was attended by over 45,000 people.  Exhibitors came from twenty-

two countries.  Although PolyBrite had exhibited at the Light Fair in 2006, CN Wong

actively dissuaded PolyBrite from participating at the fair in 2007.  He told PolyBrite

management on numerous occasions that they should not attend the fair.  Defendant

Brenner, knowing that CDW Lighting Technologies Limited would be participating at

the fair, also attempted to dissuade others from PolyBrite from attending this

exhibition.  Defendant Brenner made the decision not to allow PolyBrite to exhibit at

the exhibition, even though it previously registered and paid a deposit.

48.     CN Wong, Virgil Cheng and WN Wong arranged to exhibit CDW's wares

at the exhibition.  CDW Lighting Technologies was listed as an accredited exhibitor

on the list along with over 1,300 other manufacturers and suppliers.  See 2007

Exhibitor List, a true and correct copy is attached hereto as Ex. 10.  By this time CDW

was, according to its advertising, fully up and running.  In addition, CN Wong, Virgil

Cheng and WN Wong were actively communicating from email addresses which

included the domain "cdwlighting.com."  See cdwlighting.com emails, true and

correct copies are attached hereto as Ex. 11.

49.     CDW's participation at the Guangzhou Light Fair was an act of direct

competition with PolyBrite.

14

## ALTERNATIVE MANUFACTURING IN CHINA

50.    For approximately two years prior to August, 2007, PolyBrite sought alternative manufacturing facilities to those of Vigor & Wellstar.  The responsibility of locating a new manufacturer was entrusted to CN Wong, PolyBrite's representative in Hong Kong.  He, in turn, reported to Defendant Richard Brenner.  In August of 2007, CN Wong was asked to provide a status report on his progress of finding an alternative manufacturer.  Defendant Brenner responded for CN Wong.  Both Mr. Brenner and Mr. Wong were aware that it was extremely important to locate an alternative manufacturer in China.  Carl Scianna, President of PolyBrite, had told them that PolyBrite was going to produce light bulbs for Osram Sylvania ("Sylvania"), and that Sylvania would not approve Vigor or Wellstar production facilities to be used for that purpose.

51.    Defendant Brenner, replying for CN Wong, said that he would soon be traveling to Hong Kong, and that he would ask CN Wong to make appointments for him with several manufacturers so that he could further the selection process.  See Brenner August 21, 2007 email "China," a true and correct copy is attached hereto as Ex. 12.

52.    In truth and in fact, contrary to what Defendant Brenner said, he had no intention of identifying another manufacturer with which PolyBrite could do business. Neither did CN Wong.  On information and belief, CDW was using the production molds made for, and owned by PolyBrite, all of which were physically located at Wellstar Electronics, its current manufacturer.  WN Wong, one of the owners of CDW,

was also a principal of Wellstar Electronics. If a new manufacturer were identified

and contracted with, it would be the end of CDW's manufacturing capabilities.

Hence, to the day he was terminated, Defendant Brenner resisted PolyBrite's

attempts to contract with an alternative manufacturer. CN Wong did the same.

Wellstar Electronics has allied itself with defendants and their competing company,

CDW Lighting Technologies Limited. As a result, plaintiff has been unable to

manufacture its products. Wellstar Electronics has refused to turn over PolyBrite's

production molds. The reasons given for not returning the molds are pretextual.

CDW Lighting Technologies Limited is now selling bulbs designed by PolyBrite.

## **SUBVERSION OF POLYBRITE'S RELATIONSHIPS**

53.    PolyBrite has spent millions of dollars in research, design and testing of

its products.

54.    It has targeted large commercial enterprises for the sale of certain

products, including Dillard's Department Stores, which operates three hundred fifty

retail stores from the Atlantic to the Pacific seaboards.

55.    On April 19, 2007, Commercial Electric and PolyBrite entered into an

Authorized Distributor Agreement (the "Agreement"). See Authorized Distributor

Agreement, a true and correct copy is attached hereto as Ex. 13. By that Agreement,

Commercial Electric was authorized to distribute "those certain items manufactured

or sold by PolyBrite generally identified as LED lamps or LED systems that are

indicated by PolyBrite's representatives in writing and shall include PolyBrite's

Borealis Lighting Systems products." Ex. 13, § 9.1.

16

56.    Early in the summer of 2007, Commercial Electric and PolyBrite began a joint marketing program relating to PolyBrite's effort to develop a product to meet the particular need of a Commercial Electric customer, Dillard's Department Store.

57.    On August 27, 2007, Defendant Paul Christensen informed executive management of PolyBrite and the Goeken Group that Dillard's had committed to purchase PolyBrite's linear LED alternative to florescent lighting for its jewelry display cases. He noted in his report that, among the things necessary to achieve this level of sales, PolyBrite had to "[p]roceed with UL" (Underwriter's Laboratory).  See Christensen's August 27, 2007 email "Dillard's Contact Report," a true and correct copy is attached hereto as Ex. 14.

58.    On September 13, 2007, Paul Christensen projected that Dillard's alone would spend $7.8 million on PolyBrite's linear lighting in 2008.  See Christensen's September 13, 2007 email "Projections" and attachment, true and correct copies are attached hereto as Ex. 15.

59.    Paul Christensen was responsible for supervising the Dillard's project. Indeed, on October 12, 2007 he wrote an email to PolyBrite, Vice President, Engineering,  Raymond Janik and COO Richard Brenner in which he stated he was "prepared to function as project manager and advance both [Dillard's and Florida Plastics (sign maker for McDonald's)] through the UL process."  See Christensen's October 12, 2007 email "Production Status Items," a true and correct copy is attached hereto as Ex. 16.  Although he routinely spoke to Carl Scianna and Raymond Janik, PolyBrite's chief engineer, he never suggested to either of them that the project was

17

in jeopardy for failure to meet the customer's requirements.  From the time that he

took over the effort to obtain UL approval, Christensen represented, directly or by

implication, that the UL approval process was going according to schedule and was

not a critical issue in regard to PolyBrite's relationship with Dillard's.

60.    Four weeks later, on November 8, 2007, Defendant Christensen filed a

Contact Report from Little Rock, Arkansas.  In that Contact Report he included the

following information regarding the Dillard's account:

> The management team at CE is expressing a dual signal.
> One is appreciation for the continued sales support.  We
> have supplied them with training, printed materials and
> sales staff.
>
> The other signal is one of rising concern.  They are growing
> impatient with our progress to advance several portions of
> the Dillard's account.  We have not advanced the
> additional prototype requests for the additional sizes in
> lamps and power supplies and the UL the qualification
> process.
>
> They remind us that the Dillard's requirements are UL on
> all lamps and fixtures before it will be accepted for
> installation, and that Dillard's will not tolerate late
> delivery.  One missed delivery date will cancel all future
> orders.

See Christensen November 8, 2007 Contact Report, a true and correct copy is

attached hereto as Ex. 17.  Not until this date did Christensen suggest any urgency

relating to the Dillard's project.

61.    On November 9, 2007, Phil K. Gamache wrote a letter to Carl Scianna

expressing his "concern regarding a perceived lack of urgency . . . as it relates to

shepherding the linear LED array through the UL approved process and ultimately

through production."   See Gamache November 9, 2007 letter, a true and correct copy

is attached hereto as Ex. 18.

62.    On November 13, 2007, Carl Scianna responded to Mr. Gamache's letter.

He stated that he "had been informed that the project was operating smoothly."  In

addition, he noted the project had been handled by Paul Christensen with whom

Gamache had a meeting days before, and to whom Gamache was speaking regularly

about this project.   See Scianna November 13, 2007 letter, a true and correct copy is

attached hereto as Ex. 19.

63.    On November 16, 2007, Phil Gamache, President and CEO of

Commercial Electric, called PolyBrite's CEO, Carl Scianna, and told him that

Commercial Electric would no longer pursue the development of the linear LED

display case for Dillard's with PolyBrite.  The stated reasons for Commercial Electric's

decision not to participate in the development of the linear LED product were false

and pretextual.  They were known by both Brenner and Christensen to be false and

pretextual, neither of whom disclosed this fact to PolyBrite.   See Gamache

November 20, 2007 letter, a true and correct copy is attached hereto as Ex. 20.

64.    Although Christensen was made responsible for the UL Listing at his

own request, he did nothing to accomplish it.

65.    On November 19, 2007, Phil Gamache caused Solid State Solutions LLC

("Solid State") to be formed in Arkansas.  Solid State's address is the same as

Commercial Electric's.

66.     On November 27, 2007, Defendant Christensen resigned.  Subsequent to the termination of their employment from PolyBrite, Commercial Electric engaged Brenner and Christensen as consultants.

67.     On November 28, 2007, Commercial Electric hosted a meeting in Maumelle, Arkansas.  One of those attending was Patrick Mullins, an expert in electro-optics, including LED's.  Among those in attendance were Richard Brenner, Paul Christensen, Robert Van Auken and Bill Young of Commercial Electric.

68.     Mr. Mullins had met Paul Christensen on a prior occasion.  He had never met Defendant Brenner before November 28, 2007.

69.     At the meeting Mr. Mullins was informed that Commercial Electric had formed a new company, Solid State Solutions, LLC.  Mr. Mullins was told the Company had been formed approximately one week before the meeting of November 28, 2007.  Mr. Mullins was led to believe that Solid State Solutions was being funded by Commercial Electric.

70.     At that meeting, Mr. Mullins was shown a Borealis (PolyBrite) product that had been modified.  Christensen, Brenner and others had modified the product by removing the LED's used in one Borealis (PolyBrite) product and replacing them with LED's used in another Borealis (PolyBrite) product, so that the light would perform to a certain standard.  The customer for whom this was done was Neiman Marcus.  Mr. Mullins had seen a picture of this product on a PolyBrite quotation for the sale of the product under the Borealis brand.   Mr. Mullins was told that this modified product would now be marketed to Neiman Marcus by newly-formed Solid

20

State Solutions.  Prior to that meeting Christensen and Brenner had targeted customers, and prospective customers of PolyBrite, including Dillard's and Neiman Marcus, in arranging sales calls with their representatives, all in an attempt to steer PolyBrite's business to Solid State Solutions.

71.　　Commercial Electric is a distributor of lighting products, not a designer or manufacturer.  No one at Commercial Electric or Solid State Solutions had the technical ability to design solid state lighting products.  At the meeting, Mr. Mullins was informed that Messrs. Christensen and Brenner were going to China to arrange for the manufacture of Solid State Solutions's new production lines.  Mr. Mullins was shown a prototype of the new company's light, which was a modified PolyBrite product.  Bill Young, an employee of Commercial Electric invited Mullins to become associated with Solid State Solutions as its development designer.

72.　　Mr. Mullins did not join this group.

### ILLICIT COVERT MEETINGS IN CHINA AND HONG KONG

73.　　Less than two weeks after the meeting at Maumelle, Arkansas, on December 11, 2007, Messrs. Brenner and Christensen, accompanied by Messrs. Van Auken and Young of Commercial Electric, traveled to Dongguan City, China where Wellstar Electronics and CDW Lighting Technologies Limited are located.  Staying with them at the same hotel were Defendant CN Wong, and WN Wong of Wellstar Electronics.  They stayed at the hotel on December 11 and 12.  See Dong Chen International Hotel receipts, true and correct copies are attached hereto as Ex. 21.  The purpose of this secret meeting was to arrange to have Wellstar Electronics

produce LED lighting products that would directly compete with PolyBrite lighting products in the market.  CN Wong attempted to hide his participation in this meeting from his colleagues at PolyBrite, telling them instead that he was going on vacation with his family at the time he was meeting with his co-conspirators in Dongguan City.

74.    Shortly after the meeting in Dongguan City, CN Wong's lies were discovered by PolyBrite.  He was confronted with the truth: that he had been meeting with Brenner, Christensen and others at the same time he claimed to be away on vacation with his family.  Mr. Wong sent an email resigning from PolyBrite on December 17, 2007.  Only after CN Wong's lies were discovered did PolyBrite suspect that the defendants herein were engaged in the wrongful conduct alleged in this Complaint.

75.    On December 13, 2007, Messrs. Brenner and Christensen, accompanied by Messrs. Van Auken and Young, traveled to Hong Kong.  All four stayed at the Marco Polo Hong Kong Hotel.  See Marco Polo Hong Kong Hotel receipts, dated December 15, 2007, true and correct copies are attached hereto as Ex. 22.

76.    On February 3, 2008, Messrs. Brenner and Christensen, again accompanied by Messrs. Van Auken and Young, traveled to Hong Kong.  All four stayed at the Marco Polo Hong Kong Hotel.  See Marco Polo Hong Kong Hotel receipts dated February 12, 2008, true and correct copies are attached hereto as Ex. 23.  The reservations were made under the PolyBrite name by Shirley Sy, Mr. Wong's assistant.  Ms. Sy made the reservations on January 10, 2008 using her PolyBrite

22

email address.  Ms. Sy resigned from PolyBrite a month before in December, 2007.

See Marco Polo Hong Kong Hotel Company Confirmations, true and correct copies are

attached hereto as Ex. 24.

### REMOVAL OF CORPORATE PROPERTY AND DOCUMENTS

77.     On November 2, 2007 Defendant Christensen went to PolyBrite's

headquarters in Naperville, Illinois at approximately 8:00 p.m., after business hours.

Defendant Christensen repeatedly went in and out of the building within short

periods of time.  On information and belief the purpose was to surreptitiously remove

PolyBrite's files and product, which he had no right to possess.  Christensen began

by entering at the loading dock - the only time he was known to do so during his

employment at PolyBrite.  Two days later he repeated this routine, albeit coming in

before business hours, starting at 6:47 a.m.

78.     On the evening of November 12, 2007, at 11:41 p.m., and continuing into

the early morning hours of November 13, 2007, Defendant Brenner forwarded by

PolyBrite's email to his personal AOL account PolyBrite documents in such large

quantities that his personal AOL account began to refuse acceptance of them

because his mailbox was full.  PolyBrite was able to recover one email sent by

Brenner from his PolyBrite account to his personal AOL account at 2:32 a.m. on

November 13, 2007.  That email had attached to it 22 emails, some of which also

contained attachments.

79.     On November 12, 2007, Defendant Brenner entered PolyBrite's

headquarters at 11:41 p.m.  It had been approximately two weeks since he had last

made an appearance at the office.  Access card reports show Defendant Brenner re-entering the building at 1:38 a.m., 6:25 a.m., 6:51 a.m. and 7:47 a.m. on November 13, 2007.  On the evening of November 13, 2007, Defendant Brenner sent dozens of emails to Defendant CN Wong.

80.     Mr. Brenner was terminated on November 14.  Shortly after Defendant Brenner was terminated, an inspection of his office showed that he had removed thousands of pages of company owned documents containing files, background information on customers, product specifications, information on work in process, development work, pricing information and other confidential and sensitive materials.

## DESTRUCTION OF EMAILS

81.     On a date prior to his termination, and better known to him, Richard Brenner deleted all emails in his email inbox.  On or around October 26, 2007, Kelly Newton, Richard Brenner's assistant, deleted all emails in her email inbox and sent folder.

82.     On or around December 3, 2007, CN Wong deleted all emails in his email inbox.  On or around December 29, 2007, Wong deleted all emails in his sent folder.  Shirley Sy, CN Wong's assistant, deleted all emails in her email inbox and sent folder on or around December 14, 2007.

## COUNT I
## BREACH OF FIDUCIARY DUTY
## (RICHARD BRENNER)

83.     PolyBrite realleges paragraphs 1 through 82 as though fully set forth herein.

24

84.    At all relevant times to this Complaint, Defendant Brenner was a fiduciary of PolyBrite.  He had an obligation to act with the highest degree of honesty and loyalty toward PolyBrite and in the best interests of PolyBrite.

85.    As a fiduciary of PolyBrite Brenner had a duty to inform the company that employees were forming a rival company or engaging in other fiduciary breaches.

86.    Brenner had a duty to disclose to PolyBrite information which was relevant to the affairs entrusted to him.

87.    Brenner had a duty toward PolyBrite that prohibited him from discharging the duties of his position in such a manner as to make a secret profit for himself.

88.    Brenner had a duty not to exploit his position within the company for his own benefit.

89.    Brenner had the duty not to hinder the business of PolyBrite to continue the business for which it was developed.

90.    Brenner had the duty to disclose to PolyBrite all material facts, fully and completely before acting for his own benefit within the scope of his duties.

91.    Brenner repeatedly breached his fiduciary duties to PolyBrite.  Brenner formulated and executed a business plan to compete with PolyBrite while still employed by it.  Brenner, along with Defendants Wong and Christensen, actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers and by forming CDW Lighting Technologies.

In addition, Brenner and Defendant Wong dissuaded PolyBrite employees from attending the largest lighting show in Asia so that CDW could arrange to be at the exhibition.  Brenner derailed PolyBrite's attempts to locate alternative manufacturing in China.  Brenner also actively subverted relationships with customers and prospective customers.

92.    As a direct and proximate result of Brenner's breaches of fiduciary duties, Plaintiff PolyBrite has been damaged and continues to suffer damages.

93.    Plaintiff has no adequate remedy at law.  Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Brenner's conduct.  Money damages will not compensate for the continuing injury resulting from Brenner's use of confidential, technical, marketing and financial information.

94.    By his conduct, Defendant Brenner has demonstrated his willingness to continue to engage in acts which harm PolyBrite.  It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

95.    PolyBrite has demonstrated that Defendant Brenner has, and unless restrained will continue to, engage in conduct alleged herein.

96.    There is a likelihood that PolyBrite will prevail on the merits of this action.

97.    Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendant Brenner will be slight compared to the injury to PolyBrite if it is not granted.  No injury to Defendant Brenner will result from an order which requires

26

Defendant Brenner to comport his actions to the law, hence PolyBrite should not be required to post a bond.

98.    The granting of an injunction will not disserve the public interest.

WHEREFORE, PolyBrite prays for the following relief against Defendant Brenner:

a.    Entry of a temporary restraining order, and preliminary and permanent injunctions against Defendant Brenner enjoining and restraining him from (1) continuing to use property of PolyBrite, (2) requiring him to immediately turn over any PolyBrite property to PolyBrite, (3) soliciting customers or prospective customers of PolyBrite, or assisting any third party from doing so, and (4) using any confidential or proprietary information belonging to PolyBrite including information given by PolyBrite to suppliers and vendors.

b.    The imposition of a constructive trust on any monies that have been or will be derived from any business venture in competition with PolyBrite.

c.    An order requiring Defendant Brenner to make restitution to PolyBrite including his salary and fringe benefits dating from the time of the alleged breach, but not later than December, 2006.

27

d.    Compensatory damages in an amount yet to be

determined, but not less than $1,000,000.00.

e.    Exemplary damages of not less than $1,000,000.00.

f.    Such further and additional relief as the Court may deem

appropriate.

## COUNT II
## BREACH OF FIDUCIARY DUTY
## (PAUL CHRISTENSEN)

99.    PolyBrite realleges paragraphs 1 through 82 as though fully set forth

herein.

100.    At all relevant times to this Complaint, Defendant Christensen was a

fiduciary of PolyBrite.  He had an obligation to act with the highest degree of honesty

and loyalty toward PolyBrite and in the best interests of PolyBrite.

101.    As a fiduciary of PolyBrite Christensen had a duty to inform the

company that employees were forming a rival company or engaging in other fiduciary

breaches.

102.    Christensen had a duty to disclose to PolyBrite information which was

relevant to the affairs entrusted to him.

103.    Christensen had a duty toward PolyBrite that prohibited him from

discharging the duties of his position in such a manner as to make a secret profit for

himself.

104.    Christensen had a duty not to exploit his position within the company

for his own benefit.

28

105.    Christensen had the duty not to hinder the business of PolyBrite to continue the business for which it was developed.

106.    Christensen had the duty to disclose to PolyBrite all material facts, fully and completely before acting for his own benefit within the scope of his duties.

107.    As alleged above, Defendant Christensen was a fiduciary of PolyBrite. Christensen joined the conspiracy formed by Defendants Brenner and Wong to subvert the interests of PolyBrite with its customers and prospective customers. Defendant Christensen and the other co-conspirators actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers.  Defendant Christensen hid his actions by filing false reports with PolyBrite misrepresenting PolyBrite's relationship with customers and prospective customers.  One day after resigning from PolyBrite, Defendant Christensen, along with Defendant Brenner, attended the meeting in Maumelle, Arkansas with Commercial Electric and displayed a modified PolyBrite product as their own for Neiman Marcus.  Less than two weeks after the meeting in Arkansas, Defendant Christensen, along with Defendant Brenner, accompanied by Messrs. Van Auken and Young, traveled to China and Hong Kong and met with Defendant CN Wong, who was still employed by PolyBrite at that time.

108.    As a direct and proximate result of Defendant Christensen's breaches of fiduciary duties, Plaintiff PolyBrite has been damaged and continues to suffer damages.

109.    Plaintiff has no adequate remedy at law.  Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Christensen's conduct.  Money damages will not compensate for the continuing injury resulting from Defendant Christensen's use of confidential, technical, marketing and financial information.

110.    By his conduct, Defendant Christensen has demonstrated his willingness to continue to engage in acts which harm PolyBrite.  It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

111.    PolyBrite has demonstrated that Defendant Christensen has, and unless restrained will continue to, engage in conduct which is alleged herein.  There is a likelihood that PolyBrite will prevail on the merits of this action.

112.    Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendant Christensen will be slight compared to the injury to PolyBrite if it is not granted.  No injury to Defendant Christensen will result from an order which requires Defendant Christensen to comport his actions to the law, hence PolyBrite should not be required to post a bond.

113.    The granting of an injunction will not disserve the public interest.

WHEREFORE, PolyBrite prays for the following relief against Defendant Christensen:

     a.    Entry of a temporary restraining order, and preliminary and permanent injunctions against Defendant Christensen

enjoining and restraining him from (1) continuing to use property of PolyBrite, (2) requiring him to immediately turn over any PolyBrite property to PolyBrite, (3) soliciting customers or prospective customers of PolyBrite, or assisting any third party from doing so, and (4) using any confidential or proprietary information belonging to PolyBrite including information given by PolyBrite to suppliers and vendors.

b.     The imposition of a constructive trust on any monies that have been or will be derived from any business venture in competition with PolyBrite.

c.     An order requiring Defendant Christensen to make restitution to PolyBrite including his salary and fringe benefits dating from the time of the alleged breach, but not later than December, 2006.

d.     Compensatory damages in an amount yet to be determined, but not less than $1,000,000.00.

e.     Exemplary damages of not less than $1,000,000.00.

f.     Such further and additional relief as the Court may deem appropriate.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**(CN WONG)**

114.    PolyBrite realleges paragraphs 1 through 82 as though fully set forth herein.

115.    At all relevant times to this Complaint, Defendant Wong was a fiduciary of PolyBrite.  He had an obligation to act with the highest degree of honesty and loyalty toward PolyBrite and in the best interests of PolyBrite.

116.    As a fiduciary of PolyBrite Wong had a duty to inform the company that employees were forming a rival company or engaging in other fiduciary breaches.

117.    Wong had a duty to disclose to PolyBrite information which was relevant to the affairs entrusted to him.

118.    Wong had a duty toward PolyBrite that prohibited him from discharging the duties of his position in such a manner as to make a secret profit for himself.

119.    Wong had a duty not to exploit his position within the company for his own benefit.

120.    Wong had the duty not to hinder the business of PolyBrite to continue the business for which it was developed.

121.    Wong had the duty to disclose to PolyBrite all material facts, fully and completely before acting for his own benefit within the scope of his duties.

122.    Defendant Wong repeatedly breached his fiduciary duties to PolyBrite. Wong formulated and executed a business plan to compete with PolyBrite while still employed by it.  Defendant Wong, along with Defendants Brenner and Christensen,

32

actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers and by forming CDW Lighting Technologies. In addition, Defendants Wong and Brenner dissuaded PolyBrite employees from attending the largest lighting show in Asia so that CDW could arrange to be at the exhibition.  While still employed with PolyBrite and unbeknown to anyone at PolyBrite, Defendant Wong met with Defendants Brenner and Christensen and Messrs. Van Auken and Young in China from December 11, 2007 to December 13 2007.

123.    As a direct and proximate result of Defendant Wong's breaches of fiduciary duties, Plaintiff PolyBrite has been damaged and continues to suffer damages.

124.    Plaintiff has no adequate remedy at law.  Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Wong's conduct. Money damages will not compensate for the continuing injury resulting from Defendant Wong's use of confidential, technical, marketing and financial information.

125.    By his conduct, Defendant Wong has demonstrated his willingness to continue to engage in acts which harm PolyBrite.  It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

126.    PolyBrite has demonstrated that Defendant Wong has, and unless restrained will continue to, engage in conduct which is alleged herein.  There is a likelihood that PolyBrite will prevail on the merits of this action.

127.    Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendant Wong will be slight compared to the injury to PolyBrite if it is not granted.  No injury to Defendant Wong will result from an order which requires Defendant Wong to comport his actions to the law.

128.    The granting of an injunction will not disserve the public interest, hence PolyBrite should note be required to post a bond.

WHEREFORE, PolyBrite prays for the following relief against Defendant Wong:

a.      Entry of a temporary restraining order, and preliminary and permanent injunctions against Defendant Wong enjoining and restraining him from (1) continuing to use property of PolyBrite, (2) requiring him to immediately turn over any PolyBrite property to PolyBrite, (3) soliciting customers or prospective customers of PolyBrite, or assisting any third party from doing so, and (4) using any confidential or proprietary information belonging to PolyBrite including information given by PolyBrite to suppliers and vendors.

b.      The imposition of a constructive trust on any monies that have been or will be derived from any business venture in competition with PolyBrite.

c.      An order requiring Defendant Wong to make restitution to PolyBrite including his salary and fringe benefits dating from the time of the alleged breach, but not later than

December, 2006.

d.    Compensatory damages in an amount yet to be

determined, but not less than $1,000,000.00.

e.    Exemplary damages of not less than $1,000,000.00.

f.    Such further and additional relief as the Court may deem

appropriate.

## COUNT IV
## CONSPIRACY TO BREACH FIDUCIARY DUTY
### (RICHARD BRENNER, PAUL CHRISTENSEN AND CN WONG)

129.    PolyBrite realleges paragraphs 1 through 82 as though fully set forth

herein.

130.    At all relevant times to this Complaint, Defendants Brenner and Wong

acted in concert and conspired together to breach their fiduciary duties to PolyBrite.

On a date prior to his resignation, and better known to him, Defendant Christensen

joined the conspiracy and knowingly participated therein.  All three defendants

traveled with top executives from Commercial Electric to China on December 11, 2007

to December 13, 2007, less than one month after Defendant Brenner's termination

from PolyBrite and exactly two weeks after Defendant Christensen's resignation from

PolyBrite.  At that time Defendant Wong was still employed with PolyBrite.  As

alleged above, Defendants Brenner and Wong formulated and executed a business

plan to compete with PolyBrite while still employed by it.  Defendants Brenner,

Christensen and Wong actively competed with PolyBrite by soliciting business

agreements with PolyBrite's customers and prospective customers and by forming

CDW Lighting Technologies.  In addition, Defendants Wong and Brenner dissuaded PolyBrite employees from attending the largest lighting show in Asia so that CDW could arrange to be at the exhibition.  Defendants Brenner, Christensen and Wong subverted the interests of PolyBrite by filing false reports with PolyBrite in Naperville, Illinois,  misrepresenting PolyBrite's relationship with customers and prospective customers.  The conduct complained of constitutes overt acts in furtherance of the conspiracy by Defendants Brenner, Christensen and Wong.  Said acts were tortious and unlawful in character.

131.    As fiduciaries of PolyBrite defendants had a duty to inform the company that employees were forming a rival company or engaging in other fiduciary breaches.

132.    Defendants had a duty to disclose to PolyBrite information which was relevant to the affairs entrusted to them.

133.    Defendants had a duty toward PolyBrite that prohibited them from discharging the duties of their positions in such a manner as to make a secret profit for themselves.

134.    Defendants had a duty not to exploit their position within the company for their own benefit.

135.    Defendants had the duty not to hinder the business of PolyBrite to continue the business for which it was developed.

136.    Defendants had the duty to disclose to PolyBrite all material facts, fully and completely before acting for their own benefit within the scope of their duties.

137.    The wrongful acts alleged herein constitute acts in furtherance of a conspiracy.

138.    As a direct and proximate result of the aforementioned conspiracy, Plaintiff PolyBrite has been damaged and continues to suffer damages.

139.    Plaintiff has no adequate remedy at law.  Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendants Brenner, Christensen and Wong's conduct.  Money damages will not compensate for the continuing injury resulting from Defendants Brenner, Christensen and Wong's use of confidential, technical, marketing and financial information.

140.    By their conduct, Defendants Brenner, Christensen and Wong have demonstrated their willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

141.    PolyBrite has demonstrated that Defendants Brenner, Christensen and Wong have, and unless restrained will continue to, engage in conduct which is alleged herein.  There is a likelihood that PolyBrite will prevail on the merits of this action.

142.    Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendants Brenner, Christensen and Wong will be slight compared to the injury to PolyBrite if it is not granted.  No injury to Defendants Brenner, Christensen and Wong will result from an order which requires Defendants Brenner, Christensen and Wong to comport their actions to the law.

37

143.    The granting of an injunction will not disserve the public interest.

WHEREFORE, PolyBrite prays for the following relief against Defendants Brenner, Christensen and Wong, and each of them:

a.    Entry of a temporary restraining order, and preliminary and permanent injunctions against Defendant Brenner, Christensen and Wong enjoining and restraining them from (1) continuing to use property of PolyBrite, (2) requiring them to immediately turn over any PolyBrite property to PolyBrite, (3) soliciting customers or prospective customers of PolyBrite, or assisting any third party from doing so, and (4) using any confidential or proprietary information belonging to PolyBrite including information given by PolyBrite to suppliers and vendors.

b.    The imposition of a constructive trust on any monies that have been or will be derived from any business venture in competition with PolyBrite.

c.    An order requiring Defendants Brenner, Christensen and Wong to make restitution to PolyBrite including their salaries and fringe benefits dating from the time of the alleged breach, but not later than December, 2006.

d.    A judgment of compensatory damages in an amount yet to be determined, but not less than $1,000,000.00, jointly and

severally.

e.    Exemplary damages of not less than $1,000,000.00, per

defendant.

f.    Such further and additional relief as the Court may deem

appropriate.

## COUNT V
## FRAUD
## (RICHARD BRENNER)

144.    PolyBrite realleges paragraphs 1 through 91 as though fully set forth

herein.

145.    Defendant Brenner made numerous reports, oral and written, formal and

informal, to PolyBrite during 2006 and 2007.  In none of those reports did he disclose

the wrongful conduct alleged herein, through he had an affirmative duty to do so.

146.    Defendant Brenner's failure to report the wrongful conduct of himself

and his co-defendants were material omissions of fact.

147.    Defendant Brenner's failure to report the wrongful conduct was an effort

on his part to misrepresent the state of affairs of the company.

148.    Defendant Brenner's material omissions in his reports were done for the

purpose of inducing plaintiff not to act, because had plaintiff known of Brenner's and

his co-defendants' wrongful conduct, it would have fired them immediately.

149.    PolyBrite acted in reliance on the statements and omissions of Brenner,

and its reliance was reasonable.

150.    PolyBrite has been injured and continues to suffer injuries as a direct and proximate result of its reliance on Defendant Brenner's false representations and omissions.

151.    Plaintiff has no adequate remedy at law.  Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Brenner's conduct. Money damages will not compensate for the continuing injury resulting from Brenner's use of confidential, technical, marketing and financial information.

152.    By his conduct, Defendant Brenner has demonstrated his willingness to continue to engage in acts which harm PolyBrite.  It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

153.    PolyBrite has demonstrated that Defendant Brenner has, and unless restrained will continue to, engage in conduct alleged herein.

154.    There is a likelihood that PolyBrite will prevail on the merits of this action.

155.    Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendant Brenner will be slight compared to the injury to PolyBrite if it is not granted.  No injury to Defendant Brenner will result from an order which requires Defendant Brenner to comport his actions to the law, hence PolyBrite should not be required to post a bond.

156.    The granting of an injunction will not disserve the public interest.

WHEREFORE, PolyBrite prays for the following relief against Defendant Brenner:

a.  Entry of a temporary restraining order, and preliminary and permanent injunctions against Defendant Brenner enjoining and restraining him from (1) continuing to use property of PolyBrite, (2) requiring him to immediately turn over any PolyBrite property to PolyBrite, (3) soliciting customers or prospective customers of PolyBrite, or assisting any third party from doing so, and (4) using any confidential or proprietary information belonging to PolyBrite including information given by PolyBrite to suppliers and vendors.

b.  The imposition of a constructive trust on any monies that have been or will be derived from any business venture in competition with PolyBrite.

c.  An order requiring Defendant Brenner to make restitution to PolyBrite including his salary and fringe benefits dating from the time of the alleged breach, but not later than December, 2006.

d.  Compensatory damages in an amount yet to be determined, but not less than $1,000,000.00.

e.  Exemplary damages of not less than $1,000,000.00.

41

f.    Such further and additional relief as the Court may deem

appropriate.

## COUNT VI
## FRAUD
## (PAUL CHRISTENSEN)

157.    PolyBrite realleges paragraphs 1 through 82 and paragraphs 100

through 107 as though fully set forth herein.

158.    Defendant Christensen made numerous reports, oral and written, formal

and informal, to PolyBrite during 2006 and 2007.  In none of those reports did he

disclose the wrongful conduct alleged herein, through he had an affirmative duty to

do so.

159.    Defendant Christensen's failure to report the wrongful conduct of

himself and his co-defendants were material omissions of fact.

160.    Defendant Christensen's failure to report the wrongful conduct was an

effort on his part to misrepresent the state of affairs of the company.

161.    Defendant Christensen's material omissions in his reports were done for

the purpose of inducing plaintiff not to act, because had plaintiff known of

Christensen's and his co-defendants' wrongful conduct, it would have fired them

immediately.

162.    PolyBrite acted in reliance on the statements and omissions of

Christensen and its reliance was reasonable.

163.    PolyBrite has been injured and continues to suffer injuries as a direct

and proximate result of its reliance on Defendant Christensen's false representations

and omissions.

164.    Plaintiff has no adequate remedy at law.  Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Christensen's conduct.  Money damages will not compensate for the continuing injury resulting from Christensen's use of confidential, technical, marketing and financial information.

165.    By his conduct, Defendant Christensen has demonstrated his willingness to continue to engage in acts which harm PolyBrite.  It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

166.    PolyBrite has demonstrated that Defendant Christensen has, and unless restrained will continue to, engage in conduct alleged herein.

167.    There is a likelihood that PolyBrite will prevail on the merits of this action.

168.    Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendant Christensen will be slight compared to the injury to PolyBrite if it is not granted.  No injury to Defendant Christensen will result from an order which requires Defendant Christensen to comport his actions to the law, hence PolyBrite should not be required to post a bond.

169.    The granting of an injunction will not disserve the public interest.

WHEREFORE, PolyBrite prays for the following relief against Defendant Christensen:

a.     Entry of a temporary restraining order, and preliminary and permanent injunctions against Defendant Christensen enjoining and restraining him from (1) continuing to use property of PolyBrite, (2) requiring him to immediately turn over any PolyBrite property to PolyBrite, (3) soliciting customers or prospective customers of PolyBrite, or assisting any third party from doing so, and (4) using any confidential or proprietary information belonging to PolyBrite including information given by PolyBrite to suppliers and vendors.

b.     The imposition of a constructive trust on any monies that have been or will be derived from any business venture in competition with PolyBrite.

c.     An order requiring Defendant Christensen to make restitution to PolyBrite including his salary and fringe benefits dating from the time of the alleged breach, but not later than December, 2006.

d.     Compensatory damages in an amount yet to be determined, but not less than $1,000,000.00.

e.     Exemplary damages of not less than $1,000,000.00.

f.     Such further and additional relief as the Court may deem appropriate.

## COUNT VII
## FRAUD
## (CN WONG)

170.    PolyBrite realleges paragraphs 1 through 82 and paragraphs 115 through 122 as though fully set forth herein.

171.    Defendant Wong made numerous reports, oral and written, formal and informal, to PolyBrite during 2006 and 2007.  In none of those reports did he disclose the wrongful conduct alleged herein, through he had an affirmative duty to do so.

172.    Defendant Wong's failure to report the wrongful conduct of himself and his co-defendants were material omissions of fact.

173.    Defendant Wong's failure to report the wrongful conduct was an effort on his part to misrepresent the state of affairs of the company.

174.    Defendant Wong's material omissions in his reports were done for the purpose of inducing plaintiff not to act, because had plaintiff known of Wong's and his co-defendants' wrongful conduct, it would have fired them immediately.

175.    PolyBrite acted in reliance on the statements and omissions of Wong, and its reliance was reasonable.

176.    PolyBrite has been injured and continues to suffer injuries as a direct and proximate result of its reliance on Defendant Wong's false representations and omissions.

177.    Plaintiff has no adequate remedy at law.  Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Wong's conduct.

Money damages will not compensate for the continuing injury resulting from Wong's use of confidential, technical, marketing and financial information.

178.　By his conduct, Defendant Wong has demonstrated his willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

179.　PolyBrite has demonstrated that Defendant Wong has, and unless restrained will continue to, engage in conduct alleged herein.

180.　There is a likelihood that PolyBrite will prevail on the merits of this action.

181.　Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendant Wong will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendant Wong will result from an order which requires Defendant Wong to comport his actions to the law, hence PolyBrite should not be required to post a bond.

182.　The granting of an injunction will not disserve the public interest.

WHEREFORE, PolyBrite prays for the following relief against Defendant Wong:

a.　Entry of a temporary restraining order, and preliminary and permanent injunctions against Defendant Wong enjoining and restraining him from (1) continuing to use property of PolyBrite, (2) requiring him to immediately turn over any PolyBrite property to PolyBrite, (3) soliciting customers or prospective customers of PolyBrite, or assisting any third

party from doing so, and (4) using any confidential or
proprietary information belonging to PolyBrite including
information given by PolyBrite to suppliers and vendors.

b.    The imposition of a constructive trust on any monies that
have been or will be derived from any business venture in
competition with PolyBrite.

c.    An order requiring Defendant Wong to make restitution to
PolyBrite including his salary and fringe benefits dating
from the time of the alleged breach, but not later than
December, 2006.

d.    Compensatory damages in an amount yet to be
determined, but not less than $1,000,000.00.

e.    Exemplary damages of not less than $1,000,000.00.

f.    Such further and additional relief as the Court may deem
appropriate.

## COUNT VIII
## CONSPIRACY TO COMMIT FRAUD
## (RICHARD BRENNER, PAUL CHRISTENSEN AND CN WONG)

183.    PolyBrite realleges paragraphs 1 through 82 and paragraphs 130
through 137 as though fully set forth herein.

184.    Defendants made numerous reports, oral and written, formal and
informal, to PolyBrite during 2006 and 2007.  In none of those reports did they disclose
the wrongful conduct alleged herein, through they had an affirmative duty to do so.

47

185.    Defendants' failures to report their wrongful conduct were material omissions of fact.

186.    Defendants' failures to report the wrongful conduct was an effort on their part to misrepresent the state of affairs of the company.

187.    Defendants' material omissions in their reports were done for the purpose of inducing plaintiff not to act, because had plaintiff known of defendants' wrongful conduct, it would have fired them immediately.

188.    Defendants acted jointly, and in concert, to achieve this conspiracy of fraud, each acting to support the other, each with knowledge of the others' wrongful conduct.

189.    PolyBrite acted in reliance on the statements and omissions of defendants and its reliance was reasonable.

190.    PolyBrite has been injured and continues to suffer injuries as a direct and proximate result of its reliance on Defendants' false representations and omissions.

191.    Plaintiff has no adequate remedy at law.  Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendants' conduct. Money damages will not compensate for the continuing injury resulting from defendants' use of confidential, technical, marketing and financial information.

192.    By their conduct, Defendants have demonstrated their willingness to continue to engage in acts which harm PolyBrite.  It is clear that the injury to

PolyBrite is immediate, irreparable and continuing.

193.    PolyBrite has demonstrated that Defendants have, and unless restrained will continue to, engage in conduct alleged herein.

194.    There is a likelihood that PolyBrite will prevail on the merits of this action.

195.    Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendants will be slight compared to the injury to PolyBrite if it is not granted.  No injury to Defendants will result from an order which requires Defendants to comport their actions to the law, hence PolyBrite should not be required to post a bond.

196.    The granting of an injunction will not disserve the public interest.

WHEREFORE, PolyBrite prays for the following relief against Defendants Brenner, Christensen and Wong, and each of them:

a.    Entry of a temporary restraining order, and preliminary and permanent injunctions against Defendants enjoining and restraining them from (1) continuing to use property of PolyBrite, (2) requiring them to immediately turn over any PolyBrite property to PolyBrite, (3) soliciting customers or prospective customers of PolyBrite, or assisting any third party from doing so, and (4) using any confidential or proprietary information belonging to PolyBrite including information given by PolyBrite to suppliers and vendors.

b.    The imposition of a constructive trust on any monies that
have been or will be derived from any business venture in
competition with PolyBrite.

c.    An order requiring Defendants to make restitution to
PolyBrite including his salary and fringe benefits dating
from the time of the alleged breach, but not later than
December, 2006.

d.    A judgment of compensatory damages in an amount yet to
be determined, but not less than $1,000,000.00, jointly and
severally.

e.    Exemplary damages of not less than $1,000,000.00, per
defendant.

f.    Such further and additional relief as the Court may deem
appropriate.

Respectfully submitted,

POLYBRITE INTERNATIONAL, INC.


By:    /s/William G. Sullivan
                One of Its Attorneys


William G. Sullivan
Mason N. Floyd
MARTIN, BROWN & SULLIVAN, LTD.
321 South Plymouth Court, 10th Floor
Chicago, Illinois 60604
(312) 360-5000

50

08CV1797
JUDGE GETTLEMAN
MAGISTRATE JUDGE NOLAN

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

POLYBRITE INTERNATIONAL, INC.,　　　)
an Illinois Corporation,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　v.　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　NO.
RICHARD BRENNER, an individual,　　　　)
PAUL CHRISTENSEN, an individual, and　)
CHEE NGON WONG, an individual,　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　　　　　　)

## LIST OF EXHIBITS

Exhibit 1　　-　　Paul Christensen July 30, 2007 email "Revised Projections" and attachment.

Exhibit 2　　-　　Richard Brenner's Offer of Employment.

Exhibit 3　　-　　Richard Brenner's Employee Agreement.

Exhibit 4　　-　　Paul Christensen's Employee Agreement.

Exhibit 5　　-　　Paul Christensen's Employment Application.

Exhibit 6　　-　　Wellstar Lighting LLC Business Plan.

Exhibit 7　　-　　Richard Brenner's January 19, 2007 letter to Countrywide Home Loans.

Exhibit 8　　-　　List of names document.

Exhibit 9　　-　　Screenshots of www.cdwlighting.com.

Exhibit 10　　-　　2007 Guangzhou International Lighting Exhibition Exhibitor List.

Exhibit 11　　-　　cdwlighting.com emails.

Exhibit 12　　-　　Richard Brenner August 21, 2007 email "China."

Exhibit 13    -    Authorized Distributor Agreement.

Exhibit 14    -    Paul Christensen August 27, 2007 email "Dillard's Contact Report."

Exhibit 15    -    Paul Christensen September 13, 2007 email "Projections."

Exhibit 16    -    Paul Christensen October 12, 2007 email "Production Status Items."

Exhibit 17    -    Paul Christensen November 8, 2007 Contact Report.

Exhibit 18    -    Phil K. Gamache November 9, 2007 letter to Carl Scianna.

Exhibit 19    -    Carl Scianna November 13, 2007 letter to Phil K. Gamache.

Exhibit 20    -    Phil K. Gamache November 20, 2007 letter to Carl Scianna.

Exhibit 21    -    Dong Chen International Hotel Receipts dated December 15, 2007.

Exhibit 22    -    Marco Polo Hong Kong Hotel Receipts dated December 15, 2007.

Exhibit 23    -    Marco Polo Hong Kong Hotel Receipts dated February 12, 2008.

Exhibit 24    -    Marco Polo Hong Kong Hotel Company Confirmations dated January 10, 2008.

From: "paul christensen" <pchristensen@borealislighting.com>
To: "Miles, Sandra" <smiles@polybrite.com>,
    "Sandy MacArthur" <IMCEAEX-
_O=GOEKEN_OU=FIRST+20ADMINISTRATIVE+20GROUP_CN=RECIPIENTS_CN=SMACA
RTHUR@exchprod.usa.net>

Sandra,

Attached to this e-mail are the projections we worked on yesterday.

I will ask Jose to build this as an Excel Spread sheet.

Best,

Paul

 18 Projections.doc

 ATT218656.htm
X-MimeOLE: Produced By Microsoft Exchange V6.5
Received: from mail167.messagelabs.com ([216.82.253.179]) by ggexchange.Goeken.com
with Microsoft SMTPSVC(6.0.3790.1830); Wed, 1 Aug 2007 12:58:10 -0500
MIME-Version: 1.0
Content-Type: multipart/mixed;
    boundary="----_=_NextPart_005_01C7D465.8581A500"
Received: (qmail 29743 invoked from network); 1 Aug 2007 17:53:24 -0000
Received: from omr3.networksolutionsemail.com (HELO omr3.networksolutionsemail.com)
(205.178.146.53) by server-13.tower-167.messagelabs.com with SMTP; 1 Aug 2007
17:53:24 -0000
Received: from mail.networksolutionsemail.com (ns-omr3.mgt.netsolmail.com [10.49.6.66])
by omr3.networksolutionsemail.com (8.13.6/8.13.6) with SMTP id l71HrOnD012985 for
<smacarthur@Goeken.com>; Wed, 1 Aug 2007 13:53:24 -0400
Received: (qmail 28084 invoked by uid 78); 1 Aug 2007 17:53:23 -0000
Received: from unknown (HELO ?192.168.1.100?)
(pchristensen@borealislighting.com@72.244.157.98) by ns-omr3.lb.hosting.dc2.netsol.com
with SMTP; 1 Aug 2007 17:53:23 -0000
Return-Path: <pchristensen@borealislighting.com>
X-OriginalArrivalTime: 01 Aug 2007 17:58:12.0359 (UTC) FILETIME=[86E99970:01C7D465]
X-Originating-IP: [205.178.146.53]
x-starscan-version: 5.5.12.11; banners=-,-,goeken.com
x-msg-ref: server-13.tower-167.messagelabs.com!1185990804!6384683!1
x-env-sender: pchristensen@borealislighting.com
x-viruschecked: Checked
X-SpamReason: No, hits=0.0 required=7.0 tests=HTML_MESSAGE
Content-class: urn:content-classes:message
Subject: Fwd: Revised Excel Sheet - PAUL, SANDRA AND RANDY ARE IN WEDNESDAY
Date: Wed, 1 Aug 2007 11:53:24 -0600
Message-ID: <5F45242A-7579-4A65-A5B9-F01A5993050C@borealislighting.com>
X-MS-Has-Attach: yes



**EXHIBIT**

1

X-MS-TNEF-Correlator:
Thread-Topic: Revised Excel Sheet - PAUL, SANDRA AND RANDY ARE IN WEDNESDAY
Thread-Index: AcfUZYc9uS+5fxuyQ0OBlEzlMZKY7Q==
References: <725450FBF8455C4FB796C1177B9EB57D337D92@ggexchange.Goeken.com>
From: "paul christensen" <pchristensen@borealislighting.com>
To: "Sandy MacArthur" <smacarthur@Goeken.com>

Sandy,

So Sorry, have been up to my eyebrows.

Jose had a family emergency, his future wife's Grandmother and Aunt were killed in an
accident.

He left last nite, before he went he sent the attached file that he and Sandra worked on.

Please see the attached Excel file.

Paul

Begin forwarded message:

**From:** "Jean Gallup" <jgallup@Goeken.com>
**Date:** August 1, 2007 9:41:09 AM CDT
**To:** "Paul Christensen" <pchristensen@borealislighting.com>
**Subject: FW: Revised Excel Sheet - PAUL, SANDRA AND RANDY ARE IN WEDNESDAY**

---

**From:** Chavez, Jose [mailto:JChavez@polybrite.com]
**Sent:** Tuesday, July 31, 2007 2:43 PM
**To:** Miles, Sandra
**Cc:** Jean Gallup
**Subject:** Revised Excel Sheet

Hi Sandra,

Attached is the revised spreadsheet. Please let me know if you need anything else.

Thanks,

Jose Chavez

Sales Assistant

Polybrite International

1751 W. Diehl Road Suite 110

Naperville, IL 60563

(630) 717-6700 ext.169

(630) 717-5646 Fax

www.borealislighting.com

This e-mail has been scanned by MCI Managed Email Content Service, using Skeptic(tm) technology powered by MessageLabs. For more information on MCI's Managed Email Content Service, visit http://www.mci.com.

This e-mail has been scanned by MCI Managed Email Content Service, using Skeptic(tm) technology powered by MessageLabs. For more information on MCI's Managed Email Content Service, visit http://www.mci.com.

 18_Projections.xls

 ATT220947.htm

**DRAFT**

## Current Account Summary
## 12 Month Projections

| | | | |
|---|---|---|---|
| Sylvania | 1,325,000 Bulbs @ $ 41.25 | $ | 54,656,250 |
| | Consumer Products, annual estimate | $ | 20,000,000 |
| | | | |
| Macy's | 1,500, 000 PAR 38 @ $41.25 | $ | 61,875,000 |
| | 1, 000,000 MR 16 @ $11.50 | $ | 11,500,000 |
| | Display Cases | $ | 10,330,250 |
| | Signage, 800 Stores 4 signs | $ | 3,105,000 |
| | | | |
| Lord & Taylor | Signage, 48 stores, 2 signs | $ | 53,800 |
| | Display Cases | $ | 1,540,400 |
| | | | |
| Dillard's | 600,000 bulbs @ $41.25 | $ | 24,750.000 |
| | 100,000 bulbs @ $11.50 | $ | 1,150.000 |
| | Display Cases @ $378.60 | $ | 10,330,250 |
| | Cove Lighting @ $ 30.00 | $ | 3,040,000 |
| | | | |
| McDonald's | Menu Board (US) | $ | 18,675,000 |
| | Menu Board (Int) | $ | 9,325,000 |
| | Bulbs PAR 38, @ $41.25 | $ | 11,040,000 |
| | | | |
| Merchandise Mart | Cove Lighting, @ $30.00 | $ | 202,000 |
| | Bulbs PAR 38, @ $41.25 | $ | 1,800,000 |
| | | | |
| Hudson Bay | 1,500,000 Par 38 @ $41.25 | $ | 61,875,000 |
| | 1,000,000 MR 16 @ $11.50 | $ | 11,500,000 |
| | Display Cases | $ | 10,,330,250 |
| | Signage, 585 stores 2 signs | $ | 1,950,000 |
| | | | |
| Bloomingdales | Signage, 38 stores 4 signs | $ | 50,400 |
| | Display Cases | $ | 1,033,025 |
| | | | |
| YUM! CA | Bulbs, PAR 38 @ $41.21 | $ | 121,000 |
| | Signage, $9,614.62 each store | $ | 1,280,000 |
| | | | |
| City Of Chicago | Traffic Signals | $ | 1,300,000 |
| | | | |
| Wal-Mart | Bulbs, PAR 30 @ $41.25 | $ | 9,980,000 |
| | Indoor Signage @ $365.00 | $ | 340,000 |
| | | | |
| Harrah's IL | Bulbs, PAR 30 @ $41.25 | $ | 98,750 |
| | | | |
| NICOR | Lamp introduction program | $ | 15,000,000 |

| | | | |
|---|---|---|---|
| **COKE** | Deli Drink Case, @ $170.00 | $ | 4,080,000 |
| **General Growth** | Bulb, s14 "Tivolli" @$8.25 | $ | 6,100,000 |
| **IDOT** | Bulb, PAR 38 @ $41.25 | $ | 1,733,000 |
| **Disney** | Bulbs, s14 "Tivolli" @ $8.25 | $ | 825,000 |
| **Cedar Point** | Bulbs, s14, "Tivolli" @ $8.25 | $ | 825,000 |

| | | |
|---|---|---|
| **PROJECTION** | **12 Month Sales** | **$ 353,764,375.00** |
| **Year 2,  15% Growth** | | **$ 406,829,031.25** |
| **Year 3,  20% Growth** | | **$ 488,194,837.50** |

GREEN = Accounts active, PO in place or sales records, these client have long range plans and the sales projections are for the next 12 months, growing 15% in 2008 and 20% in 2009

PINK = Accounts entering the demonstration or evaluation stage, these clients all have indicated high interest,  projections are all for a single year growing at 15% the 20% for years  two and three.

BLUE = Accounts were clients have specified a product or lamp currently in development, these product will be completed the first quarter of 2008

Sandra,

Here's the summary of our projections. The numbers look light at this point and only show modest growth. Each customer has numerous numerous projects for us, our projections are the first tear of, in most cases, three tear multi year programs. Most clients have "pain points" that they want immediate help with. Once completed they always have us continue deeper into a total retrofit program. Please keep in mind we have not received any other sales department forecasts, these numbers only reflect what you and I have been working on.

# Current Account Summary
## 12 Month Projections

| | | 1st Year | 2nd Year | 3rd Year | Total |
|---|---|---|---|---|---|
| Sylvania | 1,325,000 Bulbs @ $ 41.25 | $54,656,250 | $62,854,687.50 | $75,425,625.00 | $192,936,563 |
| | Consumer Products, annual estimate | $20,000,000 | $23,000,000,000.00 | $27,600,000,000.00 | $70,600,000 |
| Macy's | 1,500,000 PAR 38 @ $41.25 | $ 20,625,000.00 | $ 20,625,000.00 | $ 20,625,000.00 | $61,875,000 |
| 3 year projection | 1,000,000 MR 16 @ $11.50 | $ 38,333,333.00 | $ 38,333,333.00 | $ 38,333,333.00 | $114,999,999 |
| | Display Cases | $ 3,443,416.50 | $ 3,443,416.50 | $ 3,443,416.50 | $10,330,250 |
| | Signage, 800 Stores 4 signs | $ 1,035,000.00 | $ 1,035,000.00 | $ 1,035,000.00 | $3,105,000 |
| Lord & Taylor | Signage, 48 stores, 2 signs | $26,900 | $ 26,900.00 | | $53,800 |
| | Display Cases | $770,200 | $ 770,200.00 | | $1,540,400 |
| Dillard's | 600,000 bulbs @ $41.25 | $8,250,000.00 | $ 8,250,000.00 | $ 8,250,000.00 | $ 24,750,000.00 |
| 3 year projection | 100,000 bulbs @ $11.50 | $383,333.33 | $ 383,333.33 | $ 383,333.33 | $ 1,150,000.00 |
| | 27,285 Display Cases @ $378.60 | $3,443,367 | $ 3,443,367.00 | $ 3,443,367.00 | $ 10,330,101.00 |
| | 101,333 Cove Lighting @ $ 30.00 | $1,013,330 | $ 1,013,330.00 | $ 1,013,330.00 | $ 3,039,990.00 |
| McDonald's | Menu Board (US) | $18,675,000 | | | $18,675,000 |
| | Menu Board (Int) | $9,325,000 | | | $9,325,000 |
| | 267,636 Bulbs PAR 38, @ $41.25 | $11,040,000 | | | $11,040,000 |

| Merchandise | | | | | |
|---|---|---|---|---|---|
| Mart | Cove Lighting, @ $30.00 | $202,000 | | | $202,000 |
| | 43,636 Bulbs PAR 38, @ $41.25 | $1,800,000 | | | $1,800,000 |
| Hudson Bay | 1,500,000 Par 38 @ $41.25 | $20,625,000 | $20,625,000 | $20,625,000 | $61,875,000 |
| | 1,000,000 MR 16 @ $11.50 | $3,833,333.33 | $3,833,333.33 | $3,833,333.33 | $11,500,000 |
| '03 year projection | Display Cases | $3,443,416.67 | $3,443,416.67 | $3,443,416.67 | $10,330,250 |
| | Signage, 585 stores 2 signs | $650,000 | $650,000 | $650,000 | $1,950,000 |
| Bloomingdales | Signage, 38 stores 4 signs | $25,200 | $ 25,200.00 | | $ 50,400.00 |
| | Display Cases | $516,512.50 | $ 516,512.50 | | $ 1,033,025.00 |
| YUMI CA restaurants in CA. 26 Bulbs per restaurant | 12,610 Bulbs, PAR 38 @ $41.25 | | | | $ 520,162.50 |
| YUMI USA More than 18,000 restaurants in the US. 26 Bulbs per restaurant | Signage, $9,614.62 each store | $57,687,720 | $ 57,687,720.00 | $ 57,687,720.00 | $ 173,063,160.00 |
| | 468,000 Bulbs, PAR 38 @ $41.25 | $6,435,000 | $ 6,435,000.00 | $ 6,435,000.00 | $ 19,305,000.00 |
| | | | | | $ 4,663,090.70 |
| City Of Chicago | Traffic Signals | $1,300,000 | | | $1,300,000 |
| Wal-Mart | 242,000 Bulbs, PAR 30 @ $41.25 | $9,980,000 | | | $9,980,000 |
| | Indoor Signage @ $365.00 | $340,000 | | | $340,000 |
| Harrah's IL | 2394 Bulbs, PAR 30 @ $41.25 | $98,750 | | | $98,750 |
| UNICOR | Lamp introduction program | $15,000,000 | | | $15,000,000 |
| COKE | 24,000 Deli Drink Case, @ $170.00 | $4,080,000 | | | $4,080,000 |

| | | | PROJECTION |
|---|---|---|---|
| **General Growth** | 739,940 Bulbs, s14 "Tivoli" @$8.25 | $6,100,000 | $6,100,000 |
| **IDOT** | 42,012 Bulb, PAR 38 @ $41.25 | $1,733,000 | $1,733,000 |
| **Disney** | 100,000 Bulbs, s14 "Tivoli" @ $8.25 | $825,000 | $825,000 |
| **Cedar Point** | 100,000 Bulbs, s14, "Tivoli" @ $8.25 | $825,000 | $825,000 |
| | | | **$860,324,940** |

**GREEN** = Accounts active, PO in place or sales records, these client have long range plans and some of the sales projections are for the next 36 months

**PINK** = Accounts entering the demonstration or evaluation stage, these clients all have indicated high interest, some projections are for a single year.

**BLUE** = Accounts were clients have specified a product or lamp currently in development, these product will be completed the first quarter of 2008

August 13, 2001

**IPT**™

**ILLUMINATION
POLYMER
TECHNOLOGIES, Inc.**

A GOEKEN GROUP COMPANY

Mr. Richard Brenner
1111 Armada Drive
Pasadena, CA 91103

RE: Offer of Employment

Dear Dick:

Thank you for meeting with us to discuss the needs of IPT and your interest in helping the company in achieving its objectives. After significant discussions with Bryan Snyder, we have decided that your skills and background are a good fit with our requirements, and we would like for you to join our management team as our new Vice President of Consumer Sales. The specific responsibilities for this position are detailed in the Job Description (attached).

Your compensation as outlined in this letter shall supercede any and all prior agreements between you and IPT, whether written or oral:

- $120,000 annual salary
- Moving expenses (not to exceed $10,000)
- Five (5) original shares of Goeken Group Corp. Common Sock at their original share price of $1,000/share. Said shares shall then be subject to all company stock splits; therefore the current number of shares of common stock represented by and awarded according to this agreement is 2,250.
- Additional incentive compensation of $10,000 to be awarded upon achieving sales of $500,000 (combination of retail, OEM, and premium) in the quarter ending 12/31/01. Subsequent incentive compensation calculations and amounts will be worked out by mutual agreement on a quarterly basis.
- Three weeks annual vacation – accrual basis

We are very excited about having you join our team, and look forward to your beginning work with us two weeks from the date of your acceptance of this offer. Please let me know if you have any questions or have any concerns about this offer. Congratulations!

Sincerely,                                        Accepted:

Carl Scianna                                      Richard Brenner
President

Cc:    Jack Goeken
       Bryan Snyder

**EXHIBIT**

2

## GOEKEN GROUP CORPORATION    CORPORATE POLICIES & PROCEDURES

| COMPANY | DEPARTMENT |
|---|---|
| Goeken Group Corporation<br>Global Med-NET Inc.<br>Personal Guardian Inc.<br>Illumination Polymer Technologies Inc. | All Departments |

| SUBJECT: | SECTION / POLICY # |
|---|---|
| Employee Agreement | EMPLOYEE<br>FORM HR-3 Rev 12/99 |

Employee's Name : RICHARD JAMES BRENNER        S. S. No: 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

In consideration of employment with, engagement by, or joint venture with, the Goeken Group Corporation ("GGC"), including without limitation Global Med-NET Inc., Illumination Polymer Technologies, Inc., Personal Guardian Inc., or any other subsidiary of GGC or business in which GGC has an interest, their predecessors and successors; the undersigned hereby agrees that he or she, and his or her legal representative, will:

1.  Keep confidential all GGC information and use or disclose GGC information only with the express permission of GGC. "GGC Information" includes all tangible or intangible technical, business, financial, marketing, manufacturing, or operating information that is not readily available to the general public or that might be of benefit to a competitor or an entity seeking to become a competitor.
2.  Seek advice from GGC before disclosing to any third party (not part of or affiliated with GGC) any information of which he or she is uncertain whether it may be GGC information or whether a confidentiality agreement is appropriate prior to such disclosure;
3.  Promptly advise GGC of any knowledge that a competitor or potential competitor has gained access to GGC information or is using information that is substantially similar to GGC Information;
4.  Assign to GGC or its nominee all his or her right, title and interest to each discovery, invention, idea or improvement, whether or not patentable, relating to or arising out of the business, services or products of GGC that is made or conceived during the term of his or her employment and is directly or indirectly related to, or resulting from, his or her work in the course of GGC employment
5.  Promptly advise GGC of the existence of any discovery, invention, idea or improvement that might fall within paragraph 4 above.
6.  Refuse employment or engagement, directly or indirectly, for one year after the termination of any business relationship with GGC with any entity that is or is likely to become a competitor of GGC; and
7.  Acknowledge that money damages may not be a sufficient remedy for breach of this agreement and therefore be subject to injunctive relief for any threatened or actual breach as well as any money damages appropriate therefor.

| _Richard J Brenner_ | _Sep 14, 2001_ |
|---|---|
| Employee's Signature | Date |
| | |
| Supervisor's Signature | Date |
| | |
| Witness Signature | Date |

Received:   Personnel / HR    Date: _____   By: _____
Department Head   Date: _____   By: _____

SUBMITTED:   December 1999 (Draft)
APPROVED:
EFFECTIVE:

**EXHIBIT**

tabbies

3

## GOEKEN GROUP CORPORATION    CORPORATE POLICIES & PROCEDURES

| COMPANY | DEPARTMENT |
|---|---|
| **Goeken Group Corporation**<br>**Global Med-NET Inc.**<br>**Personal Guardian Inc.**<br>**Illumination Polymer Technologies Inc.** | **All Departments** |

| SUBJECT:  **Employee Agreement** | SECTION / POLICY #<br>**EMPLOYEE**<br>**FORM HR-3** Rev 12/99 |
|---|---|

Employee's Name : *PAUL H. CHRISTENSEN*    S.S. No. *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*

In consideration of employment with, engagement by, or joint venture with, the Goeken Group Corporation ("GGC"), including without limitation Global Med-NET, Inc., Illumination Polymer Technologies, Inc., Personal Guardian Inc., or any other subsidiary of GGC or business in which GGC has an interest, their predecessors and successors, the undersigned hereby agrees that he or she, and his or her legal representative, will:

1. Keep confidential all GGC information and use or disclose GGC information only with the express permission of GGC. "GGC Information" includes all tangible or intangible technical, business, financial, marketing, manufacturing, or operating information that is not readily available to the general public or that might be of benefit to a competitor or an entity seeking to become a competitor;
2. Seek advice from GGC before disclosing to any third party (not part of or affiliated with GGC) any information of which he or she is uncertain whether it may be GGC information or whether a confidentiality agreement is appropriate prior to such disclosure;
3. Promptly advise GGC of any knowledge that a competitor or potential competitor has gained access to GGC information or is using information that is substantially similar to GGC information;
4. Assign to GGC or its nominee all his or her right, title and interest to each discovery, invention, idea or improvement, whether or not patentable, relating to or arising out of the business, services or products of GGC that is made or conceived during the term of his or her employment and is directly or indirectly related to, or resulting from, his or her work in the course of GGC employment
5. Promptly advise GGC of the existence of any discovery, invention, idea or improvement that might fall within paragraph 4 above.
6. Refuse employment or engagement, directly or indirectly, for one year after the termination of any business relationship with GGC with any entity that is or is likely to become a competitor of GGC; and
7. Acknowledge that money damages may not be a sufficient remedy for breach of this agreement and therefore be subject to injunctive relief for any threatened or actual breach as well as any money damages appropriate therefor.

_____    *JUNE 12 '06*
Employee's Signature    Date

_____    *JUNE 12 - 06*
Supervisor's Signature    Date

_____    _____
Witness Signature    Date

Received:  Personnel / HR    Date: _____    By: _____
Department Head    Date: _____    By: _____

| SUBMITTED:  December 1999 ~~(xxxx)~~ |
|---|
| APPROVED: |
| EFFECTIVE: |

**EXHIBIT**

tabbies

4



## GOEKEN GROUP CORP

1751 Diehl Road, Suite 400, Naperville, Illinois 60563
Tel: 630-717-6700    Fax: 630-717-6066    Website: http://www.goeken.com

applia.rfm

# EMPLOYMENT APPLICATION

| | |
|---|---|
| NAME OF APPLICANT *Paul Harvey Christensen* | DATE *June 12'06* |

PRESENT EMPLOYER & LOCATION *Self Employed as Sale Rep for W-Led*

PRESENT OCCUPATION *Salesman*     WORK PHONE *1-914-522-5306*

HOME ADDRESS *241 West Lane South Salem, NY 10590*     HOME PHONE *1-914-533-2637*

POSITION REFERRED FOR *Director of Sales & Marketing*

RESUME ATTACHED   ☐ YES   ☑ NO     REFERRALS ATTACHED   ☐ YES   ☑ NO

| EMPLOYEE REFERRED BY | EMPLOYEE NO. | TITLE |
|---|---|---|
| DEPT. NO. | DEPT. NAME | DIVISION | EXT. |

### FOR PERSONNEL / HUMAN RESOURCES USE ONLY

| INTERVIEWED ☐ YES ☐ NO | HIRED ☐ YES ☐ NO | START DATE *6/12/06* |
|---|---|---|
| POSITION | REQ. NO. | TITLE |
| DEPT. | PAYMENT DUE DATE | |

AWARD   ☐ EXEMPT   ☐ NON-EXEMPT   ☐ HOURLY

| EMPLOYMENT VERIFICATION | DATE |
|---|---|
| PAYMENT RECEIVED | DATE |

**EXHIBIT**

tabbies

5

OMMENTS *120K/yr*     *commissions extra upon reaching certain goals first*

appli3.tfm

## Other Information  (please print)

Name of friends and / or relatives employed by this _____

_____

Position held: _____

If you are eligible, are you interested in health insurance?  ☑ Yes    ☐ No  *(I'D like To Look)*

## Emergency Contact

### In the event of an emergency, who should we contact?

Name                         Relationship to Applicant        Phone Number
*Jennifer  Christensen*        *Wife*                 *1-914-533-2637*
(Last)              (First)

Name                         Relationship to Applicant        Phone Number
_____
(Last)              (First)

## Acknowledgement  (please read carefully)

I hereby certify that the information contained in this application form and in any attachments listed below (hereafter made a part of this application) is true and correct to the best of my knowledge and agree to have any of the statements checked by the organization unless I have indicated to the contrary.  I authorize the references listed above to provide the company any and all information concerning my previous employment and any pertinent information that they may have.  Further, I release all parties and persons from any and all liability for any damages that may result from furnishing such information to the company as well as from the use or disclosure of such information by the organization or any of its agents, employees, or representatives.  I understand that any misrepresentation, falsification, or material omission of information on this application may result in my failure to receive an offer or, if I am hired, in my dismissal from employment.

Attachments: _____

_____        *June 12 '06*
Applicant's Signature                    Date

# WELLSTAR LIGHTING LLC

BUSINESS PLAN

Prepared by

Richard J. Brenner, Founder/Director
C N Wong, Founder/Director

January 2007

**EXHIBIT**

tabbies®

6

# TABLE OF CONTENTS

I.      CONFIDENTIALITY AGREEMENT

II.     EXECUTIVE SUMMARY

III.    SUMMARY FINANCIAL PROJECTIONS

IV.     INVESTMENT OPPORTUNITY

V.      MISSION STATEMENT

VI.     GENERAL DESCRIPTION & HISTORY

VII.    TECHNOLOGY

VIII.   PRODUCT FEATURES

IX.     PRODUCTS AND SPECIFICATIONS

X.      INDUSTRY

XI.     COMPETITIVE ANALYSIS

XII.    SALES AND MARKETING

XIII.   MANUFACTURING

XIV.    OPERATIONS

XV.     MANAGEMENT

XVI.    PROJECTED SALES VOLUMES AND GROSS PROFIT MARGINS

I.     CONFIDENTIALITY AGREEMENT

II.        EXECUTIVE SUMMARY

III.    SUMMARY FINANCIAL PROJECTIONS

IV.    INVESTMENT OPPORTUNITY

During the first quarter of 2007, WLL shall have completed the designs and tooling for at least six primary HBSSL general illumination lamps and three primary decorative lamps. All such lamps will be production ready by March 2007. An initial round of capital investment is required in the range of $1 million to $5 million to provide startup production capital and funding of the operation for an initial three year period.

A priority equity interest in WLL shall be given to parties providing an initial capital investment.

V.    MISSION STATEMENT

To be a leading company designer manufacturer of High Brightness Solid State Lighting ("HBSSL") lamps and modular light engines for commercial, industrial and residential applications.  Such products  that provide enhanced lighting quality, substantial energy savings, substantial product life, and thereby improving people's quality of life at work and at home, while conserving the Earth's natural resources.

VI.    GENERAL DESCRIPTION & HISTORY

WellStar Lighting LLC ("WLL") is being established as a result of its four founders previous collaborative experience in developing and launching HBSSL products during the last three years, as well as their recognition of the current and future market potential for an expanded offering of HBSSL products.  WLL is immediately positioned to launch a new generation of HBSSL lamps and modular light engines for commercial, industrial and certain residential applications during 2007.

Wellstar Electronics, a Hong Kong based manufacturing company embracing nearly three years experience in HBSSL design, prototyping, tooling and manufacturing, and is immediately prepared to manufacture the full line of HBSSL lamps to WLI as presented in Section IV of this business plan. Depending upon lamp type, Wellstar Electronics presently has the capacity of producing between 6,000 and 10,000 lamps per day.  Wellstar Electronics is supported by its parent company, Vigor International, one of the more successful group's of manufacturing companies in Hong Kong and China.  Vigor International can provide additional design, tooling, manufacturing capacity, and component procurement capabilities.  Wellstar Electronics is managed by Mr. W N Wong, a founding member of WLI.

Two of the founders, Mr. Richard Brenner and Mr. C N Wong were previously senior executives at PolyBrite International, an SSL products company, working to develop and launch PolyBrite's line of decorative and general illumination lamps, as well as the company's channel letter lighting system.

Founder Virgil Cheng previously worked directly with the other three founders, and as an independent consultant to PolyBrite International, engaged in developing the electronics and thermal management technology for PolyBrite's lamps and lighting systems.

## VII.     TECHNOLOGY

Wellstar Electronics has initiated the process of applying for intellectual property ("IP") protection on several technical processes, technology, and material applications. These IP rights will be assigned to WLL, or affiliated company, and will become assets of WLL, or be assigned assets to WLL. By the end of January 2007, designs for six primary general illumination lamps and three primary decorative lamps will be completed, and by the end of February 2007, tooling for all such lamps will also be completed. As a result, initial production on all such lamps is projected for March 2007.

Efficient current sharing

Proprietary dimming

Proprietary thermal management design

Proprietary power factor correction

Proprietary materials applications

Proprietary insert molding housing designs

VIII.    PRODUCT FEATURES

Brands:    LumiStar        General Illumination Lamps

SpectralStar    Decorative Lamps

LineStar        Modular Lighting Systems

InnerStar       Modular Light Engines (TBD)

IX.    PRODUCTS AND SPECIFICATIONS

Each general illumination lamp will be available in four distinct white color temperatures ranging from cool white to traditional incandescent. In addition, each lamp will be available in either 110 volt, primarily for the U.S. market, as well as 220 volt for most international markets*. Furthermore, each lamp will be available in a select variety (different diameters) of screw-in bases.

Each decorative lamp will also be available in a select variety of screw-in bases, and will have standard color selections including red, green, blue, yellow and white.

Rated useful life between 40,000 and 100,000 hours

*    Certain lamps will be available at a universally acceptable 12 volts.


LumiStar        General Illumination Lamps

SpectralStar    Decorative Lamps

LineStar        Modular Lighting Systems

InnerStar       Modular Light Engines (TBD)

X.    INDUSTRY

Solid State Lighting, also known as LED Lighting has historically been known as being primarily applicable to instrument and indicator lighting, providing backlighting consumer electronics products including cellular phones, and for color (non-white) display lighting applications.

The arrival of high brightness solid state lighting ("HBSSL") white LEDs only allowed for general illumination applications starting early 2006. Concurrently, Federal, state, and local government mandates and support to conserve energy resources have fueled HBSSL based product development.

Market research reports estimate that the HBSSL market will reach $8.2 billion by 2010, with $1 billion in general illumination. The Founders believe that the $1 billion market will arrive by 2009, and will grow to $2 billion by 2010

Major players such as Philips, General Electric, and Sylvania are rapidly expanding their presence into SSL technology. Philips, leveraging on its LED manufacturing subsidiary, Lumileds, is rapidly moving into a variety of general illumination applications. Sylvania, is also leveraging on its LED manufacturing subsidiary, Osram, to explore various SSL general illumination applications.

State-of-the-art commercially available HB LED is approximately 80 lumens per watt, already competing with that of fluorescent lighting technology. Efficacy is expected to surpass 100 lumens per watt during 2007, and possibly 130 to 150 lumens per watt by 2008.

Primary risks for the industry include slow market acceptance based on price and in reference to the market absorption previously and current experienced by compact fluorescent lighting technology. In addition, the market shows signs of being flooded by low cost, low quality SSL products, thereby misleading, disappointing, and ultimately jading end users with respect to a positive perspective on HBSSL products. Furthermore, an in-rush of competition is anticipated as early entrants gain market share and positive economic results.

Primary rewards for successful manufacturers of HBSSL products will include, but not be limited to developing an industry standards for such lighting technology, sustainable future growth for a stable product line as well as next generation applications that will bring this lighting technology with tangible benefits and acceptable pricing to a strong percentage of residential end users, and attractive financial returns for participating investors and equity holders.

XI.    COMPETITIVE ANALYSIS

IP Litigation

XII.     SALES AND MARKETING

Commercial, Industrial and Government

As a direct result of the initial pricing for HBSSL lamps, the founders will direct their sales and marketing efforts to commercial and industrial end users, as well as federal (including military), state, and local government end users during 2007 and 2008.  The primary criteria for target end users include, but are not limited to the following:

1.  Intensive users of electricity for lighting applications, typically operating lighting in large scale office buildings, retail stores, manufacturing facilities, hospitality facilities, police and fire personnel facilities, transportation facilities, health care facilities, etc. at least twelve hours per day, who can recognize significant energy savings on an annual basis.

2.  The cost of lamp replacement maintenance is recognized as an incremental annual expense that can be substantially reduced or eliminated.

3.  Having a constant and consistent quality of overall facility lighting that is recognized as a reduction of liability and/or a benefit to realizing incremental revenues.

4.  Having a durable light source that is both shock and vibration resistant.

5.  Public and private entities that have an organizational mandate to become more environmentally conscious and proactive – an initiative to "Go Green".

6.  Having the vision and willingness to modify their perspective of "usable light" versus adhering to historical standards based on limited choices of previously available general illumination technology.


As a result of the above, the founders anticipate that they, along with their distribution partners, will be required to educate the above referenced end users about HBSSL products and their associated benefits, including:

Payback Periods and Internal Rates of Returns

a.  Energy savings

  - Power consumption related
  - Environmental heating (HVAC**) related

b.  Near zero maintenance cost

c.  Tax credits

Quality of Light

a.    Brightness

b.    Color temperature (cool to warm white)

c.    Color Rendering Index (ability to produce desired color of illuminated objects)

d.    Elimination of ultra violet light emissions

e.    Beam angles

The founders anticipate the Commercial users realizing acceptable payback periods, as well as large lighting OEMs, will be target customers in 2007

The primary exception to such focus will be distribution opportunities through gas and electric utility companies to their residential customer base

Major obstacle is end user cost of products as compared to traditional product lighting technology

"Usable" light concept to take advantage of directional characteristics of LED lighting

OEMs

PUBLIC UTILITY DISTRIBUTION PARTNER

REGIONAL LIGHTING DISTRIBUTORS

LIGHTING FIXTURE MANUFACTURERS
Future development of "light engines"!

## XIII.   MANUFACTURING

Wellstar Electronics/Vigor International

Plus Me International

XIV.    OPERATIONS

R& D – Hong Kong/China
Sales & Marketing, Distribution, General Administration

XV.     MANAGEMENT

Founders/Directors - Will play active roles in their respective expertise areas

**\*NEED THUMBNAILS\***

**Richard J. Brenner**

Mr. Brenner has more than 25 years experience in general management, sales & marketing, and management consulting.  Mr. Brenner's experience includes five years designing, developing, and marketing LED based products for commercial, industrial, military, and consumer markets.  As Chief Operating Officer of an LED based products company, Mr. Brenner coordinated the activities of product representatives, distributors, original equipment manufacturers in developing and implementing sales and marketing strategies.  Mr. Brenner also managed the company's lamp and lighting system research & development efforts, including the Hong Kong based engineering team and China based contract manufacturer.

Prior to his experience in the LED products industry, Mr. Brenner was a Director at a Los Angeles-based investment banking and consulting firm, managing a broad spectrum of engagements including corporate and real estate valuation, merger & acquisitions, corporate and real estate turnarounds, and strategic planning for domestic and international clients.

Mr. Brenner holds a Masters in Business Administration from the University of California, Los Angeles, and a Bachelor of Science in Business Administration from the University of Southern California.


**Virgil Cheng**

- More than 25 years in power electronics design, development and manufacturing
- Currently, Technical Director of a world-leading electronics manufacturer
- Has designed a full line of SSL products gaining in market acceptance
- Graduate in Electronics Engineering
- Currently studying in a Master's program in Lighting by Queensland University of Technology

**C N Wong**

- Previously, Vice President of an SSL based products company, managing product development, manufacturing, sourcing, and Sales & Marketing in the Asia Pacific region
- Together with Virgil Cheng and W N Wong, designed & developed the SSL lamp and lighting systems line for WellStar Electronics
- Over 30 years in electronics manufacturing, sales & marketing, import /export., etc
- MBA: University of Ottawa

- Member of Institute of Electrical & Electronics Engineers
- Studying in Master's program in Lighting by Queensland University of Technology

**W N Wong**

- More than 25 years in consumer electronics project management & manufacturing
- Currently, Managing Director of Wellstar Electronics – the company that develops and manufactures the full line of SSL based products
- Graduate in Electronics Engineering, Masters of Engineering Management degree from Warwick University, UK
- Currently studying in a Master's program in Lighting by the Queensland University of Technology

## XVI.    PROJECTED SALES VOLUMES AND GROSS PROFIT MARGINS

Three-year goals

- Account for at least 10% of the HBSSL based general illumination retrofit lamp market by the end of the third year.

- Realize $ 90 million in annual revenue within three years, with a minimum 10% operating profit.

- Generate an operating profit by the end of the first year.

- Requires an initial capital investment of $ 5 million

- 5% Plow-back in new product development

Richard and Barbara Brenner
436 Handel Court
Wheaton, Illinois 60187
630-881-1536

January 19, 2007

Countrywide Home Loans

Re:    Relocation to Southern California

Dear Countrywide:

My wife and I have been working to relocate back to Southern California for approximately two years.  During this time we have been patiently searching for a 1930's Palm Springs home to restore as our primary residence.  During the 2006 Christmas holidays we found such a property and quickly proceeded into escrow.

We are looking forward to once again enjoying the Southern California lifestyle and being close to my West Coast based family.  In addition, given that my career focuses on energy saving lighting technology, I am able to pursue a variety of business for my company given the energy conservation initiatives set forth by the state of California.

Very truly yours,

**EXHIBIT**

7

1. CD2 Lighting Technologies

2. WCD Lighting Technologies

3. Power 2 Lighting Technologies

4.

C N Wong

W N Wong

Virgil Cheng

Dick Brenner

**EXHIBIT**

tabbies®

8



# CDW Lighting Technologies Limited

www.cdwlighting.com

Home    Products    Comments & Requests    Contact Us    About Us

Home

Products

Comments & Requests

Contact Us

About Us

Product Preview



A 15 Spectral Vibrant

©2007 CDW Lighting

EXHIBIT

9

tabbies®

# Products

Category: Power Cd | Power Spectral | Spectral Cd | All



### A 15 Power-Cd ®

Our **Power-Cd®** lamp series demonstrates direct energy savings, as well as indirect cost savings realized from a reduction in maintenance and air conditioning costs. With advanced thermal management, the heat generated b...



### A 19 Power-Cd ®

Our **Power-Cd®** lamp series demonstrates direct energy savings, as well as indirect cost savings realized from a reduction in maintenance and air conditioning costs. With advanced thermal management, the heat generated b...



### MR 16 Power-Cd ®

Our **Power-Cd ®** lamp series demonstrates direct energy savings, as well as indirect cost savings realized from a reduction in maintenance and air conditioning costs. With advanced thermal management, the heat generated ...



### R 20 Power-Cd ®

Our **Power-Cd ®** lamp series demonstrates direct energy savings, as well as indirect cost savings realized from a reduction in maintenance and air conditioning costs. With advanced thermal management, the heat generated by...



### PAR 38 Power-Cd ®

Our **Power-Cd ®** lamp series demonstrates direct energy savings, as well as indirect cost savings realized from a reduction in maintenance and air conditioning costs. With advanced thermal management, the heat generated by...

Power Cd®
| A15 | A19 | MR16 |
| R20 | PAR38 | |

Power Spectral®
| MR16 | PAR38 |

Spectral Cd®

Spectral Vibrant
| A15 | A19 |

Spectral Clear
| A15 | A19 |

# Products

Category: Power Cd | **Power Spectral** | Spectral Cd | All





### MR 16 Power-Spectral ®

Our **Power-Spectral** ® lamp series demonstrates direct energy savings, as well as indirect cost savings realized from a reduction in maintenance and air conditioning costs. With advanced thermal management, the heat genera...



### PAR 38 Power-Spectral ®

Our **Power-Spectral** ® lamp series demonstrates direct energy savings, as well as indirect cost savings realized from a reduction in maintenance and air conditioning costs. With advanced thermal management, the heat genera...

**Power Cd** ®

| A15 | A19 | MR16 |
|-----|-----|------|
| R20 | PAR38 | |

**Power Spectral** ®

| MR16 | PAR38 |
|------|-------|

**Spectral Cd** ®

Spectral Vibrant

| A15 | A19 |
|-----|-----|

Spectral Clear

| A15 | A19 |
|-----|-----|

## Products

Category: Power Cd | Power Spectral | **Spectral Cd** | All




**A 15 Spectral Clear** ®

Our **Spectral-Cd**® series of lamps are designed for energy saving, longevity and near-zero maintenance. All lamps in this series consume less than 1 watt of power except for the white color....


**A 15 Spectral Vibrant** ®

Our **Spectral-Cd**® series of lamps are designed for energy saving, longevity and near-zero maintenance. All lamps in this series consume less than 1 watt of power except for the white color....

**A 19 Spectral Clear** ®

Our **Spectral-Cd** ® series of lamps are designed for energy saving, longevity and near-zero maintenance. All lamps in this series consume less than 1 watt of power except for the white color....


**A 19 Spectral Vibrant** ®

Our **Spectral-Cd** ® series of lamps are designed for energy saving, longevity and near-zero maintenance. All lamps in this series consume less than 1 watt of power except for the white color....

Power Cd®

    A15    A19    MR16

    R20    PAR38

Power Spectral®

    MR16    PAR38

Spectral Cd®

    Spectral Vibrant

        A15    A19

    Spectral Clear

        A15    A19

## Products

Category: Power Cd | Power Spectral | Spectral Cd | All





### A 15 Power-Cd ®

Our **Power-Cd**® lamp series demonstrates direct energy savings, as well as indirect cost savings realized from a reduction in maintenance and air conditioning costs. With advanced thermal management, the heat generated b...



### A 19 Power-Cd ®

Our **Power-Cd**® lamp series demonstrates direct energy savings, as well as indirect cost savings realized from a reduction in maintenance and air conditioning costs. With advanced thermal management, the heat generated b...



### MR 16 Power-Cd ®

Our **Power-Cd** ® lamp series demonstrates direct energy savings, as well as indirect cost savings realized from a reduction in maintenance and air conditioning costs. With advanced thermal management, the heat generated ...



### R 20 Power-Cd ®

Our **Power-Cd** ®lamp series demonstrates direct energy savings, as well as indirect cost savings realized from a reduction in maintenance and air conditioning costs. With advanced thermal management,the heat generated by...



### PAR 38 Power-Cd ®

Our **Power-Cd** ®lamp series demonstrates direct energy savings, as well as indirect cost savings realized from a reduction in maintenance and air conditioning costs. With advanced thermal management,the heat generated by...



### MR 16 Power-Spectral ®

Our **Power-Spectral** ®lamp series demonstrates direct energy savings, as well as indirect cost savings realized from a reduction in maintenance and air conditioning costs. With advanced thermal management,the heat genera...



### PAR 38 Power-Spectral ®

Our **Power-Spectral** ®lamp series demonstrates direct energy savings, as well as indirect cost savings realized from a reduction in maintenance and air conditioning costs. With advanced thermal management,the heat genera...

### A 15 Spectral Clear ®

Our **Spectral-Cd**® series of lamps are designed for energy saving, longevity and near-zero maintenance. All lamps in this series consume less than 1 watt of power except for the white color....

**Power Cd**®

| A15 | A19 | MR16 |
| R20 | PAR38 | |

**Power Spectral**®

| MR16 | PAR38 |

**Spectral Cd**®

Spectral Vibrant

| A15 | A19 |

Spectral Clear

| A15 | A19 |





**A 15 Spectral Vibrant** ®

Our **Spectral-Cd**® series of lamps are designed for energy saving, longevity and near-zero maintenance. All lamps in this series consume less than 1 watt of power except for the white color....



**A 19 Spectral Clear** ®

Our **Spectral-Cd** ® series of lamps are designed for energy saving, longevity and near-zero maintenance. All lamps in this series consume less than 1 watt of power except for the white color....



**A 19 Spectral Vibrant** ®

Our **Spectral-Cd** ® series of lamps are designed for energy saving, longevity and near-zero maintenance. All lamps in this series consume less than 1 watt of power except for the white color....

## Comments & Requests

We value your comments to our products and would appreciate your taking a minute to fill in the following

### *Comments:*



E-mail:sales@cdwlighting.com

| | Poor | Satisfactory | Good | Very Good | Excellent |
|---|---|---|---|---|---|
| **Appearance** | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Construction** | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Brightness** | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Color of Light** | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Quality** | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Overall Rating** | ☐ | ☐ | ☐ | ☐ | ☐ |

### *Remarks:*

Required(*)

*First name :

*Last name :

*Company :

*Address :

*City :

*State/Province :

*Country :

Zip/Postal Code :

Phone Number :

*E_mail :

*Which product(s) do you require further information   ☐ Power Cd   ☐ Power Spectral   ☐ Spectral Cd   ☐ All

**Please check your information before selecting Submit.**
Thank you for your interest in CDW Lighting.

Submit   Reset

©2007 CDW Lighting



# CDW Lighting Technologies Limited

www.cdwlighting.com

Home    Products    Comments & Requests    Contact Us    About Us

**Contact Us**

## CDW Lighting Technologies Limited

E-mail : sales@cdwlighting.com

 ©2007 CDW Lighting



# CDW Lighting Technologies Limited

www.cdwlighting.com

Home    Products    Comments & Requests    Contact Us    About Us

**About Us**



E-mail : sales@cdwlighting.com

©2007 CDW Lighting

This is **G o o g l e**'s cache of http://www.cdwlighting.com/aboutus.asp as retrieved on Nov 14, 2007 10:16:03 G
**G o o g l e**'s cache is the snapshot that we took of the page as we crawled the web.
The page may have changed since that time. Click here for the current page without highlighting.
This cached page may reference images which are no longer available. Click here for the cached text only.
To link to or bookmark this page, use the following url: `http://www.google.com/search?`
`q=cache:Z4pzwu0S7fUJ:www.cdwlighting.com/aboutus.asp+cdw+lighting+technologies+limited,+hk&hl=en&ct=clnk&cd=`

*Google is neither affiliated with the authors of this page nor responsible for its content.*

These search terms have been highlighted: **cdw lighting technologies limited**
These terms only appear in links pointing to this page: **hk**

## About Us

June 2007 represents the launch of **CDW Lighting Technologies Limited** ("**CDW**"). The Company is in
the design, engineering, and manufacturing of high quality, high brightness solid state illumination products for
commercial, industrial and residential applications. These products provide enhanced **lighting** quality,
substantial energy savings and longevity; and will improve the quality of life at work and home, while
conserving the Earth's valuable natural resources.

**CDW** was established by its founders utilizing their years of collaborative experience in developing,
engineering, and manufacturing solid state lamps and **lighting** systems, as well as their recognition of the
current and future market potential for an expanded offering of such products. In addition the founders
embrace:

- More than 25 years in power electronics design, development, and manufacturing
- More than 25 years in consumer electronics project management & manufacturing
- More than 30 years in general management, sales & marketing, import /export., etc
- Member of Institute of Electrical & Electronics Engineers
- Graduate degrees in Electronics Engineering, Engineering Management, and Business Administration

**CDW** illumination products embrace Proprietary Designs in the following areas:

- Electronic circuitry
- Thermal management
- Dimming Control
- Materials applications
- LED driving techniques

Each general illumination lamp will be available in four distinct white color temperatures ranging from cool
white to traditional incandescent, and standard or high color rendering index ("CRI"). In addition, each lamp
will be available in either 110 volt, primarily for the North American markets, and 220 volt for most other
international markets, as well as universal 12 volt applications. In addition, **CDW** also offers a line of
decorative lamps in a variety of sizes, colors, and voltages as referenced above.





Address : Flat A2, 10/FL Block A, Texaco Road Industrial
Centre,
256 Texaco Road, Tsuen Wan, Hong Kong
E-mail : sales@cdwlighting.com
Fax : (852) 30113287
Tel : (852) 36940498



www.VeryOnly.com: Building Technology & Lighting fairs > Guangzhou International L... Page 1 of 13



SUV Vehicle Spotlight
View SUV with Top Safety Scores
edmunds.com

Windows Live™    Home  Hotmail  Spaces  OneCare        Spaces  Web    Sign in

Spaces home  www.VeryOnly.com  Photos  Profile  Friends  Blog ▼                    Tools ▼

**Blog**

Listed by date

Entries

Summary

January, 2008

December, 2007

November, 2007

October, 2007

September, 2007

August, 2007

July, 2007

June, 2007

May, 2007

April, 2007

March, 2007

February, 2007

January, 2007

December, 2006

November, 2006

October, 2006

September, 2006

August, 2006

July, 2006

June, 2006

May, 2006

April, 2006

March, 2006

February, 2006

January, 2006

December, 2005

November, 2005

October, 2005

September, 2005

August, 2005

July, 2005

June, 2005

May, 2005

April, 2005

Print

**Building Technology & Lighting fairs > Guangzhou International Lighting Exhibition > Exhibitor list**
VeryOnly.com is a well established Textiles, Lightings and Furniture manufacturer and exporter in China. We are strong in offering Fabrics, Garments, Apparel and Fashion, Household Textile Products, Furniture, Lights & Lighting.
 To learn of more information about us and what are our services given, please pay a visit to our homepage at follows:
http://www.veryonly.com
http://www.verytextile.com
http://www.onlylighting.cn
or contact us by E-mail / MSN
(Textile Inquiry) verytextile@hotmail.com
Thanks and Best Regards.
VeryOnly.com
Year 2007

Austria
Dongguan Egio Lighting Commercial Co Ltd
Tridonic.atco (Shanghai) Co Ltd
Belgium
CE+T Technics
Canada
CSA International China Office
China
Aboutshow Color Light Co Ltd
Actec (Fuzhou) Electronics Co Ltd
AD TOYO Lighting (Guangzhou) Ltd.
Adlux Electronics Co Ltd
Adrilux Lighting Co.,Ltd
Ae Technologies (GD) Co Ltd
Aishi Electric Equipment Co Ltd
Aitluce S.R.L.
AKE Lighting Co Ltd
Amazon Lighting Factory
Anji Feiteng Lighting Co Ltd
Anometal Aluminum Co Ltd
Aoerh Lighting Factroy
Aoguang Lighting
Aoliang Illuminating Equipment Factory
Aoliolang Lighting Technology Co Ltd
Apollotox Electronic Appliance Co Ltd
Architecture Decoration
Artage Industrial Co Ltd
Artlas Illuminating Co Ltd
Austar Lighting Co Ltd
Baotian Lighting Industrial Co.,
Baozhu Electric Appliance Co Ltd
BCI Asia Construction Information Ltd
Beamish Electrical Co Ltd
Beatineon Lighting Co Ltd
Beijing Century Chengtong Electronics Co Ltd
Beijing China Electrical Network Advertising  CO . . LTD
Beijing Electric Light Sources Research Institute
Beijing Jiacheng Chuangxin Light Fitting Co Ltd
Beijing Aihua New Enterprise Lighting Appliance Co Ltd
Bestar Lighting
Bolang Lighting Fixture Factory
Bopo (Zhongshan) Electric Co Ltd
Bri Lighting Electrical & Equipment Co Ltd
Bright House Lighting Co Ltd
Broad Beauty Lighting Factory
Casal Lighting Manufacturing Co Ltd
Cavell Lighting
Cavendish Group
CE Lighting Ltd.
Centre of Testing Service Co Ltd
Changxing Youbang Electric Appliances Co Ltd
Changzhou Aladdin Lighting & Electric Co Ltd
Changzhou Asia Lamp & Lanterns Co Ltd
Changzhou Chaoli Electrical Co Ltd
Changzhou Chuyang Rubber Co Ltd
Changzhou City Shiya Illumination Electric Equipment Co Ltd
Changzhou City Wujin Industry Lighung Factory Co Ltd
Changzhou Fengsheng Plastics Co Ltd
Changzhou Fuxing Electrical Appliance Co Ltd
Changzhou Green Lighung Manufacture Co Ltd
Changzhou Jinkai Lighting Electrical Apparatus Co Ltd

EXHIBIT
10

Zhongshan Vapai Lighting Co Ltd
Zhongshan Visdanfo Industry Co Ltd
Zhongshan Xiaolan Gaori Lighting Factory
Zhongshan Xiaolan Jindeli Electrical Factory
Zhongshan Xiaolan Kaideng Lighting Electrical Appliance Company
Zhongshan Xiaolan Town Win Trust Lighting and Electronic Factory
Zhongshan Xiaolan Weeson DLE-Cast Factory
Zhongshan Xiaolan Weitex Appliance Factory
Zhongshan Xiaolan Xiangxing Plastic Lighting Factory
Zhongshan Xinfa Lamp-house Fitting Factory
Zhongshan Xinzhuang Electric Co Ltd
Zhongshan Yadi Lighting Co Ltd
Zhongshan Yaoxing Lighting Ltd.
Zhongshan Yaoyang Lighting
Zhongshan Yipong Lighting
Zhongshan Yihao Lighting
Zhongshan Ydauna Lighting Co Ltd
Zhongshan Yongzne Lighting Co Ltd
Zhongshan Yuafeng Lighting & Electrical Co Ltd
Zhongshan Yueyuelong Lighting and Electric Factory
Zhongshan Zhenhui Eke Equipment Co Ltd
Zhoushan Excellent Lighting
Zhuhai Huaermei Lighting Co Ltd
Zhuhai Huaermei Lighting Co Ltd
Zhuhai Huansheng Plastic Pipe Factory
Zhuhai Leadfull Optoelectronic Industry Co Ltd
Zhuhai Nanyoxing Electronics Co Ltd
Zhuhai Welluck Development Corporation Ltd.
Zibo Nolas Arts & Crafts Co Ltd
Ziamo (Foshan) Co Ltd
France
Artelite Lighting Equipment (Shanghai) Co., Ltd
France Worldshine INT'L Group Ltd.
LightTec
Germany
Alamod (Shanghai) Co Ltd
BAG Electronics (H.K.) Limited
BJB Electric Dongguan Ltd.
BLV Licht-und Vakuumtechnik Gmbh Shanghai Representative Office
Beilten International Co Ltd
BWF Profiles (Wuxi) Co Ltd
HUCO Lightronic N.I Ltd.
Osram Foshan Lighting Company Ltd.
Sylvania Asia Pacific Limited
TUV Rheinland (Guangdong) Ltd
VDE Testing and Certification Institute
Vossion-Schwabe Electrical Appliances Trading (Shanghai) Co Ltd
Hong Kong, China
Alleybright Lighting Co Ltd
Asian Channel Group Ltd
Auralite Electrical (Fanyu) Limited
Aurther Lighting Manufacturing Co Ltd
Baghein Asia Pacific Ltd.
Bright A Lite (HK) Ltd.
Brilliance Technologies Co Ltd
Brilux Industrial Holding (HK) Co Ltd
CDW Lighting Technologies Ltd
Checkson Die Casting & Product Factory Ltd.
Chof Desjure International Ltd.
Cornely Lighting & Electrical Appliances Co Ltd
Cutco International Ltd.
DND Ltd
Dongguan Grand Electric Appliances Co Ltd
Dongguan Hopestar Electronic Co Ltd
Electronine Ltd
Eis Industries Ltd
Excel Lighting
Fmace Lighting Co Ltd
Foshan Chilo Lighting Co Ltd
Friends Environmental Material Co Ltd
G.S International Ltd.
Germany Ideau (HK) limited
Global Tempered Glass Ltd.
Go Smart Development Ltd.
Green To Light S Acoustics (HK) Int'l Group Ltd
Guangzhou Dings Sunny Lighting Electric Industrial Co Ltd
Guangzhou Baoshan Electronic Co Ltd
Hosnen Yinyu Illumination Lighting Co Ltd
Hohang Logistics (Shenzhen) Co Ltd
Hong Kong Tianshangking Lighting Group (Zhongshan) Co Ltd
Hoison Lighting Co Ltd
Huayue Lighting Manufacture (HK) Co Ltd
KEMA Quality Hong Kong Ltd
Kwangzhou Beauty Shadow Lamp Equipment Co., Ltd
Libo Lighting Electrical Co Ltd
Lights of Australia Ltd
M & C Lighting Ltd.
Macostar Physis Application Technology Development (Wuhan) Ltd.

**From:**       "wn-cdw" <wn@cdwlighting.com>
**To:**         "Alva Chan" <a_chan@polybrite.com>
**Sent:**       Tuesday, August 07, 2007 10:54 AM
**Attach:**     2007广州国际照明展特价资讯.pdf
**Subject:**    Fw: CTS检测 感谢您的光临！

----- Original Message -----
**From:** wn-cdw
**To:** Virgil Cheng CDW ; CN Wong - CDW
**Sent:** Wednesday, June 20, 2007 11:38 PM
**Subject:** Fw: CTS检测 感谢您的光临！

Virgil,
Did you ever heard of this lab before ?
This one seemed to be very mature in testing.
Regards.
WN

----- Original Message -----
**From:** CTS-Lab
**To:** sales@cdwlighting.com
**Sent:** Monday, June 18, 2007 2:13 AM
**Subject:** CTS检测 感谢您的光临！

**EXHIBIT**

tabbies

11





**Guangzhou International** **Exhibition**
广州国际照明展览会

# CTS Lab

与您相约下一届 广州国际照明展览会

**CTS Laboratory**

尊敬的客户：

您好！

非常荣幸在2007广州国际照明展览会认识您，同您沟通贵方产品检测、认证、验货相关事宜。

**CTS检测**作为一家超大规模的测试机构，检测范围全面涵盖电磁兼容、安规、RF、玩具、有害物质检测等，在中国屈指可数，我们在行内有超过11年的经验，费用非常优惠，为您专业提供 CE（EMC，LVD）、EMF，FCC，RoHS，FDA，UL，GS，CB，EN71（TOY），EN62115，C-tick，UL. 等测试、认证和验货服务。

**CTS检测**一直专注于为我们的客户提供电子电器行业最新的市场趋势、法规与标准以及配套的测试认证解决方案，为我们的客户打开国际市场提供最强大的支持！

附件中包含CTS详细的服务项目介绍，您也可登陆我们的网站www.cts-lab.com了解关于我们的更多讯息，如有任何疑问，欢迎随时致电 020-85543113 期待你的回复！

敬祝 商祺
**CTS** Laboratory, G.Z



| | | | | E-mail: cts@cts-lab.com.cn |
|---|---|---|---|---|
| CTS Guangzhou | Tel: +86-20-85543113 | Fax: +86-20-38780406 | E-mail: cts@cts-lab.com |
| CTS Ningbo | Tel: +86-574-87912121 | Fax: +86-574-87907993 | E-mail: cts@cts-lab.com |
| CTS Zhongshan | Tel: +86-760-2344518 | Fax: +86-760-2344519 | E-mail: ctssz@cts-lab.com.cn |
| CTS Shenzhen | Tel: +86-755-82211346 | Fax: +86-755-82212974 | E-mail: ctssz@cts-lab.com.cn |



**www.cts-lab.com**

**CENTRE OF TESTING SERVICE**

1/11/2008

CTS Laboratory, G.Z.   专业测试  专心服务
-------------------------------------------------------
广州中山大道天河软件园建工路15号4楼东座
East Suite, 4/F, No.15 Jiangong Rd., Tianhe
Software Park, Zhongshan Dadao, Guangzhou, China
广州 中山大道 天河软件园 建中路16号三楼
3/F, No. 16 Jianzhong Rd., Tianhe software park,
Zhongshan Dadao, Guangzhou, China.
Tel: +86-20-85543113 (32 lines)
Fax: +86-20-38780406
e-mail:marketing@cts-lab.com.cn
http://www.cts-lab.com

CTS Laboratory, N.B.   专业测试  专心服务
-------------------------------------------------------
浙江 宁波 科技园区 沧海路181号 火炬大厦南二楼
Fl. 2, South of Huoju Bldg., No. 181, Changhai Rd.,
Ningbo Hi-tech Part, Ningbo, Zhejiang, China
Tel: +86-574-87912121 (16 lines)
Fax: +86-574-87907993


No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.472 / Virus Database: 269.9.0/852 - Release Date: 6/17/2007 8:23 AM

---

This e-mail has been scanned by MCI Managed Email Content Service, using Skeptic(tm)
technology powered by MessageLabs. For more information on MCI's Managed Email Content
Service, visit http://www.mci.com.

---

**From:** Brenner, Richard
**Sent:** Tuesday, August 21, 2007 5:38 PM
**To:** 'JMiEddy@aol.com'; Wong, CN
**Cc:** Scianna, Carl
**Subject:** RE: china

Mike,

I will respond for C N as Carl recently approached me on this same subject and I in turn have recently consulted with C N on this matter. C N has advised me that searching for and potentially procuring alternative manufacturing was discussed approximately two years ago. At such time some preliminary appointments were made, but travel plans changed and such meetings did not take place. The manufacturers identified were V-Tech, Flextronics, and Wong's KK. These companies are reportedly world class manufacturers that are currently presumed to be trusted with our IP once the proper documentation in is place.

Last Friday I advised Carl (and he agreed) that I need to make a trip to Hong Kong quite soon, and that I will ask C N to set up meetings with the above referenced manufacturers.

We will keep everyone apprised of the outcome of such discussions with these various factories.

Please let me know if you have any questions or require additional information.

Thanks,
Dick

**From:** JMiEddy@aol.com [mailto:JMiEddy@aol.com]
**Sent:** Tuesday, August 21, 2007 3:20 PM
**To:** Wong, CN
**Cc:** Scianna, Carl; Brenner, Richard
**Subject:** china

cn;

when Carl, George and I were last in your office we discussed your sending us a progress report on the development process and you were going to seek out alternate manufacturing facilities and costs.Can you let Carl know where you are on these subjects: I suspect we will be in China in September and would like to be updated before we plan our schedule.

Thanks in advance,

mike

Get a sneak peek of the all-new AOL.com.

This e-mail has been scanned by MCI Managed Email Content Service, using Skeptic(tm) technology powered by MessageLabs. For more information on MCI's Managed Email Content Service, visit http://www.mci.com.

EXHIBIT

12

tabbies®

# *PolyBrite International, Inc.*



## Authorized Distributor Agreement

This Agreement, made the 19th day of _April, 2007, between PolyBrite International, Inc., herein after referred to as PolyBrite, 1751 W. Diehl Road, Suite 110, Naperville, IL 60563, and Commercial Electric, LLC herein after referred to as CE. In consideration of the mutual covenants and agreements herein after set forth, the parties hereto agree to follows:

1.0     Appointment:

     PolyBrite hereby appoints CE (hereinafter referred to as "Distributor"), as it's Authorized Distributor for the Products of PolyBrite (including its Borealis Lighting Systems products) as described in Article 9.0 hereof (herein after referred to as "Products"), and the Distributor hereby accepts appointment for the same.

2.0     Term of Agreement:

     The term of this Agreement shall commence on, and shall continue until terminated in accordance with Article 12.0.

3.0     Obligations of the Parties:

    3.1     PolyBrite shall:

       3.1.1    Provide the Distributor with an adequate supply of PolyBrite product literature, bulletins and other descriptive matter, including its Borealis Lighting Systems products, free of charge.

       3.1.2    Provide the Distributor with all technical information that in the judgment of PolyBrite may be proper or desirable, including drawings, photographs and specifications.

    3.2     The Distributor shall:

       3.2.1    Advertise and promote the sales of the Products, fulfill the sales targets established by PolyBrite from time to time and otherwise promote the interest of PolyBrite in accordance with this Agreement.

       3.2.2    Order and maintain adequate stock of Products to meet and anticipate the normal needs of its customers.

       3.2.3    Provide PolyBrite, on a monthly basis, a complete listing of Product in the Distributor's inventory for the purpose of insuring proper stock movement.

       3.2.4    Notify PolyBrite immediately of any pirating, infringement or imitation of the Products that has come to the Distributor's attention.

       3.2.5    Provide PolyBrite, on a monthly basis, point of sale information about Distributor and sample of its activity.

EXHIBIT

tabbies

13

1           Confidential & Proprietary

# *PolyBrite International, Inc.*

3.2.6    Participate in training activities sponsored by PolyBrite.

3.2.7    Receive duly authorized representative of PolyBrite for the purpose of consultation and cooperation with the Distributor in connection with the promotion and sale of Products and for the periodic audit for compliance with the agreement.

3.2.8    Regardless of the expiration of any applicable warranty, promptly report to PolyBrite any alleged product failures, which come to the Distributor's attention involving Products, including those which result in personal injury or property damage.

4.0    Prices:

4.1    PolyBrite shall make sales to the Distributor at the published price or factory quotation price, as appropriate, in effect at the time of receipt and acceptance of order.

4.2    PolyBrite reserves the right to change the price of any Product upon thirty (30) days written notice to the Distributor.

5.0    Payment Terms:

Payment for the Products purchased by the Distributor shall be net thirty (30) days from date of invoice. Should any indebtedness owed by the Distributor to PolyBrite be past due, PolyBrite may, at it's option and without prejudice to its other remedies, withhold further shipments or deliveries to the Distributor until all indebtedness to PolyBrite has been fully paid.

6.0    Terms and Conditions of Sales:

All Sales of the Products to the Distributor by PolyBrite shall be subject to the provisions of this Agreement and PolyBrite's standards terms and conditions of sale in effect at time of shipment (hereinafter such standards, terms and conditions are referred to as "PolyBrite's Terms and Conditions of Sale"). Any conflicting provisions of any purchase order placed by the Distributor shall be null and void, unless specifically accepted in writing (other than by a routine acknowledgment by an Authorized Representative of PolyBrite). In case of conflict between the specific language of this Agreement and PolyBrite Terms and Conditions of Sale, this Agreement shall control over such terms and conditions.

7.0    Force Majeure; Shortages; Order Quantities:

7.1    PolyBrite shall not be responsible for any loss or damage to the Distributor occasioned by delays in the performance, or by the nonperformance, of any of PolyBrite's obligations hereunder or by loss of or damage to Products when caused directly or indirectly by acts of God, substantial changes in general economic conditions, acts of government or military authority, casualty, fire, riot, acts of the Distributor, strikes or other labor difficulties, failure of shipping facilities, inability to obtain labor, supplies, fuel material, parts, energy and transportation facilities, or any other cause beyond PolyBrite' control. The acceptance by the Distributor of Products, when received, shall constitute a waiver of all claims for damages by reason of any delay.

7.2    In time of shortage of any products, PolyBrite may allocate its supply as it sees fit.

2                                    Confidential & Proprietary

# *PolyBrite International, Inc.*

8.0    Delivery; Risk of Loss:

8.1    Shipment of Products shall be F.O.B. PolyBrite's manufacturing facility. Title and risk of loss shall pass to the Distributor upon PolyBrite's delivery of Products to the carrier at point of shipment.

8.2    PolyBrite will ship in accordance with instructions supplied by the Distributor, if any.

9.0    Products:

9.1    The Products covered by this Agreement are those certain items manufactured or sold by PolyBrite generally identified as certain LED lamps or LED systems that are indicated by PolyBrite's representatives in writing and shall include PolyBrite's Borealis Lighting Systems products.

9.2    PolyBrite reserves the right to discontinue, limit or change its production of any Product, to alter the design or construction of any Product, and to add new and additional Products to its line, without incurring any liability to the Distributor for any purchase order therefore or thereafter submitted or placed by the Distributor.

10.0    Stock Adjustment:

10.1    PolyBrite shall give the Distributor written notice of the discontinuance of any Product. Within forty-five (45) days of receipt of such notice, the Distributor shall notify PolyBrite, in writing, of it's intention to return for credit any of such discontinue Products in the Distributor's inventory purchase by the Distributor from PolyBrite within the twelve (12) month period prior to receipt of such notice. The Distributor shall include with its notice an itemized inventory of all such Products to be returned. On return of such Products in satisfactory condition, freight prepaid by the Distributor, PolyBrite shall issue a credit for the net price paid by the Distributor for these Products. The return provision of the Paragraph 10.1 shall not apply to items specially manufactured by PolyBrite to the Distributor's or its customers' specifications.

10.2    The Distributor shall notify PolyBrite immediately of any accident, fire, flood, storm, explosion, sprinkler leakage or other occurrence of Act of God, which causes damage to the Distributor's inventory of Products or any part thereof. At the Distributor's discretion or upon request by PolyBrite, the Distributor shall return such damaged inventory to PolyBrite for inspection, testing and evaluation. PolyBrite shall have the exclusive right to determine the suitability of any damaged or defective Product inventory for sale or salvage. The Distributor will not relinquish it or any part thereof in settlement of any claim, nor attempt to sell or salvage any damaged Product inventory in their possession, without PolyBrite' written consent.

10.3    Annual Rotation:

Within twelve (12) months following each annual period of this Agreement (determined as of the commencement day of this Agreement), Distributor may return to PolyBrite, for credit, a quantity of Standard Products (which are indicated in PolyBrite' catalog) that value of which shall not exceed **One Percent (1%)** of the net sales dollars invoiced by PolyBrite to Distributor for all Products purchased by Distributor during the preceding Annual Contract. Credit issued for such returned Products should equal the price paid by Distributor, less any prior credits. Distributor may make such returns from one or more stocking locations. The foregoing return privilege shall be subject to the following:

Confidential & Proprietary

# *PolyBrite International, Inc.*

10.3.1   If the Distributor chooses not to take advantage of the rotation program in any given Period, the amount eligible for that Period is not eligible to carry over into the next Period.

10.3.2   The credit allowed for inventory will be at the price paid by the Distributor less any prior credits granted by PolyBrite on the returned products.

10.3.3   Prior to the return, the Distributor must submit a list of part numbers and quantities to PolyBrite Distribution Manager.   The PolyBrite Distribution Manager, prior to the return, must approve this list.   Returns received by PolyBrite without authorization will be returned to the Distributor at the Distributor's expense.

10.3.4   Returns will not be accepted without a PolyBrite assigned RMA number.   Each return must have the PolyBrite' RMA number clearly marked on the outside of each box.   Returns received without the PolyBrite' RMA number marked on the box will be returned to the Distributor at the Distributor's expense.

10.3.5   Returned Product must be in original packaging free from damage and be in like new and resalable condition.

10.3.6   All Product returned is subject to inspection and approval by authorized personnel at PolyBrite.

10.3.7   Any Product not identified as standard Product is not eligible for stock rotation.

10.3.8   Returns must be made within thirty (30) days of the date of the RMA issuance or they will be rejected and privilege forfeited.

10.3.9   No single part number shall constitute more than twenty five percent (25%) of the return.

10.3.10  All Products returned under the rotation program must have been shipped to the Distributor within the preceding twelve (12) month period.


11.0    Advertising:

11.1    PolyBrite shall supply the Distributor with reasonable amounts of product literature pertaining to its Products at no charge to the Distributor.


12.0    Termination:

This Agreement may be terminated:

12.1    By mutual consent of the parties;

12.2    By PolyBrite upon fifteen (15) days notice in the event the Distributor attempts to assign this Agreement or any right hereunder without PolyBrite' prior written consent, or if there is a change in the control or management of the Distributor which is unacceptable to PolyBrite, or if the Distributor ceases to conduct its operations in the normal course of business, or if the Distributor shall consent to the appointment of a receiver, trustee or liquidator of itself a subsidiary, or of a substantial part of its property, or shall make a general assignment for the benefit of creditors, or otherwise show evidence of insolvency, or if the Distributor breaches the Agreement.

4                    Confidential & Proprietary

# *PolyBrite International, Inc.*

12.3    By either party thirty (30) days after written notice to the other party of breach of any provision of this Agreement by the other party, if the breach has not been cured by such other party within such thirty (30) day period.

12.4    Except as prohibited by applicable law, the Distributor or PolyBrite may terminate this Agreement for any cause whatsoever, or without cause, by giving ninety (90) days written notice of its election to do so.

13.0    Obligations upon Termination:

13.1    In the event of termination of this Agreement by Distributor as the result of a PolyBrite breach, per Paragraph 12.3 above, PolyBrite will repurchase from the Distributor, at the net purchase price paid by the Distributor, any Products in the Distributor's inventory that are unused, were purchased by the Distributor within six (6) months of the termination and that PolyBrite deems commercially usable.

13.2    In the event of termination of this Agreement by the Distributor as per Paragraph 12.4, or by the provisions of Paragraph 12.1, 12.2 and 12.3 above; except as otherwise required by law, PolyBrite shall have no obligation to repurchase any or Distributor's remaining inventory of Product.

13.3    Upon termination of this Agreement, the Distributor shall cease to use the Trade Name(s) referenced in Paragraph 15.5 hereof and shall immediately remove the Trade Name(s) from all buildings or other property under the control of the Distributor.

13.4    Termination of this Agreement shall not release either party from the payment of any sum then or thereafter owing to the other or terminate any other obligation of the Distributor to PolyBrite. PolyBrite may at its option apply any sums due or to become due, from it to the Distributor to the payment of any sums, accounts or obligations (whether contingent and whether matured) which are due, or which may become due, from the Distributor to PolyBrite, power paying any balance, when finally determined, to the Distributor.

14.0    Confirming Orders:

14.1    It shall be the Distributor's responsibility to mark confirming order as "Confirming".

15.0    Trade Names and Trademarks:

15.1    As used herein, the term "Trade Name(s)" shall mean the name and/or trademark PolyBrite, or any variation, abbreviation, or part thereof, and any name or trademark of which notice is later provided to the Distributor by PolyBrite; including, but not limited to, Borealis Lighting Systems and/or any variation thereof. The Distributor acknowledges that the Trade Name(s) are owned exclusively by PolyBrite, the goodwill and business reputation of PolyBrite represented by the Trade Name(s) are of considerable value to PolyBrite, and the Distributor agrees to operate its business and use the Trade Name(s) in a manner that will not in any way damage the business reputation of this Agreement.

15.2    PolyBrite retains the right to disapprove any utilization by the Distributor of Trade Name(s). Any failure or refusal of the Distributor to change its use of Trade Name(s) after disapproval by PolyBrite shall be considered a breach of the Agreement.

Confidential & Proprietary

# *PolyBrite International, Inc.*

15.3   The Distributor agrees to comply at all times with any rules and regulations furnished to the Distributor by PolyBrite with respect to the use of Trade Name(s).

15.4   The Distributor agrees to identify itself as an authorized non-servicing Distributor of PolyBrite and to otherwise properly identify its relationship with PolyBrite.

16.0   Miscellaneous:

16.1   The Agreement constitutes the entire agreement between the parties and supersedes all prior agreements between them, whether written or oral, with respect to the distribution by the Distributor of the Products. This Agreement shall not become effective until signed by an authorized representative of PolyBrite and the Distributor. No modification of this Agreement shall be binding upon PolyBrite unless made in writing and signed by an authorized representative of PolyBrite.

16.2   The Agreement shall be construed in accordance with the laws of the State of Illinois.

16.3   The failure of either party to enforce at any time, or for any period of time, the provisions hereof shall not be construed to be a waiver of such provisions or of the right of such party thereafter to enforce each and every such provision.

16.4   This Agreement is not assignable or transferable by the Distributor in whole or in part, except with the prior written consent of PolyBrite.

16.5   Any notice required or permitted hereunder shall be in writing and shall be given by personal delivery or by registered or certified mail to PolyBrite or the Distributor, as the case may be, at the address of such party indicated on the first page of this Agreement or to such other address as such party shall have last designated in accordance with this notice provision.

16.6   The parties hereto agree that the Distributor is an independent contractor and not an agent or employee of PolyBrite. The Distributor has no right, power or authority, expressed or implied, to incur any obligation or in any manner otherwise make any commitment in the name of or on behalf of PolyBrite. All acts done by the Distributor pursuant to this Agreement, unless otherwise expressly provided herein, shall be solely at the Distributor's expense.

16.7   The provisions of this Agreement are severable. Should any court of competent jurisdiction hold any clause of this Agreement to be unlawful, such holding shall not invalidate the entire Agreement, but rather, the unlawful clause shall be severed from this Agreement and the remaining provisions of the Agreement shall be fully enforceable.

16.8   In no event shall PolyBrite be liable to the Distributor for indirect, special or consequential damages due to any cause, irrespective of whether claims or actions for such damages are based upon contract, warranty, tort, strict liability or otherwise.

16.9   PolyBrite shall have the absolute right to accept or reject any contract or order, and no contract or order shall be binding on PolyBrite until accepted in writing by a duly authorized official of PolyBrite.

Confidential & Proprietary

# PolyBrite International, Inc.

16.10    Confidentiality, Non-Compete Provision:

Distributor agrees not to reveal, disclose or use any trade secrets, directly or indirectly, whether consisting of formulas, patterns, devices, inventions, processes, production/installation information, design information, information regarding suppliers and prices, or compilations of information, records, and specifications, which are owned or controlled by PolyBrite and which are revealed or disclosed to the Distributor by PolyBrite in the process of their business dealings. The Distributor further agrees that any files, records, documents, drawings, or specifications relating to PolyBrite' business dealings which involve trade secrets as herein above set forth, will remain the exclusive property of PolyBrite which presently owns or controls them and will be immediately returned to PolyBrite or to its authorized representative, immediately on its request, for whatever reason, by the Distributor. In addition, during the term of this agreement, and for a period of ten (10) years following termination of this agreement, for whatever reason, the Distributor must refrain from competing, directly or indirectly with PolyBrite, by utilizing any of the confidential information or trade secrets divulged to the Distributor by PolyBrite. Such competition prohibition extends to all counties and states within the United States, including all commonwealth territories and protectorates and to all foreign countries anywhere in the world.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first set forth above.

By: _____
      Distributor

_____
      Name

_____
      Title

_____
      Date

By: _____
      PolyBrite International, Inc.

Carl Scianna
      Name

Pres / CEO
      Title

4/19/07
      Date

    Confidential & Proprietary

**From:** paul christensen [mailto:pchristensen@borealislighting.com]
**Sent:** Monday, August 27, 2007 9:29 AM
**To:** Scianna, Carl; Brenner, Richard; Miles, Randy; jdgoeken@goeken.com; Miles, Sandra; Litt, Saima; Jean Gallup; Chavez, Jose; Guy Vaccaro; Eslick, Dennis; Othman, Ned; mcarney@borealislighting.com; Bill Young; Campione, Vince; Pagano, Frank; cbath@borealislighting.com; Miles Christensen; Doug Miles; David Miller; Wilson, George; Elshair, Ferras
**Subject:** Dillard's Contact Report

**Focusing on Client Needs Nets Success**
A well coordinated sales approach using the talents of the Borealis Lighting and Commercial Electric teams achieved its first success on Friday with Dillard's agreeing to a two year program for all their new stores. During the next two years Dillard's will build 16 to 20 new stores / In each location they will install new display cases equipped with an LED lighting system from Borealis under a new agreement reached on Friday in Little Rock.

**Background**
The road to this agreement started in May of 2007 when Commercial Electric succeed in adding Borealis to the evaluation process that Dillard's was engaged in to find an OEM LED light for its watch and fashion jewelry display cases.
Ray Janik and I flew to Little Rock in order to meet with Jeff Bowen who was leading the effort to evaluate LED choices and select one to OEM the new display cases.
Jeff clearly identified his goals of brightness, light color, shadow and highlight patterns as well as price. He identified the competition and described their offerings.
Three companies were under consideration Stylmark, Phoster and Borealis. (Sylvania had already been eliminated along with several others)
Stylmark and Borealis presented LED products that are fixtures Phoster presented a T-8 replacement that uses the standard mounting points.

**Evaluation**
In the Dillard's headquarters three identical display cases where merchandised with fashion jewelry. The cases where not identified in any way and the review took place without any representatives from the vendors present. In all three cases the goals in brightness and price where met. The Borealis light was selected because of a small advantage in how the jewelry appeared in the case compared to the others. In the review meeting that followed that advantage was described as a 2% difference over the others.

**Review**
The review meeting concentrated on terms. Our team asked for 20,000 feet per year for five years. Dillard's defined its goal as OEM only in new stores. They checked the total display case estimate in the store plans and arrived at 3000 feet required in watch and fashion jewelry per year.
We introduced the need for a LED solution to reduce spoilage of cosmetics due to UV and heat. They indicated that additional discussions were required before cosmetics display cases would be considered.
We outlined how easy our product was to retrofit and they defined the T-8 as easier and indicated they were inviting Phoster to make an additional presentation.

**Summary**
The agreement reached on Friday represents a true success. The competition is high, the pricing is aggressive, and it is a buyers market.
Our team sees this deal as a "toehold" and is determined to grow the account into all display cases both new and existing. We agree that there is a great deal of work to accomplish over the coming months. We clearly see the competition is still in place. Dillard's ordered $100,000.00 in Stylmark products and they are installing them today. Phoster has been invited back and we see that as a threat to the retrofit portion of this account.

**Action**
1 Proceed with UL
2 Amend the product to meet the requirements of the display case builder, a smaller power supply and a wire harness from the lamp to the power supply with a ground wire.

**EXHIBIT**

14

3 Summarize the agreement and receive a PO
4 build a small number for samples
5 Issue PO to secure position and price with LED manufacturer


Foot Note

I would like to acknowledge the team at Commercial Electric, Phil, Bob, and Bill. This success is largely theirs. It is due to their good planning and careful client handling that we succeed. They will be coming to Chicago in mid Sept. to plan the tactical around this agreement.
Our team is looking forward to seeing this account grow over the coming years.

Paul Christensen
Fire Island, NY


Paul Christensen
Borealis Lighting
1-914-522-5306, cell
pchristensen@borealislighting.com

From: paul christensen [mailto:pchristensen@borealislighting.com]
Sent: Thursday, September 13, 2007 1:56 PM
To: Miles, Sandra
Subject: Projections

Sandra,

Working through all sales initiatives that have solid evidence of real traction I have completed the sales projections in the attach file.

They show that we could really expect to see sales grow from $3 million to $20 million in one year. A seven fold improvement.

1

EXHIBIT

15

# Sales Projections for 2008

2008 will prove to be most pivotal for Borealis Lighting. The improved brightness and higher CRIs available are accumulating into some very promising results.

Using a linear LED array Borealis has developed two excellent solid-state lighting products. One for Florida Plastics and their client McDonalds, a bright backlight for out-door menu boards and for Dillard's a replacement for a fluorescent tube lighting fashion jewelry and watches in display cases.

## Gross Sales Projections, Linear Lighting 2008

| Account | Type | Unit Price | Units Per Year | 2008 Sales |
|---------|------|-----------|----------------|------------|
| Dillard's | Display Case | $300.00 | 26,250 | $7.8 Million |
| McDonalds | Menu Board | $445.00 | 12,600 | $5.6 Million |

**Dillard's** have 3000 feet of lighted display cases in each of 338 locations. They plan to install our linear in all new construction beginning in 2008 and then retrofit all existing stores. No time line for retrofit has been established we currently have a verbal PO for 8 stores of new construction and good indication that they will retrofit 10% of their stores in 2008.

**McDonald's** have 14,000 locations in North America 2100 are corporate owned. Each location will require 6 lamps for the menu boards. The current thinking is this program will be rolled out over all 2100 stores in 2008 and then expanded into franchise stores

## Lamps sales in 2008

Projected sales for lamps in both the decorative and general illumination lines in 2008 will reach $2 million.  We have small orders from recreational vehicle manufacturers, outdoor sign shops and several early adopters for lamps.

## Signage
The MLS system continues to grow in popularity. The sales in this product line will continue to increase and should reach $1 million in annual sales for 2008.

## Consumer
The pet and safety product lines are selling at a rate that will top $3 million in sales during 2008.

## Annual Sale for 2008
Linear, Lamps, Signage and consumer products will total $20 million in gross sales for 2008.

**Evans, Tammy**

| | |
|---|---|
| **From:** | paul christensen [pchristensen@borealislighting.com] |
| **Sent:** | Friday, October 12, 2007 11:59 AM |
| **To:** | Janik, Ray |
| **Cc:** | Brenner, Richard |
| **Subject:** | Production Status Items |

Ray,

I have several items that we should address on two projects.

**Florida Plastics**

Reflector pans for the COD are expected at Shape today.

1. Have we shipped LEDs for these panels.
2. Have we ordered the correct power supplies for these shortened.
3. We are being pressed for an ETA on this.

**Dillard's**

Bill Young has determined that a T-8 replacement is the only way that Dillard's will go forward on the retrofit portion of the project.

1. I have shipped the  OEM T-8  display case fixture back from NYC . (It no longer works, shorted out in photo studio)
2. A meeting is required in order to manage expectations.
3. Bill believes IF we can produce a working prototype that matches our light output in the short term, (between now and December), then he can keep this alive.  If not we should let him know.

**UL**

Assuming the FP and Dillard's projects will continue. I am prepared to function as project manager and advance both through the process.
I believe you mentioned that this process hinges on Saima. I will follow up with her.

**Samples**

We have completed reflector pans and power supplies for the FP Lamar project.  We do not have extra Dillard's display case samples,

1. Can we please build, 4- 4 foot w/ power supplies, linear display case lamp/fixtures, set at the output of the watch/fashion jewelry.

**MISC**

1

**EXHIBIT**

tabbies'

16
_____

Jose brought one of the Lamar reflector pans and a power supply from the warehouse, it is in the first floor conference room. Would you like to  have it and the Triangular Rotating Sign in that room or in your lab?

I am out of the office later this afternoon and Monday morning.  I will be joining you for the meeting Monday afternoon with Patty Veneticci, she is an engineer and a cost control consultant brought in by FP and tasked with finalizing the overall lamp performance and cost.

See you Monday,

Paul

Paul Christensen
Borealis Lighting
1-914-522-5306, cell
pchristensen@borealislighting.com

This e-mail has been scanned by MCI Managed Email Content Service, using Skeptic(tm) technology powered by MessageLabs. For more information on MCI's Managed Email Content Service, visit http://www.mci.com.

**Contact Report**

**Mid Month Summary**                                     **Nov. 8, 2007**

Commercial Electric
Curtis Stout
Dillard's
Neiman Marcus
Wal-Mart

### Account Management and Customer Relations

During the month of November, I am making a sweep from one coast to the other in order to support our key account sales efforts and manage our customer's expectations. I am at the mid point and find it very important that I submit this report

### Quality Company with High Quality Clients

Dillard's, Neiman Marcus, Bergdorf Goodman and Horchow top names in the who's who of high-end retailers. These are the clients of Commercial Electric. This company generates over 2 million dollars in sales per employee. They have a Harvard Business School MBA as their chief of Business Development who has set his sights on growth from 30 to 100 million dollars in the foreseeable future. Our company is the fortunate recipient of their trust.

### Excellent Sales Efforts and Concerns about Follow Through

The management team at CE is expressing a dual signal. One is appreciation for the continued sales support. We have supplied them with training, printed materials and sales staff.

The other signal is one of rising concern. They are growing impatient with our progress to advance several portions of the Dillard's account. We have not advanced the additional prototype requests for the additional sizes in lamps and power supplies and the UL the qualification process.

They remind us that the Dillard's requirements are UL on all lamps and fixtures before it will be accepted for installation, and that Dillard's will not tolerate late delivery. One missed delivery date will cancel all future orders.

**EXHIBIT**

tabbies®

17
_____

-2-

## Curtis Stout

Curtis H. Stout, with 200 million in annual sales, is a representative of lighting, electrical & utility products, automation controls, and audio/visual equipment, operating in Arkansas, Louisiana, Mississippi, and Tennessee.   Curtis Stout has over 100 employees covering 5 states in the mid-south. One of their single largest customers is Wal-Mart.

While in Little Rock I had a long and meaningful conversation with Ron Smith.

## Expressing Concern

Ron is expressing some concerns. He clearly sees that the tipping point in interest for LED lighting solutions is upon us.  His company is fielding almost daily requests for them. These requests cover a wide variety of applications.

He knows that many of our products are the correct answer for his clients.  He has considered several approaches that might assist us in bringing our solutions to Curtis Stout customers.   The one he discussed with me recently is placing a purchase order.

He would like sample lamps for their sales staff and for client evaluations. He qualifies this by saying how important timing is to receiving these samples. He details that even though our lamps have some market advantages, these are slipping through our fingers. He explains that this LED market is all about timing and who's first with quality products wins. When lighting products have such long useful lives, once installed in a socket they block the completion from that socket by virtue of three things. They were first to be installed, the quality units will have long lives and they are expensive, meaning the end user will be determined to see the long life to its end if not longer. Ron needs a large number of samples quickly.

## Summary

In both cases, these customers are exploring alternatives to our products.   Ron is selling LLF lamps, even though he is not a representative of that company.  His clients have needs and he must act to support them. He very much want to represent Borealis Lighting, having lamps to do so is key.

CE has  display case products from Stylemark and Foster and Intencity already pre-qualified for Dillard's Stylmark and Foster have UL in

place. Dillard's has already placed an order for $100,000.00 in Stylmark display case lighting for 2008.

These growing concerns from our clients may soon over shadow any traction that the sales initiative have built up as good will. If Ron Smith's explanation of the markets hold true we may lose these customers and be forced to start from square one.


Reporting from Little Rock

Paul Christensen
Borealis Lighting
914-522-5306





**COMMERCIAL ELECTRIC**

Mr. Carl Scianna, President and CEO
PolyBrite International, Inc.
1751 West Diehl Road
Naperville, IL 60563

November 9, 2007
Via FedEx

Dear Carl,

The purpose of this letter is to express my concern regarding a perceived lack of urgency by PolyBrite as it relates to shepherding the linear LED array through the UL approval process and ultimately into production.

On August 24th, Dillard's chose our co-developed linear LED fixture as their lighting source for new jewelry display cases in new stores. At that time Rick Willey, Vice President of Store Development, challenged us not to miss any delivery dates or risk losing the business.

In order to be able to deliver product by the end of the first quarter of 2008, we need to have prototypes produced for the various sizes of display cases, obtain UL approval and schedule production. It has been eleven weeks since the Dillard's meeting. Has PolyBrite initiated the UL approval process or ordered additional units of the product?

Carl, Dillard's has been my largest customer for more than eleven years, and I will not allow PolyBrite to jeopardize my relationship with them. Please call me tomorrow, Tuesday, November 13th and provide me with all of the details and timelines for acquiring UL approval and for meeting the production dates. If PolyBrite is unable or willing to perform, Commercial Electric will cause the product to be produced in order to honor our obligations and avoid any potential damages.

Sincerely,

Phil K. Gamache
President and CEO

CC:    Mr. Jack Goeken
       Mr. Randy Miles
       Ms. Sandra Goeken Miles
       Mr. Richard Brenner
       Mr. Paul Christensen

**EXHIBIT**
18

November 13, 2007


Phil K. Gamache
COMMERCIAL ELECTRIC
1199 Murphy Drive
Maumelle, Arkansas 72113

RE: Your letter dated 11-9-07

Dear Phil –

I was surprised and shocked by your letter of November 9th, as I had been informed that our project was operating smoothly. Obviously that is not the case, and we will look into this immediately.

We did adapt a 4 ft. +/- sample for you that we thought satisfied your current needs. We also were informed that UL would become a requirement, but had no idea there was such urgency. The T-8 project was given to us, and because of the in depth engineering required to make a functional snap-in project, we thought that you were aware that it would take some time.

All of these projects were handled by Paul Christensen on our side, and were given to our Chief Engineer Ray Janik. Ray had some working conversation with your Bill Young as well.

I look forward to your telephone call tomorrow and hope between the two of us we can get things back on track, and can satisfy Dillard's requirements. It would be helpful if you could supply to us the names of the people on your side to communicate directly with, thereby resulting in a quicker response to required timelines.

Respectfully,



Carl Scianna
President & CEO
POLYBRITE INT'L

Cc: R. Janik



EXHIBIT

19

tabbies





**COMMERCIAL
ELECTRIC**

Mr. Carl Scianna, President and CEO                    November 20, 2007
PolyBrite International, Inc.                                        Via FedEx
1751 West Diehl Road
Naperville, IL 60563

Dear Carl,

The purpose of this letter is to confirm my phone call to you last Friday, November 16, 2007.

During that call I informed you of Commercial Electric's decision to no longer pursue the development of the linear LED display case for Dillard's with PolyBrite.

Sincerely,

Phil K. Gamache
President and CEO

**EXHIBIT**

tabbies

20

VAN AUKEN ROBERT HANLON                         2007-12-15 07:48:35

1911                                              628.00

                                                    宋婷婷

2007-12-11 15:09            2007-12-13 09:08          201913

| | | | | |
|---|---|---|---|---|
| 2007-12-1. 23:59:59 | 001 Room Rate | | 1911 | 628.00 |
| 2007-12-1! 20:08:00 | 022 Western FB | | 1911 | 1,932.00 |
| 2007-12-1? 23:59:59 | 001 Room Rate | | 1911 | 628.00 |
| 2007-12-1? 09:08:00 | 1113 VISA | | 1911 | 3,188.00 |

消费合计 Charge Total:            3,188.00
结算合计 Payment Total:           3,188.00
Page 1 of 1          余 额 End Balance:            0.00

From: Dong chen International Hotel.

EXHIBIT

21

FROM :                              FAX NO. :                    Dec. 15 2007 09:05    P 4

YOUNG WILLIAM HUGH                          2007-12-15 07:47:57

    1910                                        628.00

                                            宋婷婷

    2007-12-11 18:09          2007-12-13 09:06              201912

| | | | | |
|---|---|---|---|---|
| 2007-12-11 23:59:59 | 001 Room Rate | | 1910 | 628.00 |
| 2007-12-12 09:06:00 | 022 Western FB | | 1910 | 18.00 |
| 2007-12-12 23:59:59 | 001 Room Rate | | 1910 | 628.00 |
| 2007-12-13 08:05:00 | 022 Western FB | | 1910 | 18.00 |
| 2007-12-13 09:06:22 | 1113 VISA | | 1910 | 1,292.00 |

                    消费合计 Charge Total:              1,292.00
                    结算合计 Payment Total:             1,292.00
Page 1 of 1           余  额 End Balance:                 0.00

From: Dong Chen International Hotel.

FROM :                          FAX NO. :                Dec. 15 2007 09:05    P 1

CHRISTENSEN PAUL HARVEY                 2007-12-15 07:45:05

1902                                        628.00

宋婷婷

2007-12-11 15:09          2007-12-13 09:10              201908

| 2007-12-11 23:59:59 | 001 Room Rate | 1902 | 628.00 |
| 2007-12-12 15:05:24 | 051 Minibar | 1902 | 30.00 |
| 2007-12-12 23:59:59 | 001 Room Rate | 1902 | 628.00 |
| 2007-12-13 09:10:24 | 1111 Master | 1902 | 1,286.00 |

消费合计 Charge Total:          1,286.00
结算合计 Payment Total:          1,286.00
Page 1 of 1          余 额 End Balance:          0.00

*From: Dong chen International Hotel.*

FROM :                              FAX NO. :              Dec. 15 2007 09:05    P 5

BRENNER RICHARD JAMES                    2007-12-15 07:47:16

1909                                       628.00

宋婷婷

2007-12-11 15:09          2007-12-13 09:20          201911

| 2007-12-11 23:59:59 | 001 Room Rate | 1909 | 628.00 |
| 2007-12-12 09:37:00 | 018 DDD | 1909 | 139.90 |
| 2007-12-12 23:59:59 | 001 Room Rate | 1909 | 628.00 |
| 2007-12-13 04:58:00 | 018 DDD | 1909 | 2.80 |
| 2007-12-13 04:59:00 | 018 DDD | 1909 | 8.30 |
| 2007-12-13 05:02:00 | 018 DDD | 1909 | 8.30 |
| 2007-12-13 05:31:00 | 018 DDD | 1909 | 3.70 |
| 2007-12-13 07:58:00 | 018 DDD | 1909 | 139.00 |
| 2007-12-13 08:26:00 | 018 DDD | 1909 | 219.00 |
| 2007-12-13 09:21:02 | 1113 VISA | 1909 | 1,777.00 |

消费合计 Charge Total:          1,777.00
结算合计 Payment Total:         1,777.00
余  额 End Balance:             0.00

Page 1 of 1

*From: Dong chen International Hotel.*

FROM :                          FAX NO. :                    Dec. 15 2007 09:05   P 6

黄华南                              2007-12-15 07:46:19

1905                                628.00

宋烨烨

2007-12-11 15:09           2007-12-13 09:27              201909

| 2007-12-.1 23:59:59 | 001 房租 | 1905 | 628.00 |
| 2007-12-.2 23:59:59 | 001 房租 | 1905 | 628.00 |
| 2007-12-.3 09:27:26 | 1113 VISA卡 | 1905 | 1,256.00 |

消费合计 Charge Total:          1,256.00
结算合计 Payment Total:         1,256.00
Page 1 of 1          余 额 End Balance:          0.00

*From= Dong Chen International Hotel.*

黄志昂                                          2007-12-15 07:45:37

1903                                              628.00

                                                 宋停停

    2007-12-11 15:09            2007-12-13 09:27            201907


2007-12-11 23:59:59        001 房租                 1903        628.00
2007-12-12 21:54:00        024 日本餐厅              1903      1,210.00
2007-12-12 23:59:59        001 房租                 1903        628.00
2007-12-13 09:27:06        112 运通卡               1903      2,466.00


                    消费合计 Charge Total:              2,466.00
                    结算合计 Payment Total:             2,466.00
Page 1 of 1          余 额 End Balance:                  0.00


*From: Dong Chen International Hotel.*

|  |  |
|---|---|
| Confirmation No. | : 1997583 |
| Arrival | : 13/12/07 |
| Departure | : 15/12/07 |
| Room No. | : 1724 |
| Cashier | : HFONATHAN |
| Folio No. | : 120077 |
| Print Date | : 15/12/07 |

Mr Paul Harvey Christensen
Hong Kong

Page No.          1 of 1

## INFORMATION INVOICE

| Date | Description | Reference | Debit HKD | Credit HKD |
|---|---|---|---|---|
| 13/12/07 | In House Movie | #1724 : VIDEO MOVIE  101 | 98.00 | |
| 13/12/07 | Room Charge | | 1,800.00 | |
| 13/12/07 | Service Charge | | 180.00 | |
| 13/12/07 | Government Tax | | 54.00 | |
| 14/12/07 | Room Charge | | 1,800.00 | |
| 14/12/07 | Service Charge | | 180.00 | |
| 14/12/07 | Government Tax | | 54.00 | |
| 15/12/07 | CC-Mastercard | | | 4,166.00 |

I agree that my liability for this bill is not waived and agree to be held personally liable in the event that the indicated person, company or association fails to pay for any part or the full amount of these charges.

| | | |
|---|---|---|
| Total | 4,166.00 | 4,166.00 |
| Balance Due HKD | | 0.00 |

Guest's Signature : _____

**EXHIBIT**

tabbies

22

15/12 '07 SAT 10:06 FAX +852 2113 0011   MARCOPOLO HONGKONG HOTEL   ☑001

Mr Robert Hanlon Van Auken
Hong Kong

| | |
|---|---|
| Confirmation No.: | 1997579 |
| Arrival | : 13/12/07 |
| Departure | : 15/12/07 |
| Room No. | : 1725 |
| Cashier | : HFONATHAN |
| Folio No. | : 120071 |
| Print Date | : 15/12/07 |

Page No.        1 of  1

## INFORMATION INVOICE

| Date | Description | Reference | Debit HKD | Credit HKD |
|---|---|---|---|---|
| 13/12/07 | Room Charge | | 1,800.00 | |
| 13/12/07 | Service Charge | | 180.00 | |
| 13/12/07 | Government Tax | | 54.00 | |
| 14/12/07 | L&V-Laundry | | 726.00 | |
| | *14130* | | | |
| 14/12/07 | Nishimura | 39323 | 1,430.00 | |
| | *ANGEL VW* | | | |
| 14/12/07 | L&V-Laundry | | 85.80 | |
| | *14129* | | | |
| 14/12/07 | Room Charge | | 1,800.00 | |
| 14/12/07 | Service Charge | | 180.00 | |
| 14/12/07 | Government Tax | | 54.00 | |
| 15/12/07 | CC-Visa | | | 6,309.80 |

I agree that my liability for this bill is not waived and agree to be held personally liable in the event that the indicated person, company or association fails to pay for any part or the full amount of these charges.

| | | |
|---|---|---|
| **Total** | 6,309.80 | 6,309.80 |
| **Balance Due HKD** | | 0.00 |

**Guest's Signature :**

15/12 '07 SAT 10:04 FAX +852 2113 0011     MARCOPOLO HONGKONG HOTEL                    ☑002

|  |  |
|---|---|
| Mr William Hugh Young | Confirmation No.: 1997582 |
| Hong Kong | Arrival          : 13/12/07 |
|  | Departure     : 15/12/07 |
|  | Room No.     : 1723 |
|  | Cashier        : HFONATHAN |
|  | Folio No.       : 120079 |
|  | Print Date     : 15/12/07 |

Page No.        1 of 1

## INFORMATION INVOICE

| Date | Description | Reference | Debit HKD | Credit HKD |
|---|---|---|---|---|
| 13/12/07 | Broadband | #1723 | 120.00 | |
| 13/12/07 | Room Charge | | 1,800.00 | |
| 13/12/07 | Service Charge | | 180.00 | |
| 13/12/07 | Government Tax | | 54.00 | |
| 14/12/07 | L&V-Laundry 08560 | | 449.90 | |
| 14/12/07 | L&V-Dry Cleaning 05757 | | 182.60 | |
| 14/12/07 | Personal Bar | #1723 : | 30.00 | |
| 14/12/07 | Room Charge | | 1,800.00 | |
| 14/12/07 | Service Charge | | 180.00 | |
| 14/12/07 | Government Tax | | 54.00 | |
| 15/12/07 | CC-Visa | | | 4,850.50 |

I agree that my liability for this bill is not waived and agree to be held personally liable in the event that the indicated person, company or association fails to pay for any part or the full amount of these charges.

| | Debit | Credit |
|---|---|---|
| Total | 4,850.50 | 4,850.50 |
| Balance Due HKD | | 0.00 |

Guest's Signature : _____

15/12 '07 SAT 10:04 FAX +852 2113 0011    MARCOPOLO HONGKONG HOTEL                    ☒001

1-630-717-5062-

Total 4 pgs

ATT To :PPT
7Dm = Hk hotel Nathan

Mr Richard James Brenner
Hong Kong

| | |
|---|---|
| Confirmation No. | : 1997587 |
| Arrival | : 13/12/07 |
| Departure | : 15/12/07 |
| Room No. | : 1732 |
| Cashier | : HFONATHAN |
| Folio No. | : 120081 |
| Print Date | : 15/12/07 |

Page No.      1 of 1

## INFORMATION INVOICE

| Date | Description | Reference | Debit HKD | Credit HKD |
|---|---|---|---|---|
| 13/12/07 | Room Charge | | 1,800.00 | |
| 13/12/07 | Service Charge | | 180.00 | |
| 13/12/07 | Government Tax | | 54.00 | |
| 14/12/07 | Tel-Overseas | 07:40 #1732 : 00115713341893 [00:00:04] | 67.80 | |
| 14/12/07 | Tel-Overseas | 07:57 #1732 : 00119783736965 [00:09:56] | 426.00 | |
| 14/12/07 | Continental Club-F&B | #1732 : CHECK #7022 | 181.50 | |
| 14/12/07 | Tel-Overseas | 11:26 #1732 : 00116308811536 [00:01:26] | 107.60 | |
| 14/12/07 | L&V-Laundry 11593 | | 31.90 | |
| 14/12/07 | Laundry & Valet-Adjustment TP-G 10% L'DRY DISC | | -2.90 | |
| 14/12/07 | Room Charge | | 1,800.00 | |
| 14/12/07 | Service Charge | | 180.00 | |
| 14/12/07 | Government Tax | | 54.00 | |
| 15/12/07 | CC-Visa | | | 5,266.10 |
| 15/12/07 | Tel-Overseas | 08:35 #1732 : 00116308811536 [00:08:46] | 386.20 | |

I agree that my liability for this bill is not waived and agree to be held personally liable in the event that the indicated person, company or association fails to pay for any part or the full amount of these charges.

| | | |
|---|---|---|
| Total | 5,266.10 | 5,266.10 |
| Balance Due HKD | | 0.00 |

Guest's Signature : _____



**MARCO POLO**
HONGKONG HOTEL
HONG KONG

| | |
|---|---|
| Confirmation No. | : 2040331 |
| Arrival | : 03/02/08 |
| Departure | : 07/02/08 |
| Room No. | : 1727 |
| Cashier | : HFOKIMMY |
| Folio No. | : 140461 |
| Print Date | : 12/02/08 |

Mr. Robert Hanlon Van Auken
Solid State Solutions
1199 Murphy Dr
Maumelle
Arkansas AR 72113

Page No          1 of  2

## INFORMATION INVOICE

| Date | Description | Reference | Debit HKD | Credit HKD |
|---|---|---|---|---|
| 03/02/08 | Room Charge | | 1,950.00 | |
| 03/02/08 | Service Charge | | 195.00 | |
| 03/02/08 | Government Tax | | 58.50 | |
| 04/02/08 | Tel-Overseas | 03:45 #1727 : 00115015549394 [00:00:08] | 67.80 | |
| 04/02/08 | Tel-Overseas | 03:45 #1727 : 00115013391662 [00:01:06] | 107.60 | |
| 04/02/08 | Tel-Overseas | 04:56 #1727 : 00115015549394 [00:00:04] | 67.80 | |
| 04/02/08 | Tel-Overseas | 05:00 #1727 : 00115013390055 [00:00:36] | 67.80 | |
| 04/02/08 | L&V-Laundry | | 378.40 | |
| | 04447 | | | |
| 04/02/08 | Room Charge | | 1,950.00 | |
| 04/02/08 | Service Charge | | 195.00 | |
| 04/02/08 | Government Tax | | 58.50 | |
| 05/02/08 | Private Dining-Lunch | #1727 : CHECK #2770 | 324.50 | |
| 05/02/08 | Private Dining-Lunch | #1727 : CHECK #2769 | 784.30 | |
| 05/02/08 | Continental Club-F&B | #1727 : CHECK #7441 | 1,118.70 | |
| 05/02/08 | Room Charge | | 1,950.00 | |
| 05/02/08 | Service Charge | | 195.00 | |
| 05/02/08 | Government Tax | | 58.50 | |
| 06/02/08 | L&V-Laundry | | 181.50 | |
| | 04530 | | | |
| 06/02/08 | Business Ctr-Copying Svc | 16768 | 16.00 | |
| | 4 COPIES A3 | | | |
| 06/02/08 | L&V-Dry Cleaning | | 231.00 | |
| | 05778 | | | |
| 06/02/08 | Laundry & Valet-Adjustment | | -50.90 | |
| | TP-10% | | | |
| 06/02/08 | Laundry & Valet-Adjustment | | -21.00 | |
| | TP-G 10% | | | |
| 06/02/08 | Room Charge | | 1,950.00 | |
| 06/02/08 | Service Charge | | 195.00 | |
| 06/02/08 | Government Tax | | 58.50 | |
| 07/02/08 | CC-Visa | | | 12,087.50 |

EXHIBIT
tabbies
23



# MARCO POLO
## HONGKONG HOTEL
### HONG KONG

Mr. Robert Hanlon Van Aicken
Solid Atate Solutions
1199 Murphy Dr
Maumelle
Arkansas AR 72113

| | |
|---|---|
| Confirmation No.: | 2040331 |
| Arrival | : 03/02/08 |
| Departure | : 07/02/08 |
| Room No. | 1727 |
| Cashier | : HFOKIMMY |
| Folio No. | : 140461 |
| Print Date | : 12/02/08 |

Page No          2 of  2

## INFORMATION INVOICE

| Date | Description | Reference | Debit HKD | Credit HKD |
|---|---|---|---|---|

I agree that my liability for this bill is not waived and agree to be held personally liable in the event that the indicated person, company or association fails to pay for any part or the full amount of these charges.

| | Debit HKD | Credit HKD |
|---|---|---|
| Total | 12,087.50 | 12,087.50 |
| Balance Due HKD | | 0.00 |

Guest's Signature :



MARCO POLO
HONGKONG HOTEL
HONG KONG

Mr. Richard James Brenner
,US
United States

| | |
|---|---|
| Confirmation No. | 2040327 |
| Arrival | 03/02/08 |
| Departure | 07/02/08 |
| Room No | 1734 |
| Cashier | HFOKIMMY |
| Folio No. | 140463 |
| Print Date | 12/02/08 |

Page No.        1 of  1

## INFORMATION INVOICE

| Date | Description | Reference | Debit HKD | Credit HKD |
|---|---|---|---|---|
| 03/02/08 | Room Charge | | 1,950.00 | |
| 04/02/08 | Service Charge | | 195.00 | |
| 03/02/08 | Government Tax | | 58.50 | |
| 04/02/08 | Broadband | #1734 | 120.00 | |
| 04/02/08 | L&V-Pressing | | 57.20 | |
| | 08821 | | | |
| 04/02/08 | Continental Club-F&B | #1734 : CHECK #7436 | 112.20 | |
| 04/02/08 | Room Charge | | 1,950.00 | |
| 04/02/08 | Service Charge | | 195.00 | |
| 04/02/08 | Government Tax | | 58.50 | |
| 05/02/08 | Room Charge | | 1,950.00 | |
| 05/02/08 | Service Charge | | 195.00 | |
| 05/02/08 | Government Tax | | 58.50 | |
| 06/02/08 | L&V-Laundry | | 63.80 | |
| | 20550 | | | |
| 06/02/08 | Laundry & Valet-Adjustment | | -11.00 | |
| | TP-G/10% | | | |
| 06/02/08 | Continental Club-F&B | #1734 : CHECK #7446 | 220.00 | |
| 06/02/08 | Private Dining-Dinner | #1734 : CHECK #2804 | 1,074.70 | |
| 06/02/08 | Broadband | #1734 | 70.00 | |
| 06/02/08 | Room Charge | | 1,950.00 | |
| 06/02/08 | Service Charge | | 195.00 | |
| 06/02/08 | Government Tax | | 58.50 | |
| 07/02/08 | CC-Visa | | | 10,520.90 |

I agree that my liability for this bill is not waived and agree to be held personally liable in the event that the indicated person, company or association fails to pay for any part or the full amount of these charges.

| | | |
|---|---|---|
| Total | 10,520.90 | 10,520.90 |
| Balance Due HKD | | 0.00 |

**Guest's Signature :**



**MARCO POLO**
HONGKONG HOTEL
HONG KONG

| | |
|---|---|
| Confirmation No. | 2040329 |
| Arrival | 03-02-08 |
| Departure | 07-02-08 |
| Room No. | 3729 |
| Cashier | HFOKIMMY |
| Folio No. | 140462 |
| Print Date | 12-02-08 |

Mr Paul Harvey Christensen
:US
United States

Page No          1 of 1

## INFORMATION INVOICE

| Date | Description | Reference | Debit HKD | Credit HKD |
|---|---|---|---|---|
| 03-02-08 | Room Charge | | 1,950.00 | |
| 03-02-08 | Service Charge | | 195.00 | |
| 03-02-08 | Government Tax | | 58.50 | |
| 04-02-08 | Broadband | #3729 | 250.00 | |
| 04-02-08 | Room Charge | | 1,950.00 | |
| 04-02-08 | Service Charge | | 195.00 | |
| 04-02-08 | Government Tax | | 58.50 | |
| 05-02-08 | Personal Bar | #3729 | 140.00 | |
| 05-02-08 | Room Charge | | 1,950.00 | |
| 05-02-08 | Service Charge | | 195.00 | |
| 05-02-08 | Government Tax | | 58.50 | |
| 06-02-08 | Room Charge | | 1,950.00 | |
| 06-02-08 | Service Charge | | 195.00 | |
| 06-02-08 | Government Tax | | 58.50 | |
| 07-02-08 | CC-Visa | | | 9,204.00 |

I agree that my liability for this bill is not waived and agree to be held personally liable in the event that the indicated person, company or association fails to pay for any part or the full amount of these charges.

| | | |
|---|---|---|
| Total | 9,204.00 | 9,204.00 |
| Balance Due HKD | | 0.00 |

**Guest's Signature :**



## MARCO POLO
### HONGKONG HOTEL
HONG KONG

Mr. William Hugh Young
18 Wood Sorrel Pl
LITTLE ROCK AR 72211
United States

| | |
|---|---|
| Confirmation No. | 2040332 |
| Arrival | 03/02/08 |
| Departure | 07/02/08 |
| Room No. | 1731 |
| Cashier | HFOKIMMY |
| Folio No. | 140464 |
| Print Date | 12/02/08 |

Page No          1 of 3

### INFORMATION INVOICE

| Date | Description | Reference | Debit HKD | Credit HKD |
|---|---|---|---|---|
| 03/02/08 | Room Charge | | 1,950.00 | |
| 03/02/08 | Service Charge | | 195.00 | |
| 03/02/08 | Government Tax | | 58.50 | |
| 04/02/08 | Broadband | #1731 | 250.00 | |
| 04/02/08 | L&V-Laundry | | 309.10 | |
| | 04338 | | | |
| 04/02/08 | Room Charge | | 1,950.00 | |
| 04/02/08 | Service Charge | | 195.00 | |
| 04/02/08 | Government Tax | | 58.50 | |
| 05/02/08 | Room Charge | | 1,950.00 | |
| 05/02/08 | Service Charge | | 195.00 | |
| 05/02/08 | Government Tax | | 58.50 | |
| 06/02/08 | Laundry & Valet-Adjustment | | -28.10 | |
| | TP-G 10% | | | |
| 06/02/08 | Room Charge | | 1,950.00 | |
| 06/02/08 | Service Charge | | 195.00 | |
| 06/02/08 | Government Tax | | 58.50 | |
| 07/02/08 | CC-Visa | | | 9,345.00 |

I agree that my liability for this bill is not waived and agree to be held personally liable in the event that the indicated person, company or association fails to pay for any part or the full amount of these charges.

*TP mileage will be credited to your "WorldPerks" account

| | Total | 9,345.00 | 9,345.00 |
|---|---|---|---|
| | Balance Due HKD | | 0.00 |

**Guest's Signature :**



# MARCO POLO
## HONGKONG HOTEL
馬哥孛羅香港酒店

## COMPANY CONFIRMATION

| To | : MS Szy | From | : Alice Chung / Reservations Dept. |
|---|---|---|---|
| Company | : Polybrite Intl Ltd | Fax No. | : (852) 2113-0033 |
| Tel No. / Fax No. | : 26771683 / 30054389 | Tel No. | : (852) 2113-3115 |
| Email | : ssy@polybrite.com | Email | : resv.hkh@marcopolohotels.com |
| No. of Pages (including this page): 1 | | Date. | : 10-JAN-08 |

We are pleased to confirm the following reservation(s):-

| | | | |
|---|---|---|---|
| Reservation Number | : 2040329 | Reservation Status | : FIT - Guaranteed |
| Guest Name(s) | : Mr Christensen, Paul Harvey | | |
| Arrival Date | : 03-FEB-08 | Departure Date | : 06-FEB-08 |
| Arrival Flight | : | Departure Flight | : |
| Arrival Time | : | Departure Time | : |
| Accommodation | : Continental Club Room | No. of Room(s) | : 1 |
| Daily Rate | : HKD 1,950.00 | No. of Adults/Children | : 1 / 0 |

*Room rates are subject to 10% Service Charge and 3% Government Tax per room per night.

For your information, our hotel check-in time is 14:00 and check-out time is 12:00 noon.

Requests:    Non Smoking Room Request

(All requests are subject to availability)

Payment:    All expenses incurred are on guest's personal account.

Non-Guaranteed Reservation :    Reservation(s) will be released after 18:00 on scheduled date of arrival.

Guaranteed Reservation :    All reservations are required to be guaranteed either by credit card (expiry date to be provided) or official company letter within 72 hours of making the booking. Non-guaranteed reservations will be released without prior notice. Cancellations must be received 72 hours prior to arrival to avoid a one-night cancellation charge.

Limousine Service :    Hotel limousine service between Hotel and Airport is available at HKD$550 per car per trip / HKD$1000 per roundtrip. Advance reservation required.

Shuttle Bus Service :    Shuttle bus service between Hotel and Airport is available at HKD$130 per person per trip - no reservation required.

☐ By Credit Card Number: _____    Expiry Date: _____

☐ By Company with Company Chop: _____

For above transportation service, please contact our yellow-jacketed Representative located at the Hotel Transport Counter (after clearing Customs) - Counter A16 outside Exit A or B16 outside Exit B.

We look forward to welcoming you to Marco Polo Hongkong Hotel.

**EXHIBIT**

tabbies®

24

Harbour City, Tsim Sha Tsui, Kowloon, Hong Kong  Tel: (852) 2113-0088  Fax: (852) 2113-0011
hongkong@marcopolohotels.com  www.marcopolohotels.com
Marco Polo Hongkong Hotel is the trading name of THE HONGKONG HOTEL LIMITED

# MARCO POLO
## HONGKONG HOTEL
馬哥孛羅香港酒店

## COMPANY CONFIRMATION

| | | | |
|---|---|---|---|
| To | : MS Szy | From | : Alice Chung / Reservations Dept. |
| Company | : Polybrite Intl Ltd | Fax No. | : (852) 2113-0033 |
| Tel No. / Fax No. | : 26771683 / 30054389 | Tel No. | : (852) 2113-3115 |
| Email | : ssy@polybrite.com | Email | : resv.hkh@marcopolohotels.com |
| No. of Pages (including this page): 1 | | Date. | : 10-JAN-08 |

We are pleased to confirm the following reservation(s):-

| | | | |
|---|---|---|---|
| Reservation Number | : 2040327 | Reservation Status | : FIT - Guaranteed |
| Guest Name(s) | : Mr Brenner, Richard James | | |
| Arrival Date | : 03-FEB-08 | Departure Date | : 06-FEB-08 |
| Arrival Flight | : | Departure Flight | : |
| Arrival Time | : | Departure Time | : |
| Accommodation | : Continental Club Room | No. of Room(s) | : 1 |
| Daily Rate | : HKD 1,950.00 | No. of Adults/Children | : 1 / 0 |

*Room rates are subject to 10% Service Charge and 3% Government Tax per room per night.

For your information, our hotel check-in time is 14:00 and check-out time is 12:00 noon.

Requests:    Non Smoking Room Request

(All requests are subject to availability)

Payment:    All expenses incurred are on guest's personal account.

Non-Guaranteed Reservation :    Reservation(s) will be released after 18:00 on scheduled date of arrival.

Guaranteed Reservation :    All reservations are required to be guaranteed either by credit card (expiry date to be provided) or official company letter within 72 hours of making the booking. Non-guaranteed reservations will be released without prior notice. Cancellations must be received 72 hours prior to arrival to avoid a one-night cancellation charge.

Limousine Service :    Hotel limousine service between Hotel and Airport is available at HKD$550 per car per trip / HKD$1000 per roundtrip. Advance reservation required.

Shuttle Bus Service :    Shuttle bus service between Hotel and Airport is available at HKD$130 per person per trip - no reservation required.

☐ By Credit Card Number: _____    Expiry Date: _____

☐ By Company with Company Chop: _____

For above transportation service, please contact our yellow-jacketed Representative located at the Hotel Transport Counter (after clearing Customs) - Counter A16 outside Exit A or B16 outside Exit B.

We look forward to welcoming you to Marco Polo Hongkong Hotel.

Harbour City, Tsim Sha Tsui, Kowloon, Hong Kong  Tel: (852) 2113-0088  Fax: (852) 2113-0011
hongkong@marcopolohotels.com  www.marcopolohotels.com
Marco Polo Hongkong Hotel is the trading name of THE HONGKONG HOTEL LIMITED



# MARCO POLO
## HONGKONG HOTEL
馬哥孛羅香港酒店
## COMPANY CONFIRMATION

| | | | |
|---|---|---|---|
| **To** | : MS Szy | **From** | : Alice Chung / Reservations Dept. |
| **Company** | : Polybrite Intl Ltd | **Fax No.** | : (852) 2113-0033 |
| **Tel No. / Fax No.** | : 26771683 / 30054389 | **Tel No.** | : (852) 2113-3115 |
| **Email** | : | **Email** | : resv.hkh@marcopolohotels.com |
| **No. of Pages (including this page): 1** | | **Date.** | : 10-JAN-08 |

We are pleased to confirm the following reservation(s):-

| | | | |
|---|---|---|---|
| **Reservation Number** | : 2040331 | **Reservation Status** | : FIT - Guaranteed |
| **Guest Name(s)** | : Mr Van Auken, Robert Hanlon | | |
| **Arrival Date** | : 03-FEB-08 | **Departure Date** | : 06-FEB-08 |
| **Arrival Flight** | : | **Departure Flight** | : |
| **Arrival Time** | : | **Departure Time** | : |
| **Accommodation** | : Continental Club Room | **No. of Room(s)** | : 1 |
| **Daily Rate** | : HKD 1,950.00 | **No. of Adults/Children** | : 1 / 0 |

*Room rates are subject to 10% Service Charge and 3% Government Tax per room per night.

For your information, our hotel check-in time is 14:00 and check-out time is 12:00 noon.

**Requests:**    Non Smoking Room Request

(All requests are subject to availability)

**Payment:**    All expenses incurred are on guest's personal account.

**Non-Guaranteed Reservation :**    Reservation(s) will be released after 18:00 on scheduled date of arrival.

**Guaranteed Reservation :**    All reservations are required to be guaranteed either by credit card (expiry date to be provided) or official company letter within 72 hours of making the booking. Non-guaranteed reservations will be released without prior notice. Cancellations must be received 72 hours prior to arrival to avoid a one-night cancellation charge.

**Limousine Service :**    Hotel limousine service between Hotel and Airport is available at HKD$550 per car per trip / HKD$1000 per roundtrip. Advance reservation required.

**Shuttle Bus Service :**    Shuttle bus service between Hotel and Airport is available at HKD$130 per person per trip - no reservation required.

☐ By Credit Card Number: _____    Expiry Date: _____

☐ By Company with Company Chop: _____

For above transportation service, please contact our yellow-jacketed Representative located at the Hotel Transport Counter (after clearing Customs) - Counter A16 outside Exit A or B16 outside Exit B.

We look forward to welcoming you to Marco Polo Hongkong Hotel.

Harbour City, Tsim Sha Tsui, Kowloon, Hong Kong  Tel: (852) 2113-0088  Fax: (852) 2113-0011
hongkong@marcopolohotels.com  www.marcopolohotels.com
Marco Polo Hongkong Hotel is the trading name of THE HONGKONG HOTEL LIMITED



# MARCO POLO
## HONGKONG HOTEL
馬哥孛羅香港酒店

## COMPANY CONFIRMATION

| To | : MS Szy | From | : Alice Chung / Reservations Dept. |
|---|---|---|---|
| Company | : Polybrite Intl Ltd | Fax No. | : (852) 2113-0033 |
| Tel No. / Fax No. | : 26771683 / 30054389 | Tel No. | : (852) 2113-3115 |
| Email | : ssy@polybrite.com | Email | : resv.hkh@marcopolohotels.com |
| No. of Pages (including this page): 1 | | Date. | : 10-JAN-08 |

We are pleased to confirm the following reservation(s):-

| | | | |
|---|---|---|---|
| Reservation Number | : 2040332 | Reservation Status | : FIT - Guaranteed |
| Guest Name(s) | : Mr Young, William Hugh | | |
| | | | |
| Arrival Date | : 03-FEB-08 | Departure Date | : 06-FEB-08 |
| Arrival Flight | : | Departure Flight | : |
| Arrival Time | : | Departure Time | : |
| Accommodation | : Continental Club Room | No. of Room(s) | : 1 |
| Daily Rate | : HKD 1,950.00 | No. of Adults/Children | : 1 / 0 |

*Room rates are subject to 10% Service Charge and 3% Government Tax per room per night.

For your information, our hotel check-in time is 14:00 and check-out time is 12:00 noon.

Requests:     Non Smoking Room Request

(All requests are subject to availability)

Payment:     All expenses incurred are on guest's personal account.

Non-Guaranteed Reservation :     Reservation(s) will be released after 18:00 on scheduled date of arrival.

Guaranteed Reservation :     All reservations are required to be guaranteed either by credit card (expiry date to be provided) or official company letter within 72 hours of making the booking. Non-guaranteed reservations will be released without prior notice. Cancellations must be received 72 hours prior to arrival to avoid a one-night cancellation charge.

Limousine Service :     Hotel limousine service between Hotel and Airport is available at HKD$550 per car per trip / HKD$1000 per roundtrip. Advance reservation required.

Shuttle Bus Service :     Shuttle bus service between Hotel and Airport is available at HKD$130 per person per trip - no reservation required.

☐ By Credit Card Number: _____     Expiry Date: _____

☐ By Company with Company Chop: _____

For above transportation service, please contact our yellow-jacketed Representative located at the Hotel Transport Counter (after clearing Customs) - Counter A16 outside Exit A or B16 outside Exit B.

We look forward to welcoming you to Marco Polo Hongkong Hotel.

Harbour City, Tsim Sha Tsui, Kowloon, Hong Kong  Tel: (852) 2113-0088  Fax: (852) 2113-0011
hongkong@marcopolohotels.com  www.marcopolohotels.com
Marco Polo Hongkong Hotel is the trading name of THE HONGKONG HOTEL LIMITED