**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **POLYBRITE INTERNATIONAL, INC.,** | ) | |
| **an Illinois Corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **NO.  08 C 1797** |
| | ) | **Judge R. W. Gettleman** |
| **RICHARD BRENNER, an individual,** | ) | **Mag. Judge N. R. Nolan** |
| **PAUL CHRISTENSEN, an individual, and** | ) | |
| **CHEE NGON WONG, an individual,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ANSWER TO VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

NOW COMES the Defendant, Paul Christensen, by his attorneys, Sigi M. Offenbach and

Philip L. Mandell of Pitler and Mandell, and for his Answer to the Verified Complaint for

Injunctive and Other Relief states as follows:

## NATURE OF THE CASE

1.          PolyBrite International is one of the world's leading developers of lighting

technology.  Over ten years, hundreds of shareholders have invested in excess of $45

million to nurture the Company's research, product development and marketing activities.

One of the defendants - its Director of Marketing and Sales in North America - forecasted in

2007 that PolyBrite's sales would explode, increasing by as much as $400 million annually

over a three year period. See Christensen July 30, 2007 email "Revised Projections" and

attachment, true and correct copies are attached hereto as Ex. 1. This action arises out of

defendants' scheme to steal success from PolyBrite by defrauding it out of millions of

dollars.

>**ANSWER:** This Defendant denies that Polybrite International, Inc. ("Polybrite") is one of
>the world's leading developers of lighting technology and affirmatively states that
>Polybrite was virtually a start up company and almost every year lost significant sums of
>money.   As for the second sentence of this allegation Defendant neither admits nor
>denies this allegation as the Defendant has insufficient knowledge to form a belief as to
>the truth or accuracy of the allegation.   As for the third sentence of the allegation, this
>projection was simply a projection formulated by Ms. Sandra Goeken Miles and refined
>by this Defendant and were extremely optimistic projections based on the potential
>occurrence of every fortuitous incident.   As for the answer to the last sentence, this
>Defendant denies participation in any scheme to harm Polybrite and affirmatively states
>that during his employment at Polybrite he made every effort to make Polybrite a
>successful enterprise.

2.          Defendant Richard Brenner ("Brenner") was Executive Vice President and
Chief Operating Officer of PolyBrite. He was employed by PolyBrite for more than six years.
He was fired on November 14, 2007. Defendant Paul Christensen ("Christensen") was
PolyBrite's Director of Marketing and Sales. He resigned on November 27, 2007.
Defendant Chee Ngon ("CN Wong" or "Wong") was employed by PolyBrite to run its Hong
Kong office. He was Vice President of PolyBrite for Asia-Pacific. He resigned on December
17, 2007, effective January 21, 2008.

**ANSWER:** This Defendant makes no response as to the allegations concerning the other Defendants, but as for himself, he was never an executive of Polybrite and he resigned on November 26, 2007 and not on November 27, 2007.

3.       At all times relevant to this Complaint, Brenner, Christensen and Wong were senior executives of PolyBrite, all of whom were privy to the most sensitive and confidential information of PolyBrite.

**ANSWER:** This Defendant makes no response as to the allegations concerning the other Defendants, but as for himself, he was never an executive of Polybrite, had no executive rank and had no trade secret information of Polybrite.

4.       Sometime prior to January, 2007, and at a time better known to themselves, Brenner and CN Wong entered into a conspiracy to subvert the interests of PolyBrite with its customers and prospective customers. This conspiracy was later joined by Christensen. They formulated and executed a business plan to compete with PolyBrite while still employed by PolyBrite. They and other co-conspirators actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers and by forming a business entity, CDW Lighting Technologies, to compete against PolyBrite.

**ANSWER:** This Defendant makes no response as to the allegations concerning the other Defendants, but as for himself, he never joined a conspiracy, he knew nothing about the formation and business of CDW and did nothing during his term of employment to compete against Polybrite or solicit Polybrite's customers or prospective customers.

5.       In order to further their goals, defendants entered into an active, covert

campaign to destroy PolyBrite's existing business relationships, including its relationship with the company that manufactured its products, Wellstar Electronics, Limited. Defendants hid their actions by filing false reports with PolyBrite. Defendants entered into agreements with third parties to compete surreptitiously with PolyBrite. Defendants misappropriated financial, marketing and technical product information, all of which was confidential. Defendants have used this information to harm PolyBrite and further their personal financial goals. Defendants actively competed, and continue to compete, in the market through a company secretly organized by them beginning not later than February 13, 2007.

**ANSWER:** The Defendant denies that he ever attempted to destroy any of Polybrite's existing business relationships or filed any false reports during the term of his employment at Polybrite. The Defendant denies each and every allegation of this paragraph as it relates to him and affirmatively states that he never organized or participated in the organization of any company during the term of his employment at Polybrite.

## PARTIES

6.          Plaintiff PolyBrite International, Inc. is a corporation duly formed and existing under the laws of Illinois. PolyBrite is a citizen of the State of Illinois. PolyBrite is a wholly-owned subsidiary of Goeken Group Corp. PolyBrite was founded in 1995.

**ANSWER:** The Defendant believes these allegations to be true.

7.          Defendant Richard Brenner is an individual residing at 372 Ameno Drive East, Palm Springs, California. He is a citizen of the State of California. He was hired by PolyBrite

4

in 2001 as PolyBrite's Vice-President of Consumer Sales. He was elevated to Executive Vice President and Chief Operating Officer ("COO") in 2004.  Mr. Brenner's employment with PolyBrite was terminated on November 14, 2007.

     **ANSWER:**  The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.

8.     Defendant Paul H. Christensen is an individual residing at 24 West Lane, South Salem, New York. Mr. Christensen is a citizen of the State of New York. He was hired on June 12, 2006. He served as PolyBrite's Director of Marketing & Sales - North America. Mr. Christensen resigned on November 27, 2007.

     **ANSWER:**  The Defendant admits the first three sentences of this paragraph, but denies the last sentence as he resigned on November 26, 2007.

9.     Defendant Chee Ngon ("CN") Wong was employed by PolyBrite on January 16, 2004 as Vice President for Asia Pacific affairs. In addition, Mr. Wong was a director of PolyBrite Asia Limited, a wholly-owned subsidiary of PolyBrite which was formed for the specific purpose of doing business in Asia. CN Wong is a resident of the Hong Kong Special Administrative Region of the People's Republic of China (commonly referred to as "Hong Kong"), residing at 1/F, 68 J, Ma Liu Shui San Tseun, Fanling, N T Hong Kong, China. He is a citizen of the People's Republic of China. He left the employ of PolyBrite on January 21, 2008.

     **ANSWER:**  This Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or

accuracy of the allegations, but states that he understood that Mr. Wong had announced his separation from a subsidiary of Polybrite some time in November of 2007.

## JURISDICTION AND VENUE

10.         This Court has jurisdiction of this action as to Defendants Brenner and Christensen pursuant to 28 U.S.C. §1332(1) in that this is an action between citizens of different States where the matter in controversy exceeds the amount of $75,000, exclusive of interest and costs.

**ANSWER:** The Defendant admits this allegation.

11.         This Court has jurisdiction of this action as to Defendant Wong pursuant to 28 U.S.C. §1332(2) in that this is an action between citizens of a State and citizens or subjects of a foreign state where the matter in controversy exceeds the amount of $75,000, exclusive of interest and costs.

**ANSWER:** The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.

12.         Venue of this action is proper in this district pursuant to 28 U.S.C. 1339(a) in that a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district.

**ANSWER:** The Defendant admits this allegation.

## NON-PARTY ACTORS

6

13.       Goeken Group Corp. is a Delaware corporation registered to do business in the State of Illinois. Goeken Group Corp. is the parent corporation of PolyBrite. Goeken Group Corp. was founded by John "Jack" Goeken, who also founded Microwave Communications Inc., better known as MCI. He subsequently founded FTD Mercury Network (flower delivery), Airfone (later sold to GTE), In-Flight PhoneCorp. and many others.

   **ANSWER:**  The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.

14.       Borealis Lighting ("Borealis") is a brand name used by PolyBrite. PolyBrite manufactures solid-state LED lighting systems and products under the Borealis brand.

   **ANSWER:**  The Defendant admits the allegation in the first sentence and neither admits nor denies the allegations in the second sentence, as he does not have sufficient knowledge and belief to form a belief as to the truth or accuracy of these allegations.

15.       Commercial Electric LLC ("Commercial Electric") is an Arkansas Limited Liability Company that entered into a distribution contract with PolyBrite.

   **ANSWER:**  The Defendant believes this allegation to be true.

16.       Phil K. Gamache is President and CEO of Commercial Electric. Mr. Gamache worked closely with Paul Christensen pursuing large commercial accounts, including Dillard's department stores.

**ANSWER:**  The Defendant believes that the first sentence of this allegation is true, but as for the second sentence states that he had little contact with Mr. Gamache and worked with William Young as the key contact account manager of Commercial Electric.

17.        Robert Van Auken is an employee of Commercial Electric. At all times relevant to this Complaint he was its executive vice president.

**ANSWER:**  The Defendant believes this allegation to be true.

18.        William Young is an employee of Commercial Electric. At all times relevant to this Complaint he was in charge of business development and commercial lighting for Commercial Electric.

**ANSWER:**  The Defendant believes the first sentence of this allegation to be true, but as to the second sentence has no personal, first hand knowledge.

19.        Solid State Solutions LLC is an Arkansas limited liability company. The Arkansas Secretary of State website shows that Solid State Solutions filed its Articles of Incorporation on November 19, 2007 and lists Phil Gamache as "owner."

**ANSWER:**  The Defendant believes this allegation to be true.

20.        Patrick Mullins is an expert in electro-optics, including LEDs.

**ANSWER:**   The Defendant neither admits nor denies this allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.

21.        Virgil Cheng is a resident of the Hong Kong Special Administrative Region of the People's Republic of China. He is a citizen of the People's Republic of China. He is an

engineer who served as a contractual consultant to PolyBrite.

**ANSWER:** The Defendant neither admits nor denies this allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.

22. CDW Lighting Technologies Limited is a corporation organized under the laws of the Hong Kong Special Administrative Region of the People's Republic of China. It was formed by Richard Brenner, CN Wong, WN Wong and Virgil Cheng on February 12, 2007. From at least February of 2007 CDW actively competed with PolyBrite. It sold and advertised a line of lighting products that was in every way identical to PolyBrite's.

**ANSWER:** The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation and affirmatively states that he had no involvement or knowledge of this alleged entity.

23. Shirley Sy was Assistant to Vice President of PolyBrite's Hong Kong office. She resigned from PolyBrite in December, 2007.

**ANSWER:** The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.

## FACTUAL ALLEGATIONS RELEVANT TO ALL COUNTS

24. PolyBrite serves international and domestic customers from its headquarters in Naperville, Illinois. Its products are available worldwide through distributors, retail stores,

websites and catalogs.

    **ANSWER:**  The Defendant believes these allegations to be true.

25.       PolyBrite has developed - and continues to develop - cutting edge technology that disperses light through a flexible polymer lens illuminated by light emitting diodes (LEDs). PolyBrite's polymer technology is extruded into a variety of clear, light scattering shapes, as well as certain molded applications. In addition to being extremely rugged, LEDs consume very little energy. PolyBrite has engineered advanced thermal management techniques, efficient and compact power supplies leading to more lumens per watt and greater efficiency in sophisticated LED applications.

    **ANSWER:**  The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation concerning any technical information concerning polymer technology, but affirmatively states that there are many competitors in the field of LED's, including, but not limited to GE (Lumination), Sloan LED Lighting, Sylvania (Osram), Permlight, Lemnis, Agilight, Stylmark, Bartco, Phoster and Phillips (Lumelids, Color Kinetics, Thomas Lighting Fixtures).

26.       PolyBrite's engineering versatility and design capability has resulted in creating state of the art LED systems that are incorporated into a diverse and wide range of energy efficient and "green" products for aerospace, military, pet and safety industries and unique lighting systems and LED based light bulbs (lamps).

    **ANSWER:**  The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or

10

accuracy of the allegations, but affirmatively states that during his months at Polybrite, Polybrite had many difficulties in creating LED systems due to the fact that many of its suppliers were not being paid on a timely basis.

27.        At all times relevant to the Complaint, the vast majority of PolyBrite bulbs and products were manufactured in China. PolyBrite entered into a strategic relationship with Vigor Precision Limited ("Vigor"), a high precision injection molding assembly company. Vigor is headquartered in Hong Kong and operates three manufacturing facilities in China. At certain times Vigor manufactured PolyBrite's products at its plants in China.

**ANSWER:** The Defendant admits the first allegation in this paragraph.  The Defendant neither admits nor denies the remaining allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.

28.        Wellstar Electronics Limited ("Wellstar Electronics") is a wholly-owned subsidiary of Vigor headquartered in Hong Kong, with manufacturing facilities in China. Wellstar had not previously produced products similar to those that it manufactured for PolyBrite. It did not have expertise in solid state lighting and relied on PolyBrite to provide the technical expertise to produce its products.

**ANSWER:** The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

29.        In recent years the majority of PolyBrite's production took place at the Wellstar Electronics manufacturing facility. PolyBrite has paid in excess of $3.5 million

dollars to Wellstar for products manufactured by it and for tooling, for which PolyBrite paid $429,000.00.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation, but the Defendant is aware that during times of his employment, Polybrite owed Wellstar Electronics large sums of money which were past due.

**RICHARD BRENNER**

30.        On August 13, 2001, Illumination Polymer Technologies, Inc., now known as PolyBrite, made an offer of employment to Defendant Brenner. He accepted and became PolyBrite's Vice President of Consumer Sales. He was paid a base salary of $120,000 per year, plus incentives. A true and correct copy of Brenner's Offer of Employment is attached hereto as Ex. 2. On September 14, 2001 Defendant Brenner executed the Goeken Group Corporation Employee Agreement. A true and correct copy of Brenner's Employee Agreement is attached hereto as Ex. 3. At the time Mr. Brenner joined PolyBrite, he was working for a company known as Cats USA Pets Control California in its sales group. Mr. Brenner had never worked in the lighting industry before joining PolyBrite. He had no technical background relating to the products manufactured by PolyBrite prior to becoming one of its employees. His educational background is in finance and accounting. At the time he left the employ of PolyBrite, his base salary was $180,000 per year.

        **ANSWER:** The Defendant neither admits nor denies the allegations contained in

12

this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations

31.　　　　As COO, Defendant Brenner was the second highest ranking officer of the company. He reported directly to the company's Chief Executive Officer, Carl Scianna. As COO, Mr. Brenner was privy to PolyBrite's most sensitive and confidential information. He had unfettered access to financial, marketing, technical and production information that was available in its entirety to only one other person in the company, the Chief Executive Officer. As part of his duties as COO, Mr. Brenner oversaw the activities of PolyBrite's Hong Kong office. The Hong Kong office was in turn run by Defendant CN Wong. Mr. Brenner was also directly responsible for the manufacture of PolyBrite products, including those manufactured in Asia. Mr. Brenner was a fiduciary of PolyBrite.

> **ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

## CN WONG

32.　　　In June of 2003, PolyBrite hired CN Wong. Mr. Wong was hired by PolyBrite to oversee manufacturing in China. His title was "Vice President, Asia Pacific." At all times relevant to this Complaint, CN Wong reported directly to Defendant Brenner. Defendant Wong was a fiduciary of PolyBrite. He introduced PolyBrite to Wellstar, which manufactured PolyBrite's products in China. Mr. Wong was responsible for the day-to-day contacts of PolyBrite with Vigor and Wellstar. Mr. Wong was responsible for working with Wellstar and

Vigor to ensure that production schedules were met, and to ensure that quality of produced goods met PolyBrite's standards. He was also required to report on these matters to PolyBrite's Chief Operating Officer, Richard Brenner, as well as its President, Carl Scianna.

    **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

33.        It was Defendant Wong's responsibility to locate an alternative manufacturer to produce PolyBrite's products in China.

    **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

## PAUL CHRISTENSEN

34.        On June 12, 2006, PolyBrite entered into an employment agreement with Paul Christensen. A true and correct copy of Christensen's Employee Agreement is attached hereto as Ex. 4. Christensen was hired as Director of Sales and Marketing - North America. He was paid a base salary of $120,000 per year, plus incentives. A true and correct copy of Christensen's Employment Application is attached hereto as Ex. 5.

    **ANSWER:**  The Defendant admits the allegations in the first sentence of this paragraph, but affirmatively states that paragraph 6 of the agreement is unenforceable and is void as a matter of law.  The Defendant admits the remaining allegations in this

paragraph except that his true title was Director of Sales and Marketing of Signage in North America.

35.         In his capacity as Director of Sales and Marketing-North America, Mr. Christensen was personally responsible for some of PolyBrite's most important accounts, including Macy's, Neiman Marcus, Dillard's, Autozone, Beck's and Walmart. In relation to these and other accounts, he had unfettered access to marketing, technical, financial and production information. Mr. Christensen began reporting directly to Defendant Brenner some time before May, 2007. Mr. Christensen worked closely with a distributor of PolyBrite's products, Commercial Electric, LLC, an Arkansas limited liability company, providing support to its employees in sales efforts. Though not an officer of the corporation, Mr. Christensen was a high managerial agent of PolyBrite. He was one of its highest paid employees. He had exclusive charge of some of its most important accounts. He exercised a high degree of autonomy and discretion in performing his duties, requiring PolyBrite to repose a high degree of trust and confidence in him. Mr. Christensen was a fiduciary of PolyBrite. Before being employed by PolyBrite, Christensen had no technical knowledge of, or experience with, solid state ("LED") lighting. Immediately prior to being hired by PolyBrite, Christensen worked as a commercial photographer.

**ANSWER:**  The Defendant admits that his title was Director of Sales and Marketing-North America, but denies that he was personally responsible for some of Polybrite's most important accounts.  He affirmatively states that when he was hired, he simply attempted to sell signage products in North America.  As for Polybrite's accounts, the Defendant basically worked as a sales associate under Sandra Goeken Miles, a member of the Board

15

of Directors of the Goeken Group and the chief contact with many of Polybrite's customers and potential customers.  The allegation that Macy's was a customer of Polybrite is inaccurate as to the Defendant's knowledge; Macy's was not a customer of Polybrite. Nieman Marcus and Dillard's were not customers of Polybrite, but were customers of Commercial Electric, which operated as a distributor of Polybrite.  To this Defendant's knowledge Autozone, Belk's [mistyped as Beck's] and Walmart were not customers of Polybrite.  This Defendant did not have unfettered access to technical and financial data concerning Polybrite as he was not an executive of the company and was unaware of any sensitive financial or technical data.  This Defendant admits that he reported to Mr. Brenner in May of 2007 and that he worked with Commercial Electric.  He admits he was not an officer of Polybrite and he denies that he was a high managerial agent of Polybrite, but merely an account executive selling a small portion of Polybrite's produces and just in North America.  He exercised the same degree of autonomy and discretion that any sales agent would have and did not have any significant managerial responsibility.  The Defendant does not deny a fiduciary duty to his employer.  The Defendant denies the last two allegations of this paragraph as he possessed substantial and extensive expertise in lighting and lighting technology and prior to being hired by Polybrite, he served as an independent, commission only, sales representative for PolyBrite and successfully closed the Duane Reade Pharmacy and Lord and Taylor accounts for PolyBrite's signage products, prior to joining the company as an employee in June of 2006.

## UNLAWFUL CONDUCT OF DEFENDANTS

16

**The Secret Creation Of A Competing Company By Defendants Brenner And Wong**

36.        Unknown to PolyBrite, and affirmatively hidden from it, Defendants Brenner and Wong prepared a business plan for an entirely new entity referred to in the business plan as Wellstar Lighting, LLC ("Wellstar Lighting"). See Wellstar Lighting's Business Plan, a true and correct copy of which is attached hereto as Ex. 6. This occurred in 2006. The Wellstar Lighting Business Plan was created by Defendant Brenner, using PolyBrite's computer, not later than December, 2006.

   **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations

37.        According to Wellstar Lighting's business plan, its mission was "to be a leading company designer manufacturer of High Brightness Solid State Lighting ("HBSSL") lamps and modular light engines for commercial, industrial and residential applications. Such products that provide enhanced lighting quality, substantial energy savings, substantial product life, and thereby improving people's quality of life at work and at home, while conserving the Earth's natural resources." See Ex. 6, p. 6.

   **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

38.        The Wellstar Lighting Business Plan named four founders. It stated that two of its founders, "Mr. Richard Brenner and Mr. CN Wong were previously senior executives at PolyBrite International, an SSL (solid state lighting) products company, working to

17

develop and launch PolyBrite's line of decorative and general illumination lamps, as well as the company's channel letter lighting system." Ex. 6, p. 6.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

39.        The Wellstar Lighting Business Plan called for Wellstar Electronics to manufacture products in direct competition with PolyBrite: "Wellstar Electronics, a Hong Kong based manufacturing company embracing nearly three years experience in HBSSL [high brightness solid state lighting] design, prototyping, tooling and manufacturing, and is immediately prepared to manufacture the full line of HBSSL lamps to WLI . . . Wellstar Electronics is managed by Mr. WN Wong, a founding member of WLI [Wellstar Lighting LLC]." Ex. 6, p. 6. The experience referenced by Wellstar Electronics in HBSSL design, prototyping, tooling and manufacturing was that which its principals obtained by working with PolyBrite.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

40.        The Wellstar Lighting Business Plan identified Virgil Cheng as its fourth founder. Virgil Cheng, CN Wong and WN Wong are long time personal friends. They attended school together and have been friends ever since.

18

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

41.    The Wellstar Business Plan stated, "The founders anticipate the Commercial users realizing acceptable payback periods, as well as large lighting OEMs (original equipment manufacturers), will be target customers in 2007."

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

42.    At the same time Defendants Brenner and Wong created the Wellstar Lighting Business Plan, Brenner made plans to relocate his home to California. He entered into a contract to purchase a home in Palm Springs during the December holidays of 2006. He never informed anyone at PolyBrite of his intention to do so. In a letter dated January 19, 2007 Richard Brenner wrote to Countywide Home Loans explaining that he was relocating to Southern California where his career would focus on energy saving lighting technology. See Brenner January 19, 2007 letter, a true and correct copy is attached hereto as Ex. 7. Brenner hid from PolyBrite that he sold his house in Illinois and relocated his wife to California.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

43.    A search of files backed up from Defendant Brenner's computer showed that

on January 27, 2007 Defendant Brenner listed alternative names for the new business enterprise:

      1.    CD2 Lighting Technologies
      2.    WCD Lighting Technologies
      3.    Power2 Lighting Technologies
These alternative names were followed by the names:

      CN Wong
      WN Wong
      Virgil Cheng
      Dick Brenner

See list of names document, a true and correct copy is attached hereto as Ex. 8.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

44.      On February 12, 2007, CDW Lighting Technologies Limited ("CDW") was created. The address of CDW and Wellstar Electronics Ltd. are one in the same: Flat A2, 10/FL Block A, Texaco Road Industrial Centre, Texaco Road, Tsuen Wan, Hong Kong.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

45.      On February 13, 2007, CDW Lighting Technologies Limited created a website (www.cdwlighting.com) in which it advertised a full line of "high brightness solid state illumination products for commercial, industrial and residential applications." The products advertised by CDW Lighting Technologies are PolyBrite's products. CDW used pictures of PolyBrite's bulbs on its website. See screenshots of www.cdwlighting.com, true and correct

copies are attached hereto as Ex. 9. That website continues to exist to the date of the filing of the instant Complaint. The actions of CDW made it a direct competitor of PolyBrite.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

46.        On February 21, 2007, one week after creating a company to compete directly with PolyBrite, Richard Brenner recommended to Carl Scianna that one of Brenner's co-conspirators, CN Wong, be given a $50,000.00 per annum raise. Based upon Mr. Brenner's recommendation, Mr. Wong's salary was increased on March 15, 2007 to $125,000.00 per year. Effective June 15, 2007, Mr. Wong's salary was increased to $150,000.00 per year.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.


**GUANGZHOU LIGHT FAIR**
**6/8/07 to 6/11/07**

47.        The Guangzhou Light Fair, held from June 6, 2007 through June 11, 2007, was an opportunity for PolyBrite to exhibit its products at the largest lighting show in Asia. It was attended by over 45,000 people. Exhibitors came from twenty-two countries. Although PolyBrite had exhibited at the Light Fair in 2006, CN Wong actively dissuaded PolyBrite from participating at the fair in 2007. He told PolyBrite management on numerous occasions that they should not attend the fair. Defendant Brenner, knowing that CDW

21

Lighting Technologies Limited would be participating at the fair, also attempted to dissuade others from PolyBrite from attending this exhibition. Defendant Brenner made the decision not to allow PolyBrite to exhibit at the exhibition, even though it previously registered and paid a deposit.

     **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

48.        CN Wong, Virgil Cheng and WN Wong arranged to exhibit CDW's wares at the exhibition. CDW Lighting Technologies was listed as an accredited exhibitor on the list along with over 1,300 other manufacturers and suppliers. See 2007 Exhibitor List, a true and correct copy is attached hereto as Ex. 10. By this time CDW was, according to its advertising, fully up and running. In addition, CN Wong, Virgil Cheng and WN Wong were actively communicating from email addresses which included the domain "cdwlighting.com." See cdwlighting.com emails, true and correct copies are attached hereto as Ex. 11.

     **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

49.        CDW's participation at the Guangzhou Light Fair was an act of direct competition with PolyBrite.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

## ALTERNATIVE MANUFACTURING IN CHINA

50.        For approximately two years prior to August, 2007, PolyBrite sought alternative manufacturing facilities to those of Vigor & Wellstar. The responsibility of locating a new manufacturer was entrusted to CN Wong, PolyBrite's representative in Hong Kong. He, in turn, reported to Defendant Richard Brenner. In August of 2007, CN Wong was asked to provide a status report on his progress of finding an alternative manufacturer. Defendant Brenner responded for CN Wong. Both Mr. Brenner and Mr. Wong were aware that it was extremely important to locate an alternative manufacturer in China. Carl Scianna, President of PolyBrite, had told them that PolyBrite was going to produce light bulbs for Osram Sylvania ("Sylvania"), and that Sylvania would not approve Vigor or Wellstar production facilities to be used for that purpose.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

51.        Defendant Brenner, replying for CN Wong, said that he would soon be traveling to Hong Kong, and that he would ask CN Wong to make appointments for him with several manufacturers so that he could further the selection process. See Brenner August 21, 2007 email "China," a true and correct copy is attached hereto as Ex. 12.

23

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

52.        In truth and in fact, contrary to what Defendant Brenner said, he had no intention of identifying another manufacturer with which PolyBrite could do business. Neither did CN Wong. On information and belief, CDW was using the production molds made for, and owned by PolyBrite, all of which were physically located at Wellstar Electronics, its current manufacturer. WN Wong, one of the owners of CDW, was also a principal of Wellstar Electronics. If a new manufacturer were identified and contracted with, it would be the end of CDW's manufacturing capabilities. Hence, to the day he was terminated, Defendant Brenner resisted PolyBrite's attempts to contract with an alternative manufacturer. CN Wong did the same. Wellstar Electronics has allied itself with defendants and their competing company, CDW Lighting Technologies Limited. As a result, plaintiff has been unable to manufacture its products. Wellstar Electronics has refused to turn over PolyBrite's production molds. The reasons given for not returning the molds are pretextual. CDW Lighting Technologies Limited is now selling bulbs designed by PolyBrite.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

## SUBVERSION OF POLYBRITE'S RELATIONSHIPS

53.        PolyBrite has spent millions of dollars in research, design and testing of its

products.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

54.        It has targeted large commercial enterprises for the sale of certain products, including Dillard's Department Stores, which operates three hundred fifty retail stores from the Atlantic to the Pacific seaboards.

**ANSWER:**  The Defendant admits that through his relationship with Commercial Electric, he made presentations to Dillard's.  Dillard's was not a customer of Polybrite, but rather Polybrite always worked through Commercial Electric to make any presentation to Dillard's.  In fact there was never any direct contact with representatives of Dillard's without a representative of Commercial Electric present.

55.        On April 19, 2007, Commercial Electric and PolyBrite entered into an Authorized Distributor Agreement (the "Agreement"). See Authorized Distributor Agreement, a true and correct copy is attached hereto as Ex. 13. By that Agreement, Commercial Electric was authorized to distribute "those certain items manufactured or sold by PolyBrite generally identified as LED lamps or LED systems that are indicated by PolyBrite's representatives in writing and shall include PolyBrite's Borealis Lighting Systems products." Ex. 13, § 9.1.

**ANSWER:**  The Defendant admits the allegations in this paragraph.

56.        Early in the summer of 2007, Commercial Electric and PolyBrite began a joint marketing program relating to PolyBrite's effort to develop a product to meet the particular

25

need of a Commercial Electric customer, Dillard's Department Store.

**ANSWER:**  The Defendant denies this allegation and affirmatively states that in spring of 2007, Commercial Electric and Polybrite entered into a co-development agreement in order to enter an on going competition for wrist watch and fashion jewelry display case lighting to be installed in newly constructed Dillard's stores.

57.        On August 27, 2007, Defendant Paul Christensen informed executive management of PolyBrite and the Goeken Group that Dillard's had committed to purchase PolyBrite's linear LED alternative to florescent lighting for its jewelry display cases. He noted in his report that, among the things necessary to achieve this level of sales, PolyBrite had to "[p]roceed with UL" (Underwriter's Laboratory). See Christensen's August 27, 2007 email "Dillard's Contact Report," a true and correct copy is attached hereto as Ex. 14.

**ANSWER:**  The Defendant admits that he authored Exhibit 14, but denies the Plaintiff's characterization of this document which states that Dillard's agreed to a two year program, but it was necessary to obtain UL [Underwriter's Laboratory] approval, to modify the product and to build suitable samples prior to being able to ship product to Dillard's.  The report further states that Dillard's was continuing to purchase product from one of Polybrite's competitors, Stylmark, ordering $100,000.00 of their product.  The report indicates that the Polybrite has much to accomplish in order to win the account from Stylmark, the product manufacturer which Dillard's already purchased.

58.        On September 13, 2007, Paul Christensen projected that Dillard's alone would spend $7.8 million on PolyBrite's linear lighting in 2008. See Christensen's September 13, 2007 email "Projections" and attachment, true and correct copies are

attached hereto as Ex. 15.

**ANSWER:** The Defendant admits that he authored Exhibit 15, but further affirmatively states that the basis of the projections was that Dillard's would build at least eight new stores and it has reduced its projections because of the lagging economy and that Polybrite would adequately support the development of the linear lighting product, which it did not. In fact Polybrite's efforts in selling the product to Dillard's was almost halted due to the fact that Polybrite had not paid many of its key suppliers on this project in a timely fashion.

59.    Paul Christensen was responsible for supervising the Dillard's project. Indeed, on October 12, 2007 he wrote an email to PolyBrite, Vice President, Engineering, Raymond Janik and COO Richard Brenner in which he stated he was "prepared to function as project manager and advance both [Dillard's and Florida Plastics (sign maker for McDonald's)] through the UL process." See Christensen's October 12, 2007 email "Production Status Items," a true and correct copy is attached hereto as Ex. 16. Although he routinely spoke to Carl Scianna and Raymond Janik, PolyBrite's chief engineer, he never suggested to either of them that the project was in jeopardy for failure to meet the customer's requirements. From the time that he took over the effort to obtain UL approval, Christensen represented, directly or by implication, that the UL approval process was going according to schedule and was not a critical issue in regard to PolyBrite's relationship with Dillard's.

**ANSWER:** The Defendant admits that he was a key contact on the Dillard's account and that he authored Exhibit 16, but affirmatively states that he would help manage the UL process, but as a sales person he would need the technical expertise of engineers to

27

complete the UL process.  He affirmatively states that he could not proceed with the UL

process as Polybrite was so delinquent in paying its suppliers on this project that the UL

process basically stopped through no fault of the Defendant.   The Defendant denies the

last two sentences of this paragraph as all officers of Polybrite knew that Dillard's would

never accept a product in its stores without UL approval and that the UL process was not

going smoothly as Polybrite was extremely tardy paying the key vendors for the operable

samples which were to be submitted to UL.

60.        Four weeks later, on November 8, 2007, Defendant Christensen filed a

Contact Report from Little Rock, Arkansas. In that Contact Report he included the following

information regarding the Dillard's account:

> The management team at CE is expressing a dual signal. One
> is appreciation for the continued sales support. We have
> supplied them with training, printed materials and sales staff.
>
> The other signal is one of rising concern. They are growing
> impatient with our progress to advance several portions of the
> Dillard's account. We have not advanced the additional
> prototype requests for the additional sizes in lamps and power
> supplies and the UL the qualification process.
>
> They remind us that the Dillard's requirements are UL on all
> lamps and fixtures before it will be accepted for installation,
> and that Dillard's will not tolerate late delivery. One missed
> delivery date will cancel all future orders.

See Christensen November 8, 2007 Contact Report, a true and correct copy is attached

hereto as Ex. 17. Not until this date did Christensen suggest any urgency relating to the

Dillard's project.

**ANSWER:** The Defendant admits this contact report, but denies the final allegation

as he informed the officers of Polybrite that the UL approval was absolutely critical for

28

the project and that when dealing with a large national department store, a supplier has to be prompt with all deliveries and requirements.

61.        On November 9, 2007, Phil K. Gamache wrote a letter to Carl Scianna expressing his "concern regarding a perceived lack of urgency . . . as it relates to shepherding the linear LED array through the UL approved process and ultimately through production." See Gamache November 9, 2007 letter, a true and correct copy is attached hereto as Ex. 18.

**ANSWER:**  The Defendant admits that Exhibit 18 appears to be a true copy of a letter from Mr. Gamache.

62.        On November 13, 2007, Carl Scianna responded to Mr. Gamache's letter. He stated that he "had been informed that the project was operating smoothly." In addition, he noted the project had been handled by Paul Christensen with whom Gamache had a meeting days before, and to whom Gamache was speaking regularly about this project. See Scianna November 13, 2007 letter, a true and correct copy is attached hereto as Ex. 9.

**ANSWER:**  The Defendant admits that Exhibit 19 appears to be a true copy of a letter from Mr. Scianna, but states that the letter does not need interpretation and the Defendant further affirmatively states that his contact at Commercial Electric was Mr. Bill Young and not Mr. Gamache and that he informed Mr. Scianna of the critical nature of this project.

63.        On November 16, 2007, Phil Gamache, President and CEO of Commercial Electric, called PolyBrite's CEO, Carl Scianna, and told him that Commercial Electric would no longer pursue the development of the linear LED display case for Dillard's with

PolyBrite. The stated reasons for Commercial Electric's decision not to participate in the development of the linear LED product were false and pretextual. They were known by both Brenner and Christensen to be false and pretextual, neither of whom disclosed this fact to PolyBrite. See Gamache November 20, 2007 letter, a true and correct copy is attached hereto as Ex. 20.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in the first two sentences of this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations. The Defendant denies the allegation concerning that he knew that Commercial Electric's reasons for the termination of the project were false and pretextual, as he was not told the reasons by Mr. Gamache, but knew the project would be in jeopardy due to the fact that Polybrite did not proceed with the UL approval on a timely manner as Polybrite was so delinquent with the payment of important suppliers on this project, that suppliers would not provide the necessary operating production samples to submit to UL.

64.        Although Christensen was made responsible for the UL Listing at his own request, he did nothing to accomplish it.

**ANSWER:** The Defendant denies the allegation that he was made responsible for the UL listing as he was not an engineer and no executive of the company designated him as the responsible party and he affirmatively states that he did everything in his power to accomplish the UL listing, including requesting that an officer of the company contribute money to pay the suppliers so that Polybrite could obtain working samples of the product to be submitted to UL.

65.        On November 19, 2007, Phil Gamache caused Solid State Solutions LLC ("Solid State") to be formed in Arkansas. Solid State's address is the same as Commercial Electric's.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

66.        On November 27, 2007, Defendant Christensen resigned. Subsequent to the termination of their employment from PolyBrite, Commercial Electric engaged Brenner and Christensen as consultants.

**ANSWER:**  The Defendant denies this allegation and affirmatively states that he resigned from Polybrite on November 26, 2007.  The Defendant admits the allegation in the second sentence.

67.        On November 28, 2007, Commercial Electric hosted a meeting in Maumelle, Arkansas. One of those attending was Patrick Mullins, an expert in electro-optics, including LED's. Among those in attendance were Richard Brenner, Paul Christensen, Robert Van Auken and Bill Young of Commercial Electric.

**ANSWER:**  The Defendant admits this allegation.

68.        Mr. Mullins had met Paul Christensen on a prior occasion. He had never met Defendant Brenner before November 28, 2007.

**ANSWER:**  The Defendant admits meeting Mr. Mullins on one occasion, but as for the other allegations, the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of those allegations.

31

69.        At the meeting Mr. Mullins was informed that Commercial Electric had formed a new company, Solid State Solutions, LLC. Mr. Mullins was told the Company had been formed approximately one week before the meeting of November 28, 2007. Mr. Mullins was led to believe that Solid State Solutions was being funded by Commercial Electric.

ANSWER:  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

70.        At that meeting, Mr. Mullins was shown a Borealis (PolyBrite) product that had been modified. Christensen, Brenner and others had modified the product by removing the LED's used in one Borealis (PolyBrite) product and replacing them with LED's used in another Borealis (PolyBrite) product, so that the light would perform to a certain standard. The customer for whom this was done was Neiman Marcus. Mr. Mullins had seen a picture of this product on a PolyBrite quotation for the sale of the product under the Borealis brand. Mr. Mullins was told that this modified product would now be marketed to Neiman Marcus by newly-formed Solid State Solutions. Prior to that meeting Christensen and Brenner had targeted customers, and prospective customers of PolyBrite, including Dillard's and Neiman Marcus, in arranging sales calls with their representatives, all in an attempt to steer PolyBrite's business to Solid State Solutions.

ANSWER:  The Defendant admits that Mr. Mullins saw a product, but understands that both Commercial Electric and Polybrite were the co-developers of this product.  The Defendant denies that he did anything to modify the product.  The Defendant admits that this product had the purpose of meeting Neiman Marcus's specifications.  The Defendant

32

neither admits nor denies the allegations contained in this paragraph as to what Mullins had seen or was told, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations. As for the allegation in the last sentence of this paragraph, the Defendant denies this allegation and affirmatively states that he never steered any customer from Polybrite during the term of his employment with Polybrite.

71.        Commercial Electric is a distributor of lighting products, not a designer or manufacturer. No one at Commercial Electric or Solid State Solutions had the technical ability to design solid state lighting products. At the meeting, Mr. Mullins was informed that Messrs. Christensen and Brenner were going to China to arrange for the manufacture of Solid State Solutions's new production lines. Mr. Mullins was shown a prototype of the new company's light, which was a modified PolyBrite product. Bill Young, an employee of Commercial Electric invited Mullins to become associated with Solid State Solutions as its development designer.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph relative to the business and technical abilities of Commercial Electric, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations. The Defendant denies that he was going to China to arrange for the manufacture of a new product as he was never involved in arranging manufacturing of any product. The Defendant neither admits nor denies the allegations contained in this paragraph as to what Mr. Mullins was shown or what was said to him, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

72.        Mr. Mullins did not join this group.

33

**ANSWER:**  The Defendant admits that Mr. Mullins did not accompany them to China.

## ILLICIT COVERT MEETINGS IN CHINA AND HONG KONG

73.       Less than two weeks after the meeting at Maumelle, Arkansas, on December 11, 2007, Messrs. Brenner and Christensen, accompanied by Messrs. Van Auken and Young of Commercial Electric, traveled to Dongguan City, China where Wellstar Electronics and CDW Lighting Technologies Limited are located. Staying with them at the same hotel were Defendant CN Wong, and WN Wong of Wellstar Electronics. They stayed at the hotel on December 11 and 12. See Dong Chen International Hotel receipts, true and correct copies are attached hereto as Ex. 21. The purpose of this secret meeting was to arrange to have Wellstar Electronics produce LED lighting products that would directly compete with PolyBrite lighting products in the market. CN Wong attempted to hide his participation in this meeting from his colleagues at PolyBrite, telling them instead that he was going on vacation with his family at the time he was meeting with his co-conspirators in Dongguan City.

**ANSWER:**  The Defendant admits the first three sentences of this paragraph.  The Defendant denies the allegations concerning a "secret meeting," as the meeting was not secret and he denies the allegations concerning the purpose of the meeting as the purpose was to help locate a possible manufacturer for a lighting product which in no way competed with any existing Polybrite product.  The Defendant neither admits nor

34

denies the allegation contained in this paragraph relating to CN Wong, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

74.          Shortly after the meeting in Dongguan City, CN Wong's lies were discovered by PolyBrite. He was confronted with the truth: that he had been meeting with Brenner, Christensen and others at the same time he claimed to be away on vacation with his family. Mr. Wong sent an email resigning from PolyBrite on December 17, 2007. Only after CN Wong's lies were discovered did PolyBrite suspect that the defendants herein were engaged in the wrongful conduct alleged in this Complaint.

**ANSWER:**  The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.   Furthermore, the Defendant denies any wrongful conduct on his behalf.

75.          On December 13, 2007, Messrs. Brenner and Christensen, accompanied by Messrs. Van Auken and Young, traveled to Hong Kong. All four stayed at the Marco Polo Hong Kong Hotel. See Marco Polo Hong Kong Hotel receipts, dated December 15, 2007, true and correct copies are attached hereto as Ex. 22.

**ANSWER:**  The Defendant admits the allegations in this paragraph

76.          On February 3, 2008, Messrs. Brenner and Christensen, again accompanied by Messrs. Van Auken and Young, traveled to Hong Kong. All four stayed at the Marco Polo Hong Kong Hotel. See Marco Polo Hong Kong Hotel receipts dated February 12, 2008, true and correct copies are attached hereto as Ex. 23. The reservations were made

35

under the PolyBrite name by Shirley Sy, Mr. Wong's assistant. Ms. Sy made the reservations on January 10, 2008 using her PolyBrite email address. Ms. Sy resigned from PolyBrite a month before in December, 2007.  See Marco Polo Hong Kong Hotel Company Confirmations, true and correct copies are attached hereto as Ex. 24.

ANSWER:  The Defendant admits the first two sentences of this paragraph.  The Defendant neither admits nor denies the allegations contained in this paragraph concerning Ms. Sy, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

## REMOVAL OF CORPORATE PROPERTY AND DOCUMENTS

77.  On November 2, 2007 Defendant Christensen went to PolyBrite's headquarters in Naperville, Illinois at approximately 8:00 p.m., after business hours. Defendant Christensen repeatedly went in and out of the building within short periods of time. On information and belief the purpose was to surreptitiously remove PolyBrite's files and product, which he had no right to possess. Christensen began by entering at the loading dock - the only time he was known to do so during his employment at PolyBrite. Two days later he repeated this routine, albeit coming in before business hours, starting at 6:47 a.m.

ANSWER:  The Defendant admits that he entered the Polybrite building on 8:00 p.m. on November 2, 2007 and again on Sunday morning at 6:45 a.m., but denies the erroneous characterizations and implications of these allegations.  In fact the Defendant entered and exited the building only for the benefit of Polybrite.  The Defendant's expense reports show his airplane ticket to and from a meeting at Macy's in Cincinnati, returning to O'Hare at 7:05 p.m. on November 2, 2007.  The Defendant traveled to the

office and entered through the loading dock to return sample cases and sales material which he carried to and from that meeting. The Defendant filed a Contact Report relative to this meeting and sent a copy of that report to the management of Polybrite and Goeken. He did enter and exit the building several times because he was carrying boxes of PAR 30's, daylight color lamps, to his car so that he could modify them by gluing filters to their lenses. His expense reports show a receipt from glue from Ace Hardware at 8:48 p.m. on November 2, 2007. He worked on November 3, 2007 hand cutting one-hundred and twenty filters and gluing them to the lamp lenses. He returned the lamps to the Polybrite office on the morning of November 4, 2007. Vince Campione, Jr. of Polybrite picked up these lamps and installed them at the Merchandise Mart. The Defendant prepared a contact report relative to this installation later that week. In both instances, the Defendant entered the Polybrite offices to return company property and denies that he ever removed any files or property for his own purposes.

78.        On the evening of November 12, 2007, at 11:41 p.m., and continuing into the early morning hours of November 13, 2007, Defendant Brenner forwarded by PolyBrite's email to his personal AOL account PolyBrite documents in such large quantities that his personal AOL account began to refuse acceptance of them because his mailbox was full. PolyBrite was able to recover one email sent by Brenner from his PolyBrite account to his personal AOL account at 2:32 a.m. on November 13, 2007. That email had attached to it 22 emails, some of which also contained attachments.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

79.      On November 12, 2007, Defendant Brenner entered PolyBrite's headquarters at 11:41 p.m. It had been approximately two weeks since he had last made an appearance at the office. Access card reports show Defendant Brenner re-entering the building at 1:38 a.m., 6:25 a.m., 6:51 a.m. and 7:47 a.m. on November 13, 2007. On the evening of November 13, 2007, Defendant Brenner sent dozens of emails to Defendant CN Wong.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

80.      Mr. Brenner was terminated on November 14. Shortly after Defendant Brenner was terminated, an inspection of his office showed that he had removed thousands of pages of company owned documents containing files, background information on customers, product specifications, information on work in process, development work, pricing information and other confidential and sensitive materials.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

**DESTRUCTION OF EMAILS**

38

81.        On a date prior to his termination, and better known to him, Richard Brenner deleted all emails in his email inbox. On or around October 26, 2007, Kelly Newton, Richard Brenner's assistant, deleted all emails in her email inbox and sent folder.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

82.    On or around December 3, 2007, CN Wong deleted all emails in his email inbox. On or around December 29, 2007, Wong deleted all emails in his sent folder. Shirley Sy, CN Wong's assistant, deleted all emails in her email inbox and sent folder on or around December 14, 2007.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

## COUNT I - BREACH OF FIDUCIARY DUTY (RICHARD BRENNER)

83.        PolyBrite realleges paragraphs 1 through 82 as though fully set forth herein.

**ANSWER:**   The Defendant realleges his answers to paragraphs 1 through 82 as though fully set forth herein.

84.    At all relevant times to this Complaint, Defendant Brenner was a fiduciary of PolyBrite. He had an obligation to act with the highest degree of honesty and loyalty toward PolyBrite and in the best interests of PolyBrite.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

85.        As a fiduciary of PolyBrite Brenner had a duty to inform the company that employees were forming a rival company or engaging in other fiduciary breaches.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

86.        Brenner had a duty to disclose to PolyBrite information which was relevant to the affairs entrusted to him.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

87.        Brenner had a duty toward PolyBrite that prohibited him from discharging the duties of his position in such a manner as to make a secret profit for himself.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

88.        Brenner had a duty not to exploit his position within the company for his own benefit.

40

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

89.        Brenner had the duty not to hinder the business of PolyBrite to continue the business for which it was developed.

90.        Brenner had the duty to disclose to PolyBrite all material facts, fully and completely before acting for his own benefit within the scope of his duties.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

91.    Brenner repeatedly breached his fiduciary duties to PolyBrite. Brenner formulated and executed a business plan to compete with PolyBrite while still employed by it. Brenner, along with Defendants Wong and Christensen, actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers and by forming CDW Lighting Technologies. In addition, Brenner and Defendant Wong dissuaded PolyBrite employees from attending the largest lighting show in Asia so that CDW could arrange to be at the exhibition. Brenner derailed PolyBrite's attempts to locate alternative manufacturing in China. Brenner also actively subverted relationships with customers and prospective customers.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in the first two sentences of this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations. As to the assertion that this

41

Defendant actively competed with Polybrite by soliciting business and forming CDW Lighting Technologies, the Defendant states that he had absolutely nothing to do with the formation, operation or ownership of CDW and further affirmatively states that during his employment at Polybrite, he never competed with Polybrite or tried to divert any customers from Polybrite but always acted in the best interests of Polybrite. The Defendant neither admits nor denies the allegations contained in the last three sentences of this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

92.    As a direct and proximate result of Brenner's breaches of fiduciary duties, Plaintiff PolyBrite has been damaged and continues to suffer damages.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

93.    Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Brenner's conduct. Money damages will not compensate for the continuing injury resulting from Brenner's use of confidential, technical, marketing and financial information.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

94.    By his conduct, Defendant Brenner has demonstrated his willingness to

continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:**  The Defendant denies this allegation.

95.      PolyBrite has demonstrated that Defendant Brenner has, and unless restrained will continue to, engage in conduct alleged herein.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

96.      There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:**  The Defendant believes that there is little likelihood that Polybrite will prevail on the merits relative to the allegations concerning the Defendant as many of the allegations are simply conclusions of law or completely incorrect factually.

97.  Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendant Brenner will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendant Brenner will result from an order which requires Defendant Brenner to comport his actions to the law, hence PolyBrite should not be required to post a bond.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

**ANSWER:**  The Defendant realleges its answers to paragraphs 1 through 82 as though fully set forth herein.

98.      The granting of an injunction will not disserve the public interest.

43

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

**ANSWER:** The Defendant denies this allegation and affirmatively states that an employee cannot inform his employer of facts he does not know or facts which would not harm the employer.

## COUNT II - BREACH OF FIDUCIARY DUTY (PAUL CHRISTENSEN)

99.     PolyBrite realleges paragraphs 1 through 82 as though fully set forth herein.

**ANSWER:** The Defendant realleges its answers to Paragraphs 1 through 82 as though fully set forth herein.

100.    At all relevant times to this Complaint, Defendant Christensen was a fiduciary of PolyBrite. He had an obligation to act with the highest degree of honesty and loyalty toward PolyBrite and in the best interests of PolyBrite.

**ANSWER:** The Defendant admits his legal duties as an employee.

101.    As a fiduciary of PolyBrite Christensen had a duty to inform the company that employees were forming a rival company or engaging in other fiduciary breaches.

**ANSWER:** The Defendant denies this allegation and affirmatively states that an employee cannot inform his employer of facts he does not know or facts which would not harm the employer.

44

102.         Christensen had a duty to disclose to PolyBrite information which was relevant to the affairs entrusted to him.

**ANSWER:**  The Defendant admits that he had a legal duty to Polybrite during his employment.

103.         Christensen had a duty toward PolyBrite that prohibited him from discharging the duties of his position in such a manner as to make a secret profit for himself.

**ANSWER:**  The Defendant admits that he did not act in a way which was detrimental to the employer.

104.         Christensen had a duty not to exploit his position within the company for his own benefit.

**ANSWER:**  The Defendant admits that he did not act in a way which was detrimental to the employer.

**ANSWER:**  The Defendant admits that he had a legal duty to Polybrite during the term of his employment, but this allegation is unclear.

105.         Christensen had the duty not to hinder the business of PolyBrite to continue the business for which it was developed.

**ANSWER:**   The Defendant denies this entire allegation, denies that he ever breached his fiduciary duties to Polybrite and denies that Polybrite has suffered any damage as a result of his acts or omissions and affirmatively states that during his entire

45

employment at Polybrite, he acted in the best interests of Polybrite and did everything in his power to promote the business of Polybrite.

106.        Christensen had the duty to disclose to PolyBrite all material facts, fully and completely before acting for his own benefit within the scope of his duties.

**ANSWER:**  Defendant admits that he had a legal duty to Polybrite during the term of his employment, but this allegation is unclear.

107.        As alleged above, Defendant Christensen was a fiduciary of PolyBrite. Christensen joined the conspiracy formed by Defendants Brenner and Wong to subvert the interests of PolyBrite with its customers and prospective customers. Defendant Christensen and the other co-conspirators actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers. Defendant Christensen hid his actions by filing false reports with PolyBrite misrepresenting PolyBrite's relationship with customers and prospective customers. One day after resigning from PolyBrite, Defendant Christensen, along with Defendant Brenner, attended the meeting in Maumelle, Arkansas with Commercial Electric and displayed a modified PolyBrite product as their own for Neiman Marcus. Less than two weeks after the meeting in Arkansas, Defendant Christensen, along with Defendant Brenner, accompanied by Messrs. Van Auken and Young, traveled to China and Hong Kong and met with Defendant CN Wong, who was still employed by PolyBrite at that time.

**ANSWER:**  The Defendant admits his legal status as an employee during the term of his employment and the relevant obligations as a fiduciary.  As for the second allegation, the Defendant denies ever joining a conspiracy with Defendants Brenner and

46

Wong, ever trying to subvert the interests of Polybrite with its customers or actively competing with Polybrite during his term of employment and affirmatively states that during his employment at Polybrite, he always acted consistently with his fiduciary duties as an employee of Polybrite and always tried to promote the business and best interests of Polybrite.  As for the third allegation concerning filing false reports, the Defendant denies this allegation and states that all of his reports were true and correct to the best of his knowledge and belief.  As for the allegation concerning his actions one day after resigning from Polybrite, he denies those allegations, but does state that he did meet with members of Commercial Electric on November 28, 2007 and that he did not bring any product or modified product to that meeting.  As for his response to the last allegation of this paragraph, the Defendant admits traveling to China and meeting with CN Wong, but affirmatively states that at that time his understanding was that Mr. Wong had terminated or had notified Polybrite that he was terminating his relationship with Polybrite.

108.      As a direct and proximate result of Defendant Christensen's breaches of fiduciary duties, Plaintiff PolyBrite has been damaged and continues to suffer damages.

**ANSWER:**  The Defendant denies this entire allegation, denies that he ever breached his fiduciary duties to Polybrite and denies that Polybrite has suffered any damage as a result of his acts or omissions and affirmatively states that during his entire employment at Polybrite, he acted in the best interests of Polybrite and did everything in his power to promote the business of Polybrite.

109.      Plaintiff has no adequate remedy at law. Money damages alone will not, and

cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Christensen's conduct. Money damages will not compensate for the continuing injury resulting from Defendant Christensen's use of confidential, technical, marketing and financial information.

**ANSWER:**  The Defendant denies each and every allegation contained in this paragraph and affirmatively states that he was not involved in any misconduct and never inappropriately used any confidential, technical, marketing or financial information of Polybrite, except for the purposes of promoting the business of Polybrite.

110.    By his conduct, Defendant Christensen has demonstrated his willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:**   The Defendant has not engaged in any improper acts and has done nothing to harm PolyBrite and there is no injury to Polybrite as a result of the actions of the Defendant.

111.    PolyBrite has demonstrated that Defendant Christensen has, and unless restrained will continue to engage in conduct which is alleged herein. There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:**  The Defendant denies all allegations concerning any improper conduct and asserts that relative to him, there is no likelihood that Polybrite will prevail on the merits.

112.    Should the Court grant interlocutory injunctive relief to PolyBrite, the burden

48

on Defendant Christensen will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendant Christensen will result from an order which requires Defendant Christensen to comport his actions to the law, hence PolyBrite should not be required to post a bond.

**ANSWER:** The Defendant denies these allegations and asserts that his actions never harmed Polybrite, but the requested relief would greatly harm the Defendant and his family.

113.    The granting of an injunction will not disserve the public interest.

**ANSWER:** The Defendant denies this allegation and asserts that injunctive relief is improper and restricts free and fair competition.

**WHEREFORE,** the Defendant, Paul Christensen, requests that this Court dismiss this Count against him and award him costs and attorneys' fees.

### COUNT III - BREACH OF FIDUCIARY DUTY (CN WONG)

114.    PolyBrite realleges paragraphs 1 through 82 as though fully set forth herein.

**ANSWER:** The Defendant realleges his answers to Paragraphs 1 through 82 as fully set forth herein.

115.    At all relevant times to this Complaint, Defendant Wong was a fiduciary of PolyBrite. He had an obligation to act with the highest degree of honesty and loyalty toward PolyBrite and in the best interests of PolyBrite.

49

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

116.    As a fiduciary of PolyBrite Wong had a duty to inform the company that employees were forming a rival company or engaging in other fiduciary breaches.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

117.    Wong had a duty to disclose to PolyBrite information which was relevant to the affairs entrusted to him.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

118.    Wong had a duty toward PolyBrite that prohibited him from discharging the duties of his position in such a manner as to make a secret profit for himself.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

119.    Wong had a duty not to exploit his position within the company for his own benefit.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

120.    Wong had the duty not to hinder the business of PolyBrite to continue the business for which it was developed.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

121.    Wong had the duty to disclose to PolyBrite all material facts, fully and completely before acting for his own benefit within the scope of his duties.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

122.    Defendant Wong repeatedly breached his fiduciary duties to PolyBrite. Wong formulated and executed a business plan to compete with PolyBrite while still employed by it. Defendant Wong, along with Defendants Brenner and Christensen, actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers and by forming CDW Lighting Technologies. In addition, Defendants Wong and Brenner dissuaded PolyBrite employees from attending the largest lighting show in Asia so that CDW could arrange to be at the exhibition. While still employed with PolyBrite and unbeknown to anyone at PolyBrite, Defendant Wong met with Defendants Brenner and Christensen and Messrs. Van Auken and Young in China from December 11,

2007 to December 13, 2007.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

123.        As a direct and proximate result of Defendant Wong's breaches of fiduciary duties, Plaintiff PolyBrite has been damaged and continues to suffer damages.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

124.    Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Wong's conduct. Money damages will not compensate for the continuing injury resulting from Defendant Wong's use of confidential, technical, marketing and financial information.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

125.        By his conduct, Defendant Wong has demonstrated his willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

126.        PolyBrite has demonstrated that Defendant Wong has, and unless restrained will continue to engage in conduct which is alleged herein. There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.


**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

128.        The granting of an injunction will not disserve the public interest, hence PolyBrite should note be required to post a bond.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.


## COUNT IV - CONSPIRACY TO BREACH FIDUCIARY DUTY (RICHARD BRENNER, PAUL CHRISTENSEN AND CN WONG)

129    Polybrite realleges paragraphs 1 through 82 as though fully set forth herein.

**ANSWER:** The Defendant restates his answer to 1 through 82 as though fully set forth.

130.    At all relevant times to this Complaint, Defendants Brenner and Wong acted in concert and conspired together to breach their fiduciary duties to PolyBrite. On a date prior to his resignation, and better known to him, Defendant Christensen joined the conspiracy and knowingly participated therein. All three defendants traveled with top executives from Commercial Electric to China on December 11, 2007 to December 13, 2007, less than one month after Defendant Brenner's termination from PolyBrite and exactly two weeks after Defendant Christensen's resignation from PolyBrite. At that time Defendant Wong was still employed with PolyBrite. As alleged above, Defendants Brenner and Wong formulated and executed a business plan to compete with PolyBrite while still employed by it. Defendants Brenner, Christensen and Wong actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers and by forming CDW Lighting Technologies. In addition, Defendants Wong and Brenner dissuaded PolyBrite employees from attending the largest lighting show in Asia so that CDW could arrange to be at the exhibition. Defendants Brenner, Christensen and Wong subverted the interests of PolyBrite by filing false reports with PolyBrite in Naperville, Illinois, misrepresenting PolyBrite's relationship with customers and prospective customers. The conduct complained of constitutes overt acts in furtherance of the conspiracy by Defendants Brenner, Christensen and Wong. Said acts were tortious and unlawful in character.

**ANSWER:** The Defendant neither admits nor denies the first allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the

54

truth or accuracy of the allegation.   In response to the second allegation in this paragraph, the Defendant denies this allegation and affirmatively states that he never joined in any conspiracy and during his employment at Polybrite, acted to promote the business of Polybrite.  The Defendant admits traveling to China after he resigned from Polybrite and affirmatively states that he did nothing during that trip that violated any duty he owed Polybrite.  Relative to the allegation concerning CN Wong's employment, the Defendant understood that Mr. Wong was no longer employed at Polybrite.   The Defendant neither admits nor denies the allegation contained in this paragraph relative to the business plan of Defendants Brenner and Wong, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.  The Defendant denies the next allegation concerning CDW and affirmatively states that he had nothing to with the formation, ownership or management of this entity.  The Defendant neither admits nor denies the allegation contained in this paragraph relative to attending a lighting show, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.  The Defendant denies the allegations concerning filing false reports with Polybrite and affirmatively states that his reports were completely accurate to the best of his ability.  The Defendant denies any acts in furtherance of a conspiracy and denies any tortuous or unlawful acts.

131.        As fiduciaries of PolyBrite defendants had a duty to inform the company that employees were forming a rival company or engaging in other fiduciary breaches.

        **ANSWER:**   The Defendant restates his answer to 101 as though fully set forth herein.

132.        Defendants had a duty to disclose to PolyBrite information which was relevant to the affairs entrusted to them.

**ANSWER:**  The Defendant restates his answer to 102 as though fully set forth herein.

133.        Defendants had a duty toward PolyBrite that prohibited them from discharging the duties of their positions in such a manner as to make a secret profit for themselves.

**ANSWER:**  The Defendant restates his answer to 103 as though fully set forth herein.

104.    Defendants had a duty not to exploit their position within the company for their own benefit.

**ANSWER:**  The Defendant restates his answer to 104 as though fully set forth herein.

135.          Defendants had the duty not to hinder the business of PolyBrite to continue the business for which it was developed.

**ANSWER:**  The Defendant restates his answer to 105 as though fully set forth herein.

136.        Defendants had the duty to disclose to PolyBrite all material facts, fully and completely before acting for their own benefit within the scope of their duties.

**ANSWER:**  The Defendant restates his answer to 106 as though fully set forth herein.

137.    The wrongful acts alleged herein constitute acts in furtherance of a conspiracy.

**ANSWER:** The Defendant denies any wrongful acts on his part.

138.        As a direct and proximate result of the aforementioned conspiracy, Plaintiff PolyBrite has been damaged and continues to suffer damages.

**ANSWER:** The Defendant denies any conspiracy and any damage to PolyBrite.

139.        Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendants Brenner, Christensen and Wong's conduct. Money damages will not compensate for the continuing injury resulting from Defendants Brenner, Christensen and Wong's use of confidential, technical, marketing and financial information.

**ANSWER:** The Defendant denies all allegations in this paragraph, any misconduct on his part and any use of Polybrite's confidential, technical, marketing or financial information for any purpose except to carry on business on behalf of Polybrite.

140.        By their conduct, Defendants Brenner, Christensen and Wong have demonstrated their willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:** The Defendant denies that any acts he engaged in have harmed PolyBrite and further denies any injury to PolyBrite.

141.        PolyBrite has demonstrated that Defendants Brenner, Christensen and Wong have, and unless restrained will continue to engage in conduct which is alleged herein. There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:** The Defendant denies the allegations in this paragraph and believes there is no likelihood that PolyBrite will prevail in this action.

142. Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendants Brenner, Christensen and Wong will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendants Brenner, Christensen and Wong will result from an order which requires Defendants Brenner, Christensen and Wong to comport their actions to the law.

**ANSWER:** The Defendant denies this allegation in accordance with his answer to 112.

143. The granting of an injunction will not disserve the public interest.

**ANSWER:** The Defendant denies this allegation in accordance with his answer to 113.

WHEREFORE, the Defendant, Paul Christensen, requests that this Court dismiss this Court with costs and attorneys' fees to be paid by the Plaintiff.

## COUNT V – FRAUD (RICHARD BRENNER)

144. PolyBrite realleges paragraphs 1 through 91 as though fully set forth herein.

**ANSWER:** The Defendant realleges his answers to 1 through 91 as though fully set forth herein.

145. Defendant Brenner made numerous reports, oral and written, formal and informal, to PolyBrite during 2006 and 2007. In none of those reports did he disclose the wrongful conduct alleged herein, through he had an affirmative duty to do so.

58

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

146.    Defendant Brenner's failure to report the wrongful conduct of himself and his co-defendants were material omissions of fact.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

147.    Defendant Brenner's failure to report the wrongful conduct was an effort on his part to misrepresent the state of affairs of the company.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

148.    Defendant Brenner's material omissions in his reports were done for the purpose of inducing plaintiff not to act, because had plaintiff known of Brenner's and his co-defendants' wrongful conduct, it would have fired them immediately.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

149.    PolyBrite acted in reliance on the statements and omissions of Brenner, and its reliance was reasonable.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

150.    PolyBrite has been injured and continues to suffer injuries as a direct and proximate result of its reliance on Defendant Brenner's false representations and omissions.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

151.    Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Brenner's conduct. Money damages will not compensate for the continuing injury resulting from Brenner's use of confidential, technical, marketing and financial information.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

152.    By his conduct, Defendant Brenner has demonstrated his willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

153.     PolyBrite has demonstrated that Defendant Brenner has, and unless restrained will continue to, engage in conduct alleged herein.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

154.     There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

155.     Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendant Brenner will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendant Brenner will result from an order which requires Defendant Brenner to comport his actions to the law, hence PolyBrite should not be required to post a bond.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

156.     The granting of an injunction will not disserve the public interest.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

## COUNT VI – FRAUD (PAUL CHRISTENSEN)

157.       PolyBrite realleges paragraphs 1 through 82 and paragraphs 100 through 107 as though fully set forth herein.

**ANSWER:** The Defendant realleges his answers to paragraphs 1 through 82 and 101 through 107 as though fully set forth herein.

158.   Defendant Christensen made numerous reports, oral and written, formal and informal, to PolyBrite during 2006 and 2007. In none of those reports did he disclose the wrongful conduct alleged herein, through he had an affirmative duty to do so.

**ANSWER:** The Defendant denies he made any reports in which he failed to disclose wrongful conduct and affirmatively states that he was unaware of any wrongful or competitive conduct during the term of his employment with Polybrite.

159.   Defendant Christensen's failure to report the wrongful conduct of himself and his co-defendants were material omissions of fact.

**ANSWER:** The Defendant denies the allegations in this paragraph and affirmatively states that he was never aware of any wrongful conduct on behalf of himself or the other defendants while he was an employee of the Plaintiff.

160.       Defendant Christensen's failure to report the wrongful conduct was an effort on his part to misrepresent the state of affairs of the company.

62

**ANSWER:**  The Defendant denies the allegations in this paragraph in accordance with his answer to 159.

161.        Defendant Christensen's material omissions in his reports were done for the purpose of inducing plaintiff not to act, because had plaintiff known of Christensen's and his co-defendants' wrongful conduct, it would have fired them immediately.

**ANSWER:**  The Defendant denies the allegations in this paragraph in accordance with his answer to 159 and states that he never filed or authored a report in which there were material omissions of fact.

162.    PolyBrite acted in reliance on the statements and omissions of Christensen and its reliance was reasonable.

**ANSWER:**  The Defendant denies the allegations in this paragraph and affirmatively states that he made no material omission of fact in any report.

163.    PolyBrite has been injured and continues to suffer injuries as a direct and proximate result of its reliance on Defendant Christensen's false representations and omissions.

**ANSWER:**  The Defendant denies the allegations in this paragraph as he made no false representation or omission.

164.        Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Christensen's conduct. Money damages will not compensate for the continuing injury resulting from Christensen's use of confidential, technical, marketing and financial information.

**ANSWER:**    The Defendant realleges his answer to 109 as though fully set forth.

165.    By his conduct, Defendant Christensen has demonstrated his willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

   **ANSWER:**   The Defendant realleges his answer to 110 as though fully set forth.

166.    PolyBrite has demonstrated that Defendant Christensen has, and unless restrained will continue to, engage in conduct alleged herein.

   **ANSWER:**   The Defendant denies this allegation and affirmatively states that his conduct as an employee of Polybrite was in accordance with his obligations as an employee of the company and he exerted his best efforts exclusively on behalf of Polybrite.

167.    There is a likelihood that PolyBrite will prevail on the merits of this action.

   **ANSWER:**   The Defendant denies this allegation and denies that there is any likelihood that the Plaintiff will prevail on its claims against him.

168.    Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendant Christensen will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendant Christensen will result from an order which requires Defendant Christensen to comport his actions to the law, hence PolyBrite should not be required to post a bond.

   **ANSWER:**   The Defendant realleges his answer to 112 as though fully set forth herein.

169.    The granting of an injunction will not disserve the public interest.

**ANSWER:** The Defendant denies the allegations in this paragraph as the Plaintiff has requested an unreasonable restraint of competition.

WHEREFORE, the Defendant, Paul Christensen, requests that this Court dismiss this Court with the Plaintiff to pay all costs and attorneys' fees.

## COUNT VII – FRAUD (CN WONG)

170.    PolyBrite realleges paragraphs 1 through 82 and paragraphs 115 through 122 as though fully set forth herein.

**ANSWER:** The Defendant realleges his answers to Paragraphs 1 through 82 and paragraphs 115 through 122 as though fully set forth herein.

171.    Defendant Wong made numerous reports, oral and written, formal and informal, to PolyBrite during 2006 and 2007. In none of those reports did he disclose the wrongful conduct alleged herein, through he had an affirmative duty to do so.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

172.    Defendant Wong's failure to report the wrongful conduct of himself and his co-defendants were material omissions of fact.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

173.    Defendant Wong's failure to report the wrongful conduct was an effort on his

part to misrepresent the state of affairs of the company.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

174.    Defendant Wong's material omissions in his reports were done for the purpose of inducing plaintiff not to act, because had plaintiff known of Wong's and his co-defendants' wrongful conduct, it would have fired them immediately.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

175.    PolyBrite acted in reliance on the statements and omissions of Wong, and its reliance was reasonable.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

176.    PolyBrite has been injured and continues to suffer injuries as a direct and proximate result of its reliance on Defendant Wong's false representations and omissions.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

177.    Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities

which PolyBrite will suffer as a result of Defendant Wong's conduct. Money damages will not compensate for the continuing injury resulting from Wong's use of confidential, technical, marketing and financial information.

      **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

178.      By his conduct, Defendant Wong has demonstrated his willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

      **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

179.      PolyBrite has demonstrated that Defendant Wong has, and unless restrained will continue to, engage in conduct alleged herein.

      **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

180.      There is a likelihood that PolyBrite will prevail on the merits of this action.

      **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

181.      Should the Court grant interlocutory injunctive relief to PolyBrite, the burden

on Defendant Wong will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendant Wong will result from an order which requires Defendant Wong to comport his actions to the law, hence PolyBrite should not be required to post a bond.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

182.    The granting of an injunction will not disserve the public interest.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

### COUNT VIII CONSPIRACY TO COMMIT FRAUD (RICHARD BRENNER, PAUL CHRISTENSEN AND CN WONG)

183.    PolyBrite realleges paragraphs 1 through 82 and paragraphs 130 through 137 as though fully set forth herein.

**ANSWER:** The Defendant realleges his answers to 1 through 82 and 130 through 137 as though fully set forth herein.

184.    Defendants made numerous reports, oral and written, formal and informal, to PolyBrite during 2006 and 2007. In none of those reports did they disclose the wrongful conduct alleged herein, through they had an affirmative duty to do so.

**ANSWER:** The Defendant admits that he made numerous reports but denies the remainder of these allegation and affirmatively states that he never made any false reports and never knew of any wrongful conduct to disclose in any reports.

185.        Defendants' failures to report their wrongful conduct were material omissions of fact.

   **ANSWER:**  The Defendant denies this allegation as he was unaware of any wrongful conduct during his employment at PolyBrite.

186.        Defendants' failures to report the wrongful conduct was an effort on their part to misrepresent the state of affairs of the company.

   **ANSWER:**  The Defendant denies this allegation in accordance with his answer to paragraph 185.

187.        Defendants' material omissions in their reports were done for the purpose of inducing plaintiff not to act, because had plaintiff known of defendants' wrongful conduct, it would have fired them immediately.

   **ANSWER:**  The Defendant denies this allegation as he had no knowledge of any wrongful acts.

188.        Defendants acted jointly, and in concert, to achieve this conspiracy of fraud, each acting to support the other, each with knowledge of the others' wrongful conduct.

   **ANSWER:**  The Defendant denies this allegation and moves to strike this allegation as it is simply a conclusion of law and there are no facts to indicate that the Defendant acted jointly or in concert with anyone during his employment to harm the interests of PolyBrite.

189.        PolyBrite acted in reliance on the statements and omissions of defendants and its reliance was reasonable.

   **ANSWER:**  The Defendant denies this allegation as he never made any incorrect

statement or material omission in any report to PolyBrite.

190.    PolyBrite has been injured and continues to suffer injuries as a direct and proximate result of its reliance on Defendants' false representations and omissions.

**ANSWER:**    The Defendant denies this allegation and affirmatively states that PolyBrite never suffered any damage as a result of his actions.

191.    Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendants' conduct. Money damages will not compensate for the continuing injury resulting from defendants' use of confidential, technical, marketing and financial information.

**ANSWER:**  The Defendant denies this allegation as he was never involved in any wrongful conduct and never used confidential, technical, marketing or financial information of the Plaintiff in derogation of his obligations due PolyBrite.

192.    By their conduct, Defendants have demonstrated their willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:**    The Defendant denies this allegation as he has never acted in derogation of his duties as an employee of PolyBrite.

193.        PolyBrite has demonstrated that Defendants have, and unless restrained will continue to, engage in conduct alleged herein.

**ANSWER:**  The Defendant denies this allegation in accordance with his answer to 192.

70

194.    There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:**  The Defendant denies this allegation as the allegations against him are totally false.

195.        Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendants will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendants will result from an order which requires Defendants to comport their actions to the law, hence PolyBrite should not be required to post a bond.

**ANSWER:**  The Defendant denies the allegations in accordance with his answer to 168.

196.    The granting of an injunction will not disserve the public interest.

**ANSWER:**  The Defendant denies this allegation in accordance with his answer to 169.

WHEREFORE, the Defendant, Paul Christensen, requests that this Court dismiss this Count with costs and attorney's fees to be paid for by the Plaintiff.

## AFFIRMATIVE DEFENSES

NOW COMES the Defendant, Paul Christensen, and for his Affirmative Defenses in this matter, states as follows:

## PARTIES

1.    Polybrite International, Inc. ("Polybrite") is a start up company, which is a subsidiary of the Goeken Group Corp. ("Goeken") and is involved in the LED field.   It markets three major product lines:  Polybrite Lighted Pet Products ("Pet")-which markets battery powered devices to enhance pet visibility, such as

71

dog collars; Polybrite Lighted Safety Products ("Safety")-which markets battery powered devices to provide safety in low lighting conditions, such as lighted safety vests; and Borealis Lighting ("General Lighting")-the brand name for three types of powered LED products, decorative bulbs, signage lighting systems and general illumination lamps.

2.    Paul Christensen ("Christensen") is an adult resident of the State of New York and is an expert commercial photographer and is particularly knowledgeable in the technical field of lighting to produce the desired effects.

## FACTS

3.    In early 2005, Polybrite retained Christensen as an independent sales consultant to aid in the sales of the signage products in the Polybrite General Lighting division, then branded Westinghouse Lighting Systems.  He worked under the direction of Randy S. Miles ("Miles"), with input from Sandra Goeken Miles ("Sandra"), both members of the Board of Directors of Goeken, which board served as the governing body of Polybrite.  In addition Sandra is the vice-chairman and president of Goeken, with sales responsibility for Polybrite and Miles was the director of sales for the signage section of the General Illumination division.

4.    On or about June 12, 2006, Miles hired Christensen designating him sales and marketing associate in the Polybrite signage section of its General Lighting division and reporting directly to him.  In addition Christensen reported to Sandra, assisting her by transcribing her verbal and hand-written instructions on

a variety of promotional assignments for Polybrite.  Upon information and belief, during the entire history of Polybrite, the sales of Safety and Pet products far exceeded the sales of the General Lighting products and the signage products were simply a part of the General Lighting division's product line.  Although denominated Director of Marketing and Sales of Signage-North America, in reality he was simply a sales associate in the signage part of the General Lighting division, without any staff and without an office at the time of his hiring. Polybrite was to pay Christensen a salary and to reimburse him for his business expenses.

5.     Upon information and belief, although Polybrite started operation in 1995, it sales in its General Lighting division were extremely minimal and during its entire history, Polybrite earned a profit and needed a constant infusion of cash from investors and members of the Goeken Board of Directors in order to simply meet its payables and its payroll.

6.     After Polybrite hired him, Christensen worked under the direction of Sandra and Miles.  Sandra introduced Christensen to potential customers and distributors for the Polybrite General Lighting products and also directed him in helping her prepare optimistic sales projections, which could be utilized to obtain more working capital for Polybrite to overcome its yearly cash flow problems and deficits.

7.     Sandra introduced Christensen to Commercial Electric, LLC ("CE"), which was a potential distributor for certain of Polybrite's products, including its General

Lighting products.  Christensen's main contact at CE was William Young, who was in charge of business development and commercial lighting.

8.    During his employment at Polybrite, Christensen exerted his highest and best efforts to promote the sales and marketing of Polybrite's General Lighting products and to work with others so that Polybrite could possibly achieve a sustainable and profitable business.

9.    Christensen's duties included an assignment by Sandra and Miles in or about the summer of 2007 to meet with other Polybrite employees, including Richard Brenner ("Brenner"), to make suggestions and recommendations to Sandra, Miles and other members of the Goeken Board of Directors relative to making modifications to the structure and operations of Polybrite so that Polybrite could attain positive cash flow and eventually produce a profit.

10.    As a result of this assignment, Christensen and Brenner reported to Sandra, Miles and other member of the Goeken Board of Directors its suggestions concerning modifying management of Polybrite in order to streamline Polybrite, make it a more professional organization and to formulate plans for Polybrite's eventual profitability.

11.    Upon information and belief, either in  late summer or early fall of 2007, at the direction of Patricia A. Schneider ("Schneider"), executive vice president of Goeken, the computer expert at Polybrite commenced conducting reconnaissance on Christensen and Brenner, to intercept, copy and read all their

e-mail and computer records.    In fact that program was designated-RECON@POLYBRITE.COM.

12.    During the course of RECON@POLYBRITE.COM, the computer expert reported to Schneider and John D. Goeken, the chairman and CEO of Goeken, that Christensen and Brenner were conducting an assignment to review the operations of Polybrite and make suggestions concerning potential management changes and that in fact Christensen and Brenner made suggestions concerning the upper level management at Polybrite.

13.    On information and belief, Goeken conducted a Board of Directors meeting in late October of 2007 and at that meeting certain members of the Board of Directors raised the suggestions which were made by Christensen and Brenner concerning the operation and management of Polybrite.  The Board of Directors rejected these suggestions.

14.    During this same time period in summer and early fall of 2007, Christensen was exerting his highest and best efforts to sell and market to Dillard's, through its distributor, CE,  LED lighting for jewelry display cases to be utilized in its new retail establishments.  On or about August 27, 2007, Christensen informed management at Polybrite and Goeken that Dillard's had committed to purchase certain LED lighting from Polybrite, but there were certain preconditions necessary to effectuate that sale.  Those preconditions included:  obtaining final UL approval, modifying the LED lighting product to meet Dillard's needs and building suitable manufactured samples of this lighting fixture.

15.    In September and October of 2007, Christensen attempted to aid Polybrite in accomplishing these preconditions for the potential Dillard's sale.  Relative to obtaining the necessary UL approval, it was necessary for Polybrite to submit to UL manufactured working samples of the LED lighting, as opposed to prototype models; there had to be extensive safety testing of the product with the concomitant data; there had to be detailed engineering drawings and schematics of the product submitted; the company has to submit the material safety data sheets for the component products; and the company had to submit an application fee to UL.  Christensen, as a salesman, did not have the technical expertise to actually prepare the necessary documentation or manufacture the working samples of the product, but he exerted his best efforts to coordinate the submissions to UL.

16.    The management and financial officers of Polybrite and Goeken subverted and undermined Christensen's efforts relative to completion of the Dillard's project. Polybrite had not paid key suppliers and manufacturers for the Dillard's project in a timely fashion, including, but not limited to Shape LLC, Citizen LED, Nichia Manufacturing, the mechanical drawers and the sheet metal fabricators.  As a result of not keeping current with these suppliers, the Dillard's project and the application process to UL came to a complete halt.

17.    In early fall of 2007, in order to obtain the necessary financing to prepare the manufactured samples on the Dillard project, Christensen went to board member(s) of Goeken to request an influx of capital so that the key suppliers

could be paid and they could manufacture the necessary LED samples to be submitted to UL.

18.    Instead of recognizing Christensen's extraordinary efforts to promote the Dillard's project, the CEO of Polybrite, Carl Scianna, berated Christensen and in fact, as of mid April of 2008, Polybrite had still not received the UL seal of approval on the LED product which Polybrite intended to sell to Dillard's.

19.    Polybrite further undermined Christensen's ability to perform his job in that in did not reimburse Christensen for his business expenses as it had agreed. Polybrite's management was aware that Christensen would incur travel expenses as Christensen resided in New York, he had to travel extensively on behalf of Polybrite, both to meet at Polybrite headquarters in the Chicago area and meet with potential distributors and customers for the Polybrite General Lighting products throughout North America.

20.    During the course of his employment at Polybrite, Christensen incurred significant reimbursable business expenses and as of November of 2007, Polybrite owed Christensen in excess of $29,000.00 for reimbursable and legitimate business expenses.

21.    Although Christensen often requested payment for these business expenses and received assurances from the officers of Polybrite and Goeken that he would receive these payments, Polybrite still owes Christensen a sum in excess of $29,000.00.

22.   As of the second week of November of 2007, Polybrite had subverted and undermined Christensen's position at Polybrite in numerous ways, including, but not limited to:

a.   Terminating Richard Brenner, a capable, competent and well qualified executive.

b.   Failing to reimburse Christensen for legitimate business expenses in excess of $29,000.00.

c.   Failing to pay key suppliers and others on a timely basis, who were critical to fulfilling the prerequisites for the sale to the Dillard's Department Stores.

d.   Removing Christensen from a key account, Florida Plastics, a distributor for the McDonald's Corporation.

e.   Failing to make key management changes and to adopt suggestions from members of the Goeken Board of Directors, which had oversight responsibility for the operations of Polybrite.

f.   Spied on Christensen's e-mail under the RECON@POLYBRITE program which had been approved by the upper level management at Goeken.

23.   As a result of the foregoing, Christensen knew or concluded that Polybrite no longer supported his efforts on behalf of Polybrite, that Polybrite's actions displayed a lack of trust and confidence in his ability and that Polybrite's acts and omissions were tantamount to his constructive discharge, and Christensen found it necessary to tender his resignation on November 26, 2007.

**FIRST AFFIRMATIVE DEFENSE-UNCLEAN HANDS**

For Christensen's First Affirmative Defense-Unclean Hands, Christensen states as follows:

24.    Polybrite is guilty of unclean hands in that it has made false, misleading and baseless allegations in the Complaint.  Some of those allegations are as follows:

a.  That Christensen was involved in a conspiracy.   In paragraph 4 of the Complaint, Polybrite states that, "This conspiracy was later joined by Christensen."  This allegation is simply a groundless conclusion of law and Polybrite has not stated one fact to support that bald assertion and has not specified a date or any action by Christensen during his employment at Polybrite which would substantiate this groundless position.  Polybrite again repeats this baseless assertion in paragraph 107 of the Complaint, again with out any supporting facts or dates.

b.  That Christensen made false or misleading reports to Polybrite.   The allegation that Polybrite states in this regard is at paragraph 59 of the Complaint:  "From the time that he took over the effort to obtain UL approval, Christensen represented, directly or by implication, that the UL approval process was going according to schedule and was not a critical issue in regard to PolyBrite's relationship with Dillard's."  Polybrite does not specify any such false representation, when it was made or to whom it was made. One is left to conclude that he committed some fraud "by implication."  Under Federal Rule of Civil Procedure 9 (b) does not allow such pleading of fraud "by implication," but rather the allegations must be made with particularity.

79

Polybrite repeats this groundless allegation in paragraph 107 of the Complaint, that Christensen filed "false reports," but there again Polybrite provides no factual support for this unwarranted conclusion. Second of all, Polybrite's management was always aware of the fact that every major retailer requires UL certification prior to incorporating any electrical product in their establishments. Any allegation which indicates that UL certification was not critical is simply false and known by Polybrite to be false.

c. That Christensen was guilty of fraud. The basis for this allegation is paragraph 158 of the Complaint. That paragraph states: "Defendant Christensen made numerous reports, oral and written, formal and informal, to Polybrite during 2006 and 2007. In none of those reports did he disclose wrongful conduct alleged herein, through [sic.] he had an affirmative duty to do so." That allegation would indicate that some how Christensen knew of the numerous allegations against other parties alleged in the Complaint. There is no fact, document or statement which would indicate that Christensen had any knowledge of the activities of the other parties. Fraudulent conduct is never assumed, but must be pled with factual particularity.

d. That Christensen was aware that CE's reasons for stopping their participation with Polybrite on the Dillard's linear LED display cases were false and pretextual. In paragraph 63 of the Complaint, Polybrite alleges: "They [reasons stated by CE] were known by both Brenner and Christensen to be

80

false and pretextual, neither of whom disclosed this fact to Polybrite." This allegation is simply a conclusion without any basis in fact. Polybrite never states what they believe the true reasons for the terminations were the grounds for asserting that CE was stating false reasons or the basis for believing that Christensen knew of the true reasons. There allegations are simply pleading by innuendo without any factual basis whatsoever.

e. That Christensen stole property from Polybrite. This allegation is at paragraph 77 of the Complaint. "On information and belief the purpose [of entering the building in the morning] was to surreptitiously remove PolyBrite's files and product, which he had no right to possess." Polybrite is accusing Christensen of stealing and simply makes a false assumption on information and belief. In fact Christensen never removed any product or files from Polybrite, but brought files and product into Polybrite. In contrast to this baseless allegation on information and belief, Christensen's work on that day was on behalf of Polybrite and Polybrite's customer, the Merchandise Mart. Polybrite had significant and complete documentation to conclude the propriety of Christensen's conduct, the purpose of his activities and that this allegation concerning surreptitious and dishonest conduct was false and improper.

25.  Polybrite was guilty of unclean hands in that it purposefully and improperly spied on Christensen, with their management approved program, RECON@POLYBRITE.COM, in which management at Goeken and Polybrite

intercepted, reviewed and read Christensen's private, confidential and authorized e-mail. During the course of this espionage, the management discovered that Christensen was participating with others at Polybrite in discussing the management of Polybrite and formulating recommendations for improving Polybrite's long term business success.

26.    Polybrite was guilty of unclean hands in that it constructively discharged Christensen as a result of the management's spying on his e-mail. Management discovered that Christensen and Brenner were carrying out an assignment from members of the Goeken Board of Directors and officers of Goeken and Polybrite, including Sandra, Miles and others. In that assignment, Christensen and others suggested that management hire a turn around specialist, so that Polybrite could be put on a sounder financial footing and possibly make a profit in the future. In retaliation for this suggestion, management at Polybrite undermined Christensen's efforts and made it impossible for Christensen to carry out his duties which in effect constructively terminated Christensen's employment at Polybrite.

### SECOND AFFIRMATIVE DEFENSE-INEQUITABLE CONDUCT

For Christensen's Second Affirmative Defense-Inequitable Conduct, Christensen states as follows:

1.    Christensen restates and realleges paragraph 1 through 26 of the First Affirmative Defense as though fully set forth herein.

2.    Polybrite's conduct of systematically spying on Christensen, of undermining Christensen's efforts to obtain UL approval of the product to be sold to Dillard's,

of castigating Christensen for attempting to obtain funding to pay the suppliers of the sample product to be submitted to UL, and of constructively terminating Christensen's employment at Polybrite in retaliation for his legitimate efforts to carry out the assignment given to him by officers of Polybrite and Goeken and members of the Board of Directors of Goeken involves inequitable conduct which should bar Polybrite from pursuing any equitable remedy against Christensen.

### THIRD AFFIRMATIVE DEFENSE-ESTOPPEL

For Christensen's Third Affirmative Defense-Estoppel, Christensen states as follows:

1.  Christensen realleges and restates paragraph 1 though 26 of the First Affirmative Defense as though fully set forth herein.

2.  Polybrite should be estopped from asserting its claims against Christensen for his post-employment practices as Polybrite's actions prevented Christensen from carrying out his duties on behalf of Polybrite and effectively terminated his employment by doing the following:

    a.  Polybrite did not and would not pay suppliers on the Dillard's project in a timely fashion, so that there were no manufactured samples to submit to UL.

    b.  When Christensen attempted to obtain capital from a member of the Goeken Board of Directors to pay the suppliers for the product in the Dillard's project, which in fact board members frequently had contributed capital to pay Polybrite's payables and payroll, management criticized him.

    c.  The management of Polybrite removed Christensen from the Florida Plastics account.

    d.  Although the management of Polybrite promised Christensen payment for legitimate out-of-pocket business expenses, Polybrite has not paid business expenses to Christensen in excess of $29,000.00.

    e.  Polybrite's management terminated the employment of key employees of the company for their attempts to rectify Polybrite's financial situation and honestly report their suggestions to officers of Goeken and members of the Goeken Board of Directors.

## COUNTERCLAIM

For Christensen's Counterclaim against Polybrite, Christensen states as follows:

1.    Christensen realleges and restates paragraph 1 through 26 of the First Affirmative Defense as though fully set forth herein.

2.    Polybrite presently owes Christensen a sum in excess of $29,000.00 for unpaid business expenses.

3.    Although often demanded, Polybrite has still not paid these unpaid business expenses.

WHEREFORE, Paul Christensen, requests that this Court entered judgment in his favor and against Polybrite for the sum of $29,000.00, plus pre-judgment interest and costs of this suit.

Paul Christensen

By: /s/ Sigi M. Offenbach
        One of his Attorneys

Sigi M. Offenbach
Philip L. Mandell
Pitler and Mandell
39 South LaSalle Street
Suite 1220
Chicago, Illinois  60603
312/782-9466


## DECLARATION OF PAUL CHRISTENSEN

Pursuant to 28 U.S.C. §1746, Paul Christensen declares as follows:

1. I am one of the Defendants in the above captioned matter.

2. I have read the foregoing Answer to Verified Complaint, Affirmative Defenses and Counterclaim.

3. The facts contained therein are true in substance and in fact and as to those allegations made on information and belief, I verily believe them to be true.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed at West Salem, New York, this _____ day of May, 2008.


_____
Paul Christensen

**CERTIFICATE OF SERVICE**

The undersigned certifies that on the fifth day of May, 2008, I electronically filed Paul Christensen's Answer to Verified Complaint, Affirmative Defenses and Counterclaim with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:


William G. Sullivan
Mason N. Floyd
Martin, Brown & Sullivan
321 South Plymouth Court
10th Floor
Chicago, Illinois  60604

Constantine John Gekas
Gekas & Associates, Ltd.
11 South LaSalle Street
Suite 1700
Chicago, Illinois  60603

Mark J. Rose
200 West Adams Street
Suite 2850
Chicago, Illinois  60606


/s/ Sigi M. Offenbach

Paul Christensen

By: /s/ Sigi M. Offenbach
    One of his Attorneys

Sigi M. Offenbach
Philip L. Mandell
Pitler and Mandell
39 South LaSalle Street
Suite 1220
Chicago, Illinois  60603
312/782-9466

## DECLARATION OF PAUL CHRISTENSEN

Pursuant to 28 U.S.C. §1746, Paul Christensen declares as follows:

1.    I am one of the Defendants in the above captioned matter.

2.    I have read the foregoing Answer to Verified Complaint, Affirmative Defenses

and Counterclaim.

3.    The facts contained therein are true in substance and in fact and as to those

allegations made on information and belief, I verily believe them to be true.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed at West Salem, New York, this  2  day of May, 2008.

Paul Christensen

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **POLYBRITE INTERNATIONAL, INC.,** | ) | |
| **an Illinois Corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **NO.  08 C 1797** |
| | ) | **Judge R. W. Gettleman** |
| **RICHARD BRENNER, an individual,** | ) | **Mag. Judge N. R. Nolan** |
| **PAUL CHRISTENSEN, an individual, and** | ) | |
| **CHEE NGON WONG, an individual,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ANSWER TO VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

NOW COMES the Defendant, Paul Christensen, by his attorneys, Sigi M. Offenbach and

Philip L. Mandell of Pitler and Mandell, and for his Answer to the Verified Complaint for

Injunctive and Other Relief states as follows:

## NATURE OF THE CASE

1.          PolyBrite International is one of the world's leading developers of lighting

technology.  Over ten years, hundreds of shareholders have invested in excess of $45

million to nurture the Company's research, product development and marketing activities.

One of the defendants - its Director of Marketing and Sales in North America - forecasted in

2007 that PolyBrite's sales would explode, increasing by as much as $400 million annually

over a three year period. See Christensen July 30, 2007 email "Revised Projections" and

attachment, true and correct copies are attached hereto as Ex. 1. This action arises out of

defendants' scheme to steal success from PolyBrite by defrauding it out of millions of

1

dollars.

> **ANSWER:** This Defendant denies that Polybrite International, Inc. ("Polybrite") is one of the world's leading developers of lighting technology and affirmatively states that Polybrite was virtually a start up company and almost every year lost significant sums of money. As for the second sentence of this allegation Defendant neither admits nor denies this allegation as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation. As for the third sentence of the allegation, this projection was simply a projection formulated by Ms. Sandra Goeken Miles and refined by this Defendant and were extremely optimistic projections based on the potential occurrence of every fortuitous incident. As for the answer to the last sentence, this Defendant denies participation in any scheme to harm Polybrite and affirmatively states that during his employment at Polybrite he made every effort to make Polybrite a successful enterprise.

2.      Defendant Richard Brenner ("Brenner") was Executive Vice President and Chief Operating Officer of PolyBrite. He was employed by PolyBrite for more than six years. He was fired on November 14, 2007. Defendant Paul Christensen ("Christensen") was PolyBrite's Director of Marketing and Sales. He resigned on November 27, 2007. Defendant Chee Ngon ("CN Wong" or "Wong") was employed by PolyBrite to run its Hong Kong office. He was Vice President of PolyBrite for Asia-Pacific. He resigned on December 17, 2007, effective January 21, 2008.

**ANSWER:**  This Defendant makes no response as to the allegations concerning the other Defendants, but as for himself, he was never an executive of Polybrite and he resigned on November 26, 2007 and not on November 27, 2007.

3.        At all times relevant to this Complaint, Brenner, Christensen and Wong were senior executives of PolyBrite, all of whom were privy to the most sensitive and confidential information of PolyBrite.

**ANSWER:**  This Defendant makes no response as to the allegations concerning the other Defendants, but as for himself, he was never an executive of Polybrite, had no executive rank and had no trade secret information of Polybrite.

4.        Sometime prior to January, 2007, and at a time better known to themselves, Brenner and CN Wong entered into a conspiracy to subvert the interests of PolyBrite with its customers and prospective customers. This conspiracy was later joined by Christensen. They formulated and executed a business plan to compete with PolyBrite while still employed by PolyBrite. They and other co-conspirators actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers and by forming a business entity, CDW Lighting Technologies, to compete against PolyBrite.

**ANSWER:**     This Defendant makes no response as to the allegations concerning the other Defendants, but as for himself, he never joined a conspiracy, he knew nothing about the formation and business of CDW and did nothing during his term of employment to compete against Polybrite or solicit Polybrite's customers or prospective customers.

5.          In order to further their goals, defendants entered into an active, covert

3

campaign to destroy PolyBrite's existing business relationships, including its relationship with the company that manufactured its products, Wellstar Electronics, Limited. Defendants hid their actions by filing false reports with PolyBrite. Defendants entered into agreements with third parties to compete surreptitiously with PolyBrite. Defendants misappropriated financial, marketing and technical product information, all of which was confidential. Defendants have used this information to harm PolyBrite and further their personal financial goals. Defendants actively competed, and continue to compete, in the market through a company secretly organized by them beginning not later than February 13, 2007.

**ANSWER:**  The Defendant denies that he ever attempted to destroy any of Polybrite's existing business relationships or filed any false reports during the term of his employment at Polybrite.  The Defendant denies each and every allegation of this paragraph as it relates to him and affirmatively states that he never organized or participated in the organization of any company during the term of his employment at Polybrite.

## **PARTIES**

6.          Plaintiff PolyBrite International, Inc. is a corporation duly formed and existing under the laws of Illinois. PolyBrite is a citizen of the State of Illinois. PolyBrite is a wholly-owned subsidiary of Goeken Group Corp. PolyBrite was founded in 1995.

**ANSWER:**  The Defendant believes these allegations to be true.

7.          Defendant Richard Brenner is an individual residing at 372 Ameno Drive East, Palm Springs, California. He is a citizen of the State of California. He was hired by PolyBrite

4

in 2001 as PolyBrite's Vice-President of Consumer Sales. He was elevated to Executive Vice President and Chief Operating Officer ("COO") in 2004.  Mr. Brenner's employment with PolyBrite was terminated on November 14, 2007.

      **ANSWER:**  The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.

8.          Defendant Paul H. Christensen is an individual residing at 24 West Lane, South Salem, New York. Mr. Christensen is a citizen of the State of New York. He was hired on June 12, 2006. He served as PolyBrite's Director of Marketing & Sales - North America. Mr. Christensen resigned on November 27, 2007.

      **ANSWER:**  The Defendant admits the first three sentences of this paragraph, but denies the last sentence as he resigned on November 26, 2007.

9.          Defendant Chee Ngon ("CN") Wong was employed by PolyBrite on January 16, 2004 as Vice President for Asia Pacific affairs. In addition, Mr. Wong was a director of PolyBrite Asia Limited, a wholly-owned subsidiary of PolyBrite which was formed for the specific purpose of doing business in Asia. CN Wong is a resident of the Hong Kong Special Administrative Region of the People's Republic of China (commonly referred to as "Hong Kong"), residing at 1/F, 68 J, Ma Liu Shui San Tseun, Fanling, N T Hong Kong, China. He is a citizen of the People's Republic of China. He left the employ of PolyBrite on January 21, 2008.

      **ANSWER:** This Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or

5

accuracy of the allegations, but states that he understood that Mr. Wong had announced his separation from a subsidiary of Polybrite some time in November of 2007.

## JURISDICTION AND VENUE

10.        This Court has jurisdiction of this action as to Defendants Brenner and Christensen pursuant to 28 U.S.C. §1332(1) in that this is an action between citizens of different States where the matter in controversy exceeds the amount of $75,000, exclusive of interest and costs.

   **ANSWER:**  The Defendant admits this allegation.

11.        This Court has jurisdiction of this action as to Defendant Wong pursuant to 28 U.S.C. §1332(2) in that this is an action between citizens of a State and citizens or subjects of a foreign state where the matter in controversy exceeds the amount of $75,000, exclusive of interest and costs.

   **ANSWER:**  The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.

12.        Venue of this action is proper in this district pursuant to 28 U.S.C. 1339(a) in that a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district.

   **ANSWER:**  The Defendant admits this allegation.

## NON-PARTY ACTORS

6

13.         Goeken Group Corp. is a Delaware corporation registered to do business in the State of Illinois. Goeken Group Corp. is the parent corporation of PolyBrite. Goeken Group Corp. was founded by John "Jack" Goeken, who also founded Microwave Communications Inc., better known as MCI. He subsequently founded FTD Mercury Network (flower delivery), Airfone (later sold to GTE), In-Flight PhoneCorp. and many others.

   **ANSWER:**  The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.

14.         Borealis Lighting ("Borealis") is a brand name used by PolyBrite. PolyBrite manufactures solid-state LED lighting systems and products under the Borealis brand.

   **ANSWER:**  The Defendant admits the allegation in the first sentence and neither admits nor denies the allegations in the second sentence, as he does not have sufficient knowledge and belief to form a belief as to the truth or accuracy of these allegations.

15.         Commercial Electric LLC ("Commercial Electric") is an Arkansas Limited Liability Company that entered into a distribution contract with PolyBrite.

   **ANSWER:**  The Defendant believes this allegation to be true.

16.         Phil K. Gamache is President and CEO of Commercial Electric. Mr. Gamache worked closely with Paul Christensen pursuing large commercial accounts, including Dillard's department stores.

**ANSWER:** The Defendant believes that the first sentence of this allegation is true, but as for the second sentence states that he had little contact with Mr. Gamache and worked with William Young as the key contact account manager of Commercial Electric.

17.        Robert Van Auken is an employee of Commercial Electric. At all times relevant to this Complaint he was its executive vice president.

**ANSWER:** The Defendant believes this allegation to be true.

18.        William Young is an employee of Commercial Electric. At all times relevant to this Complaint he was in charge of business development and commercial lighting for Commercial Electric.

**ANSWER:** The Defendant believes the first sentence of this allegation to be true, but as to the second sentence has no personal, first hand knowledge.

19.        Solid State Solutions LLC is an Arkansas limited liability company. The Arkansas Secretary of State website shows that Solid State Solutions filed its Articles of Incorporation on November 19, 2007 and lists Phil Gamache as "owner."

**ANSWER:** The Defendant believes this allegation to be true.

20.        Patrick Mullins is an expert in electro-optics, including LEDs.

**ANSWER:** The Defendant neither admits nor denies this allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.

21.        Virgil Cheng is a resident of the Hong Kong Special Administrative Region of the People's Republic of China. He is a citizen of the People's Republic of China. He is an

engineer who served as a contractual consultant to PolyBrite.

**ANSWER:**  The Defendant neither admits nor denies this allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.

22.        CDW Lighting Technologies Limited is a corporation organized under the laws of the Hong Kong Special Administrative Region of the People's Republic of China. It was formed by Richard Brenner, CN Wong, WN Wong and Virgil Cheng on February 12, 2007. From at least February of 2007 CDW actively competed with PolyBrite. It sold and advertised a line of lighting products that was in every way identical to PolyBrite's.

**ANSWER:**  The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation and affirmatively states that he had no involvement or knowledge of this alleged entity.

23.        Shirley Sy was Assistant to Vice President of PolyBrite's Hong Kong office. She resigned from PolyBrite in December, 2007.

**ANSWER:**  The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.

## FACTUAL ALLEGATIONS RELEVANT TO ALL COUNTS

24.        PolyBrite serves international and domestic customers from its headquarters in Naperville, Illinois. Its products are available worldwide through distributors, retail stores,

9

websites and catalogs.

**ANSWER:** The Defendant believes these allegations to be true.

25.        PolyBrite has developed - and continues to develop - cutting edge technology that disperses light through a flexible polymer lens illuminated by light emitting diodes (LEDs). PolyBrite's polymer technology is extruded into a variety of clear, light scattering shapes, as well as certain molded applications. In addition to being extremely rugged, LEDs consume very little energy. PolyBrite has engineered advanced thermal management techniques, efficient and compact power supplies leading to more lumens per watt and greater efficiency in sophisticated LED applications.

**ANSWER:** The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation concerning any technical information concerning polymer technology, but affirmatively states that there are many competitors in the field of LED's, including, but not limited to GE (Lumination), Sloan LED Lighting, Sylvania (Osram), Permlight, Lemnis, Agilight, Stylmark, Bartco, Phoster and Phillips (Lumelids, Color Kinetics, Thomas Lighting Fixtures).

26.        PolyBrite's engineering versatility and design capability has resulted in creating state of the art LED systems that are incorporated into a diverse and wide range of energy efficient and "green" products for aerospace, military, pet and safety industries and unique lighting systems and LED based light bulbs (lamps).

**ANSWER:** The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or

10

accuracy of the allegations, but affirmatively states that during his months at Polybrite, Polybrite had many difficulties in creating LED systems due to the fact that many of its suppliers were not being paid on a timely basis.

27.        At all times relevant to the Complaint, the vast majority of PolyBrite bulbs and products were manufactured in China. PolyBrite entered into a strategic relationship with Vigor Precision Limited ("Vigor"), a high precision injection molding assembly company. Vigor is headquartered in Hong Kong and operates three manufacturing facilities in China. At certain times Vigor manufactured PolyBrite's products at its plants in China.

**ANSWER:** The Defendant admits the first allegation in this paragraph. The Defendant neither admits nor denies the remaining allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.

28.        Wellstar Electronics Limited ("Wellstar Electronics") is a wholly-owned subsidiary of Vigor headquartered in Hong Kong, with manufacturing facilities in China. Wellstar had not previously produced products similar to those that it manufactured for PolyBrite. It did not have expertise in solid state lighting and relied on PolyBrite to provide the technical expertise to produce its products.

**ANSWER:** The Defendant neither admits nor denies the allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

29.        In recent years the majority of PolyBrite's production took place at the Wellstar Electronics manufacturing facility. PolyBrite has paid in excess of $3.5 million

dollars to Wellstar for products manufactured by it and for tooling, for which PolyBrite paid $429,000.00.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation, but the Defendant is aware that during times of his employment, Polybrite owed Wellstar Electronics large sums of money which were past due.

### RICHARD BRENNER

30.       On August 13, 2001, Illumination Polymer Technologies, Inc., now known as PolyBrite, made an offer of employment to Defendant Brenner. He accepted and became PolyBrite's Vice President of Consumer Sales. He was paid a base salary of $120,000 per year, plus incentives. A true and correct copy of Brenner's Offer of Employment is attached hereto as Ex. 2. On September 14, 2001 Defendant Brenner executed the Goeken Group Corporation Employee Agreement. A true and correct copy of Brenner's Employee Agreement is attached hereto as Ex. 3. At the time Mr. Brenner joined PolyBrite, he was working for a company known as Cats USA Pets Control California in its sales group. Mr. Brenner had never worked in the lighting industry before joining PolyBrite. He had no technical background relating to the products manufactured by PolyBrite prior to becoming one of its employees. His educational background is in finance and accounting. At the time he left the employ of PolyBrite, his base salary was $180,000 per year.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in

12

this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations

31.        As COO, Defendant Brenner was the second highest ranking officer of the company. He reported directly to the company's Chief Executive Officer, Carl Scianna. As COO, Mr. Brenner was privy to PolyBrite's most sensitive and confidential information. He had unfettered access to financial, marketing, technical and production information that was available in its entirety to only one other person in the company, the Chief Executive Officer. As part of his duties as COO, Mr. Brenner oversaw the activities of PolyBrite's Hong Kong office. The Hong Kong office was in turn run by Defendant CN Wong. Mr. Brenner was also directly responsible for the manufacture of PolyBrite products, including those manufactured in Asia. Mr. Brenner was a fiduciary of PolyBrite.

> **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

## CN WONG

32.        In June of 2003, PolyBrite hired CN Wong. Mr. Wong was hired by PolyBrite to oversee manufacturing in China. His title was "Vice President, Asia Pacific." At all times relevant to this Complaint, CN Wong reported directly to Defendant Brenner. Defendant Wong was a fiduciary of PolyBrite. He introduced PolyBrite to Wellstar, which manufactured PolyBrite's products in China. Mr. Wong was responsible for the day-to-day contacts of PolyBrite with Vigor and Wellstar. Mr. Wong was responsible for working with Wellstar and

13

Vigor to ensure that production schedules were met, and to ensure that quality of produced goods met PolyBrite's standards. He was also required to report on these matters to PolyBrite's Chief Operating Officer, Richard Brenner, as well as its President, Carl Scianna.

 **ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

33.  It was Defendant Wong's responsibility to locate an alternative manufacturer to produce PolyBrite's products in China.

 **ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

## PAUL CHRISTENSEN

34.  On June 12, 2006, PolyBrite entered into an employment agreement with Paul Christensen. A true and correct copy of Christensen's Employee Agreement is attached hereto as Ex. 4. Christensen was hired as Director of Sales and Marketing - North America. He was paid a base salary of $120,000 per year, plus incentives. A true and correct copy of Christensen's Employment Application is attached hereto as Ex. 5.

 **ANSWER:** The Defendant admits the allegations in the first sentence of this paragraph, but affirmatively states that paragraph 6 of the agreement is unenforceable and is void as a matter of law. The Defendant admits the remaining allegations in this

paragraph except that his true title was Director of Sales and Marketing of Signage in North America.

35.        In his capacity as Director of Sales and Marketing-North America, Mr. Christensen was personally responsible for some of PolyBrite's most important accounts, including Macy's, Neiman Marcus, Dillard's, Autozone, Beck's and Walmart. In relation to these and other accounts, he had unfettered access to marketing, technical, financial and production information. Mr. Christensen began reporting directly to Defendant Brenner some time before May, 2007. Mr. Christensen worked closely with a distributor of PolyBrite's products, Commercial Electric, LLC, an Arkansas limited liability company, providing support to its employees in sales efforts. Though not an officer of the corporation, Mr. Christensen was a high managerial agent of PolyBrite. He was one of its highest paid employees. He had exclusive charge of some of its most important accounts. He exercised a high degree of autonomy and discretion in performing his duties, requiring PolyBrite to repose a high degree of trust and confidence in him. Mr. Christensen was a fiduciary of PolyBrite. Before being employed by PolyBrite, Christensen had no technical knowledge of, or experience with, solid state ("LED") lighting. Immediately prior to being hired by PolyBrite, Christensen worked as a commercial photographer.

**ANSWER:**  The Defendant admits that his title was Director of Sales and Marketing-North America, but denies that he was personally responsible for some of Polybrite's most important accounts.  He affirmatively states that when he was hired, he simply attempted to sell signage products in North America.  As for Polybrite's accounts, the Defendant basically worked as a sales associate under Sandra Goeken Miles, a member of the Board

15

of Directors of the Goeken Group and the chief contact with many of Polybrite's customers and potential customers.  The allegation that Macy's was a customer of Polybrite is inaccurate as to the Defendant's knowledge; Macy's was not a customer of Polybrite. Nieman Marcus and Dillard's were not customers of Polybrite, but were customers of Commercial Electric, which operated as a distributor of Polybrite.  To this Defendant's knowledge Autozone, Belk's [mistyped as Beck's] and Walmart were not customers of Polybrite.  This Defendant did not have unfettered access to technical and financial data concerning Polybrite as he was not an executive of the company and was unaware of any sensitive financial or technical data.  This Defendant admits that he reported to Mr. Brenner in May of 2007 and that he worked with Commercial Electric.  He admits he was not an officer of Polybrite and he denies that he was a high managerial agent of Polybrite, but merely an account executive selling a small portion of Polybrite's produces and just in North America.  He exercised the same degree of autonomy and discretion that any sales agent would have and did not have any significant managerial responsibility.  The Defendant does not deny a fiduciary duty to his employer.  The Defendant denies the last two allegations of this paragraph as he possessed substantial and extensive expertise in lighting and lighting technology and prior to being hired by Polybrite, he served as an independent, commission only, sales representative for PolyBrite and successfully closed the Duane Reade Pharmacy and Lord and Taylor accounts for PolyBrite's signage products, prior to joining the company as an employee in June of 2006.

## UNLAWFUL CONDUCT OF DEFENDANTS

16

**The Secret Creation Of A Competing Company By Defendants Brenner And Wong**

36.        Unknown to PolyBrite, and affirmatively hidden from it, Defendants Brenner and Wong prepared a business plan for an entirely new entity referred to in the business plan as Wellstar Lighting, LLC ("Wellstar Lighting"). See Wellstar Lighting's Business Plan, a true and correct copy of which is attached hereto as Ex. 6. This occurred in 2006. The Wellstar Lighting Business Plan was created by Defendant Brenner, using PolyBrite's computer, not later than December, 2006.

    **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations

37.        According to Wellstar Lighting's business plan, its mission was "to be a leading company designer manufacturer of High Brightness Solid State Lighting ("HBSSL") lamps and modular light engines for commercial, industrial and residential applications. Such products that provide enhanced lighting quality, substantial energy savings, substantial product life, and thereby improving people's quality of life at work and at home, while conserving the Earth's natural resources." See Ex. 6, p. 6.

    **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

38.        The Wellstar Lighting Business Plan named four founders. It stated that two of its founders, "Mr. Richard Brenner and Mr. CN Wong were previously senior executives at PolyBrite International, an SSL (solid state lighting) products company, working to

17

develop and launch PolyBrite's line of decorative and general illumination lamps, as well as the company's channel letter lighting system." Ex. 6, p. 6.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

39.     The Wellstar Lighting Business Plan called for Wellstar Electronics to manufacture products in direct competition with PolyBrite: "Wellstar Electronics, a Hong Kong based manufacturing company embracing nearly three years experience in HBSSL [high brightness solid state lighting] design, prototyping, tooling and manufacturing, and is immediately prepared to manufacture the full line of HBSSL lamps to WLI . . . Wellstar Electronics is managed by Mr. WN Wong, a founding member of WLI [Wellstar Lighting LLC]." Ex. 6, p. 6. The experience referenced by Wellstar Electronics in HBSSL design, prototyping, tooling and manufacturing was that which its principals obtained by working with PolyBrite.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

40.     The Wellstar Lighting Business Plan identified Virgil Cheng as its fourth founder. Virgil Cheng, CN Wong and WN Wong are long time personal friends. They attended school together and have been friends ever since.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

41.     The Wellstar Business Plan stated, "The founders anticipate the Commercial users realizing acceptable payback periods, as well as large lighting OEMs (original equipment manufacturers), will be target customers in 2007."

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

42.     At the same time Defendants Brenner and Wong created the Wellstar Lighting Business Plan, Brenner made plans to relocate his home to California. He entered into a contract to purchase a home in Palm Springs during the December holidays of 2006. He never informed anyone at PolyBrite of his intention to do so. In a letter dated January 19, 2007 Richard Brenner wrote to Countywide Home Loans explaining that he was relocating to Southern California where his career would focus on energy saving lighting technology. See Brenner January 19, 2007 letter, a true and correct copy is attached hereto as Ex. 7. Brenner hid from PolyBrite that he sold his house in Illinois and relocated his wife to California.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

43.     A search of files backed up from Defendant Brenner's computer showed that

19

on January 27, 2007 Defendant Brenner listed alternative names for the new business enterprise:

1.    CD2 Lighting Technologies
2.    WCD Lighting Technologies
3.    Power2 Lighting Technologies
These alternative names were followed by the names:

CN Wong
WN Wong
Virgil Cheng
Dick Brenner

See list of names document, a true and correct copy is attached hereto as Ex. 8.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

44.    On February 12, 2007, CDW Lighting Technologies Limited ("CDW") was created. The address of CDW and Wellstar Electronics Ltd. are one in the same: Flat A2, 10/FL Block A, Texaco Road Industrial Centre, Texaco Road, Tsuen Wan, Hong Kong.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

45.    On February 13, 2007, CDW Lighting Technologies Limited created a website (www.cdwlighting.com) in which it advertised a full line of "high brightness solid state illumination products for commercial, industrial and residential applications." The products advertised by CDW Lighting Technologies are PolyBrite's products. CDW used pictures of PolyBrite's bulbs on its website. See screenshots of www.cdwlighting.com, true and correct

20

copies are attached hereto as Ex. 9. That website continues to exist to the date of the filing of the instant Complaint. The actions of CDW made it a direct competitor of PolyBrite.

ANSWER:  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

46.      On February 21, 2007, one week after creating a company to compete directly with PolyBrite, Richard Brenner recommended to Carl Scianna that one of Brenner's co-conspirators, CN Wong, be given a $50,000.00 per annum raise. Based upon Mr. Brenner's recommendation, Mr. Wong's salary was increased on March 15, 2007 to $125,000.00 per year. Effective June 15, 2007, Mr. Wong's salary was increased to $150,000.00 per year.

ANSWER:  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

## GUANGZHOU LIGHT FAIR
### 6/8/07 to 6/11/07

47.      The Guangzhou Light Fair, held from June 6, 2007 through June 11, 2007, was an opportunity for PolyBrite to exhibit its products at the largest lighting show in Asia. It was attended by over 45,000 people. Exhibitors came from twenty-two countries. Although PolyBrite had exhibited at the Light Fair in 2006, CN Wong actively dissuaded PolyBrite from participating at the fair in 2007. He told PolyBrite management on numerous occasions that they should not attend the fair. Defendant Brenner, knowing that CDW

Lighting Technologies Limited would be participating at the fair, also attempted to dissuade others from PolyBrite from attending this exhibition. Defendant Brenner made the decision not to allow PolyBrite to exhibit at the exhibition, even though it previously registered and paid a deposit.

   **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

48.     CN Wong, Virgil Cheng and WN Wong arranged to exhibit CDW's wares at the exhibition. CDW Lighting Technologies was listed as an accredited exhibitor on the list along with over 1,300 other manufacturers and suppliers. See 2007 Exhibitor List, a true and correct copy is attached hereto as Ex. 10. By this time CDW was, according to its advertising, fully up and running. In addition, CN Wong, Virgil Cheng and WN Wong were actively communicating from email addresses which included the domain "cdwlighting.com." See cdwlighting.com emails, true and correct copies are attached hereto as Ex. 11.

   **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

49.     CDW's participation at the Guangzhou Light Fair was an act of direct competition with PolyBrite.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

## ALTERNATIVE MANUFACTURING IN CHINA

50.        For approximately two years prior to August, 2007, PolyBrite sought alternative manufacturing facilities to those of Vigor & Wellstar. The responsibility of locating a new manufacturer was entrusted to CN Wong, PolyBrite's representative in Hong Kong. He, in turn, reported to Defendant Richard Brenner. In August of 2007, CN Wong was asked to provide a status report on his progress of finding an alternative manufacturer. Defendant Brenner responded for CN Wong. Both Mr. Brenner and Mr. Wong were aware that it was extremely important to locate an alternative manufacturer in China. Carl Scianna, President of PolyBrite, had told them that PolyBrite was going to produce light bulbs for Osram Sylvania ("Sylvania"), and that Sylvania would not approve Vigor or Wellstar production facilities to be used for that purpose.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

51.        Defendant Brenner, replying for CN Wong, said that he would soon be traveling to Hong Kong, and that he would ask CN Wong to make appointments for him with several manufacturers so that he could further the selection process. See Brenner August 21, 2007 email "China," a true and correct copy is attached hereto as Ex. 12.

23

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

52.    In truth and in fact, contrary to what Defendant Brenner said, he had no intention of identifying another manufacturer with which PolyBrite could do business. Neither did CN Wong. On information and belief, CDW was using the production molds made for, and owned by PolyBrite, all of which were physically located at Wellstar Electronics, its current manufacturer. WN Wong, one of the owners of CDW, was also a principal of Wellstar Electronics. If a new manufacturer were identified and contracted with, it would be the end of CDW's manufacturing capabilities. Hence, to the day he was terminated, Defendant Brenner resisted PolyBrite's attempts to contract with an alternative manufacturer. CN Wong did the same. Wellstar Electronics has allied itself with defendants and their competing company, CDW Lighting Technologies Limited. As a result, plaintiff has been unable to manufacture its products. Wellstar Electronics has refused to turn over PolyBrite's production molds. The reasons given for not returning the molds are pretextual. CDW Lighting Technologies Limited is now selling bulbs designed by PolyBrite.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

## SUBVERSION OF POLYBRITE'S RELATIONSHIPS

53.    PolyBrite has spent millions of dollars in research, design and testing of its

products.

      **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

54.        It has targeted large commercial enterprises for the sale of certain products, including Dillard's Department Stores, which operates three hundred fifty retail stores from the Atlantic to the Pacific seaboards.

      **ANSWER:**  The Defendant admits that through his relationship with Commercial Electric, he made presentations to Dillard's.  Dillard's was not a customer of Polybrite, but rather Polybrite always worked through Commercial Electric to make any presentation to Dillard's.  In fact there was never any direct contact with representatives of Dillard's without a representative of Commercial Electric present.

55.        On April 19, 2007, Commercial Electric and PolyBrite entered into an Authorized Distributor Agreement (the "Agreement"). See Authorized Distributor Agreement, a true and correct copy is attached hereto as Ex. 13. By that Agreement, Commercial Electric was authorized to distribute "those certain items manufactured or sold by PolyBrite generally identified as LED lamps or LED systems that are indicated by PolyBrite's representatives in writing and shall include PolyBrite's Borealis Lighting Systems products." Ex. 13, § 9.1.

      **ANSWER:**  The Defendant admits the allegations in this paragraph.

56.        Early in the summer of 2007, Commercial Electric and PolyBrite began a joint marketing program relating to PolyBrite's effort to develop a product to meet the particular

25

need of a Commercial Electric customer, Dillard's Department Store.

**ANSWER:** The Defendant denies this allegation and affirmatively states that in spring of 2007, Commercial Electric and Polybrite entered into a co-development agreement in order to enter an on going competition for wrist watch and fashion jewelry display case lighting to be installed in newly constructed Dillard's stores.

57.    On August 27, 2007, Defendant Paul Christensen informed executive management of PolyBrite and the Goeken Group that Dillard's had committed to purchase PolyBrite's linear LED alternative to florescent lighting for its jewelry display cases. He noted in his report that, among the things necessary to achieve this level of sales, PolyBrite had to "[p]roceed with UL" (Underwriter's Laboratory). See Christensen's August 27, 2007 email "Dillard's Contact Report," a true and correct copy is attached hereto as Ex. 14.

**ANSWER:** The Defendant admits that he authored Exhibit 14, but denies the Plaintiff's characterization of this document which states that Dillard's agreed to a two year program, but it was necessary to obtain UL [Underwriter's Laboratory] approval, to modify the product and to build suitable samples prior to being able to ship product to Dillard's.  The report further states that Dillard's was continuing to purchase product from one of Polybrite's competitors, Stylmark, ordering $100,000.00 of their product.  The report indicates that the Polybrite has much to accomplish in order to win the account from Stylmark, the product manufacturer which Dillard's already purchased.

58.    On September 13, 2007, Paul Christensen projected that Dillard's alone would spend $7.8 million on PolyBrite's linear lighting in 2008. See Christensen's September 13, 2007 email "Projections" and attachment, true and correct copies are

attached hereto as Ex. 15.

**ANSWER:** The Defendant admits that he authored Exhibit 15, but further affirmatively states that the basis of the projections was that Dillard's would build at least eight new stores and it has reduced its projections because of the lagging economy and that Polybrite would adequately support the development of the linear lighting product, which it did not. In fact Polybrite's efforts in selling the product to Dillard's was almost halted due to the fact that Polybrite had not paid many of its key suppliers on this project in a timely fashion.

59.      Paul Christensen was responsible for supervising the Dillard's project. Indeed, on October 12, 2007 he wrote an email to PolyBrite, Vice President, Engineering, Raymond Janik and COO Richard Brenner in which he stated he was "prepared to function as project manager and advance both [Dillard's and Florida Plastics (sign maker for McDonald's)] through the UL process." See Christensen's October 12, 2007 email "Production Status Items," a true and correct copy is attached hereto as Ex. 16. Although he routinely spoke to Carl Scianna and Raymond Janik, PolyBrite's chief engineer, he never suggested to either of them that the project was in jeopardy for failure to meet the customer's requirements. From the time that he took over the effort to obtain UL approval, Christensen represented, directly or by implication, that the UL approval process was going according to schedule and was not a critical issue in regard to PolyBrite's relationship with Dillard's.

**ANSWER:** The Defendant admits that he was a key contact on the Dillard's account and that he authored Exhibit 16, but affirmatively states that he would help manage the UL process, but as a sales person he would need the technical expertise of engineers to

complete the UL process. He affirmatively states that he could not proceed with the UL

process as Polybrite was so delinquent in paying its suppliers on this project that the UL

process basically stopped through no fault of the Defendant. The Defendant denies the

last two sentences of this paragraph as all officers of Polybrite knew that Dillard's would

never accept a product in its stores without UL approval and that the UL process was not

going smoothly as Polybrite was extremely tardy paying the key vendors for the operable

samples which were to be submitted to UL.

60.         Four weeks later, on November 8, 2007, Defendant Christensen filed a

Contact Report from Little Rock, Arkansas. In that Contact Report he included the following

information regarding the Dillard's account:

> The management team at CE is expressing a dual signal. One
> is appreciation for the continued sales support. We have
> supplied them with training, printed materials and sales staff.
>
> The other signal is one of rising concern. They are growing
> impatient with our progress to advance several portions of the
> Dillard's account. We have not advanced the additional
> prototype requests for the additional sizes in lamps and power
> supplies and the UL the qualification process.
>
> They remind us that the Dillard's requirements are UL on all
> lamps and fixtures before it will be accepted for installation,
> and that Dillard's will not tolerate late delivery. One missed
> delivery date will cancel all future orders.

See Christensen November 8, 2007 Contact Report, a true and correct copy is attached

hereto as Ex. 17. Not until this date did Christensen suggest any urgency relating to the

Dillard's project.

         **ANSWER:** The Defendant admits this contact report, but denies the final allegation

         as he informed the officers of Polybrite that the UL approval was absolutely critical for

the project and that when dealing with a large national department store, a supplier has to be prompt with all deliveries and requirements.

61.        On November 9, 2007, Phil K. Gamache wrote a letter to Carl Scianna expressing his "concern regarding a perceived lack of urgency . . . as it relates to shepherding the linear LED array through the UL approved process and ultimately through production." See Gamache November 9, 2007 letter, a true and correct copy is attached hereto as Ex. 18.

**ANSWER:**  The Defendant admits that Exhibit 18 appears to be a true copy of a letter from Mr. Gamache.

62.        On November 13, 2007, Carl Scianna responded to Mr. Gamache's letter. He stated that he "had been informed that the project was operating smoothly." In addition, he noted the project had been handled by Paul Christensen with whom Gamache had a meeting days before, and to whom Gamache was speaking regularly about this project. See Scianna November 13, 2007 letter, a true and correct copy is attached hereto as Ex. 9.

**ANSWER:**  The Defendant admits that Exhibit 19 appears to be a true copy of a letter from Mr. Scianna, but states that the letter does not need interpretation and the Defendant further affirmatively states that his contact at Commercial Electric was Mr. Bill Young and not Mr. Gamache and that he informed Mr. Scianna of the critical nature of this project.

63.        On November 16, 2007, Phil Gamache, President and CEO of Commercial Electric, called PolyBrite's CEO, Carl Scianna, and told him that Commercial Electric would no longer pursue the development of the linear LED display case for Dillard's with

29

PolyBrite. The stated reasons for Commercial Electric's decision not to participate in the development of the linear LED product were false and pretextual. They were known by both Brenner and Christensen to be false and pretextual, neither of whom disclosed this fact to PolyBrite. See Gamache November 20, 2007 letter, a true and correct copy is attached hereto as Ex. 20.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in the first two sentences of this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations. The Defendant denies the allegation concerning that he knew that Commercial Electric's reasons for the termination of the project were false and pretextual, as he was not told the reasons by Mr. Gamache, but knew the project would be in jeopardy due to the fact that Polybrite did not proceed with the UL approval on a timely manner as Polybrite was so delinquent with the payment of important suppliers on this project, that suppliers would not provide the necessary operating production samples to submit to UL.

64.         Although Christensen was made responsible for the UL Listing at his own request, he did nothing to accomplish it.

**ANSWER:** The Defendant denies the allegation that he was made responsible for the UL listing as he was not an engineer and no executive of the company designated him as the responsible party and he affirmatively states that he did everything in his power to accomplish the UL listing, including requesting that an officer of the company contribute money to pay the suppliers so that Polybrite could obtain working samples of the product to be submitted to UL.

30

65.          On November 19, 2007, Phil Gamache caused Solid State Solutions LLC ("Solid State") to be formed in Arkansas. Solid State's address is the same as Commercial Electric's.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

66.          On November 27, 2007, Defendant Christensen resigned. Subsequent to the termination of their employment from PolyBrite, Commercial Electric engaged Brenner and Christensen as consultants.

**ANSWER:**  The Defendant denies this allegation and affirmatively states that he resigned from Polybrite on November 26, 2007.  The Defendant admits the allegation in the second sentence.

67.          On November 28, 2007, Commercial Electric hosted a meeting in Maumelle, Arkansas. One of those attending was Patrick Mullins, an expert in electro-optics, including LED's. Among those in attendance were Richard Brenner, Paul Christensen, Robert Van Auken and Bill Young of Commercial Electric.

**ANSWER:**  The Defendant admits this allegation.

68.          Mr. Mullins had met Paul Christensen on a prior occasion. He had never met Defendant Brenner before November 28, 2007.

**ANSWER:**  The Defendant admits meeting Mr. Mullins on one occasion, but as for the other allegations, the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of those allegations.

69.        At the meeting Mr. Mullins was informed that Commercial Electric had formed a new company, Solid State Solutions, LLC. Mr. Mullins was told the Company had been formed approximately one week before the meeting of November 28, 2007. Mr. Mullins was led to believe that Solid State Solutions was being funded by Commercial Electric.

   **ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

70.        At that meeting, Mr. Mullins was shown a Borealis (PolyBrite) product that had been modified. Christensen, Brenner and others had modified the product by removing the LED's used in one Borealis (PolyBrite) product and replacing them with LED's used in another Borealis (PolyBrite) product, so that the light would perform to a certain standard. The customer for whom this was done was Neiman Marcus. Mr. Mullins had seen a picture of this product on a PolyBrite quotation for the sale of the product under the Borealis brand. Mr. Mullins was told that this modified product would now be marketed to Neiman Marcus by newly-formed Solid State Solutions. Prior to that meeting Christensen and Brenner had targeted customers, and prospective customers of PolyBrite, including Dillard's and Neiman Marcus, in arranging sales calls with their representatives, all in an attempt to steer PolyBrite's business to Solid State Solutions.

   **ANSWER:**  The Defendant admits that Mr. Mullins saw a product, but understands that both Commercial Electric and Polybrite were the co-developers of this product.  The Defendant denies that he did anything to modify the product.  The Defendant admits that this product had the purpose of meeting Neiman Marcus's specifications.  The Defendant

neither admits nor denies the allegations contained in this paragraph as to what Mullins had seen or was told, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.  As for the allegation in the last sentence of this paragraph, the Defendant denies this allegation and affirmatively states that he never steered any customer from Polybrite during the term of his employment with Polybrite.

71.        Commercial Electric is a distributor of lighting products, not a designer or manufacturer. No one at Commercial Electric or Solid State Solutions had the technical ability to design solid state lighting products. At the meeting, Mr. Mullins was informed that Messrs. Christensen and Brenner were going to China to arrange for the manufacture of Solid State Solutions's new production lines. Mr. Mullins was shown a prototype of the new company's light, which was a modified PolyBrite product. Bill Young, an employee of Commercial Electric invited Mullins to become associated with Solid State Solutions as its development designer.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph relative to the business and technical abilities of Commercial Electric, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.  The Defendant denies that he was going to China to arrange for the manufacture of a new product as he was never involved in arranging manufacturing of any product.  The Defendant neither admits nor denies the allegations contained in this paragraph as to what Mr. Mullins was shown or what was said to him, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

72.        Mr. Mullins did not join this group.

**ANSWER:** The Defendant admits that Mr. Mullins did not accompany them to China.

## ILLICIT COVERT MEETINGS IN CHINA AND HONG KONG

73.         Less than two weeks after the meeting at Maumelle, Arkansas, on December 11, 2007, Messrs. Brenner and Christensen, accompanied by Messrs. Van Auken and Young of Commercial Electric, traveled to Dongguan City, China where Wellstar Electronics and CDW Lighting Technologies Limited are located. Staying with them at the same hotel were Defendant CN Wong, and WN Wong of Wellstar Electronics. They stayed at the hotel on December 11 and 12. See Dong Chen International Hotel receipts, true and correct copies are attached hereto as Ex. 21. The purpose of this secret meeting was to arrange to have Wellstar Electronics produce LED lighting products that would directly compete with PolyBrite lighting products in the market. CN Wong attempted to hide his participation in this meeting from his colleagues at PolyBrite, telling them instead that he was going on vacation with his family at the time he was meeting with his co-conspirators in Dongguan City.

**ANSWER:** The Defendant admits the first three sentences of this paragraph. The Defendant denies the allegations concerning a "secret meeting," as the meeting was not secret and he denies the allegations concerning the purpose of the meeting as the purpose was to help locate a possible manufacturer for a lighting product which in no way competed with any existing Polybrite product. The Defendant neither admits nor

denies the allegation contained in this paragraph relating to CN Wong, as the Defendant

has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

74.        Shortly after the meeting in Dongguan City, CN Wong's lies were discovered

by PolyBrite. He was confronted with the truth: that he had been meeting with Brenner,

Christensen and others at the same time he claimed to be away on vacation with his family.

Mr. Wong sent an email resigning from PolyBrite on December 17, 2007. Only after CN

Wong's lies were discovered did PolyBrite suspect that the defendants herein were

engaged in the wrongful conduct alleged in this Complaint.


        **ANSWER:**  The Defendant neither admits nor denies the allegation contained in this

paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or

accuracy of the allegations.   Furthermore, the Defendant denies any wrongful conduct

on his behalf.

75.        On December 13, 2007, Messrs. Brenner and Christensen, accompanied by

Messrs. Van Auken and Young, traveled to Hong Kong. All four stayed at the Marco Polo

Hong Kong Hotel. See Marco Polo Hong Kong Hotel receipts, dated December 15, 2007,

true and correct copies are attached hereto as Ex. 22.

        **ANSWER:**  The Defendant admits the allegations in this paragraph

76.        On February 3, 2008, Messrs. Brenner and Christensen, again accompanied

by Messrs. Van Auken and Young, traveled to Hong Kong. All four stayed at the Marco

Polo Hong Kong Hotel. See Marco Polo Hong Kong Hotel receipts dated February 12,

2008, true and correct copies are attached hereto as Ex. 23. The reservations were made

under the PolyBrite name by Shirley Sy, Mr. Wong's assistant. Ms. Sy made the reservations on January 10, 2008 using her PolyBrite email address. Ms. Sy resigned from PolyBrite a month before in December, 2007.  See Marco Polo Hong Kong Hotel Company Confirmations, true and correct copies are attached hereto as Ex. 24.

      **ANSWER:**  The Defendant admits the first two sentences of this paragraph.  The Defendant neither admits nor denies the allegations contained in this paragraph concerning Ms. Sy, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

### REMOVAL OF CORPORATE PROPERTY AND DOCUMENTS

      77.  On November 2, 2007 Defendant Christensen went to PolyBrite's headquarters in Naperville, Illinois at approximately 8:00 p.m., after business hours. Defendant Christensen repeatedly went in and out of the building within short periods of time. On information and belief the purpose was to surreptitiously remove PolyBrite's files and product, which he had no right to possess. Christensen began by entering at the loading dock - the only time he was known to do so during his employment at PolyBrite. Two days later he repeated this routine, albeit coming in before business hours, starting at 6:47 a.m.

      **ANSWER:**   The Defendant admits that he entered the Polybrite building on 8:00 p.m. on November 2, 2007 and again on Sunday morning at 6:45 a.m., but denies the erroneous characterizations and implications of these allegations.  In fact the Defendant entered and exited the building only for the benefit of Polybrite.   The Defendant's expense reports show his airplane ticket to and from a meeting at Macy's in Cincinnati, returning to O'Hare at 7:05 p.m. on November 2, 2007.  The Defendant traveled to the

36

office and entered through the loading dock to return sample cases and sales material which he carried to and from that meeting. The Defendant filed a Contact Report relative to this meeting and sent a copy of that report to the management of Polybrite and Goeken. He did enter and exit the building several times because he was carrying boxes of PAR 30's, daylight color lamps, to his car so that he could modify them by gluing filters to their lenses. His expense reports show a receipt from glue from Ace Hardware at 8:48 p.m. on November 2, 2007. He worked on November 3, 2007 hand cutting one-hundred and twenty filters and gluing them to the lamp lenses. He returned the lamps to the Polybrite office on the morning of November 4, 2007. Vince Campione, Jr. of Polybrite picked up these lamps and installed them at the Merchandise Mart. The Defendant prepared a contact report relative to this installation later that week. In both instances, the Defendant entered the Polybrite offices to return company property and denies that he ever removed any files or property for his own purposes.

78.        On the evening of November 12, 2007, at 11:41 p.m., and continuing into the early morning hours of November 13, 2007, Defendant Brenner forwarded by PolyBrite's email to his personal AOL account PolyBrite documents in such large quantities that his personal AOL account began to refuse acceptance of them because his mailbox was full. PolyBrite was able to recover one email sent by Brenner from his PolyBrite account to his personal AOL account at 2:32 a.m. on November 13, 2007. That email had attached to it 22 emails, some of which also contained attachments.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

79.        On November 12, 2007, Defendant Brenner entered PolyBrite's headquarters at 11:41 p.m. It had been approximately two weeks since he had last made an appearance at the office. Access card reports show Defendant Brenner re-entering the building at 1:38 a.m., 6:25 a.m., 6:51 a.m. and 7:47 a.m. on November 13, 2007. On the evening of November 13, 2007, Defendant Brenner sent dozens of emails to Defendant CN Wong.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

80.        Mr. Brenner was terminated on November 14. Shortly after Defendant Brenner was terminated, an inspection of his office showed that he had removed thousands of pages of company owned documents containing files, background information on customers, product specifications, information on work in process, development work, pricing information and other confidential and sensitive materials.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

**DESTRUCTION OF EMAILS**

38

81.     On a date prior to his termination, and better known to him, Richard Brenner deleted all emails in his email inbox. On or around October 26, 2007, Kelly Newton, Richard Brenner's assistant, deleted all emails in her email inbox and sent folder.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

82.     On or around December 3, 2007, CN Wong deleted all emails in his email inbox. On or around December 29, 2007, Wong deleted all emails in his sent folder. Shirley Sy, CN Wong's assistant, deleted all emails in her email inbox and sent folder on or around December 14, 2007.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

## COUNT I - BREACH OF FIDUCIARY DUTY (RICHARD BRENNER)

83.     PolyBrite realleges paragraphs 1 through 82 as though fully set forth herein.

**ANSWER:**   The Defendant realleges his answers to paragraphs 1 through 82 as though fully set forth herein.

84.     At all relevant times to this Complaint, Defendant Brenner was a fiduciary of PolyBrite. He had an obligation to act with the highest degree of honesty and loyalty toward PolyBrite and in the best interests of PolyBrite.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

85.     As a fiduciary of PolyBrite Brenner had a duty to inform the company that employees were forming a rival company or engaging in other fiduciary breaches.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

86.     Brenner had a duty to disclose to PolyBrite information which was relevant to the affairs entrusted to him.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

87.     Brenner had a duty toward PolyBrite that prohibited him from discharging the duties of his position in such a manner as to make a secret profit for himself.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

88.     Brenner had a duty not to exploit his position within the company for his own benefit.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

89.    Brenner had the duty not to hinder the business of PolyBrite to continue the business for which it was developed.

90.    Brenner had the duty to disclose to PolyBrite all material facts, fully and completely before acting for his own benefit within the scope of his duties.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

91.    Brenner repeatedly breached his fiduciary duties to PolyBrite. Brenner formulated and executed a business plan to compete with PolyBrite while still employed by it. Brenner, along with Defendants Wong and Christensen, actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers and by forming CDW Lighting Technologies. In addition, Brenner and Defendant Wong dissuaded PolyBrite employees from attending the largest lighting show in Asia so that CDW could arrange to be at the exhibition. Brenner derailed PolyBrite's attempts to locate alternative manufacturing in China. Brenner also actively subverted relationships with customers and prospective customers.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in the first two sentences of this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.  As to the assertion that this

41

Defendant actively competed with Polybrite by soliciting business and forming CDW Lighting Technologies, the Defendant states that he had absolutely nothing to do with the formation, operation or ownership of CDW and further affirmatively states that during his employment at Polybrite, he never competed with Polybrite or tried to divert any customers from Polybrite but always acted in the best interests of Polybrite. The Defendant neither admits nor denies the allegations contained in the last three sentences of this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

92.      As a direct and proximate result of Brenner's breaches of fiduciary duties, Plaintiff PolyBrite has been damaged and continues to suffer damages.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

93.      Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Brenner's conduct. Money damages will not compensate for the continuing injury resulting from Brenner's use of confidential, technical, marketing and financial information.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

94.      By his conduct, Defendant Brenner has demonstrated his willingness to

continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:**  The Defendant denies this allegation.

95.         PolyBrite has demonstrated that Defendant Brenner has, and unless restrained will continue to, engage in conduct alleged herein.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

96.         There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:**  The Defendant believes that there is little likelihood that Polybrite will prevail on the merits relative to the allegations concerning the Defendant as many of the allegations are simply conclusions of law or completely incorrect factually.

97.    Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendant Brenner will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendant Brenner will result from an order which requires Defendant Brenner to comport his actions to the law, hence PolyBrite should not be required to post a bond.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

**ANSWER:**  The Defendant realleges its answers to paragraphs 1 through 82 as though fully set forth herein.

98.         The granting of an injunction will not disserve the public interest.

43

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

**ANSWER:**  The Defendant denies this allegation and affirmatively states that an employee cannot inform his employer of facts he does not know or facts which would not harm the employer.

## COUNT II - BREACH OF FIDUCIARY DUTY (PAUL CHRISTENSEN)

99.    PolyBrite realleges paragraphs 1 through 82 as though fully set forth herein.

**ANSWER:**  The Defendant realleges its answers to Paragraphs 1 through 82 as though fully set forth herein.

100.    At all relevant times to this Complaint, Defendant Christensen was a fiduciary of PolyBrite. He had an obligation to act with the highest degree of honesty and loyalty toward PolyBrite and in the best interests of PolyBrite.

**ANSWER:**  The Defendant admits his legal duties as an employee.

101.    As a fiduciary of PolyBrite Christensen had a duty to inform the company that employees were forming a rival company or engaging in other fiduciary breaches.

**ANSWER:**  The Defendant denies this allegation and affirmatively states that an employee cannot inform his employer of facts he does not know or facts which would not harm the employer.

44

102.         Christensen had a duty to disclose to PolyBrite information which was relevant to the affairs entrusted to him.

**ANSWER:**  The Defendant admits that he had a legal duty to Polybrite during his employment.

103.         Christensen had a duty toward PolyBrite that prohibited him from discharging the duties of his position in such a manner as to make a secret profit for himself.

**ANSWER:**  The Defendant admits that he did not act in a way which was detrimental to the employer.

104.         Christensen had a duty not to exploit his position within the company for his own benefit.

**ANSWER:**  The Defendant admits that he did not act in a way which was detrimental to the employer.

**ANSWER:**  The Defendant admits that he had a legal duty to Polybrite during the term of his employment, but this allegation is unclear.

105.         Christensen had the duty not to hinder the business of PolyBrite to continue the business for which it was developed.

**ANSWER:**   The Defendant denies this entire allegation, denies that he ever breached his fiduciary duties to Polybrite and denies that Polybrite has suffered any damage as a result of his acts or omissions and affirmatively states that during his entire

45

employment at Polybrite, he acted in the best interests of Polybrite and did everything in his power to promote the business of Polybrite.

106.        Christensen had the duty to disclose to PolyBrite all material facts, fully and completely before acting for his own benefit within the scope of his duties.

    **ANSWER:**  Defendant admits that he had a legal duty to Polybrite during the term of his employment, but this allegation is unclear.

107.        As alleged above, Defendant Christensen was a fiduciary of PolyBrite. Christensen joined the conspiracy formed by Defendants Brenner and Wong to subvert the interests of PolyBrite with its customers and prospective customers. Defendant Christensen and the other co-conspirators actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers. Defendant Christensen hid his actions by filing false reports with PolyBrite misrepresenting PolyBrite's relationship with customers and prospective customers. One day after resigning from PolyBrite, Defendant Christensen, along with Defendant Brenner, attended the meeting in Maumelle, Arkansas with Commercial Electric and displayed a modified PolyBrite product as their own for Neiman Marcus. Less than two weeks after the meeting in Arkansas, Defendant Christensen, along with Defendant Brenner, accompanied by Messrs. Van Auken and Young, traveled to China and Hong Kong and met with Defendant CN Wong, who was still employed by PolyBrite at that time.

    **ANSWER:**  The Defendant admits his legal status as an employee during the term of his employment and the relevant obligations as a fiduciary.  As for the second allegation, the Defendant denies ever joining a conspiracy with Defendants Brenner and

Wong, ever trying to subvert the interests of Polybrite with its customers or actively competing with Polybrite during his term of employment and affirmatively states that during his employment at Polybrite, he always acted consistently with his fiduciary duties as an employee of Polybrite and always tried to promote the business and best interests of Polybrite.  As for the third allegation concerning filing false reports, the Defendant denies this allegation and states that all of his reports were true and correct to the best of his knowledge and belief.  As for the allegation concerning his actions one day after resigning from Polybrite, he denies those allegations, but does state that he did meet with members of Commercial Electric on November 28, 2007 and that he did not bring any product or modified product to that meeting.  As for his response to the last allegation of this paragraph, the Defendant admits traveling to China and meeting with CN Wong, but affirmatively states that at that time his understanding was that Mr. Wong had terminated or had notified Polybrite that he was terminating his relationship with Polybrite.

108.    As a direct and proximate result of Defendant Christensen's breaches of fiduciary duties, Plaintiff PolyBrite has been damaged and continues to suffer damages.

**ANSWER:**  The Defendant denies this entire allegation, denies that he ever breached his fiduciary duties to Polybrite and denies that Polybrite has suffered any damage as a result of his acts or omissions and affirmatively states that during his entire employment at Polybrite, he acted in the best interests of Polybrite and did everything in his power to promote the business of Polybrite.

109.    Plaintiff has no adequate remedy at law. Money damages alone will not, and

47

cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Christensen's conduct. Money damages will not compensate for the continuing injury resulting from Defendant Christensen's use of confidential, technical, marketing and financial information.

**ANSWER:** The Defendant denies each and every allegation contained in this paragraph and affirmatively states that he was not involved in any misconduct and never inappropriately used any confidential, technical, marketing or financial information of Polybrite, except for the purposes of promoting the business of Polybrite.

110. By his conduct, Defendant Christensen has demonstrated his willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:** The Defendant has not engaged in any improper acts and has done nothing to harm PolyBrite and there is no injury to Polybrite as a result of the actions of the Defendant.

111. PolyBrite has demonstrated that Defendant Christensen has, and unless restrained will continue to engage in conduct which is alleged herein. There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:** The Defendant denies all allegations concerning any improper conduct and asserts that relative to him, there is no likelihood that Polybrite will prevail on the merits.

112. Should the Court grant interlocutory injunctive relief to PolyBrite, the burden

on Defendant Christensen will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendant Christensen will result from an order which requires Defendant Christensen to comport his actions to the law, hence PolyBrite should not be required to post a bond.

**ANSWER:** The Defendant denies these allegations and asserts that his actions never harmed Polybrite, but the requested relief would greatly harm the Defendant and his family.

113. The granting of an injunction will not disserve the public interest.

**ANSWER:** The Defendant denies this allegation and asserts that injunctive relief is improper and restricts free and fair competition.

**WHEREFORE,** the Defendant, Paul Christensen, requests that this Court dismiss this Count against him and award him costs and attorneys' fees.

## COUNT III - BREACH OF FIDUCIARY DUTY (CN WONG)

114. PolyBrite realleges paragraphs 1 through 82 as though fully set forth herein.

**ANSWER:** The Defendant realleges his answers to Paragraphs 1 through 82 as fully set forth herein.

115. At all relevant times to this Complaint, Defendant Wong was a fiduciary of PolyBrite. He had an obligation to act with the highest degree of honesty and loyalty toward PolyBrite and in the best interests of PolyBrite.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

116.       As a fiduciary of PolyBrite Wong had a duty to inform the company that employees were forming a rival company or engaging in other fiduciary breaches.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

117.       Wong had a duty to disclose to PolyBrite information which was relevant to the affairs entrusted to him.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

118.       Wong had a duty toward PolyBrite that prohibited him from discharging the duties of his position in such a manner as to make a secret profit for himself.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

119.       Wong had a duty not to exploit his position within the company for his own benefit.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

120.     Wong had the duty not to hinder the business of PolyBrite to continue the business for which it was developed.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

121.     Wong had the duty to disclose to PolyBrite all material facts, fully and completely before acting for his own benefit within the scope of his duties.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

122.     Defendant Wong repeatedly breached his fiduciary duties to PolyBrite. Wong formulated and executed a business plan to compete with PolyBrite while still employed by it. Defendant Wong, along with Defendants Brenner and Christensen, actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers and by forming CDW Lighting Technologies. In addition, Defendants Wong and Brenner dissuaded PolyBrite employees from attending the largest lighting show in Asia so that CDW could arrange to be at the exhibition. While still employed with PolyBrite and unbeknown to anyone at PolyBrite, Defendant Wong met with Defendants Brenner and Christensen and Messrs. Van Auken and Young in China from December 11,

2007 to December 13, 2007.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

123.        As a direct and proximate result of Defendant Wong's breaches of fiduciary duties, Plaintiff PolyBrite has been damaged and continues to suffer damages.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

124.    Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Wong's conduct. Money damages will not compensate for the continuing injury resulting from Defendant Wong's use of confidential, technical, marketing and financial information.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

125.        By his conduct, Defendant Wong has demonstrated his willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

126.        PolyBrite has demonstrated that Defendant Wong has, and unless restrained will continue to engage in conduct which is alleged herein. There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.


**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

128.        The granting of an injunction will not disserve the public interest, hence PolyBrite should note be required to post a bond.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.


## COUNT IV - CONSPIRACY TO BREACH FIDUCIARY DUTY (RICHARD BRENNER, PAUL CHRISTENSEN AND CN WONG)

129    Polybrite realleges paragraphs 1 through 82 as though fully set forth herein.

**ANSWER:**  The Defendant restates his answer to 1 through 82 as though fully set forth.

130.    At all relevant times to this Complaint, Defendants Brenner and Wong acted in concert and conspired together to breach their fiduciary duties to PolyBrite. On a date prior to his resignation, and better known to him, Defendant Christensen joined the conspiracy and knowingly participated therein. All three defendants traveled with top executives from Commercial Electric to China on December 11, 2007 to December 13, 2007, less than one month after Defendant Brenner's termination from PolyBrite and exactly two weeks after Defendant Christensen's resignation from PolyBrite. At that time Defendant Wong was still employed with PolyBrite. As alleged above, Defendants Brenner and Wong formulated and executed a business plan to compete with PolyBrite while still employed by it. Defendants Brenner, Christensen and Wong actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers and by forming CDW Lighting Technologies. In addition, Defendants Wong and Brenner dissuaded PolyBrite employees from attending the largest lighting show in Asia so that CDW could arrange to be at the exhibition. Defendants Brenner, Christensen and Wong subverted the interests of PolyBrite by filing false reports with PolyBrite in Naperville, Illinois, misrepresenting PolyBrite's relationship with customers and prospective customers. The conduct complained of constitutes overt acts in furtherance of the conspiracy by Defendants Brenner, Christensen and Wong. Said acts were tortious and unlawful in character.

**ANSWER:**  The Defendant neither admits nor denies the first allegation contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the

54

truth or accuracy of the allegation.  In response to the second allegation in this paragraph, the Defendant denies this allegation and affirmatively states that he never joined in any conspiracy and during his employment at Polybrite, acted to promote the business of Polybrite.  The Defendant admits traveling to China after he resigned from Polybrite and affirmatively states that he did nothing during that trip that violated any duty he owed Polybrite.  Relative to the allegation concerning CN Wong's employment, the Defendant understood that Mr. Wong was no longer employed at Polybrite.  The Defendant neither admits nor denies the allegation contained in this paragraph relative to the business plan of Defendants Brenner and Wong, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.  The Defendant denies the next allegation concerning CDW and affirmatively states that he had nothing to with the formation, ownership or management of this entity.  The Defendant neither admits nor denies the allegation contained in this paragraph relative to attending a lighting show, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegation.  The Defendant denies the allegations concerning filing false reports with Polybrite and affirmatively states that his reports were completely accurate to the best of his ability.  The Defendant denies any acts in furtherance of a conspiracy and denies any tortuous or unlawful acts.

131.      As fiduciaries of PolyBrite defendants had a duty to inform the company that employees were forming a rival company or engaging in other fiduciary breaches.

**ANSWER:**   The Defendant restates his answer to 101 as though fully set forth herein.

55

132.        Defendants had a duty to disclose to PolyBrite information which was relevant to the affairs entrusted to them.

**ANSWER:** The Defendant restates his answer to 102 as though fully set forth herein.

133.        Defendants had a duty toward PolyBrite that prohibited them from discharging the duties of their positions in such a manner as to make a secret profit for themselves.

**ANSWER:** The Defendant restates his answer to 103 as though fully set forth herein.

104.    Defendants had a duty not to exploit their position within the company for their own benefit.

**ANSWER:** The Defendant restates his answer to 104 as though fully set forth herein.

135.        Defendants had the duty not to hinder the business of PolyBrite to continue the business for which it was developed.

**ANSWER:** The Defendant restates his answer to 105 as though fully set forth herein.

136.        Defendants had the duty to disclose to PolyBrite all material facts, fully and completely before acting for their own benefit within the scope of their duties.

**ANSWER:** The Defendant restates his answer to 106 as though fully set forth herein.

137.    The wrongful acts alleged herein constitute acts in furtherance of a conspiracy.

**ANSWER:** The Defendant denies any wrongful acts on his part.

138.        As a direct and proximate result of the aforementioned conspiracy, Plaintiff PolyBrite has been damaged and continues to suffer damages.

**ANSWER:** The Defendant denies any conspiracy and any damage to PolyBrite.

139.        Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendants Brenner, Christensen and Wong's conduct. Money damages will not compensate for the continuing injury resulting from Defendants Brenner, Christensen and Wong's use of confidential, technical, marketing and financial information.

**ANSWER:** The Defendant denies all allegations in this paragraph, any misconduct on his part and any use of Polybrite's confidential, technical, marketing or financial information for any purpose except to carry on business on behalf of Polybrite.

140.        By their conduct, Defendants Brenner, Christensen and Wong have demonstrated their willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:** The Defendant denies that any acts he engaged in have harmed PolyBrite and further denies any injury to PolyBrite.

141.        PolyBrite has demonstrated that Defendants Brenner, Christensen and Wong have, and unless restrained will continue to engage in conduct which is alleged herein. There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:** The Defendant denies the allegations in this paragraph and believes there is no likelihood that PolyBrite will prevail in this action.

142. Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendants Brenner, Christensen and Wong will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendants Brenner, Christensen and Wong will result from an order which requires Defendants Brenner, Christensen and Wong to comport their actions to the law.

**ANSWER:** The Defendant denies this allegation in accordance with his answer to 112.

143. The granting of an injunction will not disserve the public interest.

**ANSWER:** The Defendant denies this allegation in accordance with his answer to 113.

WHEREFORE, the Defendant, Paul Christensen, requests that this Court dismiss this Court with costs and attorneys' fees to be paid by the Plaintiff.

## COUNT V – FRAUD (RICHARD BRENNER)

144. PolyBrite realleges paragraphs 1 through 91 as though fully set forth herein.

**ANSWER:** The Defendant realleges his answers to 1 through 91 as though fully set forth herein.

145. Defendant Brenner made numerous reports, oral and written, formal and informal, to PolyBrite during 2006 and 2007. In none of those reports did he disclose the wrongful conduct alleged herein, through he had an affirmative duty to do so.

58

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

146.        Defendant Brenner's failure to report the wrongful conduct of himself and his co-defendants were material omissions of fact.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

147.        Defendant Brenner's failure to report the wrongful conduct was an effort on his part to misrepresent the state of affairs of the company.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

148.        Defendant Brenner's material omissions in his reports were done for the purpose of inducing plaintiff not to act, because had plaintiff known of Brenner's and his co-defendants' wrongful conduct, it would have fired them immediately.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

149.        PolyBrite acted in reliance on the statements and omissions of Brenner, and its reliance was reasonable.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

150.    PolyBrite has been injured and continues to suffer injuries as a direct and proximate result of its reliance on Defendant Brenner's false representations and omissions.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

151.    Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Brenner's conduct. Money damages will not compensate for the continuing injury resulting from Brenner's use of confidential, technical, marketing and financial information.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

152.    By his conduct, Defendant Brenner has demonstrated his willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

153.      PolyBrite has demonstrated that Defendant Brenner has, and unless restrained will continue to, engage in conduct alleged herein.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

154.      There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

155.      Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendant Brenner will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendant Brenner will result from an order which requires Defendant Brenner to comport his actions to the law, hence PolyBrite should not be required to post a bond.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

156.      The granting of an injunction will not disserve the public interest.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

## COUNT VI – FRAUD (PAUL CHRISTENSEN)

157.    PolyBrite realleges paragraphs 1 through 82 and paragraphs 100 through 107 as though fully set forth herein.

**ANSWER:**  The Defendant realleges his answers to paragraphs 1 through 82 and 101 through 107 as though fully set forth herein.

158.  Defendant Christensen made numerous reports, oral and written, formal and informal, to PolyBrite during 2006 and 2007. In none of those reports did he disclose the wrongful conduct alleged herein, through he had an affirmative duty to do so.

**ANSWER:**  The Defendant denies he made any reports in which he failed to disclose wrongful conduct and affirmatively states that he was unaware of any wrongful or competitive conduct during the term of his employment with Polybrite.

159.    Defendant Christensen's failure to report the wrongful conduct of himself and his co-defendants were material omissions of fact.

**ANSWER:**  The Defendant denies the allegations in this paragraph and affirmatively states that he was never aware of any wrongful conduct on behalf of himself or the other defendants while he was an employee of the Plaintiff.

160.    Defendant Christensen's failure to report the wrongful conduct was an effort on his part to misrepresent the state of affairs of the company.

**ANSWER:**  The Defendant denies the allegations in this paragraph in accordance with his answer to 159.

161.        Defendant Christensen's material omissions in his reports were done for the purpose of inducing plaintiff not to act, because had plaintiff known of Christensen's and his co-defendants' wrongful conduct, it would have fired them immediately.

**ANSWER:**  The Defendant denies the allegations in this paragraph in accordance with his answer to 159 and states that he never filed or authored a report in which there were material omissions of fact.

162.    PolyBrite acted in reliance on the statements and omissions of Christensen and its reliance was reasonable.

**ANSWER:**  The Defendant denies the allegations in this paragraph and affirmatively states that he made no material omission of fact in any report.

163.    PolyBrite has been injured and continues to suffer injuries as a direct and proximate result of its reliance on Defendant Christensen's false representations and omissions.

**ANSWER:**  The Defendant denies the allegations in this paragraph as he made no false representation or omission.

164.        Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Christensen's conduct. Money damages will not compensate for the continuing injury resulting from Christensen's use of confidential, technical, marketing and financial information.

**ANSWER:**    The Defendant realleges his answer to 109 as though fully set forth.

63

165.    By his conduct, Defendant Christensen has demonstrated his willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:**  The Defendant realleges his answer to 110 as though fully set forth.

166.        PolyBrite has demonstrated that Defendant Christensen has, and unless restrained will continue to, engage in conduct alleged herein.

**ANSWER:**  The Defendant denies this allegation and affirmatively states that his conduct as an employee of Polybrite was in accordance with his obligations as an employee of the company and he exerted his best efforts exclusively on behalf of Polybrite.

167.        There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:**    The Defendant denies this allegation and denies that there is any likelihood that the Plaintiff will prevail on its claims against him.

168.    Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendant Christensen will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendant Christensen will result from an order which requires Defendant Christensen to comport his actions to the law, hence PolyBrite should not be required to post a bond.

**ANSWER:**  The Defendant realleges his answer to 112 as though fully set forth herein.

169.        The granting of an injunction will not disserve the public interest.

64

**ANSWER:**  The Defendant denies the allegations in this paragraph as the Plaintiff has requested an unreasonable restraint of competition.

WHEREFORE, the Defendant, Paul Christensen, requests that this Court dismiss this Court with the Plaintiff to pay all costs and attorneys' fees.

## COUNT VII – FRAUD (CN WONG)

170.      PolyBrite realleges paragraphs 1 through 82 and paragraphs 115 through 122 as though fully set forth herein.

**ANSWER:**   The Defendant realleges his answers to Paragraphs 1 through 82 and paragraphs 115 through 122 as though fully set forth herein.

171.   Defendant Wong made numerous reports, oral and written, formal and informal, to PolyBrite during 2006 and 2007. In none of those reports did he disclose the wrongful conduct alleged herein, through he had an affirmative duty to do so.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

172.   Defendant Wong's failure to report the wrongful conduct of himself and his co-defendants were material omissions of fact.

**ANSWER:**  The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

173.      Defendant Wong's failure to report the wrongful conduct was an effort on his

part to misrepresent the state of affairs of the company.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

174.     Defendant Wong's material omissions in his reports were done for the purpose of inducing plaintiff not to act, because had plaintiff known of Wong's and his co-defendants' wrongful conduct, it would have fired them immediately.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

175.     PolyBrite acted in reliance on the statements and omissions of Wong, and its reliance was reasonable.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

176.    PolyBrite has been injured and continues to suffer injuries as a direct and proximate result of its reliance on Defendant Wong's false representations and omissions.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

177.     Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities

which PolyBrite will suffer as a result of Defendant Wong's conduct. Money damages will not compensate for the continuing injury resulting from Wong's use of confidential, technical, marketing and financial information.

     **ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

178.      By his conduct, Defendant Wong has demonstrated his willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

     **ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

179.      PolyBrite has demonstrated that Defendant Wong has, and unless restrained will continue to, engage in conduct alleged herein.

     **ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

180.      There is a likelihood that PolyBrite will prevail on the merits of this action.

     **ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

181.      Should the Court grant interlocutory injunctive relief to PolyBrite, the burden

on Defendant Wong will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendant Wong will result from an order which requires Defendant Wong to comport his actions to the law, hence PolyBrite should not be required to post a bond.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

182.    The granting of an injunction will not disserve the public interest.

**ANSWER:** The Defendant neither admits nor denies the allegations contained in this paragraph, as the Defendant has insufficient knowledge to form a belief as to the truth or accuracy of the allegations.

### COUNT VIII CONSPIRACY TO COMMIT FRAUD (RICHARD BRENNER, PAUL CHRISTENSEN AND CN WONG)

183.    PolyBrite realleges paragraphs 1 through 82 and paragraphs 130 through 137 as though fully set forth herein.

**ANSWER:** The Defendant realleges his answers to 1 through 82 and 130 through 137 as though fully set forth herein.

184.        Defendants made numerous reports, oral and written, formal and informal, to PolyBrite during 2006 and 2007. In none of those reports did they disclose the wrongful conduct alleged herein, through they had an affirmative duty to do so.

**ANSWER:** The Defendant admits that he made numerous reports but denies the remainder of these allegation and affirmatively states that he never made any false reports and never knew of any wrongful conduct to disclose in any reports.

68

185.        Defendants' failures to report their wrongful conduct were material omissions of fact.

   **ANSWER:**  The Defendant denies this allegation as he was unaware of any wrongful conduct during his employment at PolyBrite.

186.        Defendants' failures to report the wrongful conduct was an effort on their part to misrepresent the state of affairs of the company.

   **ANSWER:**  The Defendant denies this allegation in accordance with his answer to paragraph 185.

187.        Defendants' material omissions in their reports were done for the purpose of inducing plaintiff not to act, because had plaintiff known of defendants' wrongful conduct, it would have fired them immediately.

   **ANSWER:**  The Defendant denies this allegation as he had no knowledge of any wrongful acts.

188.        Defendants acted jointly, and in concert, to achieve this conspiracy of fraud, each acting to support the other, each with knowledge of the others' wrongful conduct.

   **ANSWER:**  The Defendant denies this allegation and moves to strike this allegation as it is simply a conclusion of law and there are no facts to indicate that the Defendant acted jointly or in concert with anyone during his employment to harm the interests of PolyBrite.

189.        PolyBrite acted in reliance on the statements and omissions of defendants and its reliance was reasonable.

   **ANSWER:**  The Defendant denies this allegation as he never made any incorrect

69

statement or material omission in any report to PolyBrite.

190.    PolyBrite has been injured and continues to suffer injuries as a direct and proximate result of its reliance on Defendants' false representations and omissions.

**ANSWER:**    The Defendant denies this allegation and affirmatively states that PolyBrite never suffered any damage as a result of his actions.

191.    Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendants' conduct. Money damages will not compensate for the continuing injury resulting from defendants' use of confidential, technical, marketing and financial information.

**ANSWER:**  The Defendant denies this allegation as he was never involved in any wrongful conduct and never used confidential, technical, marketing or financial information of the Plaintiff in derogation of his obligations due PolyBrite.

192.    By their conduct, Defendants have demonstrated their willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:**    The Defendant denies this allegation as he has never acted in derogation of his duties as an employee of PolyBrite.

193.            PolyBrite has demonstrated that Defendants have, and unless restrained will continue to, engage in conduct alleged herein.

**ANSWER:**  The Defendant denies this allegation in accordance with his answer to 192.

194.    There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:**  The Defendant denies this allegation as the allegations against him are totally false.

195.        Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendants will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendants will result from an order which requires Defendants to comport their actions to the law, hence PolyBrite should not be required to post a bond.

**ANSWER:**  The Defendant denies the allegations in accordance with his answer to 168.

196.    The granting of an injunction will not disserve the public interest.

**ANSWER:**  The Defendant denies this allegation in accordance with his answer to 169.

WHEREFORE, the Defendant, Paul Christensen, requests that this Court dismiss this Count with costs and attorney's fees to be paid for by the Plaintiff.

## AFFIRMATIVE DEFENSES

NOW COMES the Defendant, Paul Christensen, and for his Affirmative Defenses in this matter, states as follows:

## PARTIES

1.    Polybrite International, Inc. ("Polybrite") is a start up company, which is a subsidiary of the Goeken Group Corp. ("Goeken") and is involved in the LED field.  It markets three major product lines:  Polybrite Lighted Pet Products ("Pet")-which markets battery powered devices to enhance pet visibility, such as

71

dog collars; Polybrite Lighted Safety Products ("Safety")-which markets battery powered devices to provide safety in low lighting conditions, such as lighted safety vests; and Borealis Lighting ("General Lighting")-the brand name for three types of powered LED products, decorative bulbs, signage lighting systems and general illumination lamps.

2.  Paul Christensen ("Christensen") is an adult resident of the State of New York and is an expert commercial photographer and is particularly knowledgeable in the technical field of lighting to produce the desired effects.

## FACTS

3.  In early 2005, Polybrite retained Christensen as an independent sales consultant to aid in the sales of the signage products in the Polybrite General Lighting division, then branded Westinghouse Lighting Systems.  He worked under the direction of Randy S. Miles ("Miles"), with input from Sandra Goeken Miles ("Sandra"), both members of the Board of Directors of Goeken, which board served as the governing body of Polybrite.  In addition Sandra is the vice-chairman and president of Goeken, with sales responsibility for Polybrite and Miles was the director of sales for the signage section of the General Illumination division.

4.  On or about June 12, 2006, Miles hired Christensen designating him sales and marketing associate in the Polybrite signage section of its General Lighting division and reporting directly to him.  In addition Christensen reported to Sandra, assisting her by transcribing her verbal and hand-written instructions on

72

a variety of promotional assignments for Polybrite.  Upon information and belief, during the entire history of Polybrite, the sales of Safety and Pet products far exceeded the sales of the General Lighting products and the signage products were simply a part of the General Lighting division's product line.  Although denominated Director of Marketing and Sales of Signage-North America, in reality he was simply a sales associate in the signage part of the General Lighting division, without any staff and without an office at the time of his hiring. Polybrite was to pay Christensen a salary and to reimburse him for his business expenses.

5.     Upon information and belief, although Polybrite started operation in 1995, it sales in its General Lighting division were extremely minimal and during its entire history, Polybrite earned a profit and needed a constant infusion of cash from investors and members of the Goeken Board of Directors in order to simply meet its payables and its payroll.

6.     After Polybrite hired him, Christensen worked under the direction of Sandra and Miles.  Sandra introduced Christensen to potential customers and distributors for the Polybrite General Lighting products and also directed him in helping her prepare optimistic sales projections, which could be utilized to obtain more working capital for Polybrite to overcome its yearly cash flow problems and deficits.

7.     Sandra introduced Christensen to Commercial Electric, LLC ("CE"), which was a potential distributor for certain of Polybrite's products, including its General

Lighting products. Christensen's main contact at CE was William Young, who was in charge of business development and commercial lighting.

8. During his employment at Polybrite, Christensen exerted his highest and best efforts to promote the sales and marketing of Polybrite's General Lighting products and to work with others so that Polybrite could possibly achieve a sustainable and profitable business.

9. Christensen's duties included an assignment by Sandra and Miles in or about the summer of 2007 to meet with other Polybrite employees, including Richard Brenner ("Brenner"), to make suggestions and recommendations to Sandra, Miles and other members of the Goeken Board of Directors relative to making modifications to the structure and operations of Polybrite so that Polybrite could attain positive cash flow and eventually produce a profit.

10. As a result of this assignment, Christensen and Brenner reported to Sandra, Miles and other member of the Goeken Board of Directors its suggestions concerning modifying management of Polybrite in order to streamline Polybrite, make it a more professional organization and to formulate plans for Polybrite's eventual profitability.

11. Upon information and belief, either in late summer or early fall of 2007, at the direction of Patricia A. Schneider ("Schneider"), executive vice president of Goeken, the computer expert at Polybrite commenced conducting reconnaissance on Christensen and Brenner, to intercept, copy and read all their

e-mail and computer records.    In fact that program was designated-RECON@POLYBRITE.COM.

12.    During the course of RECON@POLYBRITE.COM, the computer expert reported to Schneider and John D. Goeken, the chairman and CEO of Goeken, that Christensen and Brenner were conducting an assignment to review the operations of Polybrite and make suggestions concerning potential management changes and that in fact Christensen and Brenner made suggestions concerning the upper level management at Polybrite.

13.    On information and belief, Goeken conducted a Board of Directors meeting in late October of 2007 and at that meeting certain members of the Board of Directors raised the suggestions which were made by Christensen and Brenner concerning the operation and management of Polybrite.  The Board of Directors rejected these suggestions.

14.    During this same time period in summer and early fall of 2007, Christensen was exerting his highest and best efforts to sell and market to Dillard's, through its distributor, CE,  LED lighting for jewelry display cases to be utilized in its new retail establishments.  On or about August 27, 2007, Christensen informed management at Polybrite and Goeken that Dillard's had committed to purchase certain LED lighting from Polybrite, but there were certain preconditions necessary to effectuate that sale.  Those preconditions included:  obtaining final UL approval, modifying the LED lighting product to meet Dillard's needs and building suitable manufactured samples of this lighting fixture.

75

15.   In September and October of 2007, Christensen attempted to aid Polybrite in
      accomplishing these preconditions for the potential Dillard's sale.  Relative to
      obtaining the necessary UL approval, it was necessary for Polybrite to submit to
      UL manufactured working samples of the LED lighting, as opposed to prototype
      models; there had to be extensive safety testing of the product with the
      concomitant data; there had to be detailed engineering drawings and schematics
      of the product submitted; the company has to submit the material safety data
      sheets for the component products; and the company had to submit an
      application fee to UL.  Christensen, as a salesman, did not have the technical
      expertise to actually prepare the necessary documentation or manufacture the
      working samples of the product, but he exerted his best efforts to coordinate the
      submissions to UL.

16.   The management and financial officers of Polybrite and Goeken subverted and
      undermined Christensen's efforts relative to completion of the Dillard's project.
      Polybrite had not paid key suppliers and manufacturers for the Dillard's project in
      a timely fashion, including, but not limited to Shape LLC, Citizen LED, Nichia
      Manufacturing, the mechanical drawers and the sheet metal fabricators.  As a
      result of not keeping current with these suppliers, the Dillard's project and the
      application process to UL came to a complete halt.

17.   In early fall of 2007, in order to obtain the necessary financing to prepare the
      manufactured samples on the Dillard project, Christensen went to board
      member(s) of Goeken to request an influx of capital so that the key suppliers

could be paid and they could manufacture the necessary LED samples to be submitted to UL.

18.    Instead of recognizing Christensen's extraordinary efforts to promote the Dillard's project, the CEO of Polybrite, Carl Scianna, berated Christensen and in fact, as of mid April of 2008, Polybrite had still not received the UL seal of approval on the LED product which Polybrite intended to sell to Dillard's.

19.    Polybrite further undermined Christensen's ability to perform his job in that in did not reimburse Christensen for his business expenses as it had agreed. Polybrite's management was aware that Christensen would incur travel expenses as Christensen resided in New York, he had to travel extensively on behalf of Polybrite, both to meet at Polybrite headquarters in the Chicago area and meet with potential distributors and customers for the Polybrite General Lighting products throughout North America.

20.    During the course of his employment at Polybrite, Christensen incurred significant reimbursable business expenses and as of November of 2007, Polybrite owed Christensen in excess of $29,000.00 for reimbursable and legitimate business expenses.

21.    Although Christensen often requested payment for these business expenses and received assurances from the officers of Polybrite and Goeken that he would receive these payments, Polybrite still owes Christensen a sum in excess of $29,000.00.

22.   As of the second week of November of 2007, Polybrite had subverted and undermined Christensen's position at Polybrite in numerous ways, including, but not limited to:

a.  Terminating Richard Brenner, a capable, competent and well qualified executive.

b.  Failing to reimburse Christensen for legitimate business expenses in excess of $29,000.00.

c.  Failing to pay key suppliers and others on a timely basis, who were critical to fulfilling the prerequisites for the sale to the Dillard's Department Stores.

d.  Removing Christensen from a key account, Florida Plastics, a distributor for the McDonald's Corporation.

e.  Failing to make key management changes and to adopt suggestions from members of the Goeken Board of Directors, which had oversight responsibility for the operations of Polybrite.

f.  Spied on Christensen's e-mail under the RECON@POLYBRITE program which had been approved by the upper level management at Goeken.

23.   As a result of the foregoing, Christensen knew or concluded that Polybrite no longer supported his efforts on behalf of Polybrite, that Polybrite's actions displayed a lack of trust and confidence in his ability and that Polybrite's acts and omissions were tantamount to his constructive discharge, and Christensen found it necessary to tender his resignation on November 26, 2007.

**FIRST AFFIRMATIVE DEFENSE-UNCLEAN HANDS**

For Christensen's First Affirmative Defense-Unclean Hands, Christensen states as follows:

24. Polybrite is guilty of unclean hands in that it has made false, misleading and baseless allegations in the Complaint. Some of those allegations are as follows:

a. That Christensen was involved in a conspiracy. In paragraph 4 of the Complaint, Polybrite states that, "This conspiracy was later joined by Christensen." This allegation is simply a groundless conclusion of law and Polybrite has not stated one fact to support that bald assertion and has not specified a date or any action by Christensen during his employment at Polybrite which would substantiate this groundless position. Polybrite again repeats this baseless assertion in paragraph 107 of the Complaint, again with out any supporting facts or dates.

b. That Christensen made false or misleading reports to Polybrite. The allegation that Polybrite states in this regard is at paragraph 59 of the Complaint: "From the time that he took over the effort to obtain UL approval, Christensen represented, directly or by implication, that the UL approval process was going according to schedule and was not a critical issue in regard to PolyBrite's relationship with Dillard's." Polybrite does not specify any such false representation, when it was made or to whom it was made. One is left to conclude that he committed some fraud "by implication." Under Federal Rule of Civil Procedure 9 (b) does not allow such pleading of fraud "by implication," but rather the allegations must be made with particularity.

79

Polybrite repeats this groundless allegation in paragraph 107 of the Complaint, that Christensen filed "false reports," but there again Polybrite provides no factual support for this unwarranted conclusion. Second of all, Polybrite's management was always aware of the fact that every major retailer requires UL certification prior to incorporating any electrical product in their establishments. Any allegation which indicates that UL certification was not critical is simply false and known by Polybrite to be false.

c. That Christensen was guilty of fraud. The basis for this allegation is paragraph 158 of the Complaint. That paragraph states: "Defendant Christensen made numerous reports, oral and written, formal and informal, to Polybrite during 2006 and 2007. In none of those reports did he disclose wrongful conduct alleged herein, through [sic.] he had an affirmative duty to do so." That allegation would indicate that some how Christensen knew of the numerous allegations against other parties alleged in the Complaint. There is no fact, document or statement which would indicate that Christensen had any knowledge of the activities of the other parties. Fraudulent conduct is never assumed, but must be pled with factual particularity.

d. That Christensen was aware that CE's reasons for stopping their participation with Polybrite on the Dillard's linear LED display cases were false and pretextual. In paragraph 63 of the Complaint, Polybrite alleges: "They [reasons stated by CE] were known by both Brenner and Christensen to be

80

false and pretextual, neither of whom disclosed this fact to Polybrite." This allegation is simply a conclusion without any basis in fact. Polybrite never states what they believe the true reasons for the terminations were the grounds for asserting that CE was stating false reasons or the basis for believing that Christensen knew of the true reasons. There allegations are simply pleading by innuendo without any factual basis whatsoever.

e. That Christensen stole property from Polybrite. This allegation is at paragraph 77 of the Complaint. "On information and belief the purpose [of entering the building in the morning] was to surreptitiously remove PolyBrite's files and product, which he had no right to possess." Polybrite is accusing Christensen of stealing and simply makes a false assumption on information and belief. In fact Christensen never removed any product or files from Polybrite, but brought files and product into Polybrite. In contrast to this baseless allegation on information and belief, Christensen's work on that day was on behalf of Polybrite and Polybrite's customer, the Merchandise Mart. Polybrite had significant and complete documentation to conclude the propriety of Christensen's conduct, the purpose of his activities and that this allegation concerning surreptitious and dishonest conduct was false and improper.

25. Polybrite was guilty of unclean hands in that it purposefully and improperly spied on Christensen, with their management approved program, RECON@POLYBRITE.COM, in which management at Goeken and Polybrite

81

intercepted, reviewed and read Christensen's private, confidential and authorized e-mail.   During the course of this espionage, the management discovered that Christensen was participating with others at Polybrite in discussing the management of Polybrite and formulating recommendations for improving Polybrite's long term business success.

26.    Polybrite was guilty of unclean hands in that it constructively discharged Christensen as a result of the management's spying on his e-mail.  Management discovered that Christensen and Brenner were carrying out an assignment from members of the Goeken Board of Directors and officers of Goeken and Polybrite, including Sandra, Miles and others.   In that assignment, Christensen and others suggested that management hire a turn around specialist, so that Polybrite could be put on a sounder financial footing and possibly make a profit in the future.  In retaliation for this suggestion, management at Polybrite undermined Christensen's efforts and made it impossible for Christensen to carry out his duties which in effect constructively terminated Christensen's employment at Polybrite.

### SECOND AFFIRMATIVE DEFENSE-INEQUITABLE CONDUCT

For Christensen's Second Affirmative Defense-Inequitable Conduct, Christensen states as follows:

1.    Christensen restates and realleges paragraph 1 through 26 of the First Affirmative Defense as though fully set forth herein.

2.    Polybrite's conduct of systematically spying on Christensen, of undermining Christensen's efforts to obtain UL approval of the product to be sold to Dillard's,

of castigating Christensen for attempting to obtain funding to pay the suppliers of the sample product to be submitted to UL, and of constructively terminating Christensen's employment at Polybrite in retaliation for his legitimate efforts to carry out the assignment given to him by officers of Polybrite and Goeken and members of the Board of Directors of Goeken involves inequitable conduct which should bar Polybrite from pursuing any equitable remedy against Christensen.

### THIRD AFFIRMATIVE DEFENSE-ESTOPPEL

For Christensen's Third Affirmative Defense-Estoppel, Christensen states as follows:

1. Christensen realleges and restates paragraph 1 though 26 of the First Affirmative Defense as though fully set forth herein.

2. Polybrite should be estopped from asserting its claims against Christensen for his post-employment practices as Polybrite's actions prevented Christensen from carrying out his duties on behalf of Polybrite and effectively terminated his employment by doing the following:

   a. Polybrite did not and would not pay suppliers on the Dillard's project in a timely fashion, so that there were no manufactured samples to submit to UL.

   b. When Christensen attempted to obtain capital from a member of the Goeken Board of Directors to pay the suppliers for the product in the Dillard's project, which in fact board members frequently had contributed capital to pay Polybrite's payables and payroll, management criticized him.

   c. The management of Polybrite removed Christensen from the Florida Plastics account.

83

d.  Although the management of Polybrite promised Christensen payment for legitimate out-of-pocket business expenses, Polybrite has not paid business expenses to Christensen in excess of $29,000.00.

e.  Polybrite's management terminated the employment of key employees of the company for their attempts to rectify Polybrite's financial situation and honestly report their suggestions to officers of Goeken and members of the Goeken Board of Directors.

## COUNTERCLAIM

For Christensen's Counterclaim against Polybrite, Christensen states as follows:

1.  Christensen realleges and restates paragraph 1 through 26 of the First Affirmative Defense as though fully set forth herein.

2.  Polybrite presently owes Christensen a sum in excess of $29,000.00 for unpaid business expenses.

3.  Although often demanded, Polybrite has still not paid these unpaid business expenses.

WHEREFORE, Paul Christensen, requests that this Court entered judgment in his favor and against Polybrite for the sum of $29,000.00, plus pre-judgment interest and costs of this suit.

Paul Christensen

By:  /s/ Sigi M. Offenbach
       One of his Attorneys

Sigi M. Offenbach
Philip L. Mandell
Pitler and Mandell
39 South LaSalle Street
Suite 1220
Chicago, Illinois  60603
312/782-9466

## DECLARATION OF PAUL CHRISTENSEN

Pursuant to 28 U.S.C. §1746, Paul Christensen declares as follows:

1.    I am one of the Defendants in the above captioned matter.

2.    I have read the foregoing Answer to Verified Complaint, Affirmative Defenses

and Counterclaim.

3.    The facts contained therein are true in substance and in fact and as to those

allegations made on information and belief, I verily believe them to be true.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed at West Salem, New York, this _____ day of May, 2008.


_____
Paul Christensen

**CERTIFICATE OF SERVICE**

The undersigned certifies that on the fifth day of May, 2008, I electronically filed Paul Christensen's Answer to Verified Complaint, Affirmative Defenses and Counterclaim with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

William G. Sullivan
Mason N. Floyd
Martin, Brown & Sullivan
321 South Plymouth Court
10th Floor
Chicago, Illinois  60604

Constantine John Gekas
Gekas & Associates, Ltd.
11 South LaSalle Street
Suite 1700
Chicago, Illinois  60603

Mark J. Rose
200 West Adams Street
Suite 2850
Chicago, Illinois  60606


/s/ Sigi M. Offenbach