IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| POLYBRITE INTERNATIONAL, INC., | ) | |
| an Illinois corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08 C 1797 |
| | ) | |
| RICHARD BRENNER, PAUL | ) | Hon. Robert W. Gettleman, Presiding Judge |
| CRISTENSEN, and CHEE NGON | ) | Hon. Nan R. Nolan, Magistrate Judge |
| WONG, | ) | |
| Defendants. | ) | Jury Demanded |

## ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANT RICHARD BRENNER TO VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Defendant **RICHARD BRENNER** ("Brenner"), by and through his attorneys, Mark J. Rose

and Constantine John Gekas, answers the *Verified Complaint for Injunctive and Other Relief*

("Complaint") of Plaintiff **POLYBRITE INTERNATIONAL, INC.** ("PolyBrite") as follows:

### NATURE OF THE CASE

1.      PolyBrite International is one of the world's leading developers of lighting
technology.  Over ten years, hundreds of shareholders have invested in excess of $45 million to
nurture the Company's research, product development and marketing activities.  One of the
defendants - its Director of Marketing and Sales in North America - forecasted in 2007 that
PolyBrite's sales would explode, increasing by as much as $400 million annually over a three
year period. See Christensen July 30, 2007 email "Revised Projections" and attachment, true and
correct copies are attached hereto as Ex. 1. This action arises out of defendants' scheme to steal
success from PolyBrite by defrauding it out of millions of dollars.

**ANSWER:** For his answer to Paragraph 1 of PolyBrite's Complaint, Brenner denies that PolyBrite is

one of the world's leading developers of lighting technology and denies that he entered into any

scheme to steal success from PolyBrite by defrauding it out of millions of dollars.  For further

answer, Brenner states that the July 30, 2007 e-mail "Revised Projections" and attachment which are

attached to PolyBrite's Complaint as Exhibit "1" speak for themselves. For further answer, Brenner

admits the remaining averments contained in Paragraph 1 of PolyBrite's Complaint.

      2.     Defendant Richard Brenner ("Brenner") was Executive Vice President and Chief Operating Officer of PolyBrite. He was employed by PolyBrite for more than six years. He was fired on November 14, 2007. Defendant Paul Christensen ("Christensen") was PolyBrite's Director of Marketing and Sales. He resigned on November 27, 2007. Defendant Chee Ngon ("CN Wong" or "Wong") was employed by PolyBrite to run its Hong Kong office. He was Vice President of PolyBrite for Asia-Pacific. He resigned on December 17, 2007, effective January 21, 2008.

**ANSWER:** Brenner admits the averments contained in Paragraph 2 of PolyBrite's Complaint.

      3.     At all times relevant to this Complaint, Brenner, Christensen and Wong were senior executives of PolyBrite, all of whom were privy to the most sensitive and confidential information of PolyBrite.

**ANSWER:** Brenner admits that he was a senior executive of PolyBrite and that he had access to

certain sensitive and confidential information of PolyBrite. For further answer, Brenner denies that

Chee Ngon Wong ("CN Wong") was a senior executive officer of PolyBrite and that he had access to

certain sensitive and confidential information of PolyBrite. CN Wong worked for PolyBrite Asia,

Ltd., a different corporation.    For further answer, Brenner states that Paul Christensen

("Christensen") was PolyBrite's Director of Marketing & Sales-North America and had access to

information related to his duties.

      4.     Sometime prior to January, 2007, and at a time better known to themselves, Brenner and CN Wong entered into a conspiracy to subvert the interests of PolyBrite with its customers and prospective customers. This conspiracy was later joined by Christensen. They formulated and executed a business plan to compete with PolyBrite while still employed by PolyBrite. They and other co-conspirators actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers and by forming a business entity, CDW Lighting Technologies, to compete against PolyBrite.

**ANSWER:** Brenner denies the averments contained in Paragraph 4 of PolyBrite's Complaint.

      5.     In order to further their goals, defendants entered into an active, covert campaign to destroy PolyBrite's existing business relationships, including its relationship with the company that manufactured its products, Wellstar Electronics, Limited. Defendants hid their actions by

filing false reports with PolyBrite. Defendants entered into agreements with third parties to compete surreptitiously with PolyBrite. Defendants misappropriated financial, marketing and technical product information, all of which was confidential. Defendants have used this information to harm PolyBrite and further their personal financial goals. Defendants actively competed, and continue to compete, in the market through a company secretly organized by them beginning not later than February 13, 2007.

**ANSWER:** Brenner denies the averments contained in Paragraph 5 of PolyBrite's Complaint.

## PARTIES

6.     Plaintiff PolyBrite International, Inc. is a corporation duly formed and existing under the laws of Illinois. PolyBrite is a citizen of the State of Illinois. PolyBrite is a wholly-owned subsidiary of Goeken Group Corp. PolyBrite was founded in 1995.

**ANSWER:** Brenner admits the averments contained in Paragraph 6 of PolyBrite's Complaint.

7.     Defendant Richard Brenner is an individual residing at 372 Ameno Drive East, Palm Springs, California. He is a citizen of the State of California. He was hired by PolyBrite in 2001 as PolyBrite's Vice-President of Consumer Sales. He was elevated to Executive Vice President and Chief Operating Officer ("COO") in 2004.  Mr. Brenner's employment with PolyBrite was terminated on November 14, 2007.

**ANSWER:** Brenner admits the averments contained in Paragraph 7 of PolyBrite's Complaint.

8.     Defendant Paul H. Christensen is an individual residing at 24 West Lane, South Salem, New York. Mr. Christensen is a citizen of the State of New York. He was hired on June 12, 2006. He served as PolyBrite's Director of Marketing & Sales - North America. Mr. Christensen resigned on November 27, 2007.

**ANSWER:** Brenner admits the averments contained in the first three sentences of Paragraph 8 of

PolyBrite's Complaint but denies the last sentence on the grounds that Christensen resigned on

November 26, 2007, not November 27, 2007.

9.     Defendant Chee Ngon ("CN") Wong was employed by PolyBrite on January 16, 2004 as Vice President for Asia Pacific affairs. In addition, Mr. Wong was a director of PolyBrite Asia Limited, a wholly-owned subsidiary of PolyBrite which was formed for the specific purpose of doing business in Asia. CN Wong is a resident of the Hong Kong Special Administrative Region of the People's Republic of China (commonly referred to as "Hong Kong"), residing at 1/F, 68 J, Ma Liu Shui San Tseun, Fanling, N T Hong Kong, China. He is a citizen of the People's Republic of China. He left the employ of PolyBrite on January 21, 2008.

**ANSWER:** Brenner denies that CN Wong left PolyBrite's employment on January 21, 2008. For

further answer, Brenner states that CN Wong's last day of work for PolyBrite was on December 20,

2007. For further answer, since Mr. Wong had accrued considerable vacation time, he was paid

through January 21, 2008. For further answer, Brenner admits the remaining averments contained in

Paragraph 9 of PolyBrite's Complaint.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction of this action as to Defendants Brenner and
Christensen pursuant to 28 U.S.C. §1332(1) in that this is an action between citizens of different
States where the matter in controversy exceeds the amount of $75,000, exclusive of interest and
costs.

**ANSWER:** The averments contained in Paragraph 10 of PolyBrite's Complaint constitute a

conclusion of law requiring no answer.

11.    This Court has jurisdiction of this action as to Defendant Wong pursuant to 28
U.S.C. §1332(2) in that this is an action between citizens of a State and citizens or subjects of a
foreign state where the matter in controversy exceeds the amount of $75,000, exclusive of
interest and costs.

**ANSWER:** The averments contained in Paragraph 11 of PolyBrite's Complaint constitute a

conclusion of law requiring no answer.

12.    Venue of this action is proper in this district pursuant to 28 U.S.C. 1339(a) in that
a substantial part of the events or omissions giving rise to the claims alleged herein occurred in
this district.

**ANSWER:** The averments contained in Paragraph 12 of PolyBrite's Complaint constitute a

conclusion of law requiring no answer.

## NON-PARTY ACTORS

13.    Goeken Group Corp. is a Delaware corporation registered to do business in the
State of Illinois. Goeken Group Corp. is the parent corporation of PolyBrite. Goeken Group
Corp. was founded by John "Jack" Goeken, who also founded Microwave Communications Inc.,
better known as MCI. He subsequently founded FTD Mercury Network (flower delivery),
Airfone (later sold to GTE), In-Flight Phone Corp. and many others.

**ANSWER:** Brenner admits the averments contained in Paragraph 13 of PolyBrite's Complaint.

14.    Borealis Lighting ("Borealis") is a brand name used by PolyBrite. PolyBrite manufactures solid-state LED lighting systems and products under the Borealis brand.

**ANSWER:** For his answer to Paragraph 14 of PolyBrite's Complaint, Brenner admits that

Borealis Lighting ("Borealis") is a brand name established by PolyBrite.  For further answer,

Brenner states that he is without knowledge or information sufficient to form a belief as to the

truth of the remaining averments contained in Paragraph 14 of PolyBrite's Complaint.

15.    Commercial Electric LLC ("Commercial Electric") is an Arkansas Limited Liability Company that entered into a distribution contract with PolyBrite.

**ANSWER:** Brenner admits the averments contained in Paragraph 15 of PolyBrite's Complaint.

16.    Phil K. Gamache is President and CEO of Commercial Electric. Mr. Gamache worked closely with Paul Christensen pursuing large commercial accounts, including Dillard's department stores.

**ANSWER:** For his answer to Paragraph 16 of PolyBrite's Complaint, Brenner admits that Phil

K. Gamache ("Gamache") is President and CEO of Commercial Electric.  For further answer,

Brenner states that, since resigning from PolyBrite, Christensen has pursued sales on behalf of

Solid State Solutions, LLC ("Solid State"), a division of Commercial Electric.  For further

answer, Brenner states that, at all relevant times, Dillard's has been a near-permanent customer of

Commercial Electric.  For further answer, Brenner states that he is without knowledge or

information sufficient to form a belief as to the truth of the remaining averments contained in

Paragraph 16 of PolyBrite's Complaint.

17.    Robert Van Auken is an employee of Commercial Electric. At all times relevant to this Complaint he was its executive vice president.

**ANSWER:** Brenner admits the averments contained in Paragraph 17 of PolyBrite's Complaint.

5

18.    William Young is an employee of Commercial Electric. At all times relevant to this Complaint he was in charge of business development and commercial lighting for Commercial Electric.

**ANSWER:** Brenner admits that William Young is currently an employee of Commercial

Electric. For further answer, Brenner states that he is without knowledge or information

sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 18 of

PolyBrite's Complaint.

19.    Solid State Solutions LLC is an Arkansas limited liability company. The Arkansas Secretary of State website shows that Solid State Solutions filed its Articles of Incorporation on November 19, 2007 and lists Phil Gamache as "owner."

**ANSWER:** Brenner admits the averments contained in Paragraph 19 of PolyBrite's Complaint.

20.    Patrick Mullins is an expert in electro-optics, including LEDs.

**ANSWER:** For his answer to Paragraph 20 of PolyBrite's Complaint, Brenner admits that

Patrick Mullins ("Mullins") is an engineer who works in the field of electro-optics, including

LEDs.

21.    Virgil Cheng is a resident of the Hong Kong Special Administrative Region of the People's Republic of China. He is a citizen of the People's Republic of China. He is an engineer who served as a contractual consultant to PolyBrite.

**ANSWER:** Brenner admits the averments contained in Paragraph 21 of PolyBrite's Complaint.

22.    CDW Lighting Technologies Limited is a corporation organized under the laws of the Hong Kong Special Administrative Region of the People's Republic of China. It was formed by Richard Brenner, CN Wong, WN Wong and Virgil Cheng on February 12, 2007. From at least February of 2007 CDW actively competed with PolyBrite. It sold and advertised a line of lighting products that was in every way identical to PolyBrite's.

**ANSWER:** For his answer to Paragraph 22 of PolyBrite's Complaint, Brenner admits that CDW

Lighting Technologies Limited is a corporation organized under the laws of the Hong Kong

Special Administrative Region of the People's Republic of China which was formed by WN

Wong and Virgil Cheng in February, 2007. For further answer, Brenner denies the remaining

averments contained in Paragraph 22 of PolyBrite's Complaint.

23.    Shirley Sy was Assistant to Vice President of PolyBrite's Hong Kong office. She resigned from PolyBrite in December, 2007.

**ANSWER:** Brenner admits that Shirley Sy ("Sy") was employed with PolyBrite Asia Limited

and that she resigned her position with PolyBrite Asia Limited in December, 2007.

## FACTUAL ALLEGATIONS RELEVANT TO ALL COUNTS

24.    PolyBrite serves international and domestic customers from its headquarters in Naperville, Illinois. Its products are available worldwide through distributors, retail stores, websites and catalogs.

**ANSWER:** For his answer to Paragraph 24 of PolyBrite's Complaint, Brenner admits that

PolyBrite has its headquarters in Naperville, Illinois, and that it markets its products domestically

and internationally through distributors, retail stores, web sites and catalogues. For further

answer, Brenner affirmatively states that, due to financial difficulties and a lack of working

capital, PolyBrite's products have not been available and that, except for its sales of certain pet

and safety products, its sales have been negligible.

25.    PolyBrite has developed - and continues to develop - cutting edge technology that disperses light through a flexible polymer lens illuminated by light emitting diodes (LEDs). PolyBrite's polymer technology is extruded into a variety of clear, light scattering shapes, as well as certain molded applications. In addition to being extremely rugged, LEDs consume very little energy. PolyBrite has engineered advanced thermal management techniques, efficient and compact power supplies leading to more lumens per watt and greater efficiency in sophisticated LED applications.

**ANSWER:** For his answer to Paragraph 25 of PolyBrite's Complaint, Brenner admits that LED

products are extremely rugged, consume very little energy and represent cutting edge technology.

For further answer, Brenner admits that LEDs use thermal management techniques, are efficient

and rely on compact power supplies which lead to more lumens per watt and greater efficiency.

For further answer, Brenner denies that PolyBrite has developed, and continues to develop, this technology. Brenner affirmatively states that, since PolyBrite's incorporation in 1995, it has been severely undercapitalized and has experienced severe financial difficulties which have prevented PolyBrite from developing and engineering the techniques which it claims to have developed.

26.    PolyBrite's engineering versatility and design capability has resulted in creating state of the art LED systems that are incorporated into a diverse and wide range of energy efficient and "green" products for aerospace, military, pet and safety industries and unique lighting systems and LED based light bulbs (lamps).

**ANSWER:** For his answer to Paragraph 26 of PolyBrite's Complaint, Brenner admits that LED systems have been incorporated into a diverse and wide range of energy efficient and "green" products for aerospace, military, pet and safety industries and unique lighting systems, including LED-based light bulbs (lamps).  For further answer, Brenner denies that PolyBrite's engineering versatility and design capability have resulted in the creation of these state-of-the-art LED systems.

27.    At all times relevant to the Complaint, the vast majority of PolyBrite bulbs and products were manufactured in China. PolyBrite entered into a strategic relationship with Vigor Precision Limited ("Vigor"), a high precision injection molding assembly company. Vigor is headquartered in Hong Kong and operates three manufacturing facilities in China. At certain times Vigor manufactured PolyBrite's products at its plants in China.

**ANSWER:** For his answer to Paragraph 27 of PolyBrite's Complaint, Brenner admits that, at all times relevant to the Complaint, the vast majority of PolyBrite's bulbs and products were manufactured in China.  For further answer, Brenner admits that Vigor Precision Limited ("Vigor") is a high-precision injection molding assembly company which is headquartered in Hong Kong and operates three manufacturing facilities in China.  For further answer, Brenner admits that, at certain times, Vigor manufactured PolyBrite's products at its plants in China.  For

8

further answer, Brenner denies the remaining averments contained in Paragraph 27 of PolyBrite's

Complaint.

28.    Wellstar Electronics Limited ("Wellstar Electronics") is a wholly-owned subsidiary of Vigor headquartered in Hong Kong, with manufacturing facilities in China. Wellstar had not previously produced products similar to those that it manufactured for PolyBrite. It did not have expertise in solid state lighting and relied on PolyBrite to provide the technical expertise to produce its products.

**ANSWER:** For his answer to Paragraph 28 of PolyBrite's Complaint, Brenner admits that

Wellstar Electronics Limited ("Wellstar Electronics") is a wholly-owned subsidiary of Vigor

headquartered in Hong Kong with manufacturing facilities in China. For further answer, Brenner

is without knowledge or information sufficient to form a belief as to the truth of the remaining

averments contained in Paragraph 28 of PolyBrite's Complaint.

29.    In recent years the majority of PolyBrite's production took place at the Wellstar Electronics manufacturing facility. PolyBrite has paid in excess of $3.5 million dollars to Wellstar for products manufactured by it and for tooling, for which PolyBrite paid $429,000.00.

**ANSWER:** For his answer to Paragraph 29 of PolyBrite's Complaint, Brenner admits that, in

recent years, the majority of PolyBrite's production took place at the Wellstar Electronics

manufacturing facility. For further answer, Brenner affirmatively states that, during the time of

his employment with PolyBrite, PolyBrite owed Wellstar Electronics large sums of money which

were past due. For further answer, Brenner states that he is without knowledge or information

sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 29 of

PolyBrite's Complaint.

## RICHARD BRENNER

30.    On August 13, 2001, Illumination Polymer Technologies, Inc., now known as PolyBrite, made an offer of employment to Defendant Brenner. He accepted and became PolyBrite's Vice President of Consumer Sales. He was paid a base salary of $120,000 per year, plus incentives. A true and correct copy of Brenner's Offer of Employment is attached hereto as Ex. 2. On September 14, 2001 Defendant Brenner executed the Goeken Group Corporation

Employee Agreement. A true and correct copy of Brenner's Employee Agreement is attached hereto as Ex. 3. At the time Mr. Brenner joined PolyBrite, he was working for a company known as Cats USA Pets [sic] Control California in its sales group. Mr. Brenner had never worked in the lighting industry before joining PolyBrite. He had no technical background relating to the products manufactured by PolyBrite prior to becoming one of its employees. His educational background is in finance and accounting. At the time he left the employ of PolyBrite, his base salary was $180,000 per year.

**ANSWER:** Brenner admits the averments contained in Paragraph 30 of PolyBrite's Complaint.

31.    As COO, Defendant Brenner was the second highest ranking officer of the company. He reported directly to the company's Chief Executive Officer, Carl Scianna. As COO, Mr. Brenner was privy to PolyBrite's most sensitive and confidential information. He had unfettered access to financial, marketing, technical and production information that was available in its entirety to only one other person in the company, the Chief Executive Officer. As part of his duties as COO, Mr. Brenner oversaw the activities of PolyBrite's Hong Kong office. The Hong Kong office was in turn run by Defendant CN Wong. Mr. Brenner was also directly responsible for the manufacture of PolyBrite products, including those manufactured in Asia. Mr. Brenner was a fiduciary of PolyBrite.

**ANSWER:** For his answer to Paragraph 31 of PolyBrite's Complaint, Brenner admits that he

held the title of Chief Operating Officer of PolyBrite, that he reported directly to the company's

Chief Executive Officer, Carl Scianna, that he was privy to certain sensitive and confidential

information of PolyBrite and that he oversaw certain activities of PolyBrite's Hong Kong

division, PolyBrite for Asia-Pacific. For further answer, Brenner admits that PolyBrite for Asia-

Pacific was run by Defendant CN Wong. For further answer, Mr. Brenner admits that he was

responsible for overseeing the manufacture of PolyBrite products, including those manufactured

in Asia. For further answer, Mr. Brenner admits that he was a fiduciary of PolyBrite. For further

answer, Mr. Brenner denies the remaining averments contained in Paragraph 31 of PolyBrite's

Complaint.

## CN WONG

32.    In June of 2003, PolyBrite hired CN Wong. Mr. Wong was hired by PolyBrite to oversee manufacturing in China. His title was "Vice President, Asia Pacific." At all times relevant to this Complaint, CN Wong reported directly to Defendant Brenner. Defendant Wong

was a fiduciary of PolyBrite. He introduced PolyBrite to Wellstar, which manufactured PolyBrite's products in China. Mr. Wong was responsible for the day-to-day contacts of PolyBrite with Vigor and Wellstar. Mr. Wong was responsible for working with Wellstar and Vigor to ensure that production schedules were met, and to ensure that quality of produced goods met PolyBrite's standards. He was also required to report on these matters to PolyBrite's Chief Operating Officer, Richard Brenner, as well as its President, Carl Scianna.

**ANSWER:** Brenner admits the averments contained in Paragraph 32 of PolyBrite's Complaint.

33.    It was Defendant Wong's responsibility to locate an alternative manufacturer to produce PolyBrite's products in China.

**ANSWER:** For his answer to Paragraph 33 of PolyBrite's Complaint, Brenner admits that CN

Wong was requested to determine whether an alternative manufacturer might be available to

produce PolyBrite's products in China.

### PAUL CHRISTENSEN

34.    On June 12, 2006, PolyBrite entered into an employment agreement with Paul Christensen. A true and correct copy of Christensen's Employee Agreement is attached hereto as Ex. 4. Christensen was hired as Director of Sales and Marketing - North America. He was paid a base salary of $120,000 per year, plus incentives. A true and correct copy of Christensen's Employment Application is attached hereto as Ex. 5.

**ANSWER:** Brenner admits the averments contained in Paragraph 34 of PolyBrite's Complaint.

35.    In his capacity as Director of Sales and Marketing-North America, Mr. Christensen was personally responsible for some of PolyBrite's most important accounts, including Macy's, Neiman Marcus, Dillard's, Autozone, Beck's [sic] and Walmart. In relation to these and other accounts, he had unfettered access to marketing, technical, financial and production information. Mr. Christensen began reporting directly to Defendant Brenner some time before May, 2007. Mr. Christensen worked closely with a distributor of PolyBrite's products, Commercial Electric, LLC, an Arkansas limited liability company, providing support to its employees in sales efforts. Though not an officer of the corporation, Mr. Christensen was a high managerial agent of PolyBrite. He was one of its highest paid employees. He had exclusive charge of some of its most important accounts. He exercised a high degree of autonomy and discretion in performing his duties, requiring PolyBrite to repose a high degree of trust and confidence in him. Mr. Christensen was a fiduciary of PolyBrite. Before being employed by PolyBrite, Christensen had no technical knowledge of, or experience with, solid state ("LED") lighting. Immediately prior to being hired by PolyBrite, Christensen worked as a commercial photographer.

**ANSWER:** For his answer to Paragraph 35 of PolyBrite's Complaint, Brenner admits that, as

Director of Sales & Marketing-North America, Christensen solicited Neiman Marcus, Autozone,

Belk's and Walmart. For further answer, Brenner denies that Dillard's and Neiman Marcus were

accounts of PolyBrite. For further answer, Brenner states that Neiman Marcus and Dillard's were

customers of Commercial Electric which operated as a distributor of PolyBrite. Macy's

Autozone, Belk's and Walmart also were not light bulb customers of PolyBrite. For further

answer, Brenner denies that Christensen had unfettered access to PolyBrite's marketing,

technical, financial and production information. For further answer, Brenner admits that, some

time before May, 2007, Christensen began reporting directly to Brenner. For further answer,

Brenner denies that Christensen was a high managerial agent of PolyBrite and that he was one of

PolyBrite's highest paid employees. For further answer, Brenner admits that Christensen had a

high degree of autonomy and discretion in performing his duties. For further answer, Brenner

admits that, before Christensen was employed by PolyBrite, Christensen worked as a commercial

photographer. For further answer, Brenner states that he is without knowledge or information

sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 35 of

PolyBrite's Complaint.

## UNLAWFUL CONDUCT OF DEFENDANTS
### The Secret Creation Of A Competing Company By Defendants Brenner And Wong

36.     Unknown to PolyBrite, and affirmatively hidden from it, Defendants Brenner and
Wong prepared a business plan for an entirely new entity referred to in the business plan as
Wellstar Lighting, LLC ("Wellstar Lighting"). See Wellstar Lighting's Business Plan, a true and
correct copy of which is attached hereto as Ex. 6. This occurred in 2006. The Wellstar Lighting
Business Plan was created by Defendant Brenner, using PolyBrite's computer, not later than
December, 2006.

**ANSWER:** For his answer to Paragraph 36 of PolyBrite's Complaint, Brenner admits that,

during 2006, he prepared a business plan for a new entity referred to in the plan as Wellstar

Lighting, LLC but denies that such business plan was ever completed or used. For further

answer, Brenner states that a true and correct copy of such uncompleted business plan is attached

to PolyBrite's Complaint as Exhibit "6." For further answer, Brenner admits that he created that

plan using PolyBrite's computer.

37.    According to Wellstar Lighting's business plan, its mission was "to be a leading company designer manufacturer of High Brightness Solid State Lighting ("HBSSL") lamps and modular light engines for commercial, industrial and residential applications. Such products that provide enhanced lighting quality, substantial energy savings, substantial product life, and thereby improving people's quality of life at work and at home, while conserving the Earth's natural resources." See Ex. 6, p. 6.

**ANSWER:** For his answer to Paragraph 37 of PolyBrite's Complaint, Brenner states that the

terms of the uncompleted business plan speak for themselves.

38.    The Wellstar Lighting Business Plan named four founders. It stated that two of its founders, "Mr. Richard Brenner and Mr. CN Wong were previously senior executives at PolyBrite International, an SSL (solid state lighting) products company, working to develop and launch PolyBrite's line of decorative and general illumination lamps, as well as the company's channel letter lighting system." Ex. 6, p. 6.

**ANSWER:** For his answer to Paragraph 38 of PolyBrite's Complaint, Brenner states that the

terms of the uncompleted business plan speak for themselves.

39.    The Wellstar Lighting Business Plan called for Wellstar Electronics to manufacture products in direct competition with PolyBrite: "Wellstar Electronics, a Hong Kong based manufacturing company embracing nearly three years experience in HBSSL [high brightness solid state lighting] design, prototyping, tooling and manufacturing, and is immediately prepared to manufacture the full line of HBSSL lamps to WLI . . . Wellstar Electronics is managed by Mr. WN Wong, a founding member of WLI [Wellstar Lighting LLC]." Ex. 6, p. 6. The experience referenced by Wellstar Electronics in HBSSL design, prototyping, tooling and manufacturing was that which its principals obtained by working with PolyBrite.

**ANSWER:** For his answer to Paragraph 39 of PolyBrite's Complaint, Brenner states that the

terms of the uncompleted business plan speak for themselves.

40.    The Wellstar Lighting Business Plan identified Virgil Cheng as its fourth founder. Virgil Cheng, CN Wong and WN Wong are long time personal friends. They attended school together and have been friends ever since.

**ANSWER:** For his answer to Paragraph 40 of PolyBrite's Complaint, Brenner states that his

uncompleted business plan identified Virgil Cheng as a founder and that Virgil Cheng, CN Wong

and WN Wong are friends who attended school together.

41.    The Wellstar Business Plan stated, "The founders anticipate the Commercial users
realizing acceptable payback periods, as well as large lighting OEMs (original equipment
manufacturers), will be target customers in 2007."

**ANSWER:** For his answer to Paragraph 41 of PolyBrite's Complaint, Brenner states that the

terms of the uncompleted business plans speak for themselves.

42.    At the same time Defendants Brenner and Wong created the Wellstar Lighting
Business Plan, Brenner made plans to relocate his home to California. He entered into a contract
to purchase a home in Palm Springs during the December holidays of 2006. He never informed
anyone at PolyBrite of his intention to do so. In a letter dated January 19, 2007 Richard Brenner
wrote to Countywide [sic] Home Loans explaining that he was relocating to Southern California
where his career would focus on energy saving lighting technology. See Brenner January 19,
2007 letter, a true and correct copy is attached hereto as Ex. 7. Brenner hid from PolyBrite that he
sold his house in Illinois and relocated his wife to California.

**ANSWER:** For his answer to Paragraph 42 of PolyBrite's Complaint, Brenner denies that he

drafted the Wellstar Lighting Business Plan at the same time that he made plans to relocate his

home to California. For further answer, Brenner affirmatively states that his wife was suffering

from glaucoma and was extremely unhappy living in Illinois. For further answer, Brenner denies

never having informed anyone at PolyBrite of his intention to relocate to California and denies

hiding from PolyBrite that he had sold his house in Illinois. For further answer, Brenner states

that the January 19, 2007 letter attached to PolyBrite's Complaint as Exhibit "7" speaks for itself.

43.    A search of files backed up from Defendant Brenner's computer showed that on
January 27, 2007 Defendant Brenner listed alternative names for the new business enterprise:
    1.    CD2 Lighting Technologies
    2.    WCD Lighting Technologies
    3.    Power2 Lighting Technologies

These alternative names were followed by the names:

CN Wong
WN Wong
Virgil Cheng
Dick Brenner

See list of names document, a true and correct copy is attached hereto as Ex. 8.

**ANSWER:** Brenner admits the averments contained in Paragraph 43 of PolyBrite's Complaint.

For further answer, Brenner affirmatively states that such business enterprise was never created

by him.

44.     On February 12, 2007, CDW Lighting Technologies Limited ("CDW") was
created. The address of CDW and Wellstar Electronics Ltd. are one in the same: Flat A2, 10/FL
Block A, Texaco Road Industrial Centre, Texaco Road, Tsuen Wan, Hong Kong.

**ANSWER:** Brenner admits the averments contained in Paragraph 44 of PolyBrite's Complaint.

For further answer, Brenner affirmatively states that he had no involvement in the creation of

CDW Lighting Technologies Limited ("CDW"), was not an incorporator of CDW, is not and

never has been a shareholder in CDW, has never been an officer, director or employee of CDW

and has never derived any financial benefit from CDW.

45.     On February 13, 2007, CDW Lighting Technologies Limited created a website
(www.cdwlighting.com) in which it advertised a full line of "high brightness solid state
illumination products for commercial, industrial and residential applications." The products
advertised by CDW Lighting Technologies are PolyBrite's products. CDW used pictures of
PolyBrite's bulbs on its website. See screenshots of www.cdwlighting.com, true and correct
copies are attached hereto as Ex. 9. That website continues to exist to the date of the filing of the
instant Complaint. The actions of CDW made it a direct competitor of PolyBrite.

**ANSWER:** For his answer to Paragraph 45 of PolyBrite's Complaint, Brenner states that he is

without knowledge or information sufficient to form a belief as to the truth of PolyBrite's

averment that, on February 13, 2007, CDW created a web site at which it advertised a full line of

"high brightness solid-state illumination products for commercial, industrial and residential

applications." For further answer, Brenner denies that the products advertised by CDW are

PolyBrite's products and denies that CDW used pictures of PolyBrite's bulbs on its web site. For further answer, Brenner admits that the web site continued to exist as of the date of the filing of PolyBrite's Complaint but denies that CDW is a direct competitor of PolyBrite.

46.    On February 21, 2007, one week after creating a company to compete directly with PolyBrite, Richard Brenner recommended to Carl Scianna that one of Brenner's co-conspirators, CN Wong, be given a $50,000.00 per annum raise. Based upon Mr. Brenner's recommendation, Mr. Wong's salary was increased on March 15, 2007 to $125,000.00 per year. Effective June 15, 2007, Mr. Wong's salary was increased to $150,000.00 per year.

**ANSWER:** For his answer to Paragraph 46 of PolyBrite's Complaint, Brenner admits that on or about February 21, 2007, he recommended to Carl Scianna that CN Wong be given a $50,000.00 raise, admits that on March 15, 2007, CN Wong's salary was increased to $125,000.00 per year and admits that effective June 15, 2007, CN Wong's salary was increased to $150,000.00 per year. For further answer, Brenner denies having created a company to compete directly with PolyBrite. For further answer, Brenner affirmatively states that, prior to CN Wong's salary increase, he had been employed with PolyBrite for approximately three years and had never received an increase in his salary.

### GUANGZHOU LIGHT FAIR
#### 6/8/07 to 6/11/07

47.    The Guangzhou Light Fair, held from June 6, 2007 through June 11, 2007, was an opportunity for PolyBrite to exhibit its products at the largest lighting show in Asia. It was attended by over 45,000 people. Exhibitors came from twenty-two countries. Although PolyBrite had exhibited at the Light Fair in 2006, CN Wong actively dissuaded PolyBrite from participating at the fair in 2007. He told PolyBrite management on numerous occasions that they should not attend the fair. Defendant Brenner, knowing that CDW Lighting Technologies Limited would be participating at the fair, also attempted to dissuade others from PolyBrite from attending this exhibition. Defendant Brenner made the decision not to allow PolyBrite to exhibit at the exhibition, even though it previously registered and paid a deposit.

**ANSWER:** For his answer to Paragraph 47 of PolyBrite's Complaint, Brenner admits that the Guangzhou Light Fair was held from June 6, 2007 through June 11, 2007, admits that it was the

largest lighting show in Asia during 2007 and admits that it was an opportunity for PolyBrite, as

well as others, to exhibit products. For further answer, Brenner states that he is without

knowledge or information sufficient to form a belief as to the truth of the averment that

exhibitors came from twenty-two countries. For further answer, Brenner admits that PolyBrite

had exhibited at the light fair in 2006 but denies that CN Wong actively dissuaded PolyBrite

from participating at the fair in 2007. For further answer, Brenner denies having attempted to

dissuade others from PolyBrite from attending this exhibition and denies that he made the

decision not to allow PolyBrite to exhibit at the exhibition. For further answer, Brenner admits

that PolyBrite had paid a partial deposit to register at the Guangzhou Light Fair but affirmatively

states that PolyBrite was undergoing severe cash-flow problems and was unable to afford the cost

of paying the remaining deposit, that PolyBrite was unable to afford the cost of constructing a

booth for the 2007 Guangzhou Light Fair and was unable to afford the cost of sending its sales

personnel to the Light Fair.

48.    CN Wong, Virgil Cheng and WN Wong arranged to exhibit CDW's wares at the
exhibition. CDW Lighting Technologies was listed as an accredited exhibitor on the list along
with over 1,300 other manufacturers and suppliers. See 2007 Exhibitor List, a true and correct
copy is attached hereto as Ex. 10. By this time CDW was, according to its advertising, fully up
and running. In addition, CN Wong, Virgil Cheng and WN Wong were actively communicating
from email addresses which included the domain "cdwlighting.com." See cdwlighting.com
emails, true and correct copies are attached hereto as Ex. 11.

**ANSWER:** For his answer to Paragraph 48 of PolyBrite's Complaint, Brenner admits that CN

Wong, Virgil Cheng and WN Wong arranged to exhibit CDW's products at the Guangzhou Light

Fair. For further answer, Brenner states that the 2007 exhibitor list attached to PolyBrite's

Complaint as Exhibit "10" and the e-mails attached to PolyBrite's Complaint as Exhibit "11"

speak for themselves. For further answer, Brenner states that he is without knowledge or

information sufficient to form a belief as to the truth of the remaining averments contained in

Paragraph 48 of PolyBrite's Complaint. For further answer, Brenner affirmatively states that,

during the term of his employment with PolyBrite, CDW did not sell any of the products which it

exhibited at the 2007 Guangzhou Light Fair.

49.    CDW's participation at the Guangzhou Light Fair was an act of direct competition
with PolyBrite.

**ANSWER:** Brenner denies the averments contained in Paragraph 49 of PolyBrite's Complaint.

## ALTERNATIVE MANUFACTURING IN CHINA

50.    For approximately two years prior to August, 2007, PolyBrite sought alternative
manufacturing facilities to those of Vigor & Wellstar. The responsibility of locating a new
manufacturer was entrusted to CN Wong, PolyBrite's representative in Hong Kong. He, in turn,
reported to Defendant Richard Brenner. In August of 2007, CN Wong was asked to provide a
status report on his progress of finding an alternative manufacturer. Defendant Brenner
responded for CN Wong. Both Mr. Brenner and Mr. Wong were aware that it was extremely
important to locate an alternative manufacturer in China. Carl Scianna, President of PolyBrite,
had told them that PolyBrite was going to produce light bulbs for Osram Sylvania ("Sylvania"),
and that Sylvania would not approve Vigor or Wellstar production facilities to be used for that
purpose.

**ANSWER:** For his answer to Paragraph 50 of PolyBrite's Complaint, Brenner denies that

PolyBrite sought alternative manufacturing facilities for two years prior to August of 2007. For

further answer, Brenner admits that CN Wong was requested to look for a new manufacturer and

that CN Wong reported to Brenner. For further answer, Brenner denies that Carl Scianna,

President of PolyBrite, told Brenner and CN Wong that Sylvania would not approve Vigor or

Wellstar as production facilities to be used for the purpose of producing light bulbs for Osram

Sylvania. For further answer, Brenner admits that, because Vigor and Wellstar were refusing to

continue their production of products for PolyBrite because of non-payment, it was important for

PolyBrite to locate an alternative manufacturer in China. For further answer, Brenner

affirmatively states that arrangements, in fact, were made to meet with alternative manufacturers

but that Carl Scianna and others cancelled such appointments before the meetings could take

place.

51.     Defendant Brenner, replying for CN Wong, said that he would soon be traveling
to Hong Kong, and that he would ask CN Wong to make appointments for him with several
manufacturers so that he could further the selection process. See Brenner August 21, 2007 email
"China," a true and correct copy is attached hereto as Ex. 12.

ANSWER: Brenner admits the averments contained in Paragraph 51 of PolyBrite's Complaint.

52.     In truth and in fact, contrary to what Defendant Brenner said, he had no intention
of identifying another manufacturer with which PolyBrite could do business. Neither did CN
Wong. On information and belief, CDW was using the production molds made for, and owned
by PolyBrite, all of which were physically located at Wellstar Electronics, its current
manufacturer. WN Wong, one of the owners of CDW, was also a principal of Wellstar
Electronics. If a new manufacturer were identified and contracted with, it would be the end of
CDW's manufacturing capabilities. Hence, to the day he was terminated, Defendant Brenner
resisted PolyBrite's attempts to contract with an alternative manufacturer. CN Wong did the
same. Wellstar Electronics has allied itself with defendants and their competing company, CDW
Lighting Technologies Limited. As a result, plaintiff has been unable to manufacture its products.
Wellstar Electronics has refused to turn over PolyBrite's production molds. The reasons given for
not returning the molds are pretextual. CDW Lighting Technologies Limited is now selling bulbs
designed by PolyBrite.

ANSWER: Brenner denies the averments contained in Paragraph 52 of PolyBrite's Complaint.

For further answer, Brenner affirmatively states that appointments were, in fact, made to meet

with alternative manufacturers but that Carl Scianna and others cancelled such appointments

before the meetings could take place.

## SUBVERSION OF POLYBRITE'S RELATIONSHIPS

53.     PolyBrite has spent millions of dollars in research, design and testing of its
products.

ANSWER: Brenner states that he is without knowledge or information sufficient to form a belief

as to the truth of the averments contained in Paragraph 53 of PolyBrite's Complaint.,

54.     It has targeted large commercial enterprises for the sale of certain products,
including Dillard's Department Stores, which operates three hundred fifty retail stores from the
Atlantic to the Pacific seaboards.

**ANSWER:** Brenner admits that PolyBrite has targeted large commercial enterprises for the sale of certain products. For further answer, Brenner admits that Dillard's Department Stores ("Dillard's") operates three hundred fifty (350) retail stores in the continental United States but denies that Dillard's was a prospective customer of PolyBrite. For further answer, Brenner affirmatively states that Dillard's was a customer of Commercial Electric and that PolyBrite and Commercial Electric entered into an Authorized Distributor Agreement for the production of certain products which were to be sold to Commercial Electric's customer, Dillard's.

55.    On April 19, 2007, Commercial Electric and PolyBrite entered into an Authorized Distributor Agreement (the "Agreement"). See Authorized Distributor Agreement, a true and correct copy is attached hereto as Ex. 13. By that Agreement, Commercial Electric was authorized to distribute "those certain items manufactured or sold by PolyBrite generally identified as LED lamps or LED systems that are indicated by PolyBrite's representatives in writing and shall include PolyBrite's Borealis Lighting Systems products." Ex. 13, § 9.1.

**ANSWER:** For his answer to Paragraph 55 of PolyBrite's Complaint, Brenner admits that, on April 19, 2007, Commercial Electric and PolyBrite entered into an Authorized Distributor Agreement, a true and correct copy of which is attached to PolyBrite's Complaint as Exhibit "13." For further answer, Brenner states that the terms of such agreement speak for themselves..

56.    Early in the summer of 2007, Commercial Electric and PolyBrite began a joint marketing program relating to PolyBrite's effort to develop a product to meet the particular need of a Commercial Electric customer, Dillard's Department Store.

**ANSWER:** Brenner admits the averments contained in Paragraph 56 of PolyBrite's Complaint except that the joint marketing program between Commercial Electric and PolyBrite may have begun in Spring, 2007.

57.    On August 27, 2007, Defendant Paul Christensen informed executive management of PolyBrite and the Goeken Group that Dillard's had committed to purchase PolyBrite's linear LED alternative to florescent [sic] lighting for its jewelry display cases. He noted in his report that, among the things necessary to achieve this level of sales, PolyBrite had

to "[p]roceed with UL" (Underwriter's Laboratory). See Christensen's August 27, 2007 email "Dillard's Contact Report," a true and correct copy is attached hereto as Ex. 14.

**ANSWER:** Brenner is without knowledge or information sufficient to form a belief as to the

truth of the averments contained in Paragraph 57 of PolyBrite's Complaint. For further answer,

Brenner states that the e-mail attached to PolyBrite's Complaint as Exhibit "14" speaks for itself.

58.     On September 13, 2007, Paul Christensen projected that Dillard's alone would spend $7.8 million on PolyBrite's linear lighting in 2008. See Christensen's September 13, 2007 email "Projections" and attachment, true and correct copies are attached hereto as Ex. 15.

**ANSWER:** Brenner is without knowledge or information sufficient to form a belief as to the

truth of the averments contained in Paragraph 58 of PolyBrite's Complaint. For further answer,

Brenner states that the projections which are attached to PolyBrite's Complaint as Exhibit "15"

speak for themselves.

59.     Paul Christensen was responsible for supervising the Dillard's project. Indeed, on October 12, 2007 he wrote an email to PolyBrite, Vice President, Engineering, Raymond Janik and COO Richard Brenner in which he stated he was "prepared to function as project manager and advance both [Dillard's and Florida Plastics (sign maker for McDonald's)] through the UL process." See Christensen's October 12, 2007 email "Production Status Items," a true and correct copy is attached hereto as Ex. 16. Although he routinely spoke to Carl Scianna and Raymond Janik, PolyBrite's chief engineer, he never suggested to either of them that the project was in jeopardy for failure to meet the customer's requirements. From the time that he took over the effort to obtain UL approval, Christensen represented, directly or by implication, that the UL approval process was going according to schedule and was not a critical issue in regard to PolyBrite's relationship with Dillard's.

**ANSWER:** For his answer to Paragraph 59 of PolyBrite's Complaint, Brenner admits that

Christensen was actively involved in connection with the Dillard's project. For further answer,

Brenner is without knowledge or information sufficient to form a belief as to the truth of the

remaining averments contained in Paragraph 59 of PolyBrite's Complaint. For further answer,

Brenner states that the e-mail attached to PolyBrite's Complaint as Exhibit "16" speaks for itself.

60.     Four weeks later, on November 8, 2007, Defendant Christensen filed a Contact Report from Little Rock, Arkansas. In that Contact Report he included the following information regarding the Dillard's account:

> The management team at CE is expressing a dual signal. One is appreciation for the continued sales support. We have supplied them with training, printed materials and sales staff.
>
> The other signal is one of rising concern. They are growing impatient with our progress to advance several portions of the Dillard's account. We have not advanced the additional prototype requests for the additional sizes in lamps and power supplies and the UL the qualification process.
>
> They remind us that the Dillard's requirements are UL on all lamps and fixtures before it will be accepted for installation, and that Dillard's will not tolerate late delivery. One missed delivery date will cancel all future orders.

See Christensen November 8, 2007 Contact Report, a true and correct copy is attached hereto as Ex. 17. Not until this date did Christensen suggest any urgency relating to the Dillard's project.

**ANSWER:** For his answer to Paragraph 60 of PolyBrite's Complaint, Brenner states that he is

without knowledge or information sufficient to form a belief as to the truth of the averments

contained in Paragraph 60 of PolyBrite's Complaint.  For further answer, Brenner states that the

Contact Report attached to PolyBrite's Complaint as Exhibit "17" speaks for itself.

61.     On November 9, 2007, Phil K. Gamache wrote a letter to Carl Scianna expressing his "concern regarding a perceived lack of urgency . . . as it relates to shepherding the linear LED array through the UL approved process and ultimately through production." See Gamache November 9, 2007 letter, a true and correct copy is attached hereto as Ex. 18.

**ANSWER:** For his answer to Paragraph 61 of PolyBrite's Complaint, Brenner states that he is

without knowledge or information sufficient to form a belief as to the truth of the averments

contained in Paragraph 61 of PolyBrite's Complaint.  For further answer, Brenner states that the

letter attached to PolyBrite's Complaint as Exhibit "18" speaks for itself.

62.     On November 13, 2007, Carl Scianna responded to Mr. Gamache's letter. He stated that he "had been informed that the project was operating smoothly." In addition, he noted

the project had been handled by Paul Christensen with whom Gamache had a meeting days before, and to whom Gamache was speaking regularly about this project. See Scianna November 13, 2007 letter, a true and correct copy is attached hereto as Ex. 19.

**ANSWER:** For his answer to Paragraph 62 of PolyBrite's Complaint, Brenner states that he is

without knowledge or information sufficient to form a belief as to the truth of the averments

contained in Paragraph 62 of PolyBrite's Complaint. For further answer, Brenner states that the

letter attached to PolyBrite's Complaint as Exhibit "19" speaks for itself.

63.    On November 16, 2007, Phil Gamache, President and CEO of Commercial Electric, called PolyBrite's CEO, Carl Scianna, and told him that Commercial Electric would no longer pursue the development of the linear LED display case for Dillard's with PolyBrite. The stated reasons for Commercial Electric's decision not to participate in the development of the linear LED product were false and pretextual. They were known by both Brenner and Christensen to be false and pretextual, neither of whom disclosed this fact to PolyBrite. See Gamache November 20, 2007 letter, a true and correct copy is attached hereto as Ex. 20.

**ANSWER:** For his answer to Paragraph 63 of PolyBrite's Complaint, Brenner denies that he

knew that the stated reasons for Commercial Electric's decision not to participate in the

development of linear LED products were false and pretextual. For further answer, Brenner

states that he is without knowledge or information sufficient to form a belief as to the truth of the

remaining averments contained in Paragraph 63 of PolyBrite's Complaint. For further answer,

Brenner states that the letter attached to PolyBrite's Complaint as Exhibit "20" speaks for itself.

64.    Although Christensen was made responsible for the UL Listing at his own request, he did nothing to accomplish it.

**ANSWER:** For his answer to Paragraph 64 of PolyBrite's Complaint, Brenner denies that

Christensen did nothing to obtain UL approval for PolyBrite's products. For further answer,

Brenner affirmatively states that UL approval could not be obtained for PolyBrite's LED products

because PolyBrite failed to pay certain key vendors and, therefore, did not have a completed

prototype which could be submitted to Underwriter Laboratories for approval.

65.    On November 19, 2007, Phil Gamache caused Solid State Solutions LLC ("Solid State") to be formed in Arkansas. Solid State's address is the same as Commercial Electric's.

**ANSWER:** For his answer to Paragraph 65 of PolyBrite's Complaint, Brenner states that he is

without knowledge or information sufficient to form a belief as to the truth of the allegation that

on November 19, 2007, Gamache caused Solid State Solutions LLC to be formed in Arkansas.

For further answer, Brenner admits that Solid State's address is the same as Commercial

Electric's address.

66.    On November 27, 2007, Defendant Christensen resigned. Subsequent to the termination of their employment from PolyBrite, Commercial Electric engaged Brenner and Christensen as consultants.

**ANSWER:** For his answer to Paragraph 66 of PolyBrite's Complaint, Brenner admits that,

subsequent to the termination of his employment with PolyBrite, he was engaged as a consultant

for Commercial Electric.  For further answer, Brenner admits that, subsequent to Christensen's

resignation from PolyBrite on November 26, 2007, Christensen also became a consultant for

Commercial Electric.  For further answer, Brenner is without knowledge or information

sufficient to form a belief as to the truth of the remaining averment contained in Paragraph 66 of

PolyBrite's Complaint.

67.    On November 28, 2007, Commercial Electric hosted a meeting in Maumelle, Arkansas. One of those attending was Patrick Mullins, an expert in electro-optics, including LED's. Among those in attendance were Richard Brenner, Paul Christensen, Robert Van Auken and Bill Young of Commercial Electric.

**ANSWER:** Brenner admits the averments contained in Paragraph 67 of PolyBrite's Complaint.

68.    Mr. Mullins had met Paul Christensen on a prior occasion. He had never met Defendant Brenner before November 28, 2007.

**ANSWER:** For his answer to Paragraph 68 of PolyBrite's Complaint, Brenner admits that, prior

to November 28, 2007, he had never met Patrick Mullins ("Mullins").  For further answer,

Brenner states that he is without knowledge or information sufficient to form a belief as to the

truth of the remaining averments contained in Paragraph 68 of PolyBrite's Complaint.

69.    At the meeting Mr. Mullins was informed that Commercial Electric had formed a
new company, Solid State Solutions, LLC. Mr. Mullins was told the Company had been formed
approximately one week before the meeting of November 28, 2007. Mr. Mullins was led to
believe that Solid State Solutions was being funded by Commercial Electric.

**ANSWER:** For his answer to Paragraph 69 of PolyBrite's Complaint, Brenner admits that, at the

November 28, 2007 meeting, Mr. Mullins was told that Solid State Solutions, LLC had already

been formed or was in the process of being formed.  For further answer, Brenner is without

knowledge or information sufficient to form a belief as to the truth of the remaining averments

contained in Paragraph 69 of PolyBrite's Complaint.

70.    At that meeting, Mr. Mullins was shown a Borealis (PolyBrite) product that had
been modified. Christensen, Brenner and others had modified the product by removing the LED's
used in one Borealis (PolyBrite) product and replacing them with LED's used in another Borealis
(PolyBrite) product, so that the light would perform to a certain standard. The customer for
whom this was done was Neiman Marcus. Mr. Mullins had seen a picture of this product on a
PolyBrite quotation for the sale of the product under the Borealis brand. Mr. Mullins was told
that this modified product would now be marketed to Neiman Marcus by newly-formed Solid
State Solutions. Prior to that meeting Christensen and Brenner had targeted customers, and
prospective customers of PolyBrite, including Dillard's and Neiman Marcus, in arranging sales
calls with their representatives, all in an attempt to steer PolyBrite's business to Solid State
Solutions.

**ANSWER:** For his answer to Paragraph 70 of PolyBrite's Complaint, Brenner admits that, at the

November 28 2007 meeting, Mullins was shown a linear light array which had been co-

developed by PolyBrite and Commercial Electric.  For further answer, Brenner denies that he had

any involvement in any modification of such product.  For further answer, Brenner admits that

the customer for whom this product was done was Neiman Marcus.  For further answer, Brenner

states that he is without knowledge or information sufficient to form a belief as to whether

Mullins had seen a picture of this product on a PolyBrite quotation for the sale of the product

25

under the Borealis brand. For further answer, Brenner admits that Mullins was told that this

product would be marketed to Neiman Marcus by Solid State. For further answer, Brenner

denies the remaining averments contained in Paragraph 70 of PolyBrite's Complaint.

71.    Commercial Electric is a distributor of lighting products, not a designer or
manufacturer. No one at Commercial Electric or Solid State Solutions had the technical ability to
design solid state lighting products. At the meeting, Mr. Mullins was informed that Messrs.
Christensen and Brenner were going to China to arrange for the manufacture of Solid State
Solutions's new production lines. Mr. Mullins was shown a prototype of the new company's
light, which was a modified PolyBrite product. Bill Young, an employee of Commercial Electric
invited Mullins to become associated with Solid State Solutions as its development designer.

**ANSWER:** For his answer to Paragraph 71 of PolyBrite's Complaint, Brenner admits that

Commercial Electric is a distributor of lighting products but denies that Commercial Electric has

no designing capabilities. For further answer, Brenner admits that, at the meeting, it was

discussed that he and Christensen would be going to China to look for solutions for two products

which were being marketed to Commercial Electric's customer, Dillard's: a puck lighting system

and a T8 retro fit. For further answer, Brenner states that he is without knowledge or information

sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 71 of

PolyBrite's Complaint.

72.    Mr. Mullins did not join this group.

**ANSWER:** For his answer to Paragraph 72 of PolyBrite's Complaint, Brenner admits that

Mullins did not accompany him, Christensen, Mr. Young or Mr. VanAuken on a trip to China.

### ILLICIT COVERT MEETINGS IN CHINA AND HONG KONG

73.    Less than two weeks after the meeting at Maumelle, Arkansas, on December 11,
2007, Messrs. Brenner and Christensen, accompanied by Messrs. Van Auken and Young of
Commercial Electric, traveled to Dongguan City, China where Wellstar Electronics and CDW
Lighting Technologies Limited are located. Staying with them at the same hotel were Defendant
CN Wong, and WN Wong of Wellstar Electronics. They stayed at the hotel on December 11 and
12. See Dong Chen International Hotel receipts, true and correct copies are attached hereto as Ex.
21. The purpose of this secret meeting was to arrange to have Wellstar Electronics produce LED

lighting products that would directly compete with PolyBrite lighting products in the market. CN Wong attempted to hide his participation in this meeting from his colleagues at PolyBrite, telling them instead that he was going on vacation with his family at the time he was meeting with his co-conspirators in Dongguan City.

**ANSWER:** For his answer to Paragraph 73 of PolyBrite's Complaint, Brenner admits that, on or

about December 11, 2007, he, Christensen, Robert VanAuken, and William Young traveled to

Dongguan City, China, where they stayed at the Dong Chen International Hotel. For further

answer, Brenner admits that CN Wong and WN Wong also stayed at the Dong Chen

International Hotel, Dongguan City, China. For further answer, Brenner admits that Wellstar

Electronics and CDW are currently located in Dongguan City, China. For further answer,

Brenner admits that true and correct copies of Dong Chen International Hotel receipts are

attached to PolyBrite's Complaint as Exhibit "21." For further answer, Brenner states that he is

without knowledge or information sufficient to form a belief as to the truth of the averment that

CN Wong attempted to hide his participation in this meeting from his colleagues at PolyBrite and

is without knowledge or information sufficient to form a belief as to the truth of the averment

that CN Wong told his colleagues at PolyBrite that he was going on vacation with his family at

the time of this so-called meeting in Dongguan City. For further answer, Brenner denies the

remaining allegations contained in Paragraph 73 of PolyBrite's Complaint.

74.    Shortly after the meeting in Dongguan City, CN Wong's lies were discovered by PolyBrite. He was confronted with the truth: that he had been meeting with Brenner, Christensen and others at the same time he claimed to be away on vacation with his family. Mr. Wong sent an email resigning from PolyBrite on December 17, 2007. Only after CN Wong's lies were discovered did PolyBrite suspect that the defendants herein were engaged in the wrongful conduct alleged in this Complaint.

**ANSWER:** For his answer to Paragraph 74 of PolyBrite's Complaint, Brenner admits that CN

Wong resigned from PolyBrite on or about December 17, 2007. For further answer, Brenner

states that he is without knowledge or information sufficient to form a belief as to the truth of the

remaining averments contained in Paragraph 74 of PolyBrite's Complaint.

     75.     On December 13, 2007, Messrs. Brenner and Christensen, accompanied by
Messrs. Van Auken and Young, traveled to Hong Kong. All four stayed at the Marco Polo Hong
Kong Hotel. See Marco Polo Hong Kong Hotel receipts, dated December 15, 2007, true and
correct copies are attached hereto as Ex. 22.

**ANSWER:** Brenner admits the averments contained in Paragraph 75 of PolyBrite's Complaint.

     76.     On February 3, 2008, Messrs. Brenner and Christensen, again accompanied by
Messrs. Van Auken and Young, traveled to Hong Kong. All four stayed at the Marco Polo Hong
Kong Hotel. See Marco Polo Hong Kong Hotel receipts dated February 12, 2008, true and
correct copies are attached hereto as Ex. 23. The reservations were made under the PolyBrite
name by Shirley Sy, Mr. Wong's assistant. Ms. Sy made the reservations on January 10, 2008
using her PolyBrite email address. Ms. Sy resigned from PolyBrite a month before in December,
2007. See Marco Polo Hong Kong Hotel Company Confirmations, true and correct copies are
attached hereto as Ex. 24.

**ANSWER:** For his answer to Paragraph 76 of PolyBrite's Complaint, Brenner admits that, on or

about February 3, 2008, he, Christensen, Robert VanAuken and William Young traveled to Hong

Kong where they stayed at the Marco Polo Hong Kong Hotel. For further answer, Brenner

admits that true and correct copies of receipts from the Marco Polo Hong Kong Hotel are

attached to PolyBrite's Complaint as Exhibit "23." For further answer, Brenner admits that

Shirley Sy resigned from PolyBrite in December, 2007, and admits that Marco Polo Hong Kong

Hotel Company Confirmations are attached to PolyBrite's Complaint as Exhibit "24." For further

answer, Brenner states that he is without knowledge or information sufficient to form a belief as

to the truth of the remaining averments contained in Paragraph 76 of PolyBrite's Complaint.

### REMOVAL OF CORPORATE PROPERTY AND DOCUMENTS

     77.     On November 2, 2007 Defendant Christensen went to PolyBrite's headquarters in
Naperville, Illinois at approximately 8:00 p.m., after business hours. Defendant Christensen
repeatedly went in and out of the building within short periods of time. On information and belief
the purpose was to surreptitiously remove PolyBrite's files and product, which he had no right to
possess. Christensen began by entering at the loading dock - the only time he was known to do so

during his employment at PolyBrite. Two days later he repeated this routine, albeit coming in before business hours, starting at 6:47 a.m.

**ANSWER:** For his answer to Paragraph 77 of PolyBrite's Complaint, Brenner states that he is

without knowledge or information sufficient to form a belief as to the truth of the averments

contained in Paragraph 77 of PolyBrite's Complaint.

78.     On the evening of November 12, 2007, at 11:41 p.m., and continuing into the early morning hours of November 13, 2007, Defendant Brenner forwarded by PolyBrite's email to his personal AOL account PolyBrite documents in such large quantities that his personal AOL account began to refuse acceptance of them because his mailbox was full. PolyBrite was able to recover one email sent by Brenner from his PolyBrite account to his personal AOL account at 2:32 a.m. on November 13, 2007. That email had attached to it 22 emails, some of which also contained attachments.

**ANSWER:** For his answer to Paragraph 78 of PolyBrite's Complaint, Brenner admits that,

during the evening of November 12, 2007 and during the early morning hours of November 13,

2007, he transferred personal e-mails to his AOL account. For further answer, Brenner

affirmatively states that, on November 12, 2007, he returned to Chicago on a late-night flight

from California. Since Brenner was transitioning residences in the Chicago area and did not

want to disturb his temporary roommates, he elected to go straight to his office so that he could

work. For further answer, Brenner affirmatively states that he entered PolyBrite's offices on

multiple occasions that evening in order to bring in personal items, including luggage containing

clothing and a sleeping bag. For further answer, Brenner affirmatively states that, in the early

morning hours, Brenner used the office gym facilities and for personal hygiene prior to

commencing work the following morning. For further answer, Brenner states that he is without

knowledge or information sufficient to form a belief as to the truth of the remaining averments

contained in Paragraph 78 of PolyBrite's Complaint.

79.     On November 12, 2007, Defendant Brenner entered PolyBrite's headquarters at 11:41 p.m. It had been approximately two weeks since he had last made an appearance at the

office. Access card reports show Defendant Brenner re-entering the building at 1:38 a.m., 6:25 a.m., 6:51 a.m. and 7:47 a.m. on November 13, 2007. On the evening of November 13, 2007, Defendant Brenner sent dozens of emails to Defendant CN Wong.

**ANSWER:** For his answer to Paragraph 79 of PolyBrite's Complaint, Brenner admits that,

during the evening of November 12, 2007 and during the early morning house of November 13,

2007, he transferred personal e-mails to his AOL account. For further answer, Brenner states

that, on November 12, 2007, he returned to Chicago on a late-night flight from California. Since

Brenner was transitioning residences in the Chicago area and did not want to disturb his

temporary roommates, he elected to work at the office. For further answer, Brenner affirmatively

states that he entered PolyBrite's offices on multiple occasions that evening in order to bring in

personal items, including luggage containing clothing and a sleeping bag. In the early morning

hours, Brenner used the office gym facilities and for personal hygiene prior to commencing work

the following morning. For further answer, Brenner states that he is without knowledge or

information sufficient to form a belief as to the truth of the remaining averments contained in

Paragraph 79 of PolyBrite's Complaint.

      80.     Mr. Brenner was terminated on November 14. Shortly after Defendant Brenner was terminated, an inspection of his office showed that he had removed thousands of pages of company owned documents containing files, background information on customers, product specifications, information on work in process, development work, pricing information and other confidential and sensitive materials.

**ANSWER:** For his answer to Paragraph 80 of PolyBrite's Complaint, Brenner admits that he was

terminated by PolyBrite on November 14, 2007. For further answer, Brenner admits that,

following his termination of employment, he was interviewed by Michael Eddy, was permitted to

retain his laptop computer and was given a receipt authorizing him to do so. For further answer,

Brenner states that, prior to removing his laptop computer with PolyBrite's consent, PolyBrite

caused all company records contained in Brenner's laptop computer to be copied to PolyBrite's

30

mainframe computer. Additionally, PolyBrite removed company files from Brenner's laptop computer. For further answer, Brenner denies having removed any company-owned documents containing files, background information on customers, product specifications, information on work in process, development work, pricing information or other confidential and sensitive materials without PolyBrite's oral and written consent.

## DESTRUCTION OF EMAILS

81. On a date prior to his termination, and better known to him, Richard Brenner deleted all emails in his email inbox. On or around October 26, 2007, Kelly Newton, Richard Brenner's assistant, deleted all emails in her email inbox and sent folder.

**ANSWER:** Brenner denies the averments contained in Paragraph 81 of PolyBrite's Complaint.

82. On or around December 3, 2007, CN Wong deleted all emails in his email inbox. On or around December 29, 2007, Wong deleted all emails in his sent folder. Shirley Sy, CN Wong's assistant, deleted all emails in her email inbox and sent folder on or around December 14, 2007.

**ANSWER:** For his answer to Paragraph 82 of PolyBrite's Complaint, Brenner states that he is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 82 of PolyBrite's Complaint.

## COUNT I
## BREACH OF FIDUCIARY DUTY
## (RICHARD BRENNER)

83. PolyBrite realleges paragraphs 1 through 82 as though fully set forth herein.

**ANSWER:** For his answer to Paragraph 83 of PolyBrite's Complaint, Brenner adopts and incorporates by reference his answers to Paragraphs 1 through 82 of PolyBrite's Complaint as though fully set forth herein.

84. At all relevant times to this Complaint, Defendant Brenner was a fiduciary of PolyBrite. He had an obligation to act with the highest degree of honesty and loyalty toward PolyBrite and in the best interests of PolyBrite.

**ANSWER:** Brenner admits the averments contained in Paragraph 84 of PolyBrite's Complaint.

85.   As a fiduciary of PolyBrite Brenner had a duty to inform the company that employees were forming a rival company or engaging in other fiduciary breaches.

**ANSWER:** For his answer to Paragraph 85 of PolyBrite's Complaint, Brenner admits that, as a

fiduciary of PolyBrite, he had a duty to inform PolyBrite if employees were forming a competing

company or engaging in other fiduciary breaches but denies that any such conduct occurred while

Brenner was employed with PolyBrite.

86.   Brenner had a duty to disclose to PolyBrite information which was relevant to the affairs entrusted to him.

**ANSWER:** For his answer to Paragraph 86 of PolyBrite's Complaint, Brenner admits that he had

a duty to disclose to PolyBrite information which was relevant to the affairs entrusted to him but

denies that, while he was employed with PolyBrite, any PolyBrite information which was

relevant to the affairs entrusted to him was not disclosed to PolyBrite.

87.   Brenner had a duty toward PolyBrite that prohibited him from discharging the duties of his position in such a manner as to make a secret profit for himself.

**ANSWER:** For his answer to Paragraph 87 of PolyBrite's Complaint, Brenner admits that he had

a duty toward PolyBrite that prohibited him from discharging the duties of his position in such a

manner as to make a secret profit for himself but denies having made any secret profit for

himself.

88.   Brenner had a duty not to exploit his position within the company for his own benefit.

**ANSWER:** For his answer to Paragraph 88 of PolyBrite's Complaint, Brenner admits that he had

a duty not to exploit his position within PolyBrite for his own benefit but denies having exploited

his position within PolyBrite for his own benefit.

89.    Brenner had the duty not to hinder the business of PolyBrite to continue the business for which it was developed.

**ANSWER:** For his answer to Paragraph 89 of PolyBrite's Complaint, Brenner admits that he had

a duty not to hinder PolyBrite in the business for which it was developed but denies having

hindered PolyBrite in any way in continuing the business for which it was developed.

90.    Brenner had the duty to disclose to PolyBrite all material facts, fully and completely before acting for his own benefit within the scope of his duties.

**ANSWER:** For his answer to Paragraph 90 of PolyBrite's Complaint, Brenner admits that he had

a duty to disclose to PolyBrite all material facts, fully and completely, before acting for his own

benefit within the scope of his duties but denies having acted for his own benefit within the scope

of his duties.

91.    Brenner repeatedly breached his fiduciary duties to PolyBrite. Brenner formulated and executed a business plan to compete with PolyBrite while still employed by it. Brenner, along with Defendants Wong and Christensen, actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers and by forming CDW Lighting Technologies. In addition, Brenner and Defendant Wong dissuaded PolyBrite employees from attending the largest lighting show in Asia so that CDW could arrange to be at the exhibition. Brenner derailed PolyBrite's attempts to locate alternative manufacturing in China. Brenner also actively subverted relationships with customers and prospective customers.

**ANSWER:** For his answer to Paragraph 91 of PolyBrite's Complaint, Brenner denies having

breached his fiduciary duties to PolyBrite. For further answer, Brenner admits that he drafted a

partially completed business plan while he was employed with PolyBrite but denies having

formed or having participated in a business which competed with PolyBrite while he was still

employed with PolyBrite. For further answer, Brenner denies that, while he was employed with

PolyBrite, he actively competed with PolyBrite by soliciting business agreements with

PolyBrite's customers and prospective customers and denies forming CDW. For further answer,

Brenner denies dissuading PolyBrite employees from attending the Guangzhou 2007 Light Show,

denies derailing PolyBrite's attempts to locate alternative manufacturing in China and denies

subverting relationships with PolyBrite's customers and prospective customers.

92.    As a direct and proximate result of Brenner's breaches of fiduciary duties, Plaintiff PolyBrite has been damaged and continues to suffer damages.

**ANSWER:** Brenner denies the averments contained in Paragraph 92 of PolyBrite's Complaint.

93.    Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendant Brenner's conduct. Money damages will not compensate for the continuing injury resulting from Brenner's use of confidential, technical, marketing and financial information.

**ANSWER:** Brenner denies the averments contained in Paragraph 93 of PolyBrite's Complaint.

94.    By his conduct, Defendant Brenner has demonstrated his willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:** Brenner denies the averments contained in Paragraph 94 of PolyBrite's Complaint.

95.    PolyBrite has demonstrated that Defendant Brenner has, and unless restrained will continue to, engage in conduct alleged herein.

**ANSWER:**  Brenner denies the averments contained in Paragraph 95 of PolyBrite's Complaint.

96.    There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:** Brenner denies the averments contained in Paragraph 96 of PolyBrite's Complaint.

97.    Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendant Brenner will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendant Brenner will result from an order which requires Defendant Brenner to comport his actions to the law, hence PolyBrite should not be required to post a bond.

**ANSWER:** Brenner denies the averments contained in Paragraph 97 of PolyBrite's Complaint.

98.    The granting of an injunction will not disserve the public interest.

**ANSWER:** Brenner denies the averments contained in Paragraph 98 of PolyBrite's Complaint.

**WHEREFORE,** Defendant Richard Brenner prays for the entry of an order dismissing Count I of the *Verified Complaint for Injunctive and Other Relief* of Plaintiff Polybrite International, Inc.; awarding Brenner his court costs and attorneys' fees in defending this matter; and for such further as to the Court shall seem just and proper.

## COUNT II
### BREACH OF FIDUCIARY DUTY
### (PAUL CHRISTENSEN)

Brenner makes no answer to Paragraphs 99 through 112 of Count II of PolyBrite's Complaint because Count II of PolyBrite's Complaint seeks no relief against Brenner.

## COUNT III
### BREACH OF FIDUCIARY DUTY
### (CN WONG)

Brenner makes no answer to Paragraphs 113 through 128 of Count III of PolyBrite's Complaint. because Count III of PolyBrite's Complaint seeks no relief against Brenner.

## COUNT IV
### CONSPIRACY TO BREACH FIDUCIARY DUTY
### (RICHARD BRENNER, PAUL CHRISTENSEN AND CN WONG)

129.    PolyBrite realleges paragraphs 1 through 82 as though fully set forth herein.

**ANSWER:** For his answer to Paragraph 129 of PolyBrite's Complaint, Brenner adopts and incorporates by reference his answers to Paragraphs 1 through 82 of PolyBrite's Complaint as though fully set forth herein.

130.    At all relevant times to this Complaint, Defendants Brenner and Wong acted in concert and conspired together to breach their fiduciary duties to PolyBrite. On a date prior to his resignation, and better known to him, Defendant Christensen joined the conspiracy and knowingly participated therein. All three defendants traveled with top executives from Commercial Electric to China on December 11, 2007 to December 13, 2007, less than one month after Defendant Brenner's termination from PolyBrite and exactly two weeks after Defendant Christensen's resignation from PolyBrite. At that time Defendant Wong was still employed with PolyBrite. As alleged above, Defendants Brenner and Wong formulated and executed a business plan to compete with PolyBrite while still employed by it. Defendants Brenner, Christensen and Wong actively competed with PolyBrite by soliciting business agreements with PolyBrite's customers and prospective customers and by forming CDW Lighting Technologies. In addition, Defendants Wong and Brenner dissuaded PolyBrite employees from attending the largest lighting

show in Asia so that CDW could arrange to be at the exhibition. Defendants Brenner, Christensen and Wong subverted the interests of PolyBrite by filing false reports with PolyBrite in Naperville, Illinois, misrepresenting PolyBrite's relationship with customers and prospective customers. The conduct complained of constitutes overt acts in furtherance of the conspiracy by Defendants Brenner, Christensen and Wong. Said acts were tortious and unlawful in character.

**ANSWER:** For his answer to Paragraph 130 of PolyBrite's Complaint, Brenner admits that, on

December 11, 2007 to December 13, 2007, subsequent to the termination of his employment

with PolyBrite, he traveled with top executives from Commercial Electric to China. For further

answer, Brenner admits that CN Wong was still employed with PolyBrite during such trip. For

further answer, Brenner admits that, while he was still employed with PolyBrite, due to

PolyBrite's severe financial difficulties and his concern over whether or not he would have

continuing employment with PolyBrite, he prepared, but did not complete, a business plan for a

new company. For further answer, Brenner denies the remaining averments contained in

Paragraph 130 of PolyBrite's Complaint.

131.    As fiduciaries of PolyBrite defendants had a duty to inform the company that employees were forming a rival company or engaging in other fiduciary breaches.

**ANSWER:** For his answer to Paragraph 131 of PolyBrite's Complaint, Brenner admits that, as

fiduciaries of PolyBrite, Defendants had a duty to inform PolyBrite if its employees were forming

a rival company or engaging in other fiduciary breaches but denies that employees breached any

fiduciary duties while Brenner was employed with PolyBrite.

132.    Defendants had a duty to disclose to PolyBrite information which was relevant to the affairs entrusted to them.

**ANSWER:** For his answer to Paragraph 132 of PolyBrite's Complaint, Brenner admits that

Defendants had a duty toward PolyBrite to disclose information which was relevant to the affairs

of PolyBrite entrusted to Defendants but denies that, while he was employed with PolyBrite,

information which was relevant to the affairs entrusted to Defendants was not disclosed to

PolyBrite.

133.    Defendants had a duty toward PolyBrite that prohibited them from discharging the duties of their positions in such a manner as to make a secret profit for themselves.

**ANSWER:** For his answer to Paragraph 133 of PolyBrite's Complaint, Brenner admits that

Defendants had a duty toward PolyBrite that prohibited them from discharging their duties in

such a manner as to make a secret profit for themselves but denies that any such conduct

occurred while Brenner was employed with PolyBrite.

134.    Defendants had a duty not to exploit their position within the company for their own benefit.

**ANSWER:** For his answer to Paragraph 134 of PolyBrite's Complaint, Brenner admits that

Defendants had a duty not to exploit their positions within PolyBrite for their own benefit but

denies that any such conduct occurred while Brenner was employed with PolyBrite.

135.    Defendants had the duty not to hinder the business of PolyBrite to continue the business for which it was developed.

**ANSWER:** For his answer to Paragraph 135 of PolyBrite's Complaint, Brenner admits that

Defendants had a duty not to hinder PolyBrite in continuing the business for which it was

developed but denies that any such conduct occurred while Brenner was employed with

PolyBrite.

136.    Defendants had the duty to disclose to PolyBrite all material facts, fully and completely before acting for their own benefit within the scope of their duties.

**ANSWER:** For his answer to Paragraph 136 of PolyBrite's Complaint, Brenner admits that Defendants had a duty to disclose to PolyBrite all material facts, fully and completely, before acting for their own benefit within the scope of their duties but denies that any such conduct occurred while Brenner was employed with PolyBrite.

137.    The wrongful acts alleged herein constitute acts in furtherance of a conspiracy.

**ANSWER:** Brenner denies the averments contained in Paragraph 137 of PolyBrite's Complaint.

138.    As a direct and proximate result of the aforementioned conspiracy, Plaintiff PolyBrite has been damaged and continues to suffer damages.

**ANSWER:** Brenner denies the averments contained in Paragraph 138 of PolyBrite's Complaint.

139.    Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendants Brenner, Christensen and Wong's conduct. Money damages will not compensate for the continuing injury resulting from Defendants Brenner, Christensen and Wong's use of confidential, technical, marketing and financial information.

**ANSWER:** Brenner denies the averments contained in Paragraph 139 of PolyBrite's Complaint.

140.    By their conduct, Defendants Brenner, Christensen and Wong have demonstrated their willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:** Brenner denies the averments contained in Paragraph 140 of PolyBrite's Complaint.

141.    PolyBrite has demonstrated that Defendants Brenner, Christensen and Wong have, and unless restrained will continue to, engage in conduct which is alleged herein. There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:** Brenner denies the averments contained in Paragraph 141 of PolyBrite's Complaint.

142.    Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendants Brenner, Christensen and Wong will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendants Brenner, Christensen and Wong will result from an order which requires Defendants Brenner, Christensen and Wong to comport their actions to the law.

**ANSWER:** Brenner denies the averments contained in Paragraph 142 of PolyBrite's Complaint.

143.    The granting of an injunction will not disserve the public interest.

**ANSWER:** Brenner denies the averments contained in Paragraph 143 of PolyBrite's Complaint.

    **WHEREFORE,** Defendant Richard Brenner prays for the entry of an order dismissing

Count IV of the *Verified Complaint for Injunctive and Other Relief* of Plaintiff Polybrite

International, Inc.; awarding Brenner his court costs and attorneys' fees in defending this matter;

and for such further as to the Court shall seem just and proper.

## COUNT V
## FRAUD
## (RICHARD BRENNER)

144.    PolyBrite realleges paragraphs 1 through 91 as though fully set forth herein.

**ANSWER:** For his answer to Paragraph 144 of PolyBrite's Complaint, Brenner adopts and

incorporates by reference his answers to Paragraph 1 through 91 of PolyBrite's Complaint as

though fully set forth herein.

145.    Defendant Brenner made numerous reports, oral and written, formal and informal,
to PolyBrite during 2006 and 2007. In none of those reports did he disclose the wrongful conduct
alleged herein, through [sic] he had an affirmative duty to do so.

**ANSWER:** For his answer to Paragraph 145 of PolyBrite's Complaint, Brenner admits that,

during 2006 and 2007, he made numerous reports, oral and written, formal and informal, to

PolyBrite. For further answer, Brenner denies having engaged in any wrongful conduct and,

therefore, also denies that he had an affirmative duty to disclose such conduct to PolyBrite. For

further answer, Brenner affirmatively states that he did disclose mismanagement by Jack Goeken

and Carl Scianna to certain members of PolyBrite's Board of Directors including, but not limited

to, Randy Miles and Sandra Goeken Miles and that Brenner's disclosure of such malfeasant

conduct resulted in his wrongful termination.

146.    Defendant Brenner's failure to report the wrongful conduct of himself and his
co-defendants were material omissions of fact.

**ANSWER:** For his answer to Paragraph 146 of PolyBrite's Complaint, Brenner denies that either

he or his co-defendants engaged in any wrongful conduct and, therefore, also denies that there

was any wrongful conduct to report. For further answer, Brenner denies that he omitted any
material facts from his reports to PolyBrite.

147.    Defendant Brenner's failure to report the wrongful conduct was an effort on his
part to misrepresent the state of affairs of the company.

**ANSWER:** For his answer to Paragraph 147 of PolyBrite's Complaint, Brenner denies that

Defendants engaged in any wrongful conduct and, therefore, denies that there was any duty to

report Defendants' conduct. For further answer, Brenner denies having engaged in any effort to

misrepresent PolyBrite's state of affairs.

148.    Defendant Brenner's material omissions in his reports were done for the purpose
of inducing plaintiff not to act, because had plaintiff known of Brenner's and his co-defendants'
wrongful conduct, it would have fired them immediately.

**ANSWER:** For his answer to Paragraph 148 of PolyBrite's Complaint, Brenner denies having

made any material omissions in his reports and denies having done anything for the purpose of

inducing Plaintiff not to act. For further answer, Brenner states that he is without knowledge or

information sufficient to form a belief as to the truth of the remaining averments contained in

Paragraph 148 of PolyBrite's Complaint.

149.    PolyBrite acted in reliance on the statements and omissions of Brenner, and its
reliance was reasonable.

**ANSWER:** Brenner denies the averments contained in Paragraph 149 of PolyBrite's Complaint.

150.    PolyBrite has been injured and continues to suffer injuries as a direct and
proximate result of its reliance on Defendant Brenner's false representations and omissions.

**ANSWER:** Brenner denies the averments contained in Paragraph 150 of PolyBrite's Complaint.

151.    Plaintiff has no adequate remedy at law. Money damages alone will not, and
cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities
which PolyBrite will suffer as a result of Defendant Brenner's conduct. Money damages will not
compensate for the continuing injury resulting from Brenner's use of confidential, technical,
marketing and financial information.

**ANSWER:** Brenner denies the averments contained in Paragraph 151 of PolyBrite's Complaint.

152.    By his conduct, Defendant Brenner has demonstrated his willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:** Brenner denies the averments contained in Paragraph 152 of PolyBrite's Complaint.

153.    PolyBrite has demonstrated that Defendant Brenner has, and unless restrained will continue to, engage in conduct alleged herein.

**ANSWER:** Brenner denies the averments contained in Paragraph 153 of PolyBrite's Complaint.

154.    There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:** Brenner denies the averments contained in Paragraph 154 of PolyBrite's Complaint.

155.    Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendant Brenner will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendant Brenner will result from an order which requires Defendant Brenner to comport his actions to the law, hence PolyBrite should not be required to post a bond.

**ANSWER:** Brenner denies the averments contained in Paragraph 155 of PolyBrite's Complaint.

156.    The granting of an injunction will not disserve the public interest.

**ANSWER:** Brenner denies the averments contained in Paragraph 156 of PolyBrite's Complaint.

**WHEREFORE,** Defendant Richard Brenner prays for the entry of an order dismissing

Count V of the *Verified Complaint for Injunctive and Other Relief* of Plaintiff Polybrite

International, Inc.; awarding Brenner his court costs and attorneys' fees in defending this matter;

and for such further as to the Court shall seem just and proper.

### COUNT VI
### FRAUD
### (PAUL CHRISTENSEN)

Brenner makes no answer to Paragraphs 157 through 169 of Count VI of PolyBrite's

Complaint because Count VI of PolyBrite's Complaint seeks no relief against Brenner.

## COUNT VII
## FRAUD
## (CN WONG)

Brenner makes no answer to Paragraphs 170 through 182 of Count VII of PolyBrite's

Complaint because Count VII of PolyBrite's Complaint seeks no relief against Brenner.

## COUNT VIII
## CONSPIRACY TO COMMIT FRAUD
## (RICHARD BRENNER, PAUL CHRISTENSEN AND CN WONG)

183.    PolyBrite realleges paragraphs 1 through 82 and paragraphs 130 through 137 as
though fully set forth herein.

**ANSWER:** For his answer to Paragraph 183 of PolyBrite's Complaint, Brenner adopts and

incorporates by reference his answers to Paragraphs 1 through 82 and Paragraphs 130 through

137 of PolyBrite's Complaint as though fully set forth herein.

184.    Defendants made numerous reports, oral and written, formal and informal, to
PolyBrite during 2006 and 2007. In none of those reports did they disclose the wrongful conduct
alleged herein, through they had an affirmative duty to do so.

**ANSWER:** For his answer to Paragraph 184 of PolyBrite's Complaint, Brenner admits that,

during 2006 and 2007, Defendants made numerous reports, oral and written, formal and

informal, to PolyBrite.  For further answer, Brenner denies that during his employment with

PolyBrite, Defendants engaged in any wrongful conduct and, therefore, denies that there was any

affirmative duty to report Defendants' conduct to PolyBrite.  For further answer, Brenner

affirmatively states that he did disclose certain acts of mismanagement by Jack Goeken and Carl

Scianna to certain members of PolyBrite's Board of Directors including, but not limited to,

Randy Miles and Sandra Goeken Miles and that Brenner's disclosure of such malfeasant conduct

resulted in his termination.

185.    Defendants' failures to report their wrongful conduct were material omissions of
fact.

**ANSWER:** For his answer to Paragraph 185 of PolyBrite's Complaint, Brenner denies that

Defendants engaged in any wrongful conduct while he was employed with PolyBrite and,

therefore, denies that there was any duty to report Defendants' conduct to PolyBrite.  For further

answer, Brenner denies that Defendants omitted any material facts from their reports to

PolyBrite.  For further answer, Brenner affirmatively states that he reported certain acts of

malfeasance by Jack Goeken and by Carl Scianna to certain members of PolyBrite's Board of

Directors which resulted in PolyBrite's wrongful termination of Brenner.

186.    Defendants' failures to report the wrongful conduct was an effort on their part to
misrepresent the state of affairs of the company.

**ANSWER:** For his answer to Paragraph 186 of PolyBrite's Complaint, Brenner denies that

Defendants engaged in any wrongful conduct while he was employed with PolyBrite and,

therefore, denies that there was any duty to report Defendants' conduct to PolyBrite.  For further

answer, Brenner denies that he engaged in any effort to misrepresent the state of affairs of

PolyBrite.

187.    Defendants' material omissions in their reports were done for the purpose of
inducing plaintiff not to act, because had plaintiff known of defendants' wrongful conduct, it
would have fired them immediately.

**ANSWER:** For his answer to Paragraph 187 of PolyBrite's Complaint, Brenner denies that his

reports to PolyBrite contained any material omissions and denies that he engaged in any wrongful

conduct of inducing Plaintiff not to act.  For further answer, Brenner states that he is without

knowledge or information sufficient to form a belief as to the truth of the remaining averments

contained in Paragraph 187 of PolyBrite's Complaint.

188.    Defendants acted jointly, and in concert, to achieve this conspiracy of fraud, each
acting to support the other, each with knowledge of the others' wrongful conduct.

**ANSWER:** Brenner denies the averments contained in Paragraph 188 of PolyBrite's Complaint.

189.    PolyBrite acted in reliance on the statements and omissions of defendants and its reliance was reasonable.

**ANSWER:** Brenner denies the averments contained in Paragraph 189 of PolyBrite's Complaint.

190.    PolyBrite has been injured and continues to suffer injuries as a direct and proximate result of its reliance on Defendants' false representations and omissions.

**ANSWER:** Brenner denies the averments contained in Paragraph 190 of PolyBrite's Complaint.

191.    Plaintiff has no adequate remedy at law. Money damages alone will not, and cannot, compensate PolyBrite for the loss of goodwill, or the loss of business opportunities which PolyBrite will suffer as a result of Defendants' conduct. Money damages will not compensate for the continuing injury resulting from defendants' use of confidential, technical, marketing and financial information.

**ANSWER:** Brenner denies the averments contained in Paragraph 191 of PolyBrite's Complaint.

192.    By their conduct, Defendants have demonstrated their willingness to continue to engage in acts which harm PolyBrite. It is clear that the injury to PolyBrite is immediate, irreparable and continuing.

**ANSWER:** Brenner denies the averments contained in Paragraph 192 of PolyBrite's Complaint.

193.    PolyBrite has demonstrated that Defendants have, and unless restrained will continue to, engage in conduct alleged herein.

**ANSWER:** Brenner denies the averments contained in Paragraph 193 of PolyBrite's Complaint.

194.    There is a likelihood that PolyBrite will prevail on the merits of this action.

**ANSWER:** Brenner denies the averments contained in Paragraph 194 of PolyBrite's Complaint.

195.    Should the Court grant interlocutory injunctive relief to PolyBrite, the burden on Defendants will be slight compared to the injury to PolyBrite if it is not granted. No injury to Defendants will result from an order which requires Defendants to comport their actions to the law, hence PolyBrite should not be required to post a bond.

**ANSWER:** Brenner denies the averments contained in Paragraph 195 of PolyBrite's Complaint.

196.    The granting of an injunction will not disserve the public interest.

**ANSWER:** Brenner denies the averments contained in Paragraph 196 of PolyBrite's Complaint.

**WHEREFORE,** Defendant Richard Brenner prays for the entry of an order dismissing Count VIII of the *Verified Complaint for Injunctive and Other Relief* of Plaintiff Polybrite International, Inc.; awarding Brenner his court costs and attorneys' fees in defending this matter; and for such further as to the Court shall seem just and proper.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE–DOCTRINE OF UNCLEAN HANDS

1.      PolyBrite is not entitled to equitable relief because its claims are barred under the doctrine of unclean hands. This doctrine prohibits one seeking equity from taking advantage of his own wrong.

#### Improper Surveillance of Brenner and Christensen

2.      Commencing in late September or early October, 2007, PolyBrite, at the direction of Ned Othman (PolyBrite's Executive Vice President of Corporate Strategies) and Pat Schneider (an officer of PolyBrite's parent company, the Goeken Group Corp.), wrongfully and unlawfully commenced surveillance of Richard Brenner's and Paul Christensen's company and personal e-mail transmissions.

3.      As a result of such surveillance, PolyBrite discovered that Mr. Brenner and Mr. Christensen were communicating with certain members of PolyBrite's Board of Directors, including, but not limited to, Randy Miles and Sandra Goeken Miles.

4.      Such surveillance further revealed that Mr. Brenner and Mr. Christensen had serious concerns over PolyBrite's chronic financial difficulties and the lack of operational skills of senior management, specifically PolyBrite's Chief Executive Officer, Carl Scianna. PolyBrite also learned that Mr. Brenner and Mr. Christensen had informed Randy Miles and Sandra Goeken Miles that, for all intents and purposes, PolyBrite was shut down, that key suppliers had

not been paid and were refusing to provide PolyBrite with products, that no prototype lamps were available for customer evaluation, that business travel was at a standstill and that creditors were calling for payment on a daily basis. PolyBrite further learned that, as a result of these problems, Mr. Brenner and Mr. Christensen were considering alternative employment.

5.    PolyBrite also learned that, as a result of these communications, Randy Miles and Sandra Goeken Miles requested Mr. Brenner and Mr. Christensen to gather various information regarding PolyBrite's failing business operations and to investigate the possibility of ousting Carl Scianna as PolyBrite's Chief Financial Officer and of retaining a qualified outside turnaround specialist.

6.    The communications between Mr. Brenner and Mr. Christensen, on the one hand, and Mr. Miles and Ms. Goeken Miles, on the other hand, were brought to the attention of PolyBrite's Chief Executive Officer, Carl Scianna. Mr. Scianna construed these whistle blowing activities by Messrs. Brenner and Christensen as an attempt to get Mr. Scianna fired. Accordingly, in order to save his job, on November 14, 2007, without proper cause, Carl Scianna wrongfully and unlawfully terminated Mr. Brenner's employment with PolyBrite and on November 27, 2007, constructively terminated Mr. Christensen's employment with PolyBrite by forcing him to resign.

### Other PolyBrite Litigation

7.    PolyBrite is presently engaged in two other lawsuits arising from its failure to develop products in order to meet the needs of customers: (1) *In the matter of arbitration between PolyBrite International, Inc. and ABCO Licensing, LLC and Westinghouse Lighting Corp.*, pending before the American Arbitration Association, Commercial Arbitration Tribunal, in Philadelphia, Pennsylvania, under Docket No. 14 199 M 016568 06 ("Westinghouse Case"); and (2) *Commercial Electric, LLC v. PolyBrite International*, pending before the Circuit Court of

Pulaski County, Arkansas, Third Division, under Docket No. CV 07-16602-3 ("Commercial Electric Case").

8.      Mr. Brenner is scheduled to testify in the foregoing proceedings. Mr. Christensen already has testified in the Westinghouse Case and is scheduled to testify in the Commercial Electric Case.

9.      PolyBrite has filed this lawsuit against Mr. Brenner and Mr. Christensen in order to intimidate them and to discourage them from giving testimony in the foregoing proceedings which will be harmful to PolyBrite.

### PolyBrite's False Allegations in this Lawsuit

10.      Messrs. Brenner's and Christensen's attorneys have already conducted the depositions of various PolyBrite personnel, including, but not limited to, Carl Scianna, Ned Othman and David Miller.  Based on the testimony given by these witnesses, it has been revealed that Paragraphs 22, 63 and 81 of PolyBrite's Verified Complaint are false and without any factual basis.

11.      If PolyBrite had properly investigated the facts with its own witnesses, PolyBrite would have discovered that these allegations were untrue.

12.      Accordingly, PolyBrite has filed a sworn pleading which contains material misstatements and false accusations against Mr. Brenner and Mr. Christensen.

13.      He who seeks equity must do equity.  By reason of PolyBrite's foregoing misconduct, PolyBrite does not have clean hands and must be barred from obtaining equitable relief herein.

## SECOND AFFIRMATIVE DEFENSE–DOCTRINE OF LACHES

1.      Commencing in late September or early October, 2007, PolyBrite, at the direction of Ned Othman (PolyBrite's Executive Vice President of Corporate Strategies) and Pat Schneider (an officer of PolyBrite's parent company, the Goeken Group Corp.), wrongfully and unlawfully commenced surveillance of Richard Brenner's and Paul Christensen's company and personal e-mail transmissions.

2.      On November 14, 2007, immediately following Mr. Brenner's termination of employment with PolyBrite, PolyBrite caused all of the personal and company information contained on Mr. Brenner's laptop computer to be copied to PolyBrite's mainframe computer.

3.      By reason of PolyBrite's wrongful and unlawful surveillance of Mr. Brenner's and Mr. Christensen's aforedescribed e-mail transmissions and by reason of having copied all of the personal and company information contained on Mr. Brenner's laptop, PolyBrite was aware of all of Mr. Brenner's and Mr. Christensen's activities prior to December 1, 2007.

4.      On December 21, 2007, the date on which Commercial Electric LLC initiated its declaratory judgment action against PolyBrite in the Circuit Court of Pulaski County, Arkansas, PolyBrite was aware that Messrs. Brenner and Christensen had become consultants with Commercial Electric LLC.

5.      Although PolyBrite was aware of the foregoing, PolyBrite delayed more than three months, until March 28, 2008, in which to file this lawsuit.  Therefore, Polybrite's demand for immediate injunctive relief is disingenuous because there is no true emergency in this case. Had PolyBrite believed this to be a true emergency, it would have filed this lawsuit in December, 2007, immediately after it discovered that Messrs. Brenner and Christensen had become consultants with Commercial Electric LLC.

6.    By reason of PolyBrite's undue delay in filing this lawsuit and in seeking emergency injunctive relief against Messrs. Brenner and Christensen, Messrs. Brenner and Christensen have been severely prejudiced in their ability to make a living and to defend themselves against PolyBrite's unfounded allegations.

7.    Had Messrs. Brenner and Christensen known that PolyBrite would seek to prevent them on an emergency basis from continuing to work in the solid-state lighting industry and that they would be required to exhaust their savings in order to defend themselves in this lawsuit, they could have made arrangements to avoid the crush of this lawsuit.

8.    By reason of PolyBrite's undue delay in initiating this lawsuit to restrain Messrs. Brenner and Christensen on an emergency basis from continuing to work in the solid-state lighting industry, PolyBrite should be barred from seeking any equitable relief in this case under the doctrine of laches.

## JURY DEMAND

Defendant Richard Brenner demands a trial by jury on all issues which are triable by a jury.

Respectfully submitted,

One of the attorneys for Richard Brenner

Mark J. Rose, Esq.
LAW OFFICES OF MARK J. ROSE
200 W. Adams Street, Suite 2850
Chicago, Illinois 60606
312.704.1446
312.704.8233 (fax)
MJRoseEsq@aol.com

Constantine John Gekas, Esq.
GEKAS & ASSOCIATES, LTD.
11 S. LaSalle Street, Suite 1700
Chicago, Illinois 60603
312.726.4501
312.726.4505 (fax)
CJG@cjglaw.com

## DECLARATION OF RICHARD J. BRENNER

Pursuant to 28 U.S.C. §1746, Richard J. Brenner declares as follows:

1. I am one of the Defendants in the above-captioned matter.

2. I have read the foregoing *Answer and Affirmative Defenses of Defendant Richard Brenner to Verified Complaint for Injunctive and Other Relief.*

3. The facts contained therein are true in substance and in fact and, as to those allegations made on information and belief, I verily believe them to be true.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed at Palm Springs, California, this 2nd day of May, 2008.

*Richard J Brenner*

Richard J. Brenner

Mark J. Rose, Esq.
LAW OFFICES OF MARK J. ROSE
200 W. Adams Street, Suite 2850
Chicago, Illinois 60606
312.704.1446
312.704.8233 (fax)
MJRoseEsq@aol.com

Constantine John Gekas, Esq.
GEKAS & ASSOCIATES, LTD.
11 S. LaSalle Street, Suite 1700
Chicago, Illinois 60603
312.726.4501
312.726.4505 (fax)
CJG@cjglaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 5th day of May, 2008, I electronically filed the *Answer and Affirmative Defenses of Defendant Richard Brenner to Verified Complaint for Injunctive and Other Relief* with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Counsel for Plaintiff Polybrite International, Inc.

> William G. Sullivan, Esq.
> Mason N. Floyd, Esq.
> MARTIN, BROWN & SULLIVAN
> 321 S. Plymouth Court, 10th Floor
> Chicago, IL 60604
> sullivan@mbslaw.com
> floyd@mbslaw.com

Counsel for Defendant Paul Christensen

> Sigi M. Offenbach, Esq.
> PITLER & MANDELL
> 39 South LaSalle Street
> Suite 1220
> Chicago, IL 60603
> (312) 782-9466
> sigi@pitlerandmandell.com

Mark J. Rose, Esq.

Mark J. Rose, Esq.
LAW OFFICES OF MARK J. ROSE
200 W. Adams Street, Suite 2850
Chicago, Illinois 60606
312.704.1446
312.704.8233 (fax)
MJRoseEsq@aol.com

Constantine John Gekas, Esq.
GEKAS & ASSOCIATES, LTD.
11 S. LaSalle Street, Suite 1700
Chicago, Illinois 60603
312.726.4501
312.726.4505 (fax)
CJG@cjglaw.com

## DECLARATION OF RICHARD J. BRENNER

Pursuant to 28 U.S.C. §1746, Richard J. Brenner declares as follows:

1. I am one of the Defendants in the above-captioned matter.

2. I have read the foregoing *Answer and Affirmative Defenses of Defendant Richard Brenner to Verified Complaint for Injunctive and Other Relief.*

3. The facts contained therein are true in substance and in fact and, as to those allegations made on information and belief, I verily believe them to be true.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed at Palm Springs, California, this 2nd day of May, 2008.

Richard J. Brenner

Mark J. Rose, Esq.
LAW OFFICES OF MARK J. ROSE
200 W. Adams Street, Suite 2850
Chicago, Illinois 60606
312.704.1446
312.704.8233 (fax)
MJRoseEsq@aol.com

Constantine John Gekas, Esq.
GEKAS & ASSOCIATES, LTD.
11 S. LaSalle Street, Suite 1700
Chicago, Illinois 60603
312.726.4501
312.726.4505 (fax)
CJG@cjglaw.com