IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| POLYBRITE INTERNATIONAL, INC., an Illinois Corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 08 C 1797 |
| v. | ) ) ) | Hon. Robert W. Gettleman, Judge Presiding |
| RICHARD BRENNER, an individual, PAUL CHRISTENSEN, an individual, and CHEE NGON WONG, an individual, | ) ) ) ) | Hon. Nan R. Nolan, Magistrate Judge |
| Defendants. | ) | |

**REPLY TO DEFENDANT PAUL CHRISTENSEN'S COUNTERCLAIM**

Plaintiff PolyBrite International, Inc., by and through its attorneys, as and for its Reply to Defendant Paul Christensen's Counterclaim, states as follows:

1. Polybrite international, Inc. ("Polybrite") is a start up company, which is a subsidiary of the Goeken Group Corp. ("Goeken") and is involved in the LED field. it markets three major product lines: Polybrite Lighted Pet Products ("Pet")-which markets battery powered devices to enhance pet visibility, such as dog collars; Polybrite Lighted Safety Products ("Safety")-which markets battery powered devices to provide safety in low lighting conditions, such as lighted safety vests; and Borealis Lighting ("General Lighting")-the brand name for three types of powered LED products, decorative bulbs, signage lighting systems and general illumination lamps.

**REPLY:**

PolyBrite denies that it is a start up company and admits that it is a subsidiary of the Goeken Group Corp ("Goeken"). PolyBrite admits that it is "involved" in the LED field as a leader. PolyBrite admits the remaining allegations contained in paragraph 1.

2. Paul Christensen ("Christensen") is an adult resident of the State of New York and is an expert commercial photographer and is particularly knowledgeable in the technical field of lighting to produce the desired effects.

**REPLY:**

PolyBrite admits that Paul Christensen is an adult resident of New York but lacks sufficient knowledge to determine the truth or falsity of the remaining allegations, and therefore denies same.

3. In early 2005, Polybrite retained Christensen as an independent sales consultant to aid in the sales of the signage products in the Polybrite General Lighting division, then branded Westinghouse Lighting Systems. He worked under the direction of Randy S. Miles ("Miles"), with input from Sandra Goeken Miles ("Sandra"), both members of the Board of Directors of Goeken, which board served as the governing body of Polybrite. In addition Sandra is the vice chairman and president of Goeken, with sales responsibility for Polybrite and Miles was the director of sales for the signage section of the General Illumination division.

**REPLY:**

PolyBrite admits the first sentence of paragraph 3. PolyBrite admits that Christensen worked under the direction of Randy S. Miles for a period of time and that he received input from Sandra Goeken Miles, as well as other people. PolyBrite admits that both Randy S. Miles and Sandra Goeken Miles were, at all times relevant to this Complaint, members of the Board of Directors of Goeken. PolyBrite affirmatively states that neither Sandra nor Miles had any supervisory or executive authority that stemmed from the fact that they were members of the Board. PolyBrite admits that Sandra Goeken Miles is the Vice Chairman and President of Goeken. PolyBrite admits that Randy Miles at times held responsibility for sales of PolyBrite's signage products. PolyBrite denies the remaining allegations contained in paragraph 3.

4.      On or about June 12, 2006, Miles hired Christensen designating him sales and marketing associate in the Polybrite signage section of its General Lighting division and reporting directly to him. In addition Christensen reported to Sandra, assisting her by transcribing her verbal and hand-written instructions on a variety of promotional assignments for Polybrite. Upon information and belief, during the entire history of Polybrite, the sales of Safety and Pet products far exceeded the sales of the General Lighting products and the signage products were simply a part of the General Lighting division's product line. Although denominated Director of Marketing and Sales of Signage-North America, in reality he was simply a sales associate in the signage part of the General Lighting division, without any *staff* and without an office at the time of his hiring. Polybrite was to pay Christensen a salary and to reimburse him for his business expenses.

**REPLY:**

PolyBrite denies the first sentence of paragraph 4.  PolyBrite admits that Christensen assisted other employees and officers of PolyBrite.  PolyBrite admits that PolyBrite paid a salary to Christensen and reimbursed Christensen certain business expenses.  PolyBrite denies the remaining allegations contained in paragraph 4.

5.      Upon information and belief, although Polybrite started operation in 1995, it sales in its General Lighting division were extremely minimal and during its entire history, Polybrite earned a profit and needed a constant infusion of cash from investors and members of the Goeken Board of Directors in order to simply meet its payables and its payroll.

**REPLY:**

PolyBrite is unable to determine what is meant by the allegation that, "[S]ales in its General Lighting division were extremely minimal and during its entire history," and admits that PolyBrite has received infusions of cash from its parent corporation, and affirmatively states that it has met its payables and payroll. PolyBrite denies the remaining allegations.

6.      After Polybrite hired him, Christensen worked under the direction of Sandra and Miles. Sandra introduced Christensen to potential customers and distributors for the Polybrite General Lighting products and also directed him in

helping her prepare optimistic sales projections, which could be utilized to obtain more working capital for Polybrite to overcome its yearly cash flow problems and deficits.

**REPLY:**

PolyBrite admits that Christensen supported the sales efforts of other employees and officers of PolyBrite. PolyBrite denies the remaining allegations in paragraph 6.

7.   Sandra introduced Christensen to Commercial Electric, LLC ("CE"), which was a potential distributor for certain of Polybrite's products, including its General Lighting products. Christensen's main contact at CE was William Young, who was in charge of business development and commercial lighting.

**REPLY:**

Admitted.

8.   During his employment at Polybrite, Christensen exerted his highest and best efforts to promote the sales and marketing of Polybrite's General Lighting products and to work with others so that Polybrite could possibly achieve a sustainable and profitable business.

**REPLY:**

Denied.

9.   Christensen's duties included an assignment by Sandra and Miles in or about the summer of 2007 to meet with other Polybrite employees, including Richard Brenner ("Brenner"), to make suggestions and recommendations to Sandra, Miles and other members of the Goeken Board of Directors relative to making modifications to the structure and operations of Polybrite so that Polybrite could attain positive cash flow and eventually produce a profit.

**REPLY:**

Denied.

10.   As a result of this assignment, Christensen and Brenner reported to Sandra, Miles and other member of the Goeken Board of Directors its suggestions concerning modifying management of Polybrite in order to streamline Polybrite, make

it a more professional organization and to formulate plans for Polybrite's eventual profitability.

**REPLY:**

    Denied.

    11.    Upon information and belief, either in late summer or early fall of 2007, at the direction of Patricia A. Schneider ("Schneider"), executive vice president of Goeken, the computer expert at Polybrite commenced conducting reconnaissance on Christensen and Brenner, to intercept, copy and read all their e-mail and computer records. In fact that program was designated-RECON@POLYBRITE.COM.

**REPLY:**

    PolyBrite denies that "reconnaissance" of Christensen's or Brenner's e-mail or computer records occurred at the direction of Patricia Schneider. PolyBrite denies that it ever obtained any records of any kind from Christensen's computer. PolyBrite admits that it reviewed the emails that were sent or received on its computers, or which were stored on or processed by its server.

    12.    During the course of RECON@POLYBRITE.COM, the computer expert reported to Schneider and John D. Goeken, the chairman and CEO of Goeken, that Christensen and Brenner were conducting an assignment to review the operations of Polybrite and make suggestions concerning potential management changes and that in fact Christensen and Brenner made suggestions concerning the upper level management at Polybrite.

**REPLY:**

    Denied.

    13.    On information and belief, Goeken conducted a Board of Directors meeting in late October of 2007 and at that meeting certain members of the Board of Directors raised the suggestions which were made by Christensen and Brenner concerning the operation and management of Polybrite. The Board of Directors rejected these suggestions.

**REPLY:**

Denied.

14. During this same time period in summer and early fall of 2007, Christensen was exerting his highest and best efforts to sell and market to Dillard's, through its distributor, CE, LED lighting for jewelry display cases to be utilized in its new retail establishments. On or about August 27, 2007, Christensen informed management at Polybrite and Goeken that Dillard's had committed to purchase certain LED lighting from Polybrite, but there were certain preconditions necessary to effectuate that sale. Those preconditions included: obtaining final UL approval, modifying the LED lighting product to meet Dillard's needs and building suitable manufactured samples of this lighting fixture.

**REPLY:**

PolyBrite denies the first sentence of paragraph 14. PolyBrite admits the second sentence of paragraph 14. PolyBrite admits that, on or about August 27, 2007, Christensen informed the management of PolyBrite and Goeken that Dillard's had committed to purchase certain LED lighting from PolyBrite, but denies Christensen informed management of certain preconditions to effectuate that sale. PolyBrite denies the third sentence of paragraph 14.

15. In September and October of 2007, Christensen attempted to aid Polybrite in accomplishing these preconditions for the potential Dillard's sale. Relative to obtaining the necessary UL approval, it was necessary for Polybrite to submit to UL manufactured working samples of the LED lighting, as opposed to prototype models; there had to be extensive safety testing of the product with the concomitant data; there had to be detailed engineering drawings and schematics of the product submitted; the company has to submit the material safety data sheets for the component products; and the company had to submit an application fee to UL. Christensen, as a salesman, did not have the technical expertise to actually prepare the necessary documentation or manufacture the working samples of the product, but he exerted his best efforts to coordinate the submissions to UL.

**REPLY:**

      PolyBrite denies the first sentence of paragraph 15.  PolyBrite admits the second sentence of paragraph 15.  PolyBrite admits that Christensen lacked the technical expertise to prepare the documentation, but volunteered to act as project manager to accomplish that task.  PolyBrite denies the remaining allegations of the last sentence of paragraph 15.

      16.    The management and financial officers of Polybrite and Goeken subverted and undermined Christensen's efforts relative to completion of the Dillard's project.  Polybrite had not paid key suppliers and manufacturers for the Dillard's project in a timely fashion, including, but not limited to Shape LLC, Citizen LED, Nichia Manufacturing, the mechanical drawers and the sheet metal fabricators. As a result of not keeping current with these suppliers, the Dillards project and the application process to UL came to a complete halt.

**REPLY:**

      PolyBrite denies the first sentence of paragraph 16.  PolyBrite admits that it aged its payables.  PolyBrite denies that any of the named suppliers has severed its relationship with PolyBrite for that reason, or that the Dillard's project failed for that reason.  PolyBrite denies the final sentence of paragraph 16.

      17.    In early fall of 2007, in order to obtain the necessary financing to prepare the manufactured samples on the Dillard project, Christensen went to board member(s) of Goeken to request an influx of capital so that the key suppliers could be paid and they could manufacture the necessary LED samples to be submitted to UL.

**REPLY:**

      PolyBrite denies the first sentence of paragraph 17.  PolyBrite lacks sufficient knowledge to form a conclusion as to why Defendant Christensen went to selected

board members, stating affirmatively that board members had no management authority to grant his request.

18. Instead of recognizing Christensen's extraordinary efforts to promote the Dillard's project, the CEO of Polybrite, Carl Scianna, berated Christensen and in fact, as of mid April of 2008, Polybrite had still not received the UL seal of approval on the LED product which Polybrite intended to sell to Dillard's.

**REPLY:**

PolyBrite denies that Christensen exerted extraordinary effort to promote the Dillards project or that Carl Scianna berated Christensen for doing so. PolyBrite affirmatively states that Christensen failed to proceed with the UL application process while at PolyBrite and that PolyBrite was thereafter excluded from the project by Commercial Electric with the help of Christensen.

19. Polybrite further undermined Christensen's ability to perform his job in that in did not reimburse Christensen for his business expenses as it had agreed. Polybrite's management was aware that Christensen would incur travel expenses as Christensen resided in New York, he had to travel extensively on behalf of Polybrite, both to meet at Polybrite headquarters in the Chicago area and meet with potential distributors and customers for the Polybrite General Lighting products throughout North America.

**REPLY:**

Denied. Christensen made a decision to continue to reside in New York, rather than near the corporate headquarters of PolyBrite in Naperville, Illinois. It was always the position of PolyBrite that it would not reimburse Christensen for commuting between New York and Naperville. Although asked to come to Naperville for the purpose of resolving those issues, Christensen did not do so.

20. During the course of his employment at Polybrite, Christensen incurred significant reimbursable business expenses and as of November of 2007, Polybrite

owed Christensen in excess of $29,000.00 for reimbursable and legitimate business expenses.

**REPLY:**

PolyBrite admits that Christensen incurred certain reimbursable expenses, but denies that they are in the amount of $29,000.00, and further denies he is entitled to any payment by reason of his defalcations.

21. Although Christensen often requested payment for these business expenses and received assurances from the officers of Polybrite and Goeken that he would receive these payments, Polybrite still owes Christensen a sum in excess of $29,000.00.

**REPLY:**

PolyBrite admits Christensen requested payment for inappropriate expenses, but denies that it refused to pay his appropriate expenses, or that it owes Christensen the sum of $29,000.00.

22. As of the second week of November of 2007, Polybrite had subverted and undermined Christensen's position at Polybrite in numerous ways, including, but not limited to:

    a. Terminating Richard Brenner, a capable, competent and well qualified executive.

    b. Failing to reimburse Christensen for legitimate business expenses in excess of $29,000.00.

    c. Failing to pay key suppliers and others on a timely basis, who were critical to fulfilling the prerequisites for the sale to the Dillard's Department Stores.

    d. Removing Christensen from a key account, Florida Plastics, a distributor for the McDonald's Corporation.

    e. Failing to make key management changes and to adopt suggestions from members of the Goeken Board of Directors, which had oversight responsibility for the operations of Polybrite.

    f.    Spied on Christensen's e-mail under the RECON@POLYBRITE program which had been approved by the upper level management at Goeken.

**REPLY:**

    Denied.

    23.    As a result of the foregoing, Christensen knew or concluded that Polybrite no longer supported his efforts on behalf of Polybrite, that Polybrite's actions displayed a lack of trust and confidence in his ability and that Polybrite's acts and omissions were tantamount to his constructive discharge, and Christensen found it necessary to tender his resignation on November 26, 2007.

**REPLY:**

    PolyBrite admits that it lost confidence in Christensen, but denies the remaining allegations of paragraph 23.

    24.    Polybrite is guilty of unclean hands in that it has made false, misleading and baseless allegations in the Complaint. Some of those allegations are as follows:

**REPLY:**

    Denied.

    a.    That Christensen was involved in a conspiracy. In paragraph 4 of the Complaint, Polybrite states that, "This conspiracy was later joined by Christensen." This allegation is simply a groundless conclusion of law and Polybrite has not stated one fact to support that bald assertion and has not specified a date or any action by Christensen during his employment at Polybrite which would substantiate this groundless position. Polybrite again repeats this baseless assertion in paragraph 107 of the Complaint, again with out any supporting facts or dates.

**REPLY:**

    PolyBrite admits that Christensen was involved in a conspiracy and that it made the statements that, "This conspiracy was later joined by Christensen." PolyBrite denies the remaining allegations of subparagraph (a).

10

    b.    (1) That Christensen made false or misleading reports to Polybrite. (2) The allegation that Polybrite states in this regard is at paragraph 59 of the Complaint: "From the time that he took over the effort to obtain UL approval, Christensen represented, directly or by implication, that the UL approval process was going according to schedule and was not a critical issue in regard to PolyBrite's relationship with Dillard's." (3) Polybrite does not specify any such false representation, when it was made or to whom it was made. One is left to conclude that he committed some fraud "by implication." Under Federal Rule of Civil Procedure 9 (b) does not allow such pleading of fraud "by implication," but rather the allegations must be made with particularity.

**REPLY:**

PolyBrite admits that Christensen made false or misleading reports to PolyBrite. PolyBrite reasserts as true the statement made in paragraph 59. PolyBrite denies the second and third sentences of subparagraph (b). PolyBrite denies the penultimate sentence of subparagraph (b). To the extent that the last sentence requires a reply, it is denied.

    c.    Polybrite repeats this groundless allegation in paragraph 107 of the Complaint, that Christensen filed "false reports," but there again Polybrite provides no factual support for this unwarranted conclusion. Second of all, Polybrite's management was always aware of the fact that every major retailer requires UL certification prior to incorporating any electrical product in their establishments. Any allegation which indicates that UL certification was not critical is simply false and known by Polybrite to be false.

**REPLY:**

PolyBrite denies the assertion that the allegations against Christensen are groundless. PolyBrite denies the second sentence. PolyBrite admits most retailers want UL approval. The last sentence is denied as stated.

    d.    That Christensen was guilty of fraud. The basis for this allegation is paragraph 158 of the Complaint. That paragraph states: "Defendant Christensen made numerous reports, oral and written, formal and

>   informal, to Polybrite during 2006 and 2007. In none of those reports did he disclose wrongful conduct alleged herein, through [sic.] he had an affirmative duty to do so." That allegation would indicate that some how Christensen knew of the numerous allegations against other parties alleged in the Complaint. There is no fact, document or statement which would indicate that Christensen had any knowledge of the activities of the other parties. Fraudulent conduct is never assumed, but must be pled with factual particularity.

**REPLY:**

PolyBrite admits the first sentence of subparagraph (d). PolyBrite admits that it made certain allegations as contained in paragraph 63 of the Complaint. PolyBrite denies the remaining allegations of subparagraph (d) stating it has pled allegations with particularity.

>   e.   That Christensen was aware that CE's reasons for stopping their participation with Polybrite on the Dillard's linear LED display cases were false and pretextual. In paragraph 63 of the Complaint, Polybrite alleges: "They [reasons stated by CE] were known by both Brenner and Christensen to be false and pretextual, neither of whom disclosed this fact to Polybrite." This allegation is simply a conclusion without any basis in fact. Polybrite never states what they believe the true reasons for the terminations were the grounds for asserting that CE was stating false reasons or the basis for believing that Christensen knew of the true reasons. There allegations are simply pleading by innuendo without any factual basis whatsoever.

**REPLY:**

PolyBrite admits it made the allegations contained in paragraph 63 of the Complaint. It denies any conclusions or characterizations regarding them.

>   f.   That Christensen stole property from Polybrite. This allegation is at paragraph 77 of the Complaint. "On information and belief the purpose [of entering the building in the morning] was to surreptitiously remove PolyBrite's files and product, which he had no right to possess." Polybrite is accusing Christensen of stealing and simply makes a false assumption on information and belief. In fact Christensen never removed any product or files from Polybrite, but brought files and

>product into Polybrite. In contrast to this baseless allegation on information and belief, Christensen's work on that day was on behalf of Polybrite and Polybrite's customer, the Merchandise Mart. Polybrite had significant and complete documentation to conclude the propriety of Christensen's conduct, the purpose of his activities and that this allegation concerning surreptitious and dishonest conduct was false and improper.

**REPLY:**

PolyBrite denies that it alleged that Christensen "stole" property from PolyBrite in subparagraph 24(e). PolyBrite admits that it made allegations as contained in paragraph 77 of the Complaint. PolyBrite denies the remaining allegations in subparagraph 24(e).

25. Polybrite was guilty of unclean hands in that it purposefully and improperly spied on Christensen, with their management approved program, RECON@POLYBRITE.COM, in which management at Goeken and Polybrite intercepted, reviewed and read Christensen's private, confidential and authorized email. During the course of this espionage, the management discovered that Christensen was participating with others at Polybrite in discussing the management of Polybrite and formulating recommendations for improving Polybrite's long term business success.

**REPLY:**

PolyBrite admits that it reviewed certain emails that were sent or received on its computers, or which were stored on or processed by its server. It denies the remaining allegations of paragraph 25.

26. Polybrite was guilty of unclean hands in that it constructively discharged Christensen as a result of the management's spying on his e-mail. Management discovered that Christensen and Brenner were carrying out an assignment from members of the Goeken Board of Directors and officers of Goeken and Polybrite, including Sandra, Miles and others. In that assignment, Christensen and others suggested that management hire a turn around specialist, so that Polybrite could be put on a sounder financial footing and possibly make a profit in the future. In retaliation for this suggestion, management at Polybrite undermined Christensen's efforts and made it impossible for Christensen to carry out his duties

which in effect constructively terminated Christensen's employment at Polybrite.

**REPLY:**

Denied.

27.    PolyBrite presently owes Christensen a sum in excess of $29,000.00 for unpaid business expenses.

**REPLY:**

Denied.

28.    Although often demanded, PolyBrite has still not paid these unpaid business expenses.

**REPLY:**

PolyBrite admits that it has not paid the disputed sum of $29,000.00 and denies that the defendant is entitled to said sum.

WHEREFORE, PolyBrite respectfully prays that this Counterclaim be dismissed and that PolyBrite be awarded its costs.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE - BREACH OF FIDUCIARY DUTY

Plaintiff PolyBrite International, Inc., as and for its Affirmative Defenses to Defendant Paul Christensen's Counterclaim, states as follows:

1.    Plaintiff PolyBrite International, Inc. has named Defendant Christensen in four counts of its Verified Complaint for Injunctive and Other Relief, Count II - Breach of Fiduciary Duty, paragraphs 99 through 113, Count V - Conspiracy to Breach Fiduciary Duty, paragraphs 129 through 143, Count VI - Fraud, paragraphs 167

through 169 and Count VIII - Conspiracy to Commit Fraud, paragraphs 183 through 196.

2. Plaintiff generally realleges the fraudulent conduct contained in those paragraphs save for the following: paragraph 81 of the Verified Complaint for Injunctive and Other Relief states that Richard Brenner deleted all e-mails in his e-mail box on a date prior to his termination. PolyBrite acknowledges that this is not accurate.

3. Richard Brenner bought a hard-drive within approximately one week prior to his termination. When David Miller, a PolyBrite employee, informed Mr. Brenner that he was going to remove the vast majority of corporate data from Mr. Brenner's computer on the day Mr. Brenner was terminated. Mr. Brenner responded that he had recently purchased a hard drive and performed a complete backup of the contents of his computer. PolyBrite did not become aware of this until the day of the deposition of David Miller.

4. The first sentence of paragraph 63 of the Verified Complaint for Injunctive and Other Relief is inaccurate as stated. The paragraph should have stated as follows and alleged herein: On November 20, 2007, Phil Gamache, President and CEO of Commercial Electric, wrote a letter in which he claimed to have called Carl Scianna on November 16, 2007, and claimed to have told him that Commercial Electric would no longer pursue development of the linear LED display case for Dillard's with PolyBrite. While the call took place, Christensen's claim that, during the call Phil Gamache informed Mr. Scianna of Commercial Electric's decision

to no longer pursue the development of a linear LED display case for Dillard's with PolyBrite, is false.

5.     The conduct as alleged herein constitutes breaches of fiduciary duties owed by Defendant Christensen to the plaintiff PolyBrite International, Inc.  As a result of Defendant Christensen's breaches of fiduciary duty, Defendant Christensen is barred from the recovery of the monies sought herein.

### SECOND AFFIRMATIVE DEFENSE - CONSPIRACY TO BREACH FIDUCIARY DUTY

6.     Plaintiff realleges paragraphs 1 through 4 hereinabove as though fully stated herein.

7.     The conduct as alleged herein evidences Defendant Christensen's entry into a conspiracy to breach fiduciary duty.  Such conduct bars the relief sought herein.

### THIRD AFFIRMATIVE DEFENSE - FRAUD

8.     Plaintiff realleges paragraphs 1 through 4 hereinabove as though fully stated herein.

9.     The conduct alleged herein evidences that Defendant Christensen committed fraud against PolyBrite.  The conduct of Defendant Christensen bars recovery as sought herein.

### FOURTH AFFIRMATIVE DEFENSE - CONSPIRACY TO COMMIT FRAUD

10.     Plaintiff realleges paragraphs 1 through 4 hereinabove as though fully stated herein.

11. The conduct alleged hereinabove evidences that Defendant Christensen engaged in a conspiracy to commit fraud. Said conduct bars recovery of the relief sought by the defendant in his counterclaim.

### FIFTH AFFIRMATIVE DEFENSE - SETOFF
### (PLED IN THE ALTERNATIVE)

12. Plaintiff realleges paragraphs 1 through 4 hereinabove as though fully stated herein.

13. To the extent that Defendant Christensen would otherwise be entitled to recover against PolyBrite, PolyBrite is entitled to a setoff of any monies it may owe him by reason of the damages that Defendant Christensen owes to PolyBrite for his breaches of fiduciary duty and fraudulent conduct.

Respectfully submitted,

POLYBRITE INTERNATIONAL, INC.


By: /s/William G. Sullivan
       One of Its Attorneys


William G. Sullivan
Mason N. Floyd
MARTIN, BROWN & SULLIVAN, LTD.
321 South Plymouth Court, 10th Floor
Chicago, Illinois 60604
(312) 360-5000

**SERVICE LIST**

Constantine John Gekas, Esq.
Gekas & Associates, Ltd.
11 South LaSalle Street
Suite 1700
Chicago, Illinois 60603
(312) 726-4501
(312) 726-4505 (fax)
CJG@cjglaw.com


Mark J. Rose, Esq.
Law Offices of Mark J. Rose
200 West Adams Street
Suite 2850
Chicago, Illinois 60606
(312) 704-1446
(312) 704-8233 (fax)
MJRoseEsq@aol.com


Sigi M. Offenbach, Esq.
Pitler & Mandell
39 South LaSalle Street
Suite 1220
Chicago, Illinois 60603
(312) 782-9466
(312) 782-3493 (fax)
sigi@pitlerandmandell.com


Philip L. Mandell, Esq.
Pitler & Mandell
39 South LaSalle Street
Suite 1220
Chicago, Illinois 60603
(312) 782-9466
(312) 782-3493 (fax)
phil@pitlerandmandell.com

**CERTIFICATE OF SERVICE**

The undersigned, under penalties of perjury, hereby certifies that she served copies of the foregoing Reply to Defendant Paul Christensen's Counterclaim upon those individuals on the attached Service List via CM/ECF electronic filing this 23rd day of May, 2008.

/s/Mary W. Menas

C:\Documents and Settings\mary\My Documents\PolyBrite\Pleadings\Reply to Deft C Counterclaim.wpd